1  James M. Hanavan, State Bar No. 66097
   Kristen E. Drake, State Bar No. 202827
2  CRAIGIE, McCARTHY & CLOW
   540 Pacific Avenue
3  San Francisco, CA 94133
   Telephone: (415) 732-7788
4  Facsimile: (415) 732-7783

5

6  Attorneys for Plaintiff Trevor Moss

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11

12  TREVOR MOSS,                        Case No.: C 07-2732- SC

13         Plaintiff,                   **PLAINTIFF'S OPPOSITION TO
                                        DEFENDANT'S MOTION TO DISMISS
14         v.                           FOR *FORUM NON- CONVENIENS***

15  TIBERON MINERALS LTD.,              Hearing Date:   October 26, 2007
                                        Time:           10:00 a.m.
16         Defendant.                   Location:       Courtroom 1, 17th Floor
                                        Judge:          Hon. Samuel Conti
17

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

Plaintiff's Opposition to Defendant's Motion to
Dismiss for *Forum Non-Conveniens*

*(left margin, vertical text)* CRAIGIE, McCARTHY & CLOW · Telephone: 415/732-7788 · Facsimile: 415/732-7783

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ……………………… 1

II.   PERTINENT BACKGROUND FACTS …………………………………… 3

III.  ARGUMENT ………………………………………………………………… 13

      A.   Applicable Law and Balancing Factors Require Defendant's
           Motion be Denied …………………………………………….….. 13

      B.   Tiberon's "Choice of Law" Argument Fails to Support Dismissal ……… 15

IV.   CONCLUSION ……………………………………………………………… 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1

## **TABLE OF AUTHORITIES**

2

3                                                                                                    Page

4

                                                    Cases

5

*American Dredging Co. v. Miller* (1994) 510 U.S. 443 …………………………………... 13

6

*Cheng v. Boeing Co.,* (9th Cir. 1983) 708 F.2d 1406 ………………………………………. 17

7

*Consul Ltd. v. Solide Enterprises, Inc.* (9th Cir. 1986) 802 F.2d 1143 …………………... 16

8

*Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd.* (9th Cir. 1990) 918 F.2d 1446 …... 14-15

9

*Dole Food Co., Inc. v. Watts* (9th Cir.2002). 303 F.3d 1104 ……………………………… 13

10

*Duha v. Agrium, Inc.* (6th Cir. 2006) 448 F.3d 867 ………………………………………… 15

11

*Foreman v. George Foreman Associates, Ltd.* (9th Cir. 1975) 517 F.2d 354 ……………. 16

12

*Gulf Oil Corp. v. Gilbert*, (1947) 330 U.S. 501 …………………………………………… 15

13

*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317 ……………………………………….17

14

*In re Bridgestone/Firestone, Inc., ATX, ATX II & Wilderness Tires Products*
15         *Liab. Litig.* (SD IN 2001) 131 F. Supp.2d 1027 …………………………………… 14

16      *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal. 2d 319 ….. 17

17      *Koster v. (American) Lumbermens Mut. Cas. Co.* (1947) 330 U.S. 518 …………………. 15

18      *Lockman Foundation v. Evangelical Alliance Mission* (9th Cir. 1991) 930 F.2d 764 …… 14, 17

19      *Lueck v. Sundstrand Corp.* (9th Cir.2001) 236 F.3d 1137 ………………………………… 14

20      *Nedlloyd Lines B.V. v. Superior Court* 3 Cal.4th 459 ……………………………………… 16

21      *Pereira v. Utah Transp., Inc.,* (9th Cir.1985). 764 F.2d 686 ………………………………18

22      *Ravelo Monegro v. Rosa* (9th Cir.2000) 211 F.3d 509 ……………………………………. 13

23      *S. A. Empresa, etc. v. Boeing Co.* (9th Cir. 1981) 641 F.2d 746 …………………………. 16

24      *Sarlot-Kantarjian v. First Pa. Mortg. Trust* (9th Cir. 1979) 599 F.2d 915 ………………. 16

25      *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.* (11th Cir. 2004)
26         382 F.3d 1097 ………………………………………………………………………… 15

27      *Vasquez v. Bridgestone/Firestone, Inc.* (5th Cir. 2003) 325 F.3d 665 ……………………. 14

28

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

iii

1

2

# I.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

3    The dismissal motion of defendant Tiberon Minerals, Ltd. ("Tiberon") should be denied.

4  The "bullet points" listed by Tiberon's counsel as the bases for the motion are either factually

5  inaccurate or legally irrelevant.  The *only* percipient witness located in Ontario is Mario Caron,

6  Tiberon's *former* Board Chairman and Chief Executive.  Mr. Caron no longer has any connection

7  with Tiberon, which has relocated its offices from Ontario to Vietnam, and neither do any of the

8  other former Tiberon board members and officers listed in Mr. Caron's declaration.  [Declaration

9  of Trevor A. Moss ("Moss Decl.") at ¶ 34; Declaration of Kristen E. Drake ("Drake Decl.") at ¶

10  2.]

11    Contrary to the moving papers, two of the principal percipient witnesses are located in the

12  Northern District of California, plaintiff Trevor Moss and Dr. Kerry Connor, a world renowned

13  social expert in charge of a substantial portion of the work performed under Mr. Moss's direction.

