James M. Hanavan, State Bar No. 66097
Kristen E. Drake, State Bar No. 202827
CRAIGIE, McCARTHY & CLOW
540 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 732-7788
Facsimile: (415) 732-7783

Attorneys for Plaintiff Trevor Moss

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TREVOR MOSS, | Case No.: C 07-2732- SC |
| Plaintiff, | **DECLARATION OF PLAINTIFF TREVOR A. MOSS IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR *FORUM NON- CONVENIENS*** |
| v. | |
| TIBERON MINERALS LTD., | |
| Defendant. | Hearing Date:   October 26, 2007<br>Time:           10:00 a.m.<br>Location:       Courtroom 1, 17th Floor<br>Judge:          Hon. Samuel Conti |

///
///
///
///
///
///
///
///
///

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

I, Trevor A. Moss, declare:

1.      I am the plaintiff in the above-entitled action.  Declarant is a Registered Engineer and holds an honors degree in civil and structural engineering from the University of Bradford, England and a master's degree in civil engineering from Arizona State University.  Declarant has over 25 years of minerals industry operations and development experience for international private and public companies.  As a result of activities with major and junior mining companies such as Cyprus Amax, Barrick and Gabriel Resources, combined with contracting experience with Kvaerner E&C, Declarant has extensive industry experience and has developed projects in Europe, North America, South America and Asia.

2.      Declarant has comprehensive international experience in the areas of operations and project development, risk assessment/mitigation, enterprise financial modeling, debt/equity project financing, government relations and corporate social and environmental responsibility. As an experienced practitioner in advancing development opportunities into mining operations, Declarant has been actively engaged in the development of projects for commodities such as coal, copper, molybdenum and zinc, gold and silver, and also industrial and strategic minerals such as tungsten and bismuth.  In August of 2005, Declarant contracted with the Nui Phao Mining Joint Venture Company Ltd. ("Nuiphaovica" or "the joint venture") to provide consulting services in connection with its development plans for the Nui Phao tungsten-fluorspar project in Vietnam.

3.      The Nui Phao project is being developed under the terms of an Investment License issued by the Vietnamese Government.  The parties to the Investment License consist of Tiberon Minerals, Ltd. ("Tiberon"), Thai Nguyen Mineral Company ("TNMC") and the Export Import Investment Company Thai Nguyen ("Intraco"), the successor company to Hanoi General Export Import Company, Thai Nguyen Branch ("Geleximco").  The Investment License provided the legal basis for the formation of Nuiphaovica, in which Tiberon holds a controlling 70% interest. The Investment License gives Nuiphaovica the right to explore, mine and process minerals located in the Thai Nguyen Province of Vietnam, northwest of Hanoi.  Tiberon is a single asset company in that its only asset is the 70% controlling ownership of the Nui Phao project, so the

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1

1    success of Tiberon is directly related to the success of the project.

2         4.    In 2005, Nuiphaovica was granted a Mining License to develop and mine tungsten,

3    fluorspar, bismuth, copper and gold from the Nui Phao deposit. Nuiphaovica operates under the

4    direction of a six member Board of Management. Tiberon, as the majority owner, is entitled to

5    appoint four members to the Board while TNMC and Intraco can each appoint one member. The

6    joint venture is headquartered in Vietnam, as it has been since the inception of my contract.

7         5.    The July 2005 Nui Phao Final Feasibility Study, released the month prior to my

8    employment, anticipated processing ore at 3.5 million tons per annum, yielding an average annual

9    production of 4,700 tons of tungsten trioxide, 214,000 tons of acid-grade fluorspar, 2,000 tons of

10   bismuth, 5,500 tons of copper and 2,300 ounces of gold. Nui Phao contains over 55 million tons

11   of proven and probable reserves for an estimated mine life in excess of 16 years, making it one of

12   the largest tungsten-fluorspar deposits located outside China. Since China controls about 80% of

13   the tungsten mined each year, and has forbidden its export since 2000, the Nui Phao deposit is

14   extremely valuable to the world market.

15        6.    Declarant is a citizen of the United States and a resident of the County of Sonoma,

16   State of California. I provide consulting engineering services from my place of business in

17   Sonoma County, California. At the time I was approached by Tiberon to perform consulting

18   services in connection with the Nui Phao project in Vietnam, my consulting business was located

19   in San Ramon, California. During the course of providing consulting services on the Nui Phao

20   project, I relocated my offices to Santa Rosa, California, where I presently reside.

