IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **OSRAM SYLVANIA PRODUCTS INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**TIBERON MINERALS LTD., NUI PHAO MINING JOINT VENTURE COMPANY LIMITED and DRAGON CAPITAL MANAGEMENT LIMITED,**<br><br>**Defendants.** | **CIVIL ACTION**<br><br>**VERIFIED COMPLAINT**<br><br>**(Judge _____)**<br><br>**JURY TRIAL DEMANDED** |

Now comes the Plaintiff, OSRAM SYLVANIA Products Inc. ("SYLVANIA"), by its attorneys, and for its claims against Tiberon Minerals Ltd. ("Tiberon"), Nui Phao Mining Joint Venture Company Limited ("Nui Phao") and Dragon Capital Management Limited ("Dragon") states:

## THE PARTIES

1.    SYLVANIA is a Delaware corporation with its North American headquarters in Danvers, Massachusetts. SYLVANIA and its affiliates maintain offices and manufacturing plants throughout much of the United States and the world. SYLVANIA's principal tungsten products manufacturing plant and Global

Tungsten and Powders Headquarters is located at Hawes Street in Towanda, Bradford County, Pennsylvania (the "Towanda Factory").

2.    Upon information and belief, Tiberon is a Canadian corporation with its headquarters in Toronto, Ontario, Canada.

3.    Upon information and belief, Nui Phao, which is also known as Nuiphaovica, is a joint venture enterprise established and operating under the laws of the Socialist Republic of Vietnam, with places of business in Hanoi, Vietnam and Toronto, Canada.

4.    Upon information and belief, Dragon is a British Virgin Islands company with its principal location in Ho Chi Minh City, Vietnam.

## JURISDICTION AND VENUE

5.    This is an action for declaratory and injunctive relief and for specific performance.

6.    This court has jurisdiction over this action under Section 1332 of Title 28 of the United States Code as this action is between citizens of a state and citizens or subjects of a foreign state and the matter and controversy exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs.

7.    The court has personal jurisdiction over Nui Phao and Tiberon because the facts that give rise to this lawsuit occurred, in part, in this District, Nui

2

Phao and Tiberon have purposely directed their activities to Pennsylvania, and SYLVANIA's claims arise out of these forum-related activities.

8.    The court has personal jurisdiction over Dragon in that it has caused harm and/or tortious injury to SYLVANIA in this Commonwealth by an act or omission outside this Commonwealth, the brunt of the harm caused by Dragon's action will be felt by SYLVANIA in this forum, and Dragon expressly aimed its tortious conduct at Pennsylvania by interfering with SYLVANIA's contractual relations with Nui Phao and Tiberon in Pennsylvania.

9.    Venue in this district is proper under 28 U.S.C. §§ 1391 (a), (c) and (d) in that (a) this dispute arises out of the transaction of business in this district, (b) a substantial part of the acts, omissions and conduct giving rise to the claims herein occurred in this district; (c) the defendants are subject to personal jurisdiction in this district; and (d) the defendants are aliens.

10.    This action arises from the actions of Tiberon, Nui Phao and Dragon (collectively, the "Defendants") with respect to certain agreements between Nui Phao, Tiberon and SYLVANIA, pursuant to which Nui Phao and Tiberon agreed to supply SYLVANIA with certain minimum amounts of tungsten ore concentrates to be delivered to the Towanda Factory.

3

## FACTS

### A.    SYLVANIA AND TUNGSTEN

11.    SYLVANIA is one of the largest lighting and materials enterprises in the world, serving customers in more than 140 countries.  It manufactures and markets a wide range of products for cutting tools, hard metal products and other automotive, lighting, military and industrial products sold under the SYLVANIA and OSRAM brand names.

12.    SYLVANIA's principal tungsten products manufacturing plant and Global Tungsten and Powders headquarters is located on Hawes Street in Towanda, Bradford County, Pennsylvania.  At the Towanda Factory, SYLVANIA produces one of the widest varieties of tungsten and molybdenum materials and inorganic phosphors in the world.

13.    SYLVANIA uses large amounts of tungsten in its manufacturing operations at the Towanda Factory.  Approximately half of SYLVANIA's tungsten needs are met by acquiring tungsten ore concentrates ("Tungsten Ore"), and the remainder is satisfied by purchasing scrap tungsten.

14.    Tungsten is a chemical element. Due to its robust physical properties, tungsten and its many compounds and alloys are used today in a variety of applications, including cutting tools, hard metal products, specialty steels, electronics, lighting and military applications.    There are no industrially

4

compatible or economically competitive substitutes for tungsten in many areas of use.

15.    Tungsten Ore is very difficult to acquire.  Since 1991, no Tungsten Ore has been produced domestically.

16.    The world's largest deposits of Tungsten Ore are found in China which, until 2000, provided about 80% of the world's supply.  In 2000, China prohibited Tungsten Ore exports. This development, along with additional industry restructuring, closure of mines in the West and increased worldwide demand, have led to a worldwide tightening of supply.

17.    Ammonium paratungstate ("APT") is produced from Tungsten Ore and is the most important precursor for the majority of tungsten products.  The pricing for Tungsten Ore is typically a deriviative of APT pricing.  In recent years, purchasers of Tungsten Ore have relied upon quotations of APT as a price guide. APT prices have more than doubled since 2004.

18.    In light of the difficulty in securing Tungsten Ore and SYLVANIA's significant need for a long-term, reliable source of supply of Tungsten Ore to use in its manufacturing processes, SYLVANIA engages in a constant long range planning process in order to secure its needs for Tungsten Ore.

## B.    TIBERON, NUI PHAO AND THE MINE

19.    Defendant Tiberon is a Canadian-based exploration and development company which maintains its principal office in Toronto, Ontario, Canada. Nui Phao is a Vietnamese joint venture enterprise and maintains an office in Toronto, Ontario, Canada.

20.    Tiberon owns a 70% controlling interest in Defendant Nui Phao. As the controlling member and owner of the largest interest in Nui Phao, Tiberon is able to control and direct the actions and activities of Nui Phao, both in North America and abroad.

21.    Nui Phao and Tiberon share certain officers and directors. Mario Caron, a Canadian resident, has served as the CEO and President of Tiberon as well as the Chairman of Nui Phao. In addition, the Chief Financial Officer of Tiberon has acted as an authorized representative of Nui Phao.

22.    Nui Phao owns the mining rights to property located in the Dai Tu District, Thai Nguyen Province of northern Vietnam, near the town of Dai Tu (the "Property"). Tiberon and Nui Phao are developing a mining facility located at the Property at which Nui Phao will mine, recover and sell several minerals including Tungsten Ore (the "Mine").

23.    Approximately six years ago, Tiberon informed SYLVANIA that Tiberon was conducting a feasibility study at the Property and that the Property

6

might be capable of producing significant quantities of Tungsten Ore. SYLVANIA and Tiberon entered into a non-disclosure agreement and began to discuss a possible agreement between SYLVANIA and Nui Phao and Tiberon to supply SYLVANIA's Tungsten Ore needs.

24.    Discussions took place over several years in numerous locations, including Pennsylvania.

25.    For example, at the International Tungsten Industry Association ("ITIA") meeting held in Pittsburgh, Pennsylvania in September 2002, SYLVANIA met with Loren Komperdo, then president of Tiberon, to discuss the status of Property. Between 2001 and 2005, representatives of Nui Phao and Tiberon participated in numerous negotiating sessions with SYLVANIA at the Towanda Factory in Pennsylvania as well as other locations.

26.    Throughout the negotiations, Nui Phao and Tiberon represented that the Property controlled by Nui Phao and Tiberon has the largest primary tungsten deposit in the world outside of China.

