# Exhibit "A"

James M. Hanavan, State Bar No. 66097
Kristen E. Drake, State Bar No. 202827
CRAIGIE, McCARTHY & CLOW
540 Pacific Avenue
San Francisco, CA 94133
Telephone: (415) 732-7788
Facsimile: (415) 732-7783

Attorneys for Plaintiff Trevor Moss

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TREVOR MOSS, | Case No.: C 07-2732- SC |
| Plaintiff, | **PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION TO DEFENDANT TIBERON MINERALS LTD.** |
| v. | |
| TIBERON MINERALS LTD., | |
| Defendant. | |

///

///

///

///

///

///

///

///

///

///

///

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1    PROPOUNDING PARTY:           Plaintiff TREVOR MOSS

2    RESPONDING PARTY:            Defendant TIBERON MINERALS LTD.

3    SET NO.:                     ONE (1)

4

5    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

6    Pursuant to Federal Rule of Civil Procedure, Rule 36, plaintiff Trevor Moss requests that

7    defendant Tiberon Minerals Ltd. ("Tiberon") answer the following requests for admissions under

8    oath within thirty (30) days after service of these interrogatories.

9                          **REQUESTS FOR ADMISSIONS**

10    REQUEST NO. 1:       Admit that Tiberon or any successor entity has closed its offices in

11    Canada.

12    REQUEST NO. 2:       Admit that Tiberon or any successor entity has relocated its offices

13    to Vietnam.

14    REQUEST NO. 3:       Admit that TML Acquisition Limited is the parent of Tiberon or

15    any successor entity and Vietnam Enterprise Investments Limited.

16    REQUEST NO. 4:       Admit that Vietnam Growth Fund Limited and Vietnam Dragon

17    Fund Limited are Vietnam entities which own 100% of the stock in Tiberon or any successor

18    entity.

19    REQUEST NO. 5:       Admit that Tiberon or any successor entity is no longer a Canadian

20    business entity.

21    REQUEST NO. 6:       Admit that Dragon Capital Group Limited is the parent of Dragon

22    Capital Management Limited.

23    REQUEST NO. 7:       Admit that Exhibit "3" entitled "Pre-Acquisition Agreement" to

24    the Verified Complaint in the case of *Osram Sylvania Products, Inc. v. Tiberon Minerals Ltd.,*

25    *et al.,* United States District Court for the Middle District of Pennsylvania Case Number 3:07-

26    cv-865, attached hereto as Exhibit "A", is a true and correct copy of excerpts from the Pre-

27    Acquisition Agreement between Tiberon and its acquirer.

28

1

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1  REQUEST NO. 8:    Admit that the information contained in the press releases

2  attached hereto as Exhibit "B" is true and correct.

3  REQUEST NO. 9:    Admit that the Tiberon officers and directors identified by Mario

4  Caron in his declaration filed in support of Tiberon's Motion to Dismiss for *Forum Non-*

5  *Conveniens,* and Mr. Caron himself, were bound by the Pre-Acquisition Agreement between

6  Tiberon and its acquirer referenced in Request No. 7, above.

7  REQUEST NO. 10:    Admit that Mario Caron and Tiberon's other officers and directors

8  during calendar year 2006 agreed to sell and transfer all of their equity interests in Tiberon to an

9  acquiring entity by no later than December 19, 2006.

10  REQUEST NO. 11:    Admit that the Tiberon officers and directors identified by Mario

11  Caron in his declaration filed in support of Tiberon's Motion to Dismiss for *Forum Non-*

12  *Conveniens,* and Mr. Caron himself, had contracted away their corporate authority to award

13  Trevor Moss the bonus compensation, as referenced in his consulting agreement, for the portion

14  of the year worked by him in 2006.

15  REQUEST NO. 12:    Admit that both Tiberon's former board members and Vietnam

16  Enterprise Investments Limited ("VEIL") agreed on December 18, 2006, that neither Tiberon nor

17  the venture would "...take any action other than in the ordinary, regular and usual course of

18  business and consistent with past practice (none of which actions shall be unreasonable or

19  unusual) ... with respect to the grant of any bonuses... payable to ... officers ... consultants or

20  agents of [Tiberon or the venture] otherwise than pursuant to agreements ... or arrangements in

21  effect ... on the date hereof ..."