14  Another six witnesses, all of whom are intimately familiar with various aspects of the project

15  overseen by Mr. Moss, are located in Australia, considerably closer to California's Northern

16  District than to Ontario.  [Moss Decl. at ¶ 34; Request for Judicial Notice ("RJN") at ¶ 2.]

17    Two additional witnesses, both familiar with the project and various aspects of Mr.

18  Moss's performance, are located in Denver, Colorado, and Vancouver, British Columbia.  Both

19  locations are a short plane flight from California's Northern District, and closer to this Court than

20  they are to Ontario.  Finally, three of the remaining percipient witnesses are located in Hanoi,

21  Vietnam, and another lives in Singapore, both locations substantially closer to this Court than to

22  Ontario.  [Moss Decl. at ¶ 34; RJN at ¶¶ 1, 3-4.]

23    According to Tiberon press releases, the Ontario "witnesses" listed by Mr. Caron sold all

24  of their holdings in Tiberon in December of last year, and relinquished any authority they would

25  otherwise have had to play any role in the determination of Mr. Moss's bonus at that time.  Mr.

26  Moss's consulting agreement with the Vietnam joint venture in which Tiberon owns a 70%

27  interest ended on August 31, 2006, and he wrote a letter to Mr. Caron inquiring about his bonus

28  payment on December 19, 2006.  Unbeknownst to Mr. Moss, and not discovered by him until his

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

Plaintiff's Opposition to Defendant's Motion to
Dismiss for *Forum Non-Conveniens*

counsel recently became aware of a lawsuit filed against Tiberon in the Central District of Pennsylvania, both Tiberon's former board members and the Vietnam joint venture agreed on December 18, 2006, that neither Tiberon nor the venture would "…take any action other than in the ordinary, regular and usual course of business and consistent with past practice (none of which actions shall be unreasonable or unusual) … with respect to the grant of any bonuses… payable to … officers … consultants or agents of [Tiberon or the venture] otherwise than pursuant to agreements … or arrangements in effect … on the date hereof …" [Declaration of James M. Hanavan ("Hanavan Decl.") at ¶ 2, Press Releases attached as Exhibit "A" thereto; Corporate Disclosure Statement, Ex. "B" to RJN; Moss Decl. at ¶ 35, Ex. "A" thereto; Complaint, Ex. "C" to RJN, Pre-Acquisition Agreement at p.13, Ex. 3 to Complaint.]

According to Tiberon's press release, Mr. Caron and Tiberon's other former officers and directors sold and transferred their interest in Tiberon at the same time, realizing a substantial profit over the value of those interests at the time Mr. Moss began his consulting services. Accordingly, those "witnesses" identified by Mr. Caron, including Mr. Caron himself, had contracted away their ability to award Mr. Moss the bonus he had earned in 2006 and cashed out their respective interests in Tiberon.  From the time Mr. Moss became an officer of Tiberon until its former board members sold their interests in Tiberon 16 months later, *the value of the Tiberon stock increased by more than 55%.*  [Hanavan Decl. at ¶ 3, Press Releases, Ex. "A" thereto.]

While Mr. Moss was satisfying the requirements of the joint venture's lenders and meeting the requirements for his bonus, the value of the joint venture's managing partner, Tiberon, increased dramatically.  The extent of Mr. Moss's effort and performance, resulting in this success, can only be explained by those personally familiar with that effort and performance. While Mr. Caron has personal knowledge of Mr. Moss's work, the other Ontario residents listed in Mr. Caron's declaration do not.  [See, generally, Declaration of Trevor Moss.]

Finally, the primary argument set forth in Tiberon's "bullet points" is based upon the notion that Ontario is the preferred venue because the subject agreements are governed by Ontario law.  In fact, however, Ontario has no interest in this dispute between a privately held Vietnamese mining operation's general partner, also located in Vietnam, and a California mining

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

2

1    consultant, who was hired and performed a substantial portion of his services in California.

2    Further, Tiberon has failed to provide the information concerning Ontario law to enable this Court

3    to perform the required preliminary "conflict of law" analysis.

II.

PERTINENT BACKGROUND FACTS

6    Mr. Moss is a Registered Engineer and holds an honors degree in civil and structural

7    engineering from the University of Bradford, England and a master's degree in civil engineering

8    from Arizona State University. Mr. Moss has over 25 years of minerals industry operations and

9    development experience for international private and public companies. As a result of activities

10   with major and junior mining companies such as Cyprus Amax, Barrick and Gabriel Resources,

11   combined with contracting experience with Kvaerner E&C, Mr. Moss has extensive industry

12   experience and has developed projects in Europe, North America, South America and Asia.

13   [Moss Decl. at ¶ 1.]

14   Mr. Moss has comprehensive international experience in the areas of operations and

15   project development, risk assessment/mitigation, enterprise financial modeling, debt/equity

16   project financing, government relations and corporate social and environmental responsibility.

17   As an experienced practitioner in advancing development opportunities into mining operations,

18   Mr. Moss has been actively engaged in the development of projects for commodities such as coal,

19   copper, molybdenum and zinc, gold and silver, and also industrial and strategic minerals such as

20   tungsten and bismuth. In August of 2005, Mr. Moss contracted with the Nui Phao Mining Joint

21   Venture Company Ltd. ("Nuiphaovica" or "the joint venture") to provide consulting services in

22   connection with its development plans for the Nui Phao tungsten-fluorspar project in Vietnam.

23   [Moss Decl. at ¶ 2.]

24   The Nui Phao project is being developed under the terms of an Investment License issued

25   by the Vietnamese Government. The parties to the Investment License consist of Tiberon

26   Minerals, Ltd. ("Tiberon"), Thai Nguyen Mineral Company ("TNMC") and the Export Import

27   Investment Company Thai Nguyen ("Intraco"), the successor company to Hanoi General Export

28   Import Company, Thai Nguyen Branch ("Geleximco"). The Investment License provided the

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

3

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1   legal basis for the formation of Nuiphaovica, in which Tiberon holds a controlling 70% interest.