21        7.    Tiberon solicited me in California and appointed me to the position of Vice

22   President, Operations, although I continued to reside and provide my consulting services from my

23   California office. A substantial portion of my services were performed at my California office, as

24   well as in Australia, Vietnam and elsewhere. During my contract I reported to the Chief

25   Executive Officer of Tiberon – Mr. Mario Caron.

26        8.    At the time of commencement of contract, Tiberon was a publicly listed Canadian

27   corporation, while the other two members of Nuiphaovica were located in Vietnam, where the

28

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

Declaration of Plaintiff Trevor Moss in Support of
Opposition to Defendant's Motion to Dismiss for
*Forum Non-Conviens*

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1  joint venture was located and all of its business activities were and are located.  I was directly

2  responsible for the management of Nuiphaovica in Vietnam and, accordingly, the General

3  Director of Nuiphaovica reported to me.  Further, the project development team, managed by Mr.

4  Ivor Whitefield as Project Director, reported directly to me, as did other individuals as noted

5  herein.

6       9.     Based upon press releases from Tiberon, it is my understanding that Tiberon is

7  now the wholly owned subsidiary of Vietnam-located entities, has closed its Canadian office and

8  has relocated its principal place of business to Hanoi.  It is my understanding, again based upon

9  Tiberon press releases, that Mario Caron and the other members of Tiberon's Board of Directors

10 during my employment have been replaced and no longer have any connection to either Tiberon

11 or Nuiphaovica. The sale price they apparently received for their stock was 55% higher than the

12 market price of that stock when I began my consulting work for Nuiphaovica, 16 months earlier.

13      10.    During my term as an Officer of Tiberon and consultant to Nuiphaovica,

14 approximately two thirds of my time was divided about evenly between California and Australia,

15 where the project engineers and some of the project consultants were and are located.  Most of the

16 remaining time was spent in Vietnam, in the offices of Nuiphaovica and at the project site, or in

17 Singapore, where counsel for the project lenders is located.  Substantially less time was spent in

18 Vancouver, B.C., Denver and lastly in Toronto, where Tiberon was then located.  I worked full

19 time each and every day of the contract calendar including weekends and holidays in my efforts

20 to advance the project.

21      11.    For reasons related to project delays anticipated by all concerned, and as a cost

22 benefit to the project, my consulting contract, along with my Tiberon officer status, ended on

23 August 31st, 2006, although I continued to provide consulting services to Nuiphaovica under a

24 separate contractual arrangement for the purpose of preparing a statutory technical and financial

25 document for submission to the Ontario Securities Commission.  I was paid my base salary in a

26 timely fashion, and received the minimum bonus of 40% of that base salary for the *pro-rata*

27 portion of the 2005 calendar year that I worked.  The 40% bonus amount was the minimum

28

3

Declaration of Plaintiff Trevor Moss in Support of
Opposition to Defendant's Motion to Dismiss for
*Forum Non-Conviens*

target, and the objectives to be agreed upon as called for in my consulting agreement were to be established as a measure against which to determine the *additional* bonus up to 75% of the "prior twelve (12) month consulting fee."

12.    Since no objectives had been agreed upon between me and Nuiphaovica for calendar year 2005, I received the 40% minimum bonus. We did identify objectives for calendar year 2006, and I achieved each and every one of those objectives. The issue to be determined by this lawsuit is my attainment of those 2006 objectives. Qualified percipient witnesses must have sufficient detailed knowledge of the aspects governing my work on the project to be able to attest with regard to the details of my achievement of the objectives.

13.    In my view, only individuals directly involved with development activities can qualify as witnesses, which precludes anyone who did not visit the work sites in Vietnam or Australia during my contract. For anyone to be considered a percipient witness, and especially anyone who claims to have "intimate knowledge," that person would have to have had specific knowledge of the details of the project. This would entail them having visited the key development sites in Dai Tu and Hanoi, Vietnam (the project sites), Brisbane Australia (the development engineers) and Singapore (the bankers and lawyers).

14.    To my knowledge, Richard Lister did not visit any of the development sites during my contract and, therefore, could not have been "intimately familiar" as Tiberon contends. During the entire time I was providing consulting services, I do not recall, with two exceptions, any of the then Tiberon directors making a visit to any of the project locations and hence none had any direct interaction with the personnel involved with development. One exception is Director Komperdo, who visited Hanoi, but not the project site, to advance another company in which he had an interest and who informed me that he was not qualified to opine on project management. Any knowledge the former Directors of Tiberon may have acquired can only have been obtained vicariously through Board discussions with Chairman Mario Caron, the other exception.