27.    Nui Phao and Tiberon were aware that SYLVANIA was capable of consuming the volume of Tungsten Ore output expected from the Mine. As a result, a Tungsten Ore supply agreement with SYLVANIA would be advantageous to Nui Phao and Tiberon, enabling them to proceed with their plans for the Mine, particularly its financing.

7

28.    As a result of the representations and ultimately the agreements of Nui Phao and Tiberon, SYLVANIA made the Mine a key part of SYLVANIA's long range plan to secure a reliable supply of Tungsten Ore for a long-term period.

## C.    THE SUPPLY AGREEMENTS

29.    Following approximately four years of discussions and negotiations, SYLVANIA, Nui Phao and Tiberon entered into an Agreement dated May 16, 2005, as amended (the "Base Agreement"), and an Option Agreement dated May 16, 2005, as amended (the "Option Agreement" and, together with the Base Agreement, the "Agreements"). SYLVANIA exercised its option under the Option Agreement on or about February 20, 2006.

30.    Pursuant to the Agreements, Nui Phao and Tiberon agreed to sell to SYLVANIA the high grade Tungsten Ore to be produced at the Mine subject to certain specifications.

31.    Under the Agreements, SYLVANIA has the specific and enforceable right to purchase up to 100% of the Tungsten Ore produced by the Mine during the term of the Agreements. SYLVANIA expected the Agreements to fulfill up to 100% of its needs for Tungsten Ore for 10 to 15 years.

32.    As recited in the Agreements, SYLVANIA agreed to make this long-term commitment to purchase Tungsten Ore from the Mine, in order to facilitate

8

Nui Phao and Tiberon "entering into lending arrangements with institutional lenders to provide debt financing for the [Mine]."

33.   Section 1.1 of the Agreements requires Nui Phao to:

a.   provide SYLVANIA, upon commencement of the Mine construction, with written status reports with regard to the construction progress of the Mine on a quarterly basis, or more frequently, if required by Nui Phao's lenders;

b.   provide SYLVANIA, prior to the Delivery Date (as defined in the Agreements), with quarterly updates with regard to the status of permitting for the Mine;

c.   use its best efforts to (i) meet the deadlines set forth in the Construction Schedule (as defined in the Agreements); (ii) obtain the Required Financing Amount (as defined in the Agreements); and (iii) cause the Delivery Date to occur on or before January 1, 2008; and

d.   deliver the Tungsten Ore to the Towanda Factory in Towanda, Pennsylvania.

34.   Section 27.1 of each of the Agreements provides that Tiberon "covenants and agrees that it shall take all actions as are required to cause [Nui Phao] to perform fully and on a timely basis all of its obligations under this Agreement," including those actions set forth above.

35.    This separate commitment of Tiberon to SYLVANIA was material and fundamental to SYLVANIA's willingness to enter into the Agreements, and each of the Agreements recites that "[SYLVANIA] would not have entered into this Agreement without the execution and delivery of this Agreement by Tiberon."

36.    In order to assure SYLVANIA that it could rely on the Mine to supply its needs for Tungsten Ore, Nui Phao agreed in Section 4.1 of the Base Agreement and Section 4.3 of the Option Agreement, that it would not sell any tungsten containing products of any kind produced by the Mine to any person or entity other than SYLVANIA if such a sale would impede Nui Phao's ability to sell and deliver the Tungsten Ore to SYLVANIA.

37.    Further, in Section 4.3 of the Option Agreement, Nui Phao and Tiberon agreed that, except in certain inapplicable circumstances:

> Neither [Nui Phao] nor Tiberon shall, and they shall cause their respective Affiliates not to, directly or indirectly, solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any other Person relating to the sale of any tungsten containing products of any kind produced from the [Mine] which would adversely affect [Nui Phao]'s ability to sell and deliver products to [SYLVANIA] in accordance with this Agreement.

38.    In Section 3.4 of the Agreements, Nui Phao estimated that it would begin delivering Tungsten Ore from the Mine to SYLVANIA in Pennsylvania on or about January 1, 2008.

10

### D.    MINE FINANCING OBTAINED

39.    In Section 1.1 of the Agreements, Nui Phao and Tiberon jointly and severally warranted that the Required Financing Amount, which would be a combination of equity and debt, would not exceed two hundred eleven million dollars (US $211,000,000) or such greater amount as might be indicated in a Final Feasibility Study which was being prepared by Nui Phao and Tiberon when the Agreements were signed.

40.    The Final Feasibility Study was completed by Nui Phao and Tiberon in July 2005. In a press release dated July 12, 2005, Tiberon and Nui Phao announced (a) the completion of the Final Feasibility Study for the Mine and (b) that the Final Feasibility Study indicated that the total capital costs for the Mine had increased to US $229.8 million. Tiberon has reconfirmed that the July 2005 study was the Final Feasibility Study in press releases and public filings with the Canadian securities regulatory authorities. Accordingly, in Section 1.1 of the Agreements, Nui Phao and Tiberon jointly and severally warranted that the "Required Financing Amount" would not exceed two hundred twenty-nine million and eight hundred thousand dollars (US $229,800,000).

41.    On or about July 6, 2005, Tiberon issued a press release in which it announced that it had closed a US $10 million loan facility with WestLB AG (the

CLT 1039855v15

"WestLB Financing") and that the proceeds would be used to advance the development of the Mine.

42.    On or about August 9, 2005, Tiberon announced that it had closed a public equity offering for approximately CAN $80 million (the "Equity Financing"). Tiberon later announced that approximately US $55 million of the net proceeds would be used to fund the development of the Mine.

43.    In reliance upon the continued validity of the Agreements and Nui Phao's and Tiberon's continued representations about the progress of the Mine, SYLVANIA entered into a Supply Agreement on or about February 17, 2006 to sell to Sandvik AB, Sandvik Coromant AB, Sandvik Limited and Seco Tools AB (collectively, the "Sandvik Companies") tungsten oxide generated from Tungsten Ore from the Mine. Tiberon and Nui Phao were and are aware of the contract between SYLVANIA and the Sandvik Companies. In order to have sufficient quantities of Tungsten Ore available to meet its obligations under the Supply Agreement with the Sandvik Companies, SYLVANIA exercised its option under the Option Agreement on or about February 20, 2006.

44.    SYLVANIA has also entered into an agreement with another customer in reliance upon the continued validity and existence of the Agreements.

45.    On June 7, 2006, Tiberon and Nui Phao publicly announced and confirmed that the financing for the Mine had been obtained. In a press release

12

entitled "TIBERON SECURES PROJECT FINANCING FOR NUI PHAO DEVELOPMENT," a copy of which is attached hereto as Exhibit 1, Tiberon, on behalf of Nui Phao, announced that "it has received and approved an underwriting commitment letter from its previously announced Mandated Lead Arrangers.....to provide a Commercial Facility for up to US$210MM and a Cost Overrun Facility for up to US$14MM" (collectively, the "Debt Financing").

46.    In addition, the June 7, 2006 press release reconfirmed that the Final Feasibility Study was issued in July 2005 and that, under the Final Feasibility Study, the Required Financing Amount would be US $229,800,000.

47.    On or about July 5, 2006, Tiberon issued a press release in which it announced that it had signed a memorandum of understanding (MOU) with Siemens Project Ventures GmbH ("SPV"), part of Siemens Aktiengesellschaft (SAG) headquartered in Munich, Germany whereby SPV agreed to subscribe to preferred shares in Tiberon's wholly-owned subsidiary, Singapore Holding, for up to US $30 million (the "Siemens Financing"). The press release further announced that the proceeds were expected to be used to fund the development of the Mine.