22  REQUEST NO. 13:    Admit that none of the Ontario witnesses identified by Mario Caron

23  in his declaration filed in support of Tiberon's Motion to Dismiss for *Forum Non-Conveniens* has

24  any existing business relationship with Tiberon or any successor entity.

25  REQUEST NO. 14:    Admit that Mario Caron no longer has any business relationship

26  with Tiberon or any successor entity.

27  REQUEST NO. 15:    Admit that Walter Henry no longer has any business relationship

28  with Tiberon or any successor entity.

2

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

1    REQUEST NO. 16:    Admit that any bonuses that were approved for any of the joint

2    venture contract workers for work performed in 2006 were approved before December 18, 2006.

3    REQUEST NO. 17:    Admit that John Shrimpton is a founder of Dragon Capital

4    Management Limited.

5    REQUEST NO. 18:    Admit that John Shrimpton is a managing director of Dragon

6    Capital Management Limited.

7    REQUEST NO. 19:    Admit that John Shrimpton is an agent and representative of

8    Dragon Capital Management Limited.

9    REQUEST NO. 20:    Admit that John Shrimpton has resided in Ho Chi Minh City,

10    Vietnam, for more than 10 years.

11    REQUEST NO. 21:    Admit that John Shrimpton is Chief Executive Officer and

12    Managing Director of Tiberon or any successor entity.

13    REQUEST NO. 22:    Admit that "[o]n December 8, 2006, John Shrimpton ('Shrimpton'),

14    managing director of Dragon, telephoned SYLVANIA management," and "[o]n January 10,

15    2007, Dragon (Shrimpton) again telephoned SYLVANIA … [to tell] them that…Dragon had

16    directed Tiberon management to provide SYLVANIA with a Power Point presentation and press

17    release in which Dragon expected Tiberon to announce the acquisition of Tiberon by Dragon."

18    REQUEST NO. 23:    Admit that the allegations contained in Paragraph 4 of the

19    Verified Complaint in the case of *Osram Sylvania Products, Inc. v. Tiberon Minerals Ltd., et*

20    *al.,* United States District Court for the Middle District of Pennsylvania Case Number 3:07-cv-

21    865, attached hereto as Exhibit "A", are true and correct.

22    REQUEST NO. 24:    Admit that the allegations contained in Paragraph 59 of the

23    Verified Complaint in the case of *Osram Sylvania Products, Inc. v. Tiberon Minerals Ltd., et*

24    *al.,* United States District Court for the Middle District of Pennsylvania Case Number 3:07-cv-

25    865, attached hereto as Exhibit "A", are true and correct.

26    REQUEST NO. 25:    Admit that the allegations contained in Paragraph 61 of the

27    Verified Complaint in the case of *Osram Sylvania Products, Inc. v. Tiberon Minerals Ltd., et*

28

3

1    *al.,* United States District Court for the Middle District of Pennsylvania Case Number 3:07-cv-

2    865, attached hereto as Exhibit "A", are true and correct.

3         REQUEST NO. 26:   Admit that the allegations contained in Paragraph 66 of the

4    Verified Complaint in the case of *Osram Sylvania Products, Inc. v. Tiberon Minerals Ltd., et*

5    *al.,* United States District Court for the Middle District of Pennsylvania Case Number 3:07-cv-

6    865, attached hereto as Exhibit "A", are true and correct.

7         REQUEST NO. 27:   Admit that the allegations contained in Paragraph 71 of the

8    Verified Complaint in the case of *Osram Sylvania Products, Inc. v. Tiberon Minerals Ltd., et*

9    *al.,* United States District Court for the Middle District of Pennsylvania Case Number 3:07-cv-

10   865, attached hereto as Exhibit "A", are true and correct.