2   The Investment License gives Nuiphaovica the right to explore, mine and process minerals

3   located in the Thai Nguyen Province of Vietnam, northwest of Hanoi.  Tiberon is a single asset

4   company in that its only asset is the 70% controlling ownership of the Nui Phao project, so the

5   success of Tiberon is directly related to the success of the project.  [Moss Decl. at ¶ 3.]

6         In 2005, Nuiphaovica was granted a Mining License to develop and mine tungsten,

7   fluorspar, bismuth, copper and gold from the Nui Phao deposit.  Nuiphaovica operates under the

8   direction of a six member Board of Management.  Tiberon, as the majority owner, is entitled to

9   appoint four members to the Board while TNMC and Intraco can each appoint one member.  The

10  joint venture is headquartered in Vietnam, as it has been since the inception of Mr. Moss's

11  contract.  [Moss Decl. at ¶ 4.]

12        The July 2005 Nui Phao Final Feasibility Study, released the month prior to Mr. Moss's

13  employment, anticipated processing ore at 3.5 million tons per annum, yielding an average annual

14  production of 4,700 tons of tungsten trioxide, 214,000 tons of acid-grade fluorspar, 2,000 tons of

15  bismuth, 5,500 tons of copper and 2,300 ounces of gold.  Nui Phao contains over 55 million tons

16  of proven and probable reserves for an estimated mine life in excess of 16 years, making it one of

17  the largest tungsten-fluorspar deposits located outside China.  Since China controls about 80% of

18  the tungsten mined each year, and has forbidden its export since 2000, the Nui Phao deposit is

19  extremely valuable to the world market.  [Moss Decl. at ¶ 5.]

20        At the time of commencement of contract, Tiberon was a publicly listed Canadian

21  corporation, while the other two members of Nuiphaovica were located in Vietnam, where the

22  joint venture was located and all of its business activities were and are located. Mr. Moss was

23  directly responsible for the management of Nuiphaovica in Vietnam and, accordingly, the

24  General Director of Nuiphaovica reported to Mr. Moss.  Further, the project development team,

25  managed by Mr. Ivor Whitefield as Project Director, reported directly to Mr. Moss, as did other

26  individuals as noted herein.  [Moss Decl. at ¶ 8.]

27        Based upon press releases from Tiberon, Tiberon is now the wholly owned subsidiary of

28  Vietnam-located entities, has closed its Canadian office and has relocated its principal place of

4

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1   business to Vietnam.  It is Mr. Moss's understanding, again based upon Tiberon press releases,

2   that Mario Caron and the other members of Tiberon's Board of Directors during Mr. Moss's

3   employment have been replaced and no longer have any connection to either Tiberon or

4   Nuiphaovica.  Tiberon's counsel has confirmed that Mr. Caron is no longer connected with

5   Tiberon.  [Moss Decl. at ¶ 9; Hanavan Decl. at ¶ 2-4, Press Releases attached as Exhibit "A"

6   thereto; Drake Decl. at ¶ 2.]

7   During Mr. Moss's term as an Officer of Tiberon and consultant to Nuiphaovica,

8   approximately two thirds of Mr. Moss's time was divided about evenly between California and

9   Australia, where the project engineers and some of the project consultants were and are located.

10  Most of the remaining time was spent in Vietnam, in the offices of Nuiphaovica and at the project

11  site, or in Singapore, where counsel for the project lenders are located.  Substantially less time

12  was spent in Vancouver, B.C., Denver and lastly in Toronto, where Tiberon was then located. Mr.

13  Moss worked full time, each and every day of the contract calendar including weekends and

14  holidays in Mr. Moss's efforts to advance the project.  [Moss Decl. at ¶ 10.]

15  For reasons related to project delays anticipated by all concerned, and as a cost benefit to

16  the project, Mr. Moss's consulting contract, along with Mr. Moss's Tiberon officer status, ended

17  on August 31st, 2006, although he continued to provide consulting services to Nuiphaovica under

18  a separate contractual arrangement for the purpose of preparing a statutory technical and financial

19  document for submission to the Ontario Securities Commission.  Mr. Moss was paid his base

20  salary in a timely fashion, and received the minimum bonus of 40% of that base salary for the

21  *pro-rata* portion of the 2005 calendar year that Mr. Moss worked.  The 40% bonus amount was

22  the minimum target, and the objectives to be agreed upon as called for in Mr. Moss's consulting

23  agreement were to be established as a measure against which to determine the *additional* bonus

24  up to 75% of the "prior twelve (12) month consulting fee."  [Moss Decl. at ¶ 11.]

25  Since no objectives had been agreed upon between Mr. Moss and Nuiphaovica for

26  calendar year 2005, Mr. Moss received the 40% minimum bonus.  The parties did identify

27  objectives for calendar year 2006, and Mr. Moss achieved each and every one of those objectives.

28  The issue to be determined by this lawsuit is Mr. Moss's attainment of those 2006 objectives.

5

1    Qualified percipient witnesses must have sufficient detailed knowledge of the aspects governing

2    Mr. Moss's work on the project to be able to attest with regard to the details of Mr. Moss's

3    achievement of the objectives.  [Moss Decl. at ¶ 12.]