15.    Tiberon's brief in support of its motion states that my contract was terminated "for

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

4

performance reasons," but this is simply <u>untrue</u>.  Throughout my consulting work there was *never* any suggestion or accusation regarding poor performance on my part.  In fact, so far as I am aware, at no time did the Board of Directors of Tiberon criticize my personal performance.

16.     The fact that delays in the development of the project were occurring and that costs were increasing was acknowledged at many points in time by Tiberon's executive management and the Directors.  Such delays and cost increases were occurring in all aspects, not only those under my management, and were (and still are) an understood and accepted result of the commodity boom being experienced throughout the minerals industry.  In fact, Mario Caron, who was then Chairman of both Tiberon and Nuiphaovica, openly stated on several occasions, including to third parties, that he expected delays and significant cost increases to occur – when actual performance was compared to the projections of the Feasibility Study completed in 2005 prior to my employment, and press releases from Tiberon and other sources of information available to me establish that delays in the schedule continue to occur.

17.     The 2005 Final Feasibility Study (the "2005 Study"), which I inherited at the commencement of my employment, comprised two main documents: (a) the proposed engineering and technical plans, which included cost estimates for construction and operation as well as a detailed financial analysis; and, (b) an Environmental and Social Impact Assessment (the "2005 ESIA") purportedly compliant with the "Equator Principles" - a set of international standards adopted by the majority of international lender banks which are based upon the policies and standards of the World Bank Group.  Development of the project requires the resettlement of almost 5000 Vietnamese nationals who live within the project boundary and engage in subsistence farming on the land or conduct business in the area of the project site.  The 2005 ESIA included a Resettlement Action Plan (RAP) developed to describe the management of the resettlement program, which must be performed in accordance with both Vietnamese law and the policies established by the Equator Principles.

18.     The development of a compliant RAP further required that it adhere to a World Bank policy document.  The 2005 Study had been provided to the lender group prior to the

Declaration of Plaintiff Trevor Moss in Support of
Opposition to Defendant's Motion to Dismiss for
*Forum Non-Conviens*

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1  commencement of my employment, and independent specialist consultants had been engaged by

2  the lenders to undertake detailed reviews for the purpose of advising the lender group on

3  suitability and compliance.  Compliance of the ESIA to the Equator Principles is a mandatory

4  requirement for all of the lenders to enable them to provide project loans, which was also

5  enhanced by the inclusion in the lender group of a member of the World Bank Group – MIGA

6  (which is the political risk insurance arm).

7      19.    It is important to understand that the lender group would *not* undertake financial

8  support for the project until MIGA and the specialist review consultants had confirmed

9  compliance of both the documentation and implementation of the ESIA practices in accordance

10  with the Equator Principles.  Hence, any delay in completion of the ESIA had a direct impact on

11  the timing of the project financing.  In the absence of financing, the project could not proceed to

12  the construction phase.

13      20.    Upon commencement of my employment, I undertook a review of the 2005 Study.

14  Within just a few weeks it became clear that certain technical and cost aspects of the project were

15  not fully developed and that the 2005 ESIA did not comply with accepted international standard

16  in both social and environmental aspects.  This fact can readily be confirmed and verified by the

17  independent specialist consultant advising the lenders.  Moreover, further evaluation during the

18  remaining months of 2005 and into 2006 identified significant mischaracterization of key

19  technical aspects related to the existing environment and the impact of the project.  Beginning in

20  August 2005, and on several occasions thereafter, I provided details of the non-compliance of the

21  2005 ESIA to the Board of Tiberon, Nuiphaovica's Board of Management, and to the executive

22  management of Tiberon.  I obtained approval from the Board of Tiberon to prepare a revised

23  ESIA document which met standards and to engage an individual to manage its completion – the

24  ESIA Manager.

25      21.    In order to facilitate compliance with the Equator Principles, I re-engaged the

26  Vancouver office of the international consulting firm which had developed the 2005 ESIA to

27  prepare a revised document suitable for re-issue to the lender group.  Moreover, I engaged a

28

Declaration of Plaintiff Trevor Moss in Support of
Opposition to Defendant's Motion to Dismiss for
*Forum Non-Conviens*

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1  further consultant to prepare a fundamental social document which had been omitted from the

2  2005 ESIA.  Upon commencement of the re-development of the ESIA, two key factors became

3  clear: (1) the extent of the non-compliance of the ESIA included in the 2005 Study was much

4  greater than initially concluded (in fact to an extent not, as then, identified even by the specialist

5  consultants to the lender group); and, (2) that the capabilities of the Vancouver office were not

6  sufficient to support its timely and accurate completion.