48.    Accordingly, by July 5, 2006, Nui Phao and Tiberon had obtained the following financings: the WestLB Financing (US $10 million), the Equity Financing (US $55 million), the Debt Financing (US $224 million) and the

13

Siemens Financing (US $30 million) with a sum total of US $319 million, thereby exceeding the Required Financing Amount by US $89,200,000.

49.    In September of 2006, Tiberon and Nui Phao issued an updated Technical Report (the "September 2006 Report").

50.    The September 2006 Report described a dramatic increase in tungsten prices since early 2005 and acknowledged that "dependency on a single country as the major supply source [i.e. China] is a strategic concern to all major tungsten consumers who are seeking non-Chinese sources of supply."

51.    The September 2006 Report also described an increase in capital costs for the Mine to $302.6 million, a risk specifically assumed by Nui Phao and Tiberon under Section 1.1 of the Agreements.

52.    The amount of financing obtained by Nui Phao and Tiberon as set forth above was still in excess of the capital costs amount described in the September 2006 Report by more than $16 million.

53.    Nui Phao and Tiberon have obtained an important part of the benefit of their bargain by using the Agreements to obtain the Required Financing Amount.

54.    At the September 2006 ITIA conference in Boston, Massachusetts, Nui Phao and Tiberon made the following representations about the Mine in a public presentation made by them: tungsten "is an essential commodity with no

substitute;" "end users need stable, non-Chinese supply to meet current requirements, new applications;" the Agreements with SYLVANIA "cover up to 100% of tungsten concentrate production for a five year minimum with extension options to 15 years;" and, Nui Phao and Tiberon had obtained a "debt financing commitment for up to US$210 million (announced June 2006)."

### E.    DRAGON'S ACQUISITION OF TIBERON

55.    In the fall of 2006, SYLVANIA learned that several companies were bidding for Tiberon. The following sequence of events is taken from public filings made by Tiberon.

56.    On September 26, 2006, as provided in the Directors' Circular of Tiberon dated January 4, 2007 (the "Tiberon Circular"), Dragon contacted Tiberon through an intermediary and expressed an interest in acquiring Tiberon.

57.    On October 18, 2006, "following irregular trading activity, the Toronto Stock Exchange halted trading in Tiberon Shares," and Tiberon issued a press release stating that it had been approached by a third party [Dragon] and was in discussions regarding a possible acquisition transaction.

58.    While negotiating with Dragon, Tiberon received an unsolicited offer from another third party on November 10, 2006, per the Tiberon Circular, and Tiberon commenced negotiations with the other third party.

59.    During the period from September 26, 2006 until December 18, 2006, Tiberon and its management negotiated an acquisition transaction and related agreements with Dragon and/or the competing third party, including offer letters, confidentiality and standstill agreements, pre-acquisition agreements, and lock-up agreements.

60.    On December 8, 2006, John Shrimpton ("Shrimpton"), managing director of Dragon, telephoned SYLVANIA management in Towanda.    After introducing himself and Dragon, Shrimpton discussed the competing bids for Tiberon and asked Towanda management to encourage Tiberon management to favor Dragon's bid to acquire Tiberon. Shrimpton stated that the Agreements and SYLVANIA's continued involvement in the Mine were important to Dragon and emphasized Dragon's intent to keep current Tiberon and Nui Phao management in place in the event of Tiberon's purchase by Dragon.

61.    On December 19, 2006, Tiberon announced that it had signed a Pre-Acquisition Agreement dated December 18, 2006 (the "Pre-Acquisition Agreement") with Dragon and three investment funds managed by Dragon, Vietnam Enterprise Investments Limited, Vietnam Growth Fund Limited and Vietnam Dragon Fund Limited (collectively, the "VEIL Funds").    Under the Pre-Acquisition Agreement, the VEIL Funds made an offer (the "Offer") to acquire all of the issued and outstanding common shares of Tiberon for cash consideration.

CLT 1039855v15

62.    SYLVANIA is now informed and believes that Section 3.1 of the Pre-Acquisition Agreement prohibited Nui Phao and Tiberon from incurring any debt (other than in the ordinary course of business) or issuing any equity securities, without the consent of Dragon, from December 18, 2006 until Dragon appointed its own persons to the board of Tiberon after the completion of the Offer.

63.    On that same day, December 19, 2006, Tiberon management called SYLVANIA management in Towanda to discuss the Dragon takeover, assuring SYLVANIA that Tiberon management would remain in place but failing to mention the restrictions upon financing imposed by the Pre-Acquisition Agreement.

64.    On January 4, 2007, in a call between Dragon and SYLVANIA management in Towanda, Shrimpton elaborated on Dragon's structure and financial strength, discussed the tender offer for Tiberon and its timing, and reassured SYLVANIA management that, although Tiberon would have new ownership, i.e. Dragon, as to Nui Phao, "everything will remain the same."

65.    On January 10, 2007, Dragon (Shrimpton) again telephoned SYLVANIA management in Towanda and informed them that the acquisition appeared to be on track and that Dragon had directed Tiberon management to provide SYLVANIA management with a Power Point presentation and press

17

release in which Dragon expected Tiberon to announce the acquisition of Tiberon by Dragon.

66.    On February 12, 2007, Dragon announced that the Offer, presented through TML Acquisition Ltd, a British Columbia corporation organized by Dragon ("TML"), had been accepted by the owners of 93.2% of the outstanding Tiberon common shares.  On that day, Dragon also announced that TML would complete the compulsory acquisition of all remaining publicly-held Tiberon common shares and that, following completion of these transactions, TML and the VEIL Funds managed by Dragon and its affiliates would beneficially own, directly or indirectly, and exercise control or direction over, all the outstanding common shares of Tiberon.

67.    Dragon invited SYLVANIA management to meet in Toronto, Ontario, Canada on February 16, 2007 in connection with meetings between Dragon and the Tiberon board of directors. As a result of weather difficulties, the conference occurred by telephone with SYLVANIA management remaining in Towanda, Pennsylvania and Dragon and Tiberon representatives in Toronto.

68.    During the February 16, 2007 conference call, Shrimpton again represented that Nui Phao would be unaffected by the acquisition, acknowledged that the takeover by Dragon had caused significant delays in the development of the Mine, and asked SYLVANIA to consider constructing an APT plant in

18

Vietnam and taking delivery of the Tungsten Ore in Vietnam instead of Towanda, Pennsylvania in order to permit Nui Phao to avoid certain export taxes recently announced by the Vietnamese government.

69.    Under the Agreements, Nui Phao and Tiberon expressly agreed to bear and assume the risk of the imposition of all export taxes upon Tungsten Ore by Vietnam.

70.    Nui Phao and Tiberon have cancelled several meetings to discuss the Siemens Financing with SPV over the last several months during the period of the takeover of Tiberon.

71.    Following the acquisition of Tiberon, representatives of Dragon, specifically John Shrimpton, and possibly others, have become officers of Tiberon, have assumed positions on the Tiberon board of directors, and have undertaken the direction and management of Tiberon and Nui Phao.

## F.    PRETEXTUAL TERMINATION OF THE AGREEMENTS

72.    In or about March 2007, Dragon, Tiberon and Nui Phao suggested that the Defendants wanted to increase the Tungsten Ore purchase prices contained in the Agreements.    SYLVANIA rejected the suggestion on the basis that the Agreements governed the prices.

73.    On March 29, 2007, Tiberon publicly issued a detailed report on the status of the Mine in which it described and reconfirmed the Debt Financing, the Equity Financing and the Siemens Financing.

74.    In early April 2007, Dragon, Tiberon and Nui Phao threatened to terminate the Agreements. On April 25, 2007, Nui Phao provided letters to SYLVANIA in which Nui Phao purported to give formal notice of termination to SYLVANIA on the basis of Section 2.3(d) of the Agreements and its contention that it failed to obtain the Required Financing Amount and thus was entitled to terminate the Agreements. See Exhibit 2.