11        REQUEST NO. 28:   Admit that the allegations contained in Paragraph 80 of the

12   Verified Complaint in the case of *Osram Sylvania Products, Inc. v. Tiberon Minerals Ltd., et*

13   *al.,* United States District Court for the Middle District of Pennsylvania Case Number 3:07-cv-

14   865, attached hereto as Exhibit "A", are true and correct.

15

16   Dated: October 19, 2007                    CRAIGIE, McCARTHY & CLOW

17

18                                              By: Kristen E. Drake
19                                              Attorneys for Plaintiff Trevor Moss

20

21

22

23

24

25

26

27

28

CRAIGIE, McCARTHY & CLOW
Telephone: 415/732-7788 · Facsimile: 415/732-7783

                                  4

# Exhibit "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **OSRAM SYLVANIA PRODUCTS INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**TIBERON MINERALS LTD., NUI PHAO MINING JOINT VENTURE COMPANY LIMITED and DRAGON CAPITAL MANAGEMENT LIMITED,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION**<br><br>**VERIFIED COMPLAINT**<br><br>**(Judge _____)**<br><br>**JURY TRIAL DEMANDED** |

Now comes the Plaintiff, OSRAM SYLVANIA Products Inc. ("SYLVANIA"), by its attorneys, and for its claims against Tiberon Minerals Ltd. ("Tiberon"), Nui Phao Mining Joint Venture Company Limited ("Nui Phao") and Dragon Capital Management Limited ("Dragon") states:

## THE PARTIES

1.     SYLVANIA is a Delaware corporation with its North American headquarters in Danvers, Massachusetts. SYLVANIA and its affiliates maintain offices and manufacturing plants throughout much of the United States and the world. SYLVANIA's principal tungsten products manufacturing plant and Global

Tungsten and Powders Headquarters is located at Hawes Street in Towanda, Bradford County, Pennsylvania (the "Towanda Factory").

2.    Upon information and belief, Tiberon is a Canadian corporation with its headquarters in Toronto, Ontario, Canada.

3.    Upon information and belief, Nui Phao, which is also known as Nuiphaovica, is a joint venture enterprise established and operating under the laws of the Socialist Republic of Vietnam, with places of business in Hanoi, Vietnam and Toronto, Canada.

4.    Upon information and belief, Dragon is a British Virgin Islands company with its principal location in Ho Chi Minh City, Vietnam.

## JURISDICTION AND VENUE

5.    This is an action for declaratory and injunctive relief and for specific performance.

6.    This court has jurisdiction over this action under Section 1332 of Title 28 of the United States Code as this action is between citizens of a state and citizens or subjects of a foreign state and the matter and controversy exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs.

7.    The court has personal jurisdiction over Nui Phao and Tiberon because the facts that give rise to this lawsuit occurred, in part, in this District, Nui

Phao and Tiberon have purposely directed their activities to Pennsylvania, and SYLVANIA's claims arise out of these forum-related activities.

8.    The court has personal jurisdiction over Dragon in that it has caused harm and/or tortious injury to SYLVANIA in this Commonwealth by an act or omission outside this Commonwealth, the brunt of the harm caused by Dragon's action will be felt by SYLVANIA in this forum, and Dragon expressly aimed its tortious conduct at Pennsylvania by interfering with SYLVANIA's contractual relations with Nui Phao and Tiberon in Pennsylvania.

9.    Venue in this district is proper under 28 U.S.C. §§ 1391 (a), (c) and (d) in that (a) this dispute arises out of the transaction of business in this district, (b) a substantial part of the acts, omissions and conduct giving rise to the claims herein occurred in this district; (c) the defendants are subject to personal jurisdiction in this district; and (d) the defendants are aliens.

10.    This action arises from the actions of Tiberon, Nui Phao and Dragon (collectively, the "Defendants") with respect to certain agreements between Nui Phao, Tiberon and SYLVANIA, pursuant to which Nui Phao and Tiberon agreed to supply SYLVANIA with certain minimum amounts of tungsten ore concentrates to be delivered to the Towanda Factory.