4         The fact that delays in the development of the project were occurring and that costs were

5    increasing was acknowledged at many points in time by Tiberon's executive management and the

6    Directors.  Such delays and cost increases were occurring in all aspects, not only those under Mr.

7    Moss's management, and were (and still are) an understood and accepted result of the commodity

8    boom being experienced throughout the minerals industry.  In fact, Mr. Caron, who was then

9    Chairman of both Tiberon and Nuiphaovica, openly stated on several occasions, including to third

10   parties, that he expected delays and significant cost increases to occur – when actual performance

11   was compared to the projections of the Feasibility Study completed in 2005 prior to Mr. Moss's

12   employment, and press releases from Tiberon and other sources of information available to Mr.

13   Moss establish that delays in the schedule continue to occur.  [Moss Decl. at ¶ 16.]

14        The 2005 Final Feasibility Study (the "2005 Study"), which Mr. Moss inherited at the

15   commencement of Mr. Moss's employment, comprised two main documents: (a) the proposed

16   engineering and technical plans, which included cost estimates for construction and operation as

17   well as a detailed financial analysis; and, (b) an Environmental and Social Impact Assessment

18   (the "2005 ESIA") purportedly compliant with the "Equator Principles" - a set of international

19   standards adopted by the majority of international lender banks which are based upon the policies

20   and standards of the World Bank Group.  Development of the project requires the resettlement of

21   almost 5000 Vietnamese nationals who live within the project boundary and engage in

22   subsistence farming on the land or conduct business in the area of the project site.  The 2005

23   ESIA included a Resettlement Action Plan (RAP) developed to describe the management of the

24   resettlement program, which must be performed in accordance with both Vietnamese law and the

25   policies established by the Equator Principles.  [Moss Decl. at ¶ 17.]

26        The development of a compliant RAP further required that it adhere to a World Bank

27   policy document.  The 2005 Study had been provided to the lender group prior to the

28   commencement of Mr. Moss's employment, and independent specialist consultants had been

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

6

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1    engaged by the lenders to undertake detailed reviews for the purpose of advising the lender group

2    on suitability and compliance.  Compliance of the ESIA to the Equator Principles is a mandatory

3    requirement for all of the lenders to enable them to provide project loans, which was also

4    enhanced by the inclusion in the lender group of a member of the World Bank Group – MIGA

5    (which is the political risk insurance arm).  [Moss Decl. at ¶ 18.]

6        It is important to understand that the lender group would *not* undertake financial support

7    for the project until MIGA and the specialist review consultants had confirmed compliance of

8    both the documentation and implementation of the ESIA practices in accordance with the Equator

9    Principles.  Hence, any delay in completion of the ESIA had a direct impact on the timing of the

10   project financing.  In the absence of financing, the project could not proceed to the construction

11   phase.  [Moss Decl. at ¶ 19.]

12       Upon commencement of Mr. Moss's employment, he undertook a review of the 2005

13   Study.  Within just a few weeks it became clear that certain technical and cost aspects of the

14   project were not fully developed and that the 2005 ESIA did not comply with accepted

15   international standard in both social and environmental aspects.  This fact can readily be

16   confirmed and verified by the independent specialist consultants advising the lenders.  Moreover,

17   further evaluation during the remaining months of 2005 and into 2006 identified significant

18   mischaracterization of key technical aspects related to the existing environment and the impact of

19   the project.  Beginning in August 2005, and on several occasions thereafter, Mr. Moss provided

20   details of the non-compliance of the 2005 ESIA to the Board of Tiberon, Nuiphaovica's Board of

21   Management, and to the executive management of Tiberon.  Mr. Moss obtained approval from

22   the Board of Tiberon to prepare a revised ESIA document which met standards and to engage an

23   individual to manage its completion – the ESIA Manager.  [Moss Decl. at ¶ 20.]

24       In order to facilitate compliance with the Equator Principles, Mr. Moss re-engaged the

25   Vancouver office of the international consulting firm which had developed the 2005 ESIA to

26   prepare a revised document suitable for re-issue to the lender group.  Moreover, Mr. Moss

27   engaged a further consultant to prepare a fundamental social document which had been omitted

28   from the 2005 ESIA. Upon commencement of the re-development of the ESIA, two key factors

7

1    became clear: (1) the extent of the non-compliance of the ESIA included in the 2005 Study was

2    much greater than initially concluded (in fact to an extent not, as then, identified even by the

3    specialist consultants to the lender group); and, (2) that the capabilities of the Vancouver office

4    were not sufficient to support its timely and accurate completion.  [Moss Decl. at ¶ 21.]

5         In the meantime, MIGA had informed the lender group that it had suspended

6    consideration of support of the project due to a concern related to the impact of the project on

7    arsenic contamination in soils and its effect on the local populace.  Due to the lack of

8    performance of the Vancouver office, Mr. Moss managed a transfer of responsibility for

9    document completion to the Denver office of the same international consultant, to individuals

10   who Mr. Moss knew had direct prior experience in the production of compliant ESIA documents.

11   During re-development, it became clear that the circumstances and impact of the project on

12   arsenic contaminated soils had been completely mischaracterized in the 2005 ESIA.  [Moss Decl.

13   at ¶ 22.]

14        Significant further studies were undertaken and assessments made regarding arsenic

15   contaminated soils.  As a result of extensive documentation and consultation, MIGA eventually

16   agreed to support the project and made this support known to the remainder of the project group.

17   The re-development of the ESIA entailed an extensive rewriting of the original document,

18   whereby its content and structure were completely revised.  [Moss Decl. at ¶ 23.]

19        Concurrently, MIGA identified certain management practices which required clarification

20   in the RAP and instructed Tiberon that, as a condition of supporting the financing, it had to

21   engage a social Panel of Experts (the "PoE") to perform periodic reviews of the RAP document

22   and its practical implementation throughout the project development period, reporting to both

23   MIGA and the lender group.  Upon Mr. Moss's recommendation, Nuiphaovica appointed Dr.

24   Kerry Connor and Frederic Giovannetti to the PoE, such persons being accepted by MIGA as

25   experts in the field of RAP management.  [Moss Decl. at ¶ 24.]