7       22.    In the meantime, MIGA had informed the lender group that it had suspended

8  consideration of support of the project due to a concern related to the impact of the project on

9  arsenic contamination in soils and its effect on the local populace.  Due to the lack of

10 performance of the Vancouver office, I managed a transfer of responsibility for document

11 completion to the Denver office of the same international consultant, to individuals who I knew

12 had direct prior experience in the production of compliant ESIA documents.  During re-

13 development, it became clear that the circumstances and impact of the project on arsenic

14 contaminated soils had been completely mischaracterized in the 2005 ESIA.

15      23.    Significant further studies were undertaken and assessments made regarding

16 arsenic contaminated soils.  As a result of extensive documentation and consultation, MIGA

17 eventually agreed to support the project and made this support known to the remainder of the

18 project group.  The re-development of the ESIA entailed an extensive rewriting of the original

19 document, whereby its content and structure were completely revised.

20      24.    Concurrently, MIGA identified certain management practices which required

21 clarification in the RAP and instructed Tiberon that, as a condition of supporting the financing, it

22 had to engage a social Panel of Experts (the "PoE") to perform periodic reviews of the RAP

23 document and its practical implementation throughout the project development period, reporting

24 to both MIGA and the lender group.  Upon my recommendation, Nuiphaovica appointed Dr.

25 Kerry Connor and Frederic Giovannetti to the PoE, such persons being accepted by MIGA as

26 experts in the field of RAP management.

27      25.    A revised ESIA (the "2006 ESIA") was completed in early 2006 and submitted to

28

7

Declaration of Plaintiff Trevor Moss in Support of
Opposition to Defendant's Motion to Dismiss for
*Forum Non-Conviens*

the lender group.  Furthermore, MIGA, after issuing contradictory instructions which delayed its official release, ultimately posted the resultant document on a World Bank website specifically designed for the purpose of soliciting international comment on World Bank projects, a posting that it had been unwilling to perform with the 2005 ESIA.  Concurrent with the re-development of the 2006 ESIA, significant further technical and cost studies were undertaken to address shortcomings of the 2005 Study and to provide further definition of key aspects of the project designed to mitigate the higher areas of development risk.

26.     In particular, the technical and cost studies included the integration of certain planning aspects related to mine sequencing and the development of the process tailings storage facility; mitigation of chemical impacts and their relationship to the re-development of the ESIA; overall site configuration planning to minimize development cost and timetable; and further metallurgical studies related to process plant performance.  The technical aspects were fundamental to the completion of the 2006 ESIA.   During this period of additional technical development, several shortcomings of the 2005 Study were identified which lead to concern regarding final development cost.  In many instances, the costs provided by the 2005 Study were deemed by the engineers to be inadequate to perform the technical services intended therein.

27.     In December 2005, as a key part of the technical development of the project, under my direction and based upon my recommendation, the Board of Management of Nuiphaovica, and the group of lender banks, approved the selection of Ausenco Limited ("Ausenco") of Brisbane, Australia, to undertake the detailed engineering, procurement and construction management ("EPCM") for the project.  I was directed to conclude a contract with Ausenco by 1st February 2006 for these services.  The EPCM contract had to be generally acceptable to the lender group for project financing.

28.     The letter of commencement for the contract with Ausenco was issued on 31st January 2006.  The first phase of this engagement included the completion of a review of the 2005 Study, the technical developments performed in the meantime, and the further definition of key aspects to enable the completion of a updated financial analysis of the project.  This first

Declaration of Plaintiff Trevor Moss in Support of Opposition to Defendant's Motion to Dismiss for *Forum Non-Conviens*

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1  phase was to be followed by the completion of detailed engineering design for the project,

2  procurement, construction and final commissioning.