75.    Nui Phao and Tiberon are in breach of the Agreements in that their ability to terminate under the portion of Section 2.3(d) cited by Nui Phao ended when Tiberon and Nui Phao obtained the Required Financing Amount in 2006.

76.    SYLVANIA will be significantly and irreparably harmed by this pretextual and unfounded termination of the Agreements and remains ready, willing and able to perform its obligations under the Agreements.

77.    SYLVANIA is informed and believes that Nui Phao and Tiberon have not terminated any other supply agreements to sell fluorspar, bismuth and other minerals from the Mine and that it is fully within the power of Nui Phao and Tiberon to perform.

78.   Moreover, Nui Phao and Tiberon breached the Agreements by failing to use their best efforts to close the Debt Financing and the Siemens Financing, with the result that any loss of Mine financing or other delays or disruptions of the development of the Mine arise entirely out of the conduct of Nui Phao and Tiberon and their abandonment and breach of their contractual obligations to SYLVANIA.

79.   For example, Tiberon's negotiations with Dragon and the competing third party from September 26, 2006 to December 18, 2006 materially interfered with, and disrupted the closing of, the Debt Financing and the Siemens Financing, causing Nui Phao and Tiberon to be in material violation of their obligations under the Agreements to use their best efforts to finalize the Debt Financing and the Siemens Financing.

80.   In addition, the Pre-Acquisition Agreement between Dragon and Tiberon prohibits Nui Phao and Tiberon from incurring debt or issuing any equity securities unless approved by Dragon.  This proscription began in December 18, 2006 and continues until Dragon designates its own appointees to the board of directors of Tiberon.  These restrictions on the ability of Tiberon and Nui Phao to incur debt or issue equity securities materially interfered with their performance of their obligations and directly caused Tiberon and Nui Phao to be in knowing violation of the Agreements.   A copy of the relevant portions of the Pre-Acquisition Agreement is attached as Exhibit 3.

21

81.    SYLVANIA is informed and now believes that, at the end of 2006, Nui Phao and Tiberon deliberately and in bad faith abandoned the financing that they had obtained months before by allowing the bank mandate for the development of the Mine to expire.

82.    SYLVANIA is informed and believes that the Defendants intentionally and in bad faith allowed the WestLB Financing to expire on or about January 2, 2007.

83.    In addition, SYLVANIA is informed and believes that the Defendants intentionally and in bad faith delayed the closing of the Debt Financing and the Siemens Financing for the last several months.

84.    Nui Phao and Tiberon and their new owner Dragon seek to avoid or mitigate risks undertaken by them in the Agreements by using this improper termination as a pretext to attempt to force SYLVANIA to renegotiate the terms of the Agreements.

85.    SYLVANIA relied on Nui Phao and Tiberon's commitments in the Agreements and the representations and assurances provided to SYLVANIA by Nui Phao and Tiberon since the execution of the Agreements. In light of current market conditions and the lengthy period of time required to develop sources of Tungsten Ore, SYLVANIA will be unable to secure a reliable supply of Tungsten

Ore from a supplier with proven sources of Tungsten Ore in the volumes promised over the terms of the Agreements.

## FIRST CLAIM FOR RELIEF
## ACTION FOR DECLARATORY JUDGMENT
## AGAINST NUI PHAO AND TIBERON

86.    SYLVANIA reasserts the facts and statements contained in the previous paragraphs and incorporates the same herein as if restated verbatim.

87.    Section 2.3(d) of the Agreements provides that Nui Phao may terminate if it "fails to obtain the Required Financing Amount" by April 26, 2007.

88.    Nui Phao obtained the Required Financing Amount prior to April 26, 2007.  As a result, Nui Phao does not have the right or ability to terminate the Agreements pursuant to Section 2.3(d) of the Agreements.

89.    Nui Phao and Tiberon have repeatedly confirmed the fact, in public announcements as late as March 2007, that the Required Financing Amount was obtained.

90.    The conditions cited by Nui Phao as its basis for termination have not occurred, and by attempting to terminate the Agreements Nui Phao and Tiberon are in breach of the Agreements.

91.    As a result of the foregoing, the rights, status and other relations between SYLVANIA and Nui Phao and Tiberon are uncertain, and an actual and

23

justiciable controversy exists between SYLVANIA and Nui Phao and Tiberon regarding their obligations under the Agreements.

92.     Declaratory relief from this Court will determine all or some of the dispute between SYLVANIA and Nui Phao and Tiberon.

93.     A judicial declaration is necessary to establish SYLVANIA's rights and Nui Phao and Tiberon's obligations under the Agreements.

94.     Pursuant to 28 U.S.C. § 2201, SYLVANIA seeks a declaration by this Court that Nui Phao and Tiberon have not lawfully terminated the Agreements and that the Agreements continue in full force and effect.

**SECOND CLAIM FOR RELIEF**
**BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

95.     SYLVANIA reasserts the facts and statements contained in the previous paragraphs and incorporates the same herein as if restated verbatim.

96.     Nui Phao and Tiberon are in breach of their representations, warranties, covenants and obligations under the Agreements including the following:

a.     Nui Phao and Tiberon are in breach of their warranty under Section 1.1 of the Agreements that the Required Financing Amount would be no greater than the amount indicated by the June 2005 Final Feasibility Study.

24

b.    Nui Phao is in breach of its obligations to provide SYLVANIA, upon commencement of the Mine construction, with written status reports with regard to the construction progress of the Mine.

c.    Nui Phao is in breach of its obligations to provide SYLVANIA, prior to the Delivery Date, with quarterly updates with regard to the status of permitting for the Mine.

d.    Nui Phao is in breach of its obligations to use its best efforts to meet the deadlines set forth in the Construction Schedule.

e.    Nui Phao is in breach of its obligations to use its best efforts to obtain and finalize the Required Financing Amount.

f.    Nui Phao is in breach of its obligations to use its best efforts to cause the Delivery Date to occur on or before January 1, 2008.

g.    Nui Phao is in breach of its obligations to reconfirm in writing to SYLVANIA the Estimated Delivery Date (as defined in the Agreements), from time to time as requested by SYLVANIA.

h.    Tiberon is in breach of its obligations under Section 27.1 of each of the Agreements to "take all actions as are required to cause [Nui Phao] to perform fully and on a timely basis all of its obligations under this Agreement," including those actions set forth above.

25

i.    Nui Phao and Tiberon are in breach of their obligations to comply with implied covenants under the Agreements, including the implied covenants to act in good faith and with fair dealing.

97.    SYLVANIA is informed and believes that (a) the Defendants, either individually or through their affiliates, have solicited or entertained offers from, negotiated with, or encouraged, discussed, accepted or considered proposals from other persons or entities relating to the sale of Tungsten Ore or other tungsten containing products of any kind produced from the Mine in breach of their obligations under Section 4.3 of the Option Agreement and that they are continuing such activities and (b) such actions would and will adversely affect Nui Phao and Tiberon's ability to sell and deliver Tungsten Ore to SYLVANIA in violation of the Agreements. SYLVANIA is informed and believes that such solicitations and negotiations occurred both before and after the pretextual termination of the Agreements.

98.    Defendants' solicitation of other buyers of Tungsten Ore or other tungsten containing products, whether individually or through affiliates, and their corresponding repudiation of their commitment to provide up to 100% of the Tungsten Ore output of the Mine to SYLVANIA under the terms of the Agreements will chill SYLVANIA'S ability to contract with its customers for the tungsten products expected to be manufactured by SYLVANIA and subject

26

SYLVANIA, and the Towanda Factory in particular, to business uncertainty well into the next decade.