## FACTS

### A.    SYLVANIA AND TUNGSTEN

11.    SYLVANIA is one of the largest lighting and materials enterprises in the world, serving customers in more than 140 countries.  It manufactures and markets a wide range of products for cutting tools, hard metal products and other automotive, lighting, military and industrial products sold under the SYLVANIA and OSRAM brand names.

12.    SYLVANIA's principal tungsten products manufacturing plant and Global Tungsten and Powders headquarters is located on Hawes Street in Towanda, Bradford County, Pennsylvania.  At the Towanda Factory, SYLVANIA produces one of the widest varieties of tungsten and molybdenum materials and inorganic phosphors in the world.

13.    SYLVANIA uses large amounts of tungsten in its manufacturing operations at the Towanda Factory.  Approximately half of SYLVANIA's tungsten needs are met by acquiring tungsten ore concentrates ("Tungsten Ore"), and the remainder is satisfied by purchasing scrap tungsten.

14.    Tungsten is a chemical element. Due to its robust physical properties, tungsten and its many compounds and alloys are used today in a variety of applications, including cutting tools, hard metal products, specialty steels, electronics, lighting and military applications.   There are no industrially

compatible or economically competitive substitutes for tungsten in many areas of use.

15.    Tungsten Ore is very difficult to acquire.  Since 1991, no Tungsten Ore has been produced domestically.

16.    The world's largest deposits of Tungsten Ore are found in China which, until 2000, provided about 80% of the world's supply.  In 2000, China prohibited Tungsten Ore exports. This development, along with additional industry restructuring, closure of mines in the West and increased worldwide demand, have led to a worldwide tightening of supply.

17.    Ammonium paratungstate ("APT") is produced from Tungsten Ore and is the most important precursor for the majority of tungsten products.  The pricing for Tungsten Ore is typically a deriviative of APT pricing.  In recent years, purchasers of Tungsten Ore have relied upon quotations of APT as a price guide. APT prices have more than doubled since 2004.

18.    In light of the difficulty in securing Tungsten Ore and SYLVANIA's significant need for a long-term, reliable source of supply of Tungsten Ore to use in its manufacturing processes, SYLVANIA engages in a constant long range planning process in order to secure its needs for Tungsten Ore.

CLT 1039855v15

**B.    TIBERON, NUI PHAO AND THE MINE**

19.    Defendant Tiberon is a Canadian-based exploration and development company which maintains its principal office in Toronto, Ontario, Canada. Nui Phao is a Vietnamese joint venture enterprise and maintains an office in Toronto, Ontario, Canada.

20.    Tiberon owns a 70% controlling interest in Defendant Nui Phao. As the controlling member and owner of the largest interest in Nui Phao, Tiberon is able to control and direct the actions and activities of Nui Phao, both in North America and abroad.

21.    Nui Phao and Tiberon share certain officers and directors. Mario Caron, a Canadian resident, has served as the CEO and President of Tiberon as well as the Chairman of Nui Phao. In addition, the Chief Financial Officer of Tiberon has acted as an authorized representative of Nui Phao.

22.    Nui Phao owns the mining rights to property located in the Dai Tu District, Thai Nguyen Province of northern Vietnam, near the town of Dai Tu (the "Property"). Tiberon and Nui Phao are developing a mining facility located at the Property at which Nui Phao will mine, recover and sell several minerals including Tungsten Ore (the "Mine").

23.    Approximately six years ago, Tiberon informed SYLVANIA that Tiberon was conducting a feasibility study at the Property and that the Property

6

might be capable of producing significant quantities of Tungsten Ore. SYLVANIA and Tiberon entered into a non-disclosure agreement and began to discuss a possible agreement between SYLVANIA and Nui Phao and Tiberon to supply SYLVANIA's Tungsten Ore needs.

24.    Discussions took place over several years in numerous locations, including Pennsylvania.

25.    For example, at the International Tungsten Industry Association ("ITIA") meeting held in Pittsburgh, Pennsylvania in September 2002, SYLVANIA met with Loren Komperdo, then president of Tiberon, to discuss the status of Property.    Between 2001 and 2005, representatives of Nui Phao and Tiberon participated in numerous negotiating sessions with SYLVANIA at the Towanda Factory in Pennsylvania as well as other locations.