26        A revised ESIA (the "2006 ESIA") was completed in early 2006 and submitted to the

27   lender group.  Furthermore, MIGA, after issuing contradictory instructions which delayed its

28   official release, ultimately posted the resultant document on a World Bank website specifically

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

8

1   designed for the purpose of soliciting international comment on World Bank projects, a posting

2   that it had been unwilling to perform with the 2005 ESIA.  Concurrent with the re-development of

3   the 2006 ESIA, significant further technical and cost studies were undertaken to address

4   shortcomings of the 2005 Study and to provide further definition of key aspects of the project

5   designed to mitigate the higher areas of development risk.  [Moss Decl. at ¶ 25.]

6       In particular, the technical and cost studies included the integration of certain planning

7   aspects related to mine sequencing and the development of the process tailings storage facility;

8   mitigation of chemical impacts and their relationship to the re-development of the ESIA; overall

9   site configuration planning to minimize development cost and timetable; and further metallurgical

10  studies related to process plant performance.  The technical aspects were fundamental to the

11  completion of the 2006 ESIA.  During this period of additional technical development, several

12  shortcomings of the 2005 Study were identified which lead to concern regarding final

13  development costs.  In many instances, the costs provided by the 2005 Study were deemed by the

14  engineers to be inadequate to perform the technical services intended.  [Moss Decl. at ¶ 26.]

15      In December 2005, as a key part of the technical development of the project, under Mr.

16  Moss's direction and based upon Mr. Moss's recommendation, the Board of Management of

17  Nuiphaovica, and the group of lender banks, approved the selection of Ausenco Limited

18  ("Ausenco") of Brisbane, Australia, to undertake the detailed engineering, procurement and

19  construction management ("EPCM") for the project.  Mr. Moss was directed to conclude a

20  contract with Ausenco by 1st February 2006 for these services.  The EPCM contract had to be

21  generally acceptable to the lender group for project financing.  [Moss Decl. at ¶ 27.]

22      The letter of commencement for the EPCM contract with Ausenco was issued on 31st

23  January 2006.  The first phase of this engagement included the completion of a review of the

24  2005 Study, the technical performed in the meantime, and the further definition of key aspects of

25  the project development.  This first phase was to be followed by the completion of detailed

26  engineering design for the project, procurement, construction and final commissioning.  [Moss

27  Decl. at ¶ 28.]

28

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

9

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1   The construction phase was to include the processing plant as well as all site infrastructure

2   including road and rail relocation, accommodation, tailings dam and water management systems.

3   Ausenco has significant experience in Asia, having successfully executed several projects, which

4   Mr. Moss is informed totaled over $600 million in the five years prior to its retention by the joint

5   venture, including the design and construction of several industrial facilities in Vietnam. At the

6   time Nuiphaovica hired the firm, Mr. Moss understood Ausenco was providing EPCM services

7   on the $70 million Jinfeng Gold BIOX Project in China, the $50 million Kainantu Gold Project in

8   Papua New Guinea, and had had recently completed a feasibility study for the Ban Phuc Nickel

9   Sulfide Project in Vietnam.  [Moss Decl. at ¶ 29.]

10  From the commencement of Mr. Moss's contract, he identified omissions or shortcoming

11  in the costs defined in the 2005 Study.  The most notable defective cost item was the cost of the

12  Nuiphaovica management staff team, which is directly related to the time duration necessary for

13  development of the project.  The 2005 Study's management staff structure did not even reflect the

14  personnel already in existence at the time in the Vietnamese offices, and underestimated the

15  requirements throughout the project's development life.  The cost of re-development of the ESIA,

16  of course, was not included nor was the cost associated with PoE.  [Moss Decl. at ¶ 30.]

17  As development continued further, the costs for mining and resettlement, as well as

18  associated social programs, also became areas identified as insufficient in the 2005 Study.  The

19  resettlement costs are governed by rates established by Vietnamese government bodies, and in

20  late 2005 suffered a significant cost increase – in some cases at 100% higher than previously

21  estimated.  During the first phase of development by Ausenco, further cost deficiencies of the

22  2005 Study were identified, most notably in the areas of infrastructure, ancillary facilities, and

23  EPCM services.  [Moss Decl. at ¶ 31.]

24  The cost deficiencies were exacerbated by the impact of the worldwide commodities

25  boom on costs industry wide.  A diligent effort was conducted by Ausenco, other key engineers,

26  the project management team and the joint venture management team in the Vietnam office of

27  Nuiphaovica to prepare an updated, complete cost estimate for the project suitable for

28  presentation to the respective Boards.  The initial cost estimates developed by Ausenco did not

10

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1    support a suitable financial return and placed the project development in jeopardy.  Along with

2    the Nuiphaovica Project Director, whom Mr. Moss had engaged during the period of Mr. Moss's

3    employment and a process engineering manager who also represented Nuiphaovica, Mr. Moss

4    expended considerable effort in revisions to the project in order to mitigate cost increases.  [Moss

5    Decl. at ¶ 32.]

6        One particular aspect of cost increase related to the delays being incurred by the

7    resettlement program, which directly delayed the project, and the cost of the associated

8    Nuiphaovica management team required throughout the resultant extended period of

9    development.  Termination of Mr. Moss's contract was agreed to between Mr. Moss and

10   Chairman Caron to provide a cost benefit to the project by eliminating one of the highest cost

11   aspects of the Nuiphaovica management team. Contrary to Tiberon's moving papers, the

12   termination was *not* "performance related."  [Moss Decl. at ¶ 33.]