3    29.    The construction phase was to include the processing plant as well as all site

4  infrastructure including road and rail relocation, accommodation, tailings dam and water

5  management systems.  Ausenco has significant experience in Asia, having successfully executed

6  several projects, which I am informed totaled over $600 million in the five years prior to its

7  retention by the joint venture, including the design and construction of several industrial facilities

8  in Vietnam.  At the time Nuiphaovica hired the firm, it is my understanding Ausenco was

9  providing EPCM services on the $70 million Jinfeng Gold BIOX Project in China and the $50

10  million Kainantu Gold Project in Papua New Guinea.  Of significant note, it was my further

11  understanding that the firm had recently completed the $220 million expansion of the Sepon

12  Copper Project and $30 million expansion of the Sepon Gold Project for Oxiana Limited in Laos.

13  In addition, it was my understanding that Ausenco had recently completed a feasibility study for

14  the Ban Phuc Nickel Sulfide Project in Vietnam.

15    30.    From the commencement of my contract I identified omissions or shortcoming in

16  the costs defined in the 2005 Study.  The most notable defective cost item was the cost of the

17  Nuiphaovica management staff team, which is directly related to the time duration necessary for

18  development of the project. The 2005 Study's management staff structure did not even reflect the

19  personnel already in existence at the time in the Vietnamese offices, and underestimated the

20  requirements throughout the project's development life.  The cost of re-development of the ESIA,

21  of course, was not included nor was the cost associated with PoE.

22    31.    As development continued further, the costs for mining and resettlement, as well

23  as associated social programs, also became areas identified as insufficient in the 2005 Study.  The

24  resettlement costs are governed by rates established by Vietnamese government bodies and in late

25  2005 endured a significant cost increase – in some cases at 100% higher than previously

26  estimated.  During the first phase of development by Ausenco, further cost deficiencies of the

27  2005 Study were identified, most notably in the areas of infrastructure, ancillary facilities, and

28

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

Declaration of Plaintiff Trevor Moss in Support of
Opposition to Defendant's Motion to Dismiss for
*Forum Non-Conviens*

EPCM services.

32.    The cost deficiencies were exacerbated by the impact of the worldwide commodities boom on costs industry wide.  A diligent effort was conducted by Ausenco, other key engineers, the project management team and the joint venture management team in the Vietnam office of Nuiphaovica to prepare an updated, complete cost estimate for the project suitable for presentation to the respective Boards.  The initial cost estimates developed by Ausenco did not support a suitable financial return and placed the project development in jeopardy.  Along with the Nuiphaovica Project Director, whom I had engaged during the period of my employment and a process engineering manager who also represented Nuiphaovica, I expended considerable effort in revisions to the project to mitigate cost increases.

33.    One particular aspect of cost increase related to the delays being incurred by the resettlement program, which directly delayed the project, and the cost of the associated Nuiphaovica management team required throughout the resultant extended period of development.  Termination of my contract was agreed to between me and Chairman Caron to provide a cost benefit to the project by eliminating one of the highest cost aspects of the Nuiphaovica management team.  Contrary to Tiberon's moving papers, the termination was *not* "performance related."

34.    The resultant project cost and associated financials along with the technical, environmental and social aspect that supported them were the topics of the regulatory report I was engaged to prepare, under separate contract, immediately subsequent to the termination of my initial consulting agreement with the joint venture. The principle percipient witnesses who have direct knowledge of the aforementioned facts are as follows:

| | |
|---|---|
| **Angela Reeman**<br>Independent Consultant<br>Melbourne, Australia | The ESIA Manager engaged to manage the completion of the 2006 ESIA. |
| **Barbara Filas**<br>Knight Piésold<br>Denver, Colorado | President of Knight Piésold Denver – President of the independent consulting firm that completed the revised 2006 ESIA and its principal author. |