99.    Through their pretextual termination, the failure to use best efforts to finalize the financing obtained by them and their other breaches of the Agreements, Nui Phao and Tiberon are preventing SYLVANIA from receiving the benefit of its contractual rights.

100.    SYLVANIA has no adequate remedy at law in respect of such breaches.    Money damages are inadequate to protect SYLVANIA'S expectation interest.    SYLVANIA's damages will be very difficult to calculate.

101.    If Nui Phao and Tiberon are not ordered to specifically perform their obligations under the Agreements, SYLVANIA will suffer significant damages that are not fully reparable through an award of money damages, and SYLVANIA will be unable to secure a reliable supply of Tungsten Ore from a supplier with proven sources of Tungsten Ore in the volumes promised over the terms of the Agreements.

102.    SYLVANIA has attempted to address this issue with both Nui Phao, Tiberon and Dragon but has been unsuccessful.    To remedy these breaches of contract, SYLVANIA seeks a court order for specific performance that would:

> a.    Require Nui Phao and Tiberon to withdraw their Notice of Termination;

27

b.    Prohibit Nui Phao and Tiberon from terminating the Agreements pursuant to Section 2.3(d) of the Agreements;

c.    Require Nui Phao and Tiberon to perform Section 4.1 of the Base Agreement and Section 4.3 of the Option Agreement including the cessation, directly or indirectly, of all negotiations or discussions with, all solicitations of, and all entertaining of offers from, other potential purchasers of Tungsten Ore or other tungsten containing products of any kind produced from the Mine;

d.    Require Nui Phao and Tiberon to use their best efforts to meet the deadlines set forth in the Agreements; and

e.    Cause Tiberon to require Nui Phao to perform fully and on a timely basis all of its obligations under the Agreements as provided in Section 27.1 of the Agreements.

## THIRD CLAIM FOR RELIEF
## BREACH OF CONTRACT-INJUNCTIVE RELIEF

103.  SYLVANIA reasserts the facts and statements contained in the previous paragraphs and incorporates the same herein as if restated verbatim.

104.  SYLVANIA is also informed and believes that, since its acquisition of Tiberon, Dragon has taken Tiberon private such that it has become de-listed from the Toronto Stock Exchange. In addition, SYLVANIA is informed and believes that Dragon has replaced one or more of the directors and officers of Tiberon and

28

that, as a result, it now exercises control over Tiberon and Nui Phao. Dragon is not publicly held.

105.  SYLVANIA will be irreparably and permanently harmed if Tiberon continues to be further reorganized or dissolved by Dragon, which can direct Tiberon to take steps that may impair the licenses and other assets currently held by Nui Phao and which are necessary to enable Nui Phao and Tiberon to perform the Agreements.

106.  SYLVANIA requests that this Court issue such injunctive relief as is necessary and proper to preserve the assets, books and records of Tiberon and Nui Phao and to maintain their status quo until such time as SYLVANIA'S rights under the Agreements have been determined.

107.  SYLVANIA requests that the Court grant it such preliminary and permanent injunctive relief as is necessary and proper including:

> a.  Preserving the status quo by enjoining Defendants from, directly or indirectly, soliciting or entertaining offers from, negotiating or discussing with, or selling to any other person or entity the Tungsten Ore or other tungsten containing products of any kind produced from the Mine in violation of the Agreements;

b.    Enjoining Nui Phao and Tiberon from altering, removing or destroying corporate books and records whether in documentary or electronic form; and

c.    Enjoining Nui Phao and Tiberon from (i) taking further action to terminate the Agreements under Section 2.3(d) of the Agreements, (ii) conducting themselves as if the Agreements have been terminated, or (iii) impairing their ability to perform under the Agreements.

## FOURTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACT

108.  SYLVANIA reasserts the facts and statements contained in the previous paragraphs and incorporates the same herein as if restated verbatim.

109.  Dragon was, and at all times relevant to this complaint has been, aware of the existence of the Agreements.

110.  Upon information and belief, the restrictions imposed upon Nui Phao and Tiberon by Dragon pursuant to the Pre-Acquisition Agreement and otherwise in connection with and after its orchestrated takeover, through TML, of Tiberon, has directly and substantially interfered with Nui Phao and Tiberon's ability to honor their obligations under the Agreements.

111.  Despite its knowledge of the Agreements, Dragon has taken actions knowing that such actions on its part would prevent Nui Phao and Tiberon from being able to honor their obligations under the Agreements.

112.  The actions of Dragon constitute tortious interference with the Agreements.

113.  Dragon's actions, as set forth above, are wrongful, willful, malicious and without legitimate business justification.

114.  For these reasons, Plaintiff is entitled to have the Court preliminarily and permanently enjoin Dragon from continuing to interfere, directly or indirectly, with the contractual relations between SYLVANIA and Nui Phao and Tiberon.

**WHEREFORE**, SYLVANIA requests that this Court enter judgment as follows:

1.    Declare that Defendants Nui Phao and Tiberon have not lawfully terminated the Agreements and that the Agreements continue in full force and effect; and

2.    Grant an order for specific performance to:

a.    Require Nui Phao and Tiberon to withdraw their Notice of Termination;

b.    Prohibit Nui Phao and Tiberon from terminating the Agreements pursuant to Section 2.3(d) of the Agreements;

c.    Require Nui Phao and Tiberon to perform Section 4.1 of the Base Agreement and Section 4.3 of the Option Agreement including the cessation, directly or indirectly, of all negotiations or discussions with, all

31

solicitations of, and all entertaining of offers from, other potential purchasers of Tungsten Ore or other tungsten containing products of any kind produced from the Mine;

       d.    Require Nui Phao and Tiberon to use their best efforts to meet the deadlines set forth in the Agreement; and

       e.    Cause Tiberon to require Nui Phao to perform fully and on a timely basis all of its obligations under the Agreements as provided in Section 27.1 of the Agreements;

3.    Enjoin the Defendants preliminarily and permanently from, directly or indirectly, soliciting or entertaining offers from, negotiating or discussing with, or selling to any other person or entity, Tungsten Ore or other tungsten containing products of any kind produced from the Mine in violation of the Agreements;

4.    Enjoin the Defendants preliminarily and permanently from altering, removing or destroying corporate books and records whether in documentary or electronic form;

5.    Enjoin Nui Phao and Tiberon preliminarily and permanently from (a) taking further action to terminate the Agreements under Section 2.3(d) of the Agreements, (b) conducting themselves as if the Agreements have been terminated or (c) impairing their ability to perform under the Agreements;

CLT 1039855v15

6.    Enjoin Dragon preliminarily and permanently from interfering, directly or indirectly, with the contractual relations between SYLVANIA and Nui Phao and Tiberon;

7.    Such other and further relief as the Court deems just and proper;

8.    Plaintiff requests that it be permitted to recover costs and attorneys fees as appropriate; and

9.    Plaintiff requests trial by jury on all issues so triable.

This 11th day of May, 2007.

/s/ Nicholas M. Centrella
Nicholas M. Centrella
PA. Bar No. 67666
P. Connell McNulty
PA. Bar No. 87966
**CONRAD O'BRIEN GELLMAN &
ROHN, P.C.**
1515 Market Street, 16th Floor
Philadelphia, Pennsylvania 19102-1916
Telephone: 215-864-9600
Fax: 215-864-9620

**OF COUNSEL**:

Catharine B. Arrowood
N.C. Bar No. 6984
Deborah L. Edney
N.C. Bar No. 24220
**PARKER POE ADAMS & BERNSTEIN LLP**
Wachovia Capitol Center
150 Fayetteville Street, Suite 1400
Post Office Box 389
Raleigh, NC 27602

CLT 1039855v15

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **OSRAM SYLVANIA PRODUCTS INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**TIBERON MINERALS LTD., NUI PHAO MINING JOINT VENTURE COMPANY LIMITED and DRAGON CAPITAL MANAGEMENT LIMITED,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION**<br><br><br>**VERIFICATION** |

COMMONWEALTH OF PENNSYLVANIA

COUNTY OF  BRADFORD

ROBERT J. FILLNOW, being first duly sworn, says that he is the Vice President of the Plaintiff in the above-captioned action; that he has read the foregoing complaint and knows the contents thereof, and that the complaint and contents are true to his own knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters he believes them to be true.