26.    Throughout the negotiations, Nui Phao and Tiberon represented that the Property controlled by Nui Phao and Tiberon has the largest primary tungsten deposit in the world outside of China.

27.    Nui Phao and Tiberon were aware that SYLVANIA was capable of consuming the volume of Tungsten Ore output expected from the Mine. As a result, a Tungsten Ore supply agreement with SYLVANIA would be advantageous to Nui Phao and Tiberon, enabling them to proceed with their plans for the Mine, particularly its financing.

7

28.    As a result of the representations and ultimately the agreements of Nui Phao and Tiberon, SYLVANIA made the Mine a key part of SYLVANIA's long range plan to secure a reliable supply of Tungsten Ore for a long-term period.

## C.    THE SUPPLY AGREEMENTS

29.    Following approximately four years of discussions and negotiations, SYLVANIA, Nui Phao and Tiberon entered into an Agreement dated May 16, 2005, as amended (the "Base Agreement"), and an Option Agreement dated May 16, 2005, as amended (the "Option Agreement" and, together with the Base Agreement, the "Agreements"). SYLVANIA exercised its option under the Option Agreement on or about February 20, 2006.

30.    Pursuant to the Agreements, Nui Phao and Tiberon agreed to sell to SYLVANIA the high grade Tungsten Ore to be produced at the Mine subject to certain specifications.

31.    Under the Agreements, SYLVANIA has the specific and enforceable right to purchase up to 100% of the Tungsten Ore produced by the Mine during the term of the Agreements. SYLVANIA expected the Agreements to fulfill up to 100% of its needs for Tungsten Ore for 10 to 15 years.

32.    As recited in the Agreements, SYLVANIA agreed to make this long-term commitment to purchase Tungsten Ore from the Mine, in order to facilitate

CLT 1039855v15

Nui Phao and Tiberon "entering into lending arrangements with institutional lenders to provide debt financing for the [Mine]."

33.     Section 1.1 of the Agreements requires Nui Phao to:

a.     provide SYLVANIA, upon commencement of the Mine construction, with written status reports with regard to the construction progress of the Mine on a quarterly basis, or more frequently, if required by Nui Phao's lenders;

b.     provide SYLVANIA, prior to the Delivery Date (as defined in the Agreements), with quarterly updates with regard to the status of permitting for the Mine;

c.     use its best efforts to (i) meet the deadlines set forth in the Construction Schedule (as defined in the Agreements); (ii) obtain the Required Financing Amount (as defined in the Agreements); and (iii) cause the Delivery Date to occur on or before January 1, 2008; and

d.     deliver the Tungsten Ore to the Towanda Factory in Towanda, Pennsylvania.

34.     Section 27.1 of each of the Agreements provides that Tiberon "covenants and agrees that it shall take all actions as are required to cause [Nui Phao] to perform fully and on a timely basis all of its obligations under this Agreement," including those actions set forth above.

9

35.    This separate commitment of Tiberon to SYLVANIA was material and fundamental to SYLVANIA's willingness to enter into the Agreements, and each of the Agreements recites that "[SYLVANIA] would not have entered into this Agreement without the execution and delivery of this Agreement by Tiberon."

36.    In order to assure SYLVANIA that it could rely on the Mine to supply its needs for Tungsten Ore, Nui Phao agreed in Section 4.1 of the Base Agreement and Section 4.3 of the Option Agreement, that it would not sell any tungsten containing products of any kind produced by the Mine to any person or entity other than SYLVANIA if such a sale would impede Nui Phao's ability to sell and deliver the Tungsten Ore to SYLVANIA.

37.    Further, in Section 4.3 of the Option Agreement, Nui Phao and Tiberon agreed that, except in certain inapplicable circumstances:

> Neither [Nui Phao] nor Tiberon shall, and they shall cause their respective Affiliates not to, directly or indirectly, solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any other Person relating to the sale of any tungsten containing products of any kind produced from the [Mine] which would adversely affect [Nui Phao]'s ability to sell and deliver products to [SYLVANIA] in accordance with this Agreement.