13       The resultant project cost and associated financials along with the technical,

14   environmental and social aspect that supported them were the topics of the regulatory report Mr.

15   Moss was engaged to prepare, under separate contract, immediately subsequent to the termination

16   of Mr. Moss's initial consulting agreement with the joint venture.  The principle percipient

17   witnesses who have direct knowledge of all of the aforementioned facts are as follows:

18

| | |
|---|---|
| **Angela Reeman**<br>Independent Consultant<br>Melbourne, Australia | The ESIA Manager engaged to manage the completion of the 2006 ESIA. |
| **Barbara Filas**<br>Knight Piésold<br>Denver, Colorado | President of Knight Piésold Denver – President of the independent consulting firm that completed the revised 2006 ESIA and its principal author. |
| **Dr. Kerry Connor**<br>Social Consultant<br>San Francisco, California | Independent Social expert who lead the PoE reviewing the RAP and its implementation.  Dr. Connor is a world renowned social expert. |
| **Ivor Whitefield**<br>Independent Consultant<br>Brisbane, Australia | Project Director representing the joint venture and reporting to me.  Mr. Whitefield managed Ausenco and other engineering firms. |

11

| | |
|---|---|
| **Matt Bolu**<br>Independent Consultant<br>Vancouver, British Columbia,<br>Canada | Process Manager representing the joint venture who reported to Mr. Whitefield and who has detailed knowledge of the Ausenco services and the technical aspects of the completion of the 2006 ESIA. |
| **Vu Hong**<br>Deputy Director<br>Nui Phao Mining Joint Venture<br>Company<br>Hanoi, Vietnam | Deputy Director of the joint venture and also RAP Manager for the project.  Mr. Vu reported to the General Director of the joint venture who in turn reported to me.  Mr. Vu was responsible for the implementation of the RAP in all aspects including the estimate of cost and relations with the Vietnamese authorities.  Previously Mr. Vu worked for the Word Bank in Hanoi, Vietnam. |
| **Les Adrian**<br>Environmental Director<br>Nui Phao Mining Joint Venture<br>Company<br>Hanoi, Vietnam | Environmental Manager for the joint venture who was instrumental in providing Owner input to the 2006 ESIA.  Mr. Adrian reported to the General Director of the joint venture, who in turn reported to me. |
| **Steven Cresswell**<br>Finance Director<br>Nui Phao Mining Joint Venture<br>Company<br>Hanoi, Vietnam | Finance Director for the joint venture reporting to the General Director who in turn reported to me.  Mr. Cresswell managed the completion of all Owner cost estimates for the Vietnamese operations for the project. |
| **Brett Smith**<br>Ausenco Ltd.<br>Brisbane, Australia | Chief Operating Officer of Ausenco who was responsible for negotiating the EPCM contract with the joint venture and for managing Mr. Ed Meka. |
| **Ed Meka**<br>Ausenco Ltd.<br>Brisbane, Australia | Project Manager for EPCM services performed by Ausenco and the individual who managed the completion of the first phase of development including the project cost estimate in 2006. |
| **Scott Baggett**<br>Associate Lawyer<br>Sherman and Sterling LLP<br>Singapore | Mr. Baggett Esq. is the lawyer who developed the EPCM contract executed with Ausenco. Such contract was structured to meet the requirements of the lender group. |
| **Quentin Amos**<br>Director Project and Structured<br>Finance – HVB Bank<br>Sydney, Australia | Mr. Amos was the assigned technical representative of the lender group to whom reported the independent technical consultant Behre Dolbear Australia as managed by Mr. Hancock. |
| **Malcolm Hancock**<br>Executive Director of Behre<br>Dolbear Australia (engineers for | Manager of the independent technical review consultant reporting to the project lenders. |

CRAIGIE, McCARTHY & CLOW<br>Telephone: 415/732-7788 · Facsimile: 415/732-7783

12

| the lender group) Sydney, Australia | |
|---|---|

[Moss Decl. at ¶ 34.]  Finally, correspondence between Mr. Moss and Mr. Caron regarding the outstanding bonus payment due under Mr. Moss's consulting agreement are attached as Exhibits "A" through "G" to Mr. Moss's declaration.

### III.

### ARGUMENT

**A.**    **Applicable Law and Balancing Factors Require Defendant's Motion be Denied**

"At bottom, the doctrine of *forum non conveniens* is nothing more or less than a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined." *American Dredging Co. v. Miller* (1994) 510 U.S. 443, 453, 114 S.Ct. 981, 988.  As the Ninth Circuit has recognized, *forum non conveniens* is "an exceptional tool to be employed sparingly, [not a] ... doctrine that compels plaintiffs to choose the optimal forum for their claim." *Ravelo Monegro v. Rosa* (9th Cir.2000) 211 F.3d 509, 514.  Accordingly, the standard to be applied is whether defendant has made "a clear showing of facts which establish such *oppression and vexation* of a defendant as to be *out of proportion* to plaintiff's convenience, which may be shown to be slight or nonexistent." *Ravelo Monegro, supra,* at 514 (emphasis added; internal quotes omitted).  See, e.g., *Dole Food Co., Inc. v. Watts* (9th Cir.2002). 303 F.3d 1104, 1118.

Plaintiff Moss is a citizen of the United States and a resident of the County of Sonoma, State of California.  He provides consulting engineering services from his place of business in Sonoma County, California.  At the time he was approached by Tiberon to perform consulting services in connection with the Nui Phao project in Vietnam, his consulting business was located in San Ramon, California.  During the course of providing consulting services on the Nui Phao project, he relocated his office to Santa Rosa, California, where he presently resides.  [Moss Decl. at ¶ 6.]