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

10

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

| | |
|---|---|
| **Dr. Kerry Connor**<br>Social Consultant<br>San Francisco, California | Independent Social expert who lead the PoE reviewing the RAP and its implementation. Dr. Connor is a world renowned social expert. |
| **Ivor Whitefield**<br>Independent Consultant<br>Brisbane, Australia | Project Director representing the joint venture and reporting to me. Mr. Whitefield managed Ausenco and other engineering firms. |
| **Matt Bolu**<br>Independent Consultant<br>Vancouver, British Columbia, Canada | Process Manager representing the joint venture who reported to Mr. Whitefield and who has detailed knowledge of the Ausenco services and the technical aspects of the completion of the 2006 ESIA. |
| **Vu Hong**<br>Deputy Director<br>Nui Phao Mining Joint Venture Company<br>Hanoi, Vietnam | Deputy Director of the joint venture and also RAP Manager for the project. Mr. Vu reported to the General Director of the joint venture who in turn reported to me. Mr. Vu was responsible for the implementation of the RAP in all aspects including the estimate of cost and relations with the Vietnamese authorities. Previously Mr. Vu worked for the Word Bank in Hanoi, Vietnam. |
| **Les Adrian**<br>Environmental Director<br>Nui Phao Mining Joint Venture Company<br>Hanoi, Vietnam | Environmental Manager for the joint venture who was instrumental in providing Owner input to the 2006 ESIA. Mr. Adrian reported to the General Director of the joint venture, who in turn reported to me. |
| **Steven Cresswell**<br>Finance Director<br>Nui Phao Mining Joint Venture Company<br>Hanoi, Vietnam | Finance Director for the joint venture reporting to the General Director who in turn reported to me. Mr. Cresswell managed the completion of all Owner cost estimates for the Vietnamese operations for the project. |
| **Brett Smith**<br>Ausenco Ltd.<br>Brisbane, Australia | Chief Operating Officer of Ausenco who was responsible for negotiating the EPCM contract with the joint venture and for managing Mr. Ed Meka. |
| **Ed Meka**<br>Ausenco Ltd.<br>Brisbane, Australia | Project Manager for EPCM services performed by Ausenco and the individual who managed the completion of the first phase of development including the project cost estimate in 2006. |
| **Scott Baggett**<br>Associate Lawyer<br>Sherman and Sterling LLP<br>Singapore | Mr. Baggett Esq. is the lawyer who developed the EPCM contract executed with Ausenco. Such contract was structured to meet the requirements of the lender group. |

11

| **Quentin Amos**<br>Director Project and Structured Finance – HVB Bank<br>Sydney, Australia | Mr. Amos was the assigned technical representative of the lender group to whom reported the independent technical consultant Behre Dolbear Australia as managed by Mr. Hancock. |
| --- | --- |
| **Malcolm Hancock**<br>Executive Director of Behre Dolbear Australia (engineers for the lender group)<br>Sydney, Australia | Manager of the independent technical review consultant reporting to the project lenders. |

35.    Attached hereto as Exhibits "A" through "G", respectively, are true and correct copies of correspondence between me and Mario Caron regarding the outstanding bonus due under my consulting agreement:

| Exhibit A | December 19, 2006 letter from Trevor A. Moss to Mario Caron |
| --- | --- |
| Exhibit B | Undated letter from Mario Caron to Trevor Moss |
| Exhibit C | January 12, 2007 letter from Trevor A. Moss to Mario Caron |
| Exhibit D | January 12, 2007 letter from Trevor A. Moss to Mr. Mario Caron |
| Exhibit E | January 24, 2007 letter from Mario Caron to Trevor A. Moss |
| Exhibit F | January 25, 2007 letter from Trevor A. Moss to Mario Caron |
| Exhibit G | February 19, 2007 letter from Mario Caron to Mr. Trevor Moss |

36.    It would be extremely costly and detrimental to my business should I be required to pursue my claim in Ontario. I have no employees or assistants to assume responsibility for my work in the event I am required to spend any significant time in Toronto. The cost of pursuing this case in Ontario would be a substantial financial hardship, which I can ill afford.

12

CRAIGIE, McCARTHY & CLOW<br>Telephone: 415/732-7788 · Facsimile: 415/732-7783

1      37.    I am over eighteen years of age and have the capacity to perceive and recollect.  If

2  called upon to testify, I am competent to testify to the foregoing matters, which are within my

3  personal knowledge.

4

5      I declare under penalty of perjury under the laws of the United States that the foregoing is

6  true and correct and that this declaration was executed on October 5, 2007.

7

8

9           */s/ Trevor A. Moss*
Trevor A. Moss

10

11

12      <u>GENERAL ORDER 45 CERTIFICATION</u>

13      I, James M. Hanavan, hereby attest pursuant to N.D. Cal. General Order No. 45 that the

14  concurrence to the filing of this document has been obtained from each signatory hereto.

15

16

17  Dated: October 5, 2007         CRAIGIE, McCARTHY & CLOW

18

19

20           */s/ James M. Hanavan*
By: James M. Hanavan

21  Attorneys for Plaintiff Trevor Moss

22

23

24

25

26

27

28

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

13

Declaration of Plaintiff Trevor Moss in Support of
Opposition to Defendant's Motion to Dismiss for
*Forum Non-Conviens*