35

This the _10th_ day of May, 2007.

_Robert J. Fillnow_

ROBERT J. FILLNOW

Subscribed and sworn before me

this _May 10, 2007_ (Date)

_Suzanne P. Holbert_ Notary Public

_Bradford_ County

My Commissions Expires: _____ (Date)

> COMMONWEALTH OF PENNSYLVANIA
> Notarial Seal
> Suzanne P. Holbert, Notary Public
> North Towanda Twp., Bradford County
> My Commission Expires Sept. 17, 2009
> Member, Pennsylvania Association of Notaries

# EXHIBIT 1



Press Release #06-09

### TIBERON SECURES PROJECT FINANCING FOR NUI PHAO DEVELOPMENT
- Project financing facility represents last major milestone on the road to production -

**Toronto, ON, June 7, 2006** – Tiberon Minerals Ltd. (TBR:TSX), on behalf of the Nui Phao Mining Joint Venture Company Ltd. (Nuiphaovica), today announced that it has received and approved an underwriting commitment letter from its previously announced Mandated Lead Arrangers which include Bayerische Hypo-und Vereinsbank AG (HVB), Caterpillar Financial SARL (Caterpillar), Export Development Canada (EDC), Fortis Bank S.A./N.V. (Fortis) and Standard Chartered Bank (SCB), to provide a Commercial Facility for up to US$210 million and a Cost Overrun Facility for up to US$14 million (the Facilities).

The Commercial Facility represents 70 percent of the direct project cost estimate of US$230 million (July 2005 Final Feasibility Study), capitalized interest during construction, startup costs, financing fees and a cost escalation allowance at the Lead Arrangers' request. The remaining 30 percent will be funded by Tiberon and each of its joint venture partners on a pro-rata basis. The Commercial Facility consists of two tranches which will both be fully underwritten. The first tranche is for up to US$180 million and will have a ten and a half-year term from initial drawdown and the second tranche is for up to US$30 million and will have an eleven and a half-year term.

Financial close is subject to completion of final loan documentation which is expected to be completed before year-end, and initial drawdown is contingent upon satisfying certain conditions precedent normally associated with a facility of this type. Repayment of the Commercial Facility will begin following completion of construction and initial startup. Both Facilities are secured against the Nui Phao Mine and will be guaranteed by Nuiphaovica and Tiberon until completion is achieved.

The Mandated Lead Arrangers have also provided a Cost Overrun Facility for up to US$14 million which will be drawn down on an equal basis with contingent equity, which will be held in escrow, to fund any cost overruns that could incur during development of the Nui Phao mine.

Both Commercial Facility and Cost Overrun Facility will be administered by Fortis as Documentation and Political Risk Mitigation Agent, HVB as Technical Agent, SCB as Offtake and Modeling Agent, EDC as Environment and Resettlement Agent and Caterpillar as Insurance Agent.

"The Mandated Lead Arrangers have previously worked in collaboration to support projects for several major international mining companies," commented Walter Henry, Tiberon's vice president finance and CFO. "Given the fact that they have partnered with Tiberon in developing this world-class tungsten-fluorspar deposit is validation of the quality of the project and is a vote of confidence in Tiberon's management and development plans for Nui Phao."

In addition, the Multilateral Investment Guarantee Agency (MIGA), a member of the World Bank, and Export Development Canada are currently working toward finalizing a proposal with respect to providing political risk insurance up to the level required by the Lead Arrangers.

"Throughout the past several months, Tiberon has achieved both financial and offtake agreements with organizations that are leaders in their respective fields," said Mario Caron, president and CEO, Tiberon Minerals. "Furthermore, global trends within tungsten and fluorspar markets have remained firm despite an overall commodity price pullback – reflecting well upon the agreements struck between Tiberon and its partners."



EXHIBIT

1

2

**About Tiberon Minerals**

Tiberon Minerals Ltd. is poised to become the world's largest primary tungsten producer and a major producer of acid-grade fluorspar, as well as bismuth, copper and gold through development of its Nui Phao property in Vietnam. Nui Phao contains over 55 million tonnes of proven and probable reserves (25.1 million tonnes proven, 30.6 million tonnes probable) for an estimated mine life in excess of 16 years, making it one of the largest tungsten-fluorspar deposits located outside China. Tiberon's common shares trade on the Toronto Stock Exchange under the symbol TBR. There are currently 75.3 million shares outstanding.

For further information, please visit our website at www.tiberon.com, or contact:
Mario Caron, P. Eng., President & CEO
Walter Henry, Vice President, Finance and CFO
Jodi Peake, Vice President, Investor Relations
(416) 214-1877

*Some of the statements contained in this release are "forward-looking statements". Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to differ materially from the anticipated results, performance or achievements expressed or implied by such forward-looking statements. Factors that could cause actual results to differ materially from anticipated results include risks and uncertainties such as: risks relating to estimates of reserves, mineral deposits and production costs; mining and development risks; the risk of commodity price fluctuations; political and regulatory risks; and other risks and uncertainties detailed in the Company's Annual Information Form dated March 24, 2006 and in the reports and disclosure documents filed by Tiberon from time-to-time with Canadian securities regulatory authorities. The Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

# **EXHIBIT 2**



**CÔNG TY LIÊN DOANH KHAI THÁC CHẾ BIẾN KHOÁNG SẢN NÚI PHÁO**
**NUI PHAO MINING JOINT VENTURE COMPANY**

| Trụ sở chính/Head Office | Văn phòng dự án/Project Office | Văn phòng đại diện Hà Nội/Hanoi Representative Office |
|---|---|---|
| Xã Hà Thượng, huyện Đại Từ, tỉnh Thái Nguyên, Việt Nam | Phố Chợ Mới, thị trấn Đại Từ, tỉnh Thái Nguyên, Việt Nam<br>ĐT: 84-280-824 063   Fax: 84-280-824 487<br>Email: nuiphao@hn.vnn.vn | 29 Xuân Diệu, Tây Hồ, Hà Nội, Việt Nam<br>ĐT: 84-4-718 2490   Fax: 84-4-718 2491<br>Email: nuiphaovica@hn.vnn.vn |

25 April 2007

<u>By Facsimile</u>

OSRAM Sylvania Products Inc.
Attention:  Purchasing Manager (Mr. Dean Schiller)
Hawes Street
Towanda, Pennsylvania 18840
USA

Fax:  +1 570 268 5178

<u>**Base Agreement Termination Notice**</u>

Ladies and Gentlemen:

Reference is made to the Base Agreement dated 16 May 2005 among Osram Sylvania Products Inc.
("Buyer"), Nui Phao Mining Joint Venture Company Limited, a/k/a Nuiphaovica ("Seller"), and
Tiberon Minerals Ltd. ("Tiberon"), as amended as of the date hereof (the "Base Agreement").
Capitalized terms that are used in this notice that are not defined in this notice are used as defined in
the Base Agreement.

As you are aware, Seller failed to obtain the Required Financing Amount by the date which is 270
days after the Financing Deadline.  Pursuant to Section 2.3(d) of the Base Agreement, Seller hereby
notifies Buyer of the termination of the Base Agreement effective as of the date of this notice.