38.    In Section 3.4 of the Agreements, Nui Phao estimated that it would begin delivering Tungsten Ore from the Mine to SYLVANIA in Pennsylvania on or about January 1, 2008.

10

### D.    MINE FINANCING OBTAINED

39.    In Section 1.1 of the Agreements, Nui Phao and Tiberon jointly and severally warranted that the Required Financing Amount, which would be a combination of equity and debt, would not exceed two hundred eleven million dollars (US $211,000,000) or such greater amount as might be indicated in a Final Feasibility Study which was being prepared by Nui Phao and Tiberon when the Agreements were signed.

40.    The Final Feasibility Study was completed by Nui Phao and Tiberon in July 2005.   In a press release dated July 12, 2005, Tiberon and Nui Phao announced (a) the completion of the Final Feasibility Study for the Mine and (b) that the Final Feasibility Study indicated that the total capital costs for the Mine had increased to US $229.8 million.   Tiberon has reconfirmed that the July 2005 study was the Final Feasibility Study in press releases and public filings with the Canadian securities regulatory authorities.   Accordingly, in Section 1.1 of the Agreements, Nui Phao and Tiberon jointly and severally warranted that the "Required Financing Amount" would not exceed two hundred twenty-nine million and eight hundred thousand dollars (US $229,800,000).

41.    On or about July 6, 2005, Tiberon issued a press release in which it announced that it had closed a US $10 million loan facility with WestLB AG (the

"WestLB Financing") and that the proceeds would be used to advance the development of the Mine.

42.    On or about August 9, 2005, Tiberon announced that it had closed a public equity offering for approximately CAN $80 million (the "Equity Financing"). Tiberon later announced that approximately US $55 million of the net proceeds would be used to fund the development of the Mine.

43.    In reliance upon the continued validity of the Agreements and Nui Phao's and Tiberon's continued representations about the progress of the Mine, SYLVANIA entered into a Supply Agreement on or about February 17, 2006 to sell to Sandvik AB, Sandvik Coromant AB, Sandvik Limited and Seco Tools AB (collectively, the "Sandvik Companies") tungsten oxide generated from Tungsten Ore from the Mine. Tiberon and Nui Phao were and are aware of the contract between SYLVANIA and the Sandvik Companies. In order to have sufficient quantities of Tungsten Ore available to meet its obligations under the Supply Agreement with the Sandvik Companies, SYLVANIA exercised its option under the Option Agreement on or about February 20, 2006.

44.    SYLVANIA has also entered into an agreement with another customer in reliance upon the continued validity and existence of the Agreements.

45.    On June 7, 2006, Tiberon and Nui Phao publicly announced and confirmed that the financing for the Mine had been obtained. In a press release

12

entitled "TIBERON SECURES PROJECT FINANCING FOR NUI PHAO DEVELOPMENT," a copy of which is attached hereto as <u>Exhibit 1</u>, Tiberon, on behalf of Nui Phao, announced that "it has received and approved an underwriting commitment letter from its previously announced Mandated Lead Arrangers.....to provide a Commercial Facility for up to US$210MM and a Cost Overrun Facility for up to US$14MM" (collectively, the "Debt Financing").

46.    In addition, the June 7, 2006 press release reconfirmed that the Final Feasibility Study was issued in July 2005 and that, under the Final Feasibility Study, the Required Financing Amount would be US $229,800,000.

47.    On or about July 5, 2006, Tiberon issued a press release in which it announced that it had signed a memorandum of understanding (MOU) with Siemens Project Ventures GmbH ("SPV"), part of Siemens Aktiengesellschaft (SAG) headquartered in Munich, Germany whereby SPV agreed to subscribe to preferred shares in Tiberon's wholly-owned subsidiary, Singapore Holding, for up to US $30 million (the "Siemens Financing"). The press release further announced that the proceeds were expected to be used to fund the development of the Mine.

48.    Accordingly, by July 5, 2006, Nui Phao and Tiberon had obtained the following financings: the WestLB Financing (US $10 million), the Equity Financing (US $55 million), the Debt Financing (US $224 million) and the

13