Where, as here, the action has been filed by a United States citizen, the defendant has *a very heavy burden to satisfy* because granting the motion denies that citizen access to courts in his

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

13

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

own country.  See, e.g., *Lockman Foundation v. Evangelical Alliance Mission* (9th Cir. 1991) 930 F.2d 764, 767.  Further, a party moving to dismiss based on *forum non conveniens* bears the burden of showing: (1) that there is an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal.  See, e.g., *Lueck v. Sundstrand Corp.* (9th Cir.2001) 236 F.3d 1137, 1142-43.  The "private interest" or party convenience factors include the residence of the parties and witnesses; costs of bringing willing witnesses and parties to the place of trial; and access to physical evidence and other sources of proof.  See. e.g., *Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd.* (9th Cir. 1990) 918 F.2d 1446, 1449; *Vasquez v. Bridgestone/Firestone, Inc.* (5th Cir. 2003) 325 F.3d 665, 672–674.

Without exception, the "private interest" or convenience factors mentioned support venue in California's Northern District rather than Ontario.  Two of the principal percipient witnesses reside in the Northern District and none other than Mr. Caron resides in Ontario, since the other Ontario residents he identifies have *no percipient knowledge* of Mr. Moss's performance of his consulting agreement.  Of the remaining percipient witnesses, all are thousands of miles closer to this Court than to Ontario, including defendant Tiberon, which has relocated its office to Vietnam.  The same is true of the documentary records supporting Mr. Moss's claim, which are in Mr. Moss's possession, Australia, Vietnam or British Columbia, since the moving papers verify that Tiberon's records were moved from Toronto to British Columbia "on August 23, 2007." [Moss Decl. at ¶ 34; Drake Decl. at ¶ 2.]

Although Mr. Moss has not been able to fully establish the relevant facts as yet[1], Tiberon press releases and other reliable information indicate that neither Mr. Caron nor the other Toronto witnesses he identifies have any present connection to Tiberon, that all of them sold and transferred 100% of their interests in Tiberon nearly a year ago [at a substantial profit above its

---

[1] While plaintiff Moss respectfully maintains there is sufficient evidence before this Court to deny defendant's motion, if the Court does not concur, Mr. Moss in the alternative requests a continuation of the hearing date to allow him to receive responses to discovery that will be propounded.  Deciding a motion based upon *forum non conveniens* "requires the court to 'scrutinize the substance of the dispute between the parties to evaluate what proof is required and [to] determine whether the pieces of evidence cited by the parties are critical, or even relevant to the plaintiff's cause of action and to any potential defenses to the action.' … This rather daunting task is hardly one to be undertaken without adequate information.  Therefore, it behooves courts to permit discovery on facts relevant to forum non conveniens motions."  *In re Bridgestone/Firestone, Inc., ATX, ATX II & Wilderness Tires Products Liab. Litig.* (SD IN 2001) 131 F. Supp.2d 1027, 1029-130.

Plaintiff's Opposition to Defendant's Motion to Dismiss for *Forum Non-Conveniens*

value when Mr. Moss began his consultation] and all expressly agreed with the buyer of their

interests that they would *not* award Mr. Moss the bonus he had earned.  Of the Toronto group,

*only* Mr. Caron has percipient knowledge of Mr. Moss's performance under his consulting

agreement.  In the circumstances, with all of the percipient witnesses either in the Northern

District or physically in much closer proximity to the Northern District than to Toronto, the scale

clearly tips in Mr. Moss's favor.  [Hanavan Decl. at ¶ 2, Press Releases attached as Ex. "A"

thereto; Corporate Disclosure Statement, Ex. "B" to RJN; Complaint, Ex. "C" to RJN, Pre-

Acquisition Agreement at p.13, Ex. 3 to Complaint; RJN at ¶¶ 1-4.]

The trial court is to consider "practical problems that make trial of a case easy,

expeditious and inexpensive."  *Gulf Oil Corp. v. Gilbert*, (1947) 330 U.S. 501, 508, 67 S.Ct. 839,

843.  Further, a plaintiff's choice of forum ordinarily will *not be disturbed* unless the "balancing

of interest" factors *strongly* favors trial in the foreign country, since "[i]n any balancing of

conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will

normally outweigh the inconvenience the defendant may have shown."  See, e.g., *Koster v.*

*(American) Lumbermens Mut. Cas. Co.* (1947) 330 U.S. 518, 524, 67 S.Ct. 828, 832; *Duha v.*

*Agrium, Inc.* (6th Cir. 2006) 448 F.3d 867, 873–874.  On balance, venue should be retained and

Tiberon's motion denied.

**B.    Tiberon's "Choice of Law" Argument Fails to Support Dismissal**

Many federal courts, including the Ninth Circuit, hold that when the inconveniences in

one forum versus the proposed alternative forum are roughly equal, such "public factors" as

familiarity with governing law and avoidance of unnecessary problems in conflicts of law or

application of foreign law *need not be considered*.  In such cases, plaintiff's forum choice will not

be disturbed.  See, e.g., *Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd.*, *supra*, 918 F.2d at

1449; *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.* (11th Cir. 2004) 382 F.3d

1097, 1103.  Since the "balancing of convenience" factors clearly do not favor a trial in Ontario,

this Court need not address the "choice of law" argument offered by Tiberon's counsel.