Pursuant to Section 19.1 of the Base Agreement, a copy of this notice has been deposited with an
international overnight delivery service for delivery to you.

Sincerely,

For and on behalf of
Nui Phao Mining Joint Venture Company Limited:

Mario Caron
Chairman,
Nui Phao Mining Joint Venture Company Limited

cc:    Mr. James A. Gass,
       VP, Corporate Projects, Osram Sylvania

       President, Tiberon Minerals Ltd.



**EXHIBIT**

2



**CÔNG TY LIÊN DOANH KHAI THÁC CHẾ BIẾN KHOÁNG SẢN NÚI PHÁO**
**NUI PHAO MINING JOINT VENTURE COMPANY**

| Trụ sở chính/Head Office | Văn phòng dự án/Project Office | Văn phòng đại diện Hà Nội/Hanoi Representative Office |
|---|---|---|
| Xã Hà Thượng, huyện Đại Từ, tỉnh Thái Nguyên, Việt Nam | Phố Chợ Mới, thị trấn Đại Từ, tỉnh Thái Nguyên, Việt Nam | 29 Xuân Diệu, Tây Hồ, Hà Nội, Việt Nam |
| | ĐT: 84-280-824 063 · Fax: 84-280-824 487 | ĐT: 84-4-718 2490   Fax: 84-4-718 2491 |
| | Email: nuiphao@hn.vnn.vn | Email: nuiphaovica@hn.vnn.vn |

25 April 2007

<u>By Facsimile</u>

OSRAM Sylvania Products Inc.
Attention: Purchasing Manager (Mr. Dean Schiller)
Hawes Street
Towanda, Pennsylvania 18840
USA

Fax: +1 570 268 5178

<b><u>Option Agreement Termination Notice</u></b>

Ladies and Gentlemen:

Reference is made to the Option Agreement dated 16 May 2005 among Osram Sylvania Products Inc. ("**Buyer**"), Nui Phao Mining Joint Venture Company Limited, a/k/a Nuiphaovica ("**Seller**"), and Tiberon Minerals Ltd. ("**Tiberon**"), as amended as of the date hereof (the "**Option Agreement**"). Capitalized terms that are used in this notice that are not defined in this notice are used as defined in the Option Agreement.

As you are aware, Seller failed to obtain the Required Financing Amount by the date which is 270 days after the Financing Deadline. Pursuant to Section 2.3(d) of the Option Agreement, Seller hereby notifies Buyer of the termination of the Option Agreement effective as of the date of this notice.

Pursuant to Section 19.1 of the Option Agreement, a copy of this notice has been deposited with an international overnight delivery service for delivery to you.

Sincerely,

For and on behalf of
Nui Phao Mining Joint Venture Company Limited:

Mario Caron
Chairman,
Nui Phao Mining Joint Venture Company Limited

cc:    Mr. James A. Gass,
       VP, Corporate Projects, Osram Sylvania

       President, Tiberon Minerals Ltd.

# **EXHIBIT 3**

EXECUTION COPY

## PRE-ACQUISITION AGREEMENT

**THIS PRE-ACQUISITION AGREEMENT** (this "**Agreement**") is made as of the 18th day of December, 2006.

**BETWEEN:**

> **Vietnam Enterprise Investments Limited**, a company existing under the laws of the Cayman Islands ("**VEIL**"),
>
> - and –
>
> **Tiberon Minerals Ltd.**, a corporation existing under the laws of Canada (the "**Corporation**"),
>
> - and –
>
> **The other Parties hereto** (as defined herein).

**BACKGROUND:**

A.  The Corporation is a mining exploration and development company with a controlling interest in Nui Phao Mining Joint Venture Company which holds the Nui Phao tungsten/fluorspar polymetallic project ("**Nui Phao Project**") in Vietnam.

B.  The Corporation received a proposal from Dragon Capital Management Limited ("**DCML**"), as agent and manager of VEIL, Vietnam Growth Fund Limited ("**VGFL**") and Vietnam Dragon Fund Limited ("**VDFL**") (VEIL, VGFL and VDFL are hereinafter referred to collectively as the "**Dragon Funds**"), and entered into discussions which culminated in receipt of the Offer (as defined herein).

C.  After concluding that the Offer is fair to the Corporation's shareholders, from a financial point of view, and is in the best interests of the Corporation and its shareholders, the board of directors of the Corporation (the "**Board**") desires that VEIL directly or through a direct or indirect subsidiary (the "**Acquisition Company**") make an offer to purchase all of the issued and outstanding common shares in the capital of the Corporation (the "**Shares**") to all of the holders of Shares (the "**Shareholders**") and to all of the holders of other rights and securities entitling the beneficiary or holder thereof to receive or acquire Shares or securities convertible, exercisable or exchangeable for Shares other than Options (as hereinafter defined).

D.  VEIL and the Acquisition Company are prepared to make or cause an offer to purchase all of the issued and outstanding Shares to be made, subject to the terms and conditions of this Agreement.

E.  DCML is a party to this Agreement for the purpose of providing a covenant to cause the Dragon Funds to complete the transactions set out herein.

Tiberon Pre-Acquisition Agreement December 18 2006 v10 Limited.DOC



EXHIBIT

tabbies

3

- 11 -

of the Subsidiaries of the Corporation has agreed to resign as a director promptly after the Offeror takes up and pays for at least a majority of the issued and outstanding Shares calculated on a fully diluted basis pursuant to the Offer, if so requested by the Offeror.

**2.11    Options.** Subject to receipt of all necessary Regulatory Approvals, the Corporation shall be permitted to pay to those Option Holders who elect to exercise the Cashless Alternative referred to in Section 7 of the Stock Option Plan an amount equal to the amount by which $3.65 exceeds the exercise price for the relevant Options. The Corporation agrees to use its best efforts to encourage all Persons holding Options to either (a) exercise their Options prior to the expiry of the Offer and to deposit all Shares issued in connection therewith to the Offer, or (b) elect to exercise the Cashless Alternative with respect to their Options on the Take-up Date and to receive payment from the Corporation equal to the cash difference between the exercise price and $3.65. The Board shall not, prior to completion of the Offer, grant any additional Other Securities (including Options) to any Person.

**2.12    Solicitation of Acceptances of Offer.** The Offeror will have the right to appoint a dealer manager in connection with the Offer and to solicit acceptances of the Offer. If appointed, the dealer manager will be authorised to form a soliciting dealer group comprised of members of the Investment Dealers Association of Canada and of the stock exchanges in Canada and the United States to solicit acceptances of the Offer.

### ARTICLE 3
### COVENANTS OF THE CORPORATION

**3.1    Ordinary Course of Business.** The Corporation covenants and agrees that, prior to the earlier of the termination of this Agreement and the appointment or election to the Board of the persons designated by the Offeror pursuant to Section 2.10, except as set out in the Disclosure Letter or unless the Offeror shall otherwise agree in writing or as otherwise expressly contemplated or permitted by this Agreement:

    (a)    the Corporation shall, and shall cause each of its Subsidiaries to, conduct its and their respective businesses only in, and not take any action except in, the usual, ordinary and regular course of business and consistent with past practice;

    (b)    the Corporation shall not, by itself or by its Subsidiaries, directly or indirectly, do or permit to occur any of the following:

        (i)    issue, sell, pledge, lease, dispose of, encumber or agree to issue, sell, pledge, lease, dispose of or encumber (or permit any of its Subsidiaries to issue, sell, pledge, lease, dispose of, or encumber or agree to issue, sell, pledge, lease, dispose of or encumber):

            (A)    any additional shares of, or any options, warrants, calls, conversion privileges or any other rights or securities of any kind entitling the beneficiary or holder thereof to receive or acquire shares or other ownership interests of, the Corporation or any of its Subsidiaries (other than pursuant to the exercise of Options as contemplated in this Agreement); or