In any case, a determination that Ontario law applies would be improper at this juncture

since Tiberon has not met its burden of satisfying the California requirements for applying a

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

15

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1    "choice of law" provision.  When a contract specifies the parties' purported choice of law,

2    California state and federal courts recognize that enforcement of that choice is subject to *two*

3    *limitations*.  As California's Supreme Court held in *Nedlloyd Lines B.V. v. Superior Court* 3

4    Cal.4th 459, 479 (Cal. 1992), "the chosen state must bear some *substantial relationship* to the

5    parties or the contract, or there must be some other reasonable basis for the parties' choice [and]

6    … application of the chosen state's law *must not violate a strong policy of California law.*"

7    [Emphasis supplied.]

8         The federal courts of this state, in applying California law, have uniformly applied the two

9    limitations.  See, e.g., *Consul Ltd. v. Solide Enterprises, Inc.* (9th Cir. 1986) 802 F.2d 1143, 1146-

10   1147; *S. A. Empresa, etc. v. Boeing Co.* (9th Cir. 1981) 641 F.2d 746, 749; *Sarlot-Kantarjian v.*

11   *First Pa. Mortg. Trust* (9th Cir. 1979) 599 F.2d 915, 917; *Foreman v. George Foreman*

12   *Associates, Ltd.* (9th Cir. 1975) 517 F.2d 354, 357.  Both limitations apply here, as Ontario does

13   not have a "substantial relationship" to the dispute, and California has strong public policies

14   applicable to Mr. Moss's claim.  Tiberon, as the moving party, has failed to satisfy its burden that

15   Ontario law should be applied in the circumstances.

16        Ontario does not have a "substantial relationship" to this dispute.  During Mr. Moss's

17   work as a consultant to Nuiphaovica, approximately two thirds of his time was divided about

18   evenly between California and Australia, where the project engineers and some of the project

19   consultants were and are located.  Most of his remaining time was spent in Vietnam, in the offices

20   of Nuiphaovica and at the project site, or in Singapore, where counsel for the project lenders is

21   located.  Substantially less time was spent in Vancouver, B.C., Denver and lastly in Toronto,

22   where Tiberon was then located, although it has now relocated to Vietnam where all the rest of

23   the Nuiphaovica operations are sited.  [Moss Decl. at ¶ 10; Drake Decl. at ¶ 2.]

24        In any case, the parties' dispute is in no way centered upon the unambiguous guarantee

25   whereby Tiberon unconditionally promises to pay any and all amounts owed by the Vietnamese

26   joint venture, Nuiphaovica, under its consulting agreement with Mr. Moss.  The dispute pertains

27   to the bonus Mr. Moss claims he is owed after satisfying the criteria agreed upon between him

28

                                        16

1    and Nuiphaovica.  With respect to the issue in controversy, between a California resident and a

2    Vietnamese joint venture, Ontario has no interest whatsoever, substantial or otherwise.

3         Further, California has a strong public policy favouring payment of earned compensation.

4    See, e.g., *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal. 2d 319,

5    326.  In addition, California recognizes an implied covenant of good faith and fair dealing has

6    been violated where an employer acts, as here, so as to deprive an employee of earned

7    compensation.  See, e.g., *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 350.  Since

8    California has a strong public interest in protecting its citizens from bad faith attempts to avoid

9    paying earned compensation, Tiberon has the burden of showing Ontario would likewise honor

10   these policies.

11        Tiberon, rather than presenting evidence to support the application of Ontario law, simply

12   asserts that this Court would apply Ontario law.  In considering a motion to dismiss on the ground

13   of *forum non conveniens*, however, "the burden of proving an alternative forum is the defendant's

14   and ... the remedy must be clear before the case will be dismissed."  *Cheng v. Boeing Co.,* 708

15   F.2d 1406, 1411 (9th Cir. 1983), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723

16   (1983).  Accordingly, defendant "must provide sufficient information to enable the district court

17   to balance the parties' interests," a requirement which Tiberon has ignored.  *Contact Lumber Co.*

18   *v. P.T. Moges Shipping Co. Ltd.*, *supra*, 918 F.2d at 1449.

19                                    **IV.**

20                               **CONCLUSION**

21        The factors to be considered in determining a *forum non conveniens* motion clearly favor

22   Mr. Moss.  Two of the principal witnesses reside in the Northern District, and nearly all of the

23   remaining percipient witnesses to Mr. Moss's performance reside much closer to the Northern

24   District than to the alternative proposed by Tiberon.  Since Mr. Moss is a United States citizen

25   and granting this motion would deny him access to courts in his own country, Tiberon has *a very*

26   *heavy burden to satisfy*, which it has failed to satisfy here.  See, e.g., *Lockman Foundation v.*

27   *Evangelical Alliance Mission*, *supra*, 930 F.2d at 767.

28

Plaintiff's Opposition to Defendant's Motion to
Dismiss for *Forum Non-Conveniens*

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1    In view of California's strong public policy, and the complete absence of information

2    from the moving party as to the law to be applied in the alternative forum, the motion must be

3    denied.  The Ninth Circuit has held that "a choice of law determination must be made before a

4    district court dismisses a case under *forum non conveniens." Pereira v. Utah Transp., Inc.,* (9th

5    Cir.1985). 764 F.2d 686, 688-89.  Since Tiberon has failed to provide sufficient information for

6    this Court to make such a determination, the motion must be denied.

7

8    Dated: October 5, 2007                              CRAIGIE, McCARTHY & CLOW

9

10

11                                        _____*/s/ James M. Hanavan*_____
                                          By: James M. Hanavan
12                                        Attorneys for Plaintiff Trevor Moss

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Opposition to Defendant's Motion to
Dismiss for *Forum Non-Conveniens*

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783