- 12 -

    (B)    any material assets or property of the Corporation or any of its Subsidiaries;

(ii)    amend or propose to amend its articles, by-laws or other constating documents or those of any of its Subsidiaries;

(iii)    split, combine or reclassify any Shares, or declare, set aside or pay any dividends or other distributions payable in cash, stock, property or otherwise with respect to the Shares or the shares of any of the Subsidiaries;

(iv)    redeem, purchase or offer to purchase (or permit any of its Subsidiaries to redeem, purchase or offer to purchase) any shares or other securities of the Corporation or any of its Subsidiaries, including under any normal course issuer bid;

(v)    reorganize, amalgamate, merge or otherwise continue the Corporation or any of its Subsidiaries with any other Person whatsoever;

(vi)    acquire or agree to acquire (by merger, amalgamation, arrangement, acquisition of stock or assets or otherwise) any Person or business whatsoever (including any division) or acquire or agree to acquire any material assets;

(vii)    enter into, amend, modify or terminate any agreement, contract or licence that is material to the business of the Corporation and its Subsidiaries, and in particular, any Offtake Agreements or Credit Arrangements or any similar agreement, contract or licence;

(viii)    amend, modify or terminate the Mining Rights;

(ix)    enter into, amend or terminate any Hedging Arrangements;

(x)    except in the usual, ordinary and regular course of business and consistent with past practice, satisfy any material claims or liabilities (except such as have been reserved against in the Financial Statements), or relinquish any material contractual rights;

(xi)    incur or commit to incur any indebtedness for borrowed money or issue any debt securities, except in the ordinary course of business pursuant to the existing credit facilities of the Corporation and its Subsidiaries and consistent with past practice;

(xii)    commit to any capital expenditures other than as set out in the Disclosure Letter;

- 13 -

(xiii)   change or modify in any way the mining plan or methods at the Nui Phao disclosed to the Offeror;

(xiv)   change or deviate in any material way from the plans outlined in the Technical Report for the Nui Phao Project filed on SEDAR dated September, 2006 and disclosed to the Offeror;

(xv)   grant any participation or earn-in rights in connection with the Mining Rights;

(xvi)   appoint or permit the appointment of a liquidator, receiver or trustee in bankruptcy for the Corporation or its Subsidiaries or in respect of the assets of the Corporation or its Subsidiaries; or

(xvii)   permit the making of an order by a court for the winding-up or dissolution of the Corporation or its Subsidiaries;

(c)   the Corporation shall not, and shall cause each of its Subsidiaries to not take any action other than in the ordinary, regular and usual course of business and consistent with past practice (none of which actions shall be unreasonable or unusual) or as set out in the Disclosure Letter with respect to the entering into or modifying of any employment, severance, collective bargaining or similar agreements, policies or arrangements or with respect to the grant of any bonuses, salary increases, pension benefits, retirement allowances, deferred compensation, severance or termination pay or any other form of compensation or profit sharing or with respect to any increase of benefits payable to directors, officers, employees, consultants or agents of the Corporation or any Subsidiaries otherwise than pursuant to agreements, policies or arrangements in effect (without amendment) on the date hereof and which have been disclosed to the Offeror;

(d)   the Corporation shall use its best efforts to cause its (and its Subsidiaries') current insurance (or re-insurance) policies not to be cancelled or terminated or any of the coverage thereunder to lapse, unless simultaneously with such termination, cancellation or lapse, replacement policies underwritten by insurance and re-insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies for substantially similar premiums are in full force and effect;

(e)   the Corporation shall:

(i)   use its best efforts, and shall cause each of its Subsidiaries to use their best efforts, to preserve intact its and its Subsidiaries' respective business organizations, assets, goodwill, mining leases, licences and permits and tax accounts, to keep available the services of its officers and employees as a group and to maintain satisfactory relationships with suppliers, agents, distributors, customers

- 14 -

and others having business relationships with it or its Subsidiaries;

(ii)     not take any action that would result in, or permit, the unrestricted and unencumbered cash balances and short term or money market investments of the Corporation to be less than an aggregate of Thirty Million Dollars in United States currency (US$30,000,000);

(iii)    not take any action, or permit any of its Subsidiaries to take any action, that would render, or that reasonably may be expected to render, any representation or warranty made by it in this Agreement untrue in any material respect at any time prior to the Expiry Time;

(iv)    use its best efforts to enable the conditions set forth in Section 2.3 and Schedule A to be satisfied;

(v)     promptly notify the Offeror orally and in writing of any material change in its or any of its Subsidiaries' businesses, properties, assets, financial condition or prospects and of any material governmental or third party complaints, claims, investigations or hearings (or communications indicating that the same may be contemplated);

(vi)    confer on a regular basis with the Offeror with respect to operational matters and promptly notify the Offeror orally and in writing of any material change in the normal course or operation of its or any of its Subsidiaries' businesses or properties, and of any material governmental or third party complaints, investigations (including any accident or incident investigations by any Governmental Entity) or hearings (or communications indicating that the same may be contemplated);

(vii)   not settle or compromise any claim brought by any present, former or purported holder of any securities of the Corporation in connection with the transactions contemplated by this Agreement or the Offer without the prior written consent of the Offeror;

(viii)  furnish the Offeror with a copy of all information and reports (including financial statements, officer's certificates, operating statements, reports of operations and operating plans) prepared by or on behalf of the Corporation and provided to directors and management of the Corporation after the date hereof;

(ix)    continue to file all documents or information required to be filed by the Corporation under applicable Laws, in accordance

- 15 -

with applicable Laws and all such documents or information, when filed, shall comply as to form in all material respects with the requirements of applicable Laws; and

(x) make or cooperate as necessary in the preparation of any exemption applications or orders and any other documents deemed reasonably necessary by the Corporation or the Offeror, acting reasonably, to discharge their respective obligations under applicable Laws in connection with the Offer or as required under applicable Laws in order to permit the making or consummation of the Offer.

(f) the Corporation shall not enter into or modify any contract, agreement, commitment or arrangement with respect to any of the matters set forth in this Section 3.1, other than as contemplated by this Section 3.1, without the prior written consent of the Offeror.

**3.2    Non-Solicitation.**

(a) The Corporation shall not, shall cause its Subsidiaries not to, and shall ensure that their respective officers, directors, employees, advisers, representatives or agents do not, directly or indirectly:

(i) solicit, initiate or encourage any Acquisition Proposal;

(ii) subject to this Section 3.2 and Section 3.3, and except as may be required by applicable Laws, provide any material non-public information to, continue or participate in any discussions or negotiations relating to any such transactions in respect of an Acquisition Proposal;

(iii) withdraw the Board's recommendation of the Offer or change such recommendation in a manner adverse to the Offeror; or

(iv) approve or recommend any Acquisition Proposal or enter into any agreement related to any Acquisition Proposal,

provided that, if the provisions of this Section 3.2 are complied with, nothing contained in this Section 3.2 shall prevent the Board from responding to and recommending to the Shareholders a Superior Proposal. Any good faith determination to be made by the Board in connection with an Acquisition Proposal or Superior Proposal shall only be made after consultation with its Advisors and receipt by the Board of a written opinion of outside counsel or advice of outside counsel that is reflected in the minutes of the Board to the effect that the Board is required to consider such Acquisition Proposal or to furnish information concerning the Corporation in connection therewith in order to discharge its fiduciary duties under applicable Laws.

(b) The Corporation shall immediately cease and cause to be terminated any existing solicitations, encouragements, activities, discussions or negotiations with any parties (other than the Offeror) with respect to any Acquisition