Siemens Financing (US $30 million) with a sum total of US $319 million, thereby exceeding the Required Financing Amount by US $89,200,000.

49. In September of 2006, Tiberon and Nui Phao issued an updated Technical Report (the "September 2006 Report").

50. The September 2006 Report described a dramatic increase in tungsten prices since early 2005 and acknowledged that "dependency on a single country as the major supply source [i.e. China] is a strategic concern to all major tungsten consumers who are seeking non-Chinese sources of supply."

51. The September 2006 Report also described an increase in capital costs for the Mine to $302.6 million, a risk specifically assumed by Nui Phao and Tiberon under Section 1.1 of the Agreements.

52. The amount of financing obtained by Nui Phao and Tiberon as set forth above was still in excess of the capital costs amount described in the September 2006 Report by more than $16 million.

53. Nui Phao and Tiberon have obtained an important part of the benefit of their bargain by using the Agreements to obtain the Required Financing Amount.

54. At the September 2006 ITIA conference in Boston, Massachusetts, Nui Phao and Tiberon made the following representations about the Mine in a public presentation made by them: tungsten "is an essential commodity with no

substitute;" "end users need stable, non-Chinese supply to meet current requirements, new applications;" the Agreements with SYLVANIA "cover up to 100% of tungsten concentrate production for a five year minimum with extension options to 15 years;" and, Nui Phao and Tiberon had obtained a "debt financing commitment for up to US$210 million (announced June 2006)."

### E.   DRAGON'S ACQUISITION OF TIBERON

55.   In the fall of 2006, SYLVANIA learned that several companies were bidding for Tiberon. The following sequence of events is taken from public filings made by Tiberon.

56.   On September 26, 2006, as provided in the Directors' Circular of Tiberon dated January 4, 2007 (the "Tiberon Circular"), Dragon contacted Tiberon through an intermediary and expressed an interest in acquiring Tiberon.

57.   On October 18, 2006, "following irregular trading activity, the Toronto Stock Exchange halted trading in Tiberon Shares," and Tiberon issued a press release stating that it had been approached by a third party [Dragon] and was in discussions regarding a possible acquisition transaction.

58.   While negotiating with Dragon, Tiberon received an unsolicited offer from another third party on November 10, 2006, per the Tiberon Circular, and Tiberon commenced negotiations with the other third party.

59. During the period from September 26, 2006 until December 18, 2006, Tiberon and its management negotiated an acquisition transaction and related agreements with Dragon and/or the competing third party, including offer letters, confidentiality and standstill agreements, pre-acquisition agreements, and lock-up agreements.

60. On December 8, 2006, John Shrimpton ("Shrimpton"), managing director of Dragon, telephoned SYLVANIA management in Towanda. After introducing himself and Dragon, Shrimpton discussed the competing bids for Tiberon and asked Towanda management to encourage Tiberon management to favor Dragon's bid to acquire Tiberon. Shrimpton stated that the Agreements and SYLVANIA's continued involvement in the Mine were important to Dragon and emphasized Dragon's intent to keep current Tiberon and Nui Phao management in place in the event of Tiberon's purchase by Dragon.

61. On December 19, 2006, Tiberon announced that it had signed a Pre-Acquisition Agreement dated December 18, 2006 (the "Pre-Acquisition Agreement") with Dragon and three investment funds managed by Dragon, Vietnam Enterprise Investments Limited, Vietnam Growth Fund Limited and Vietnam Dragon Fund Limited (collectively, the "VEIL Funds"). Under the Pre-Acquisition Agreement, the VEIL Funds made an offer (the "Offer") to acquire all of the issued and outstanding common shares of Tiberon for cash consideration.

62.  SYLVANIA is now informed and believes that Section 3.1 of the Pre-Acquisition Agreement prohibited Nui Phao and Tiberon from incurring any debt (other than in the ordinary course of business) or issuing any equity securities, without the consent of Dragon, from December 18, 2006 until Dragon appointed its own persons to the board of Tiberon after the completion of the Offer.

63.  On that same day, December 19, 2006, Tiberon management called SYLVANIA management in Towanda to discuss the Dragon takeover, assuring SYLVANIA that Tiberon management would remain in place but failing to mention the restrictions upon financing imposed by the Pre-Acquisition Agreement.

64.  On January 4, 2007, in a call between Dragon and SYLVANIA management in Towanda, Shrimpton elaborated on Dragon's structure and financial strength, discussed the tender offer for Tiberon and its timing, and reassured SYLVANIA management that, although Tiberon would have new ownership, i.e. Dragon, as to Nui Phao, "everything will remain the same."

65.  On January 10, 2007, Dragon (Shrimpton) again telephoned SYLVANIA management in Towanda and informed them that the acquisition appeared to be on track and that Dragon had directed Tiberon management to provide SYLVANIA management with a Power Point presentation and press

release in which Dragon expected Tiberon to announce the acquisition of Tiberon by Dragon.

66. On February 12, 2007, Dragon announced that the Offer, presented through TML Acquisition Ltd, a British Columbia corporation organized by Dragon ("TML"), had been accepted by the owners of 93.2% of the outstanding Tiberon common shares. On that day, Dragon also announced that TML would complete the compulsory acquisition of all remaining publicly-held Tiberon common shares and that, following completion of these transactions, TML and the VEIL Funds managed by Dragon and its affiliates would beneficially own, directly or indirectly, and exercise control or direction over, all the outstanding common shares of Tiberon.

67. Dragon invited SYLVANIA management to meet in Toronto, Ontario, Canada on February 16, 2007 in connection with meetings between Dragon and the Tiberon board of directors. As a result of weather difficulties, the conference occurred by telephone with SYLVANIA management remaining in Towanda, Pennsylvania and Dragon and Tiberon representatives in Toronto.

68. During the February 16, 2007 conference call, Shrimpton again represented that Nui Phao would be unaffected by the acquisition, acknowledged that the takeover by Dragon had caused significant delays in the development of the Mine, and asked SYLVANIA to consider constructing an APT plant in

Vietnam and taking delivery of the Tungsten Ore in Vietnam instead of Towanda, Pennsylvania in order to permit Nui Phao to avoid certain export taxes recently announced by the Vietnamese government.

69. Under the Agreements, Nui Phao and Tiberon expressly agreed to bear and assume the risk of the imposition of all export taxes upon Tungsten Ore by Vietnam.

70. Nui Phao and Tiberon have cancelled several meetings to discuss the Siemens Financing with SPV over the last several months during the period of the takeover of Tiberon.

71. Following the acquisition of Tiberon, representatives of Dragon, specifically John Shrimpton, and possibly others, have become officers of Tiberon, have assumed positions on the Tiberon board of directors, and have undertaken the direction and management of Tiberon and Nui Phao.

F. PRETEXTUAL TERMINATION OF THE AGREEMENTS

72. In or about March 2007, Dragon, Tiberon and Nui Phao suggested that the Defendants wanted to increase the Tungsten Ore purchase prices contained in the Agreements. SYLVANIA rejected the suggestion on the basis that the Agreements governed the prices.

73. On March 29, 2007, Tiberon publicly issued a detailed report on the status of the Mine in which it described and reconfirmed the Debt Financing, the Equity Financing and the Siemens Financing.

74. In early April 2007, Dragon, Tiberon and Nui Phao threatened to terminate the Agreements. On April 25, 2007, Nui Phao provided letters to SYLVANIA in which Nui Phao purported to give formal notice of termination to SYLVANIA on the basis of Section 2.3(d) of the Agreements and its contention that it failed to obtain the Required Financing Amount and thus was entitled to terminate the Agreements. See <u>Exhibit 2</u>.

75. Nui Phao and Tiberon are in breach of the Agreements in that their ability to terminate under the portion of Section 2.3(d) cited by Nui Phao ended when Tiberon and Nui Phao obtained the Required Financing Amount in 2006.

76. SYLVANIA will be significantly and irreparably harmed by this pretextual and unfounded termination of the Agreements and remains ready, willing and able to perform its obligations under the Agreements.

77. SYLVANIA is informed and believes that Nui Phao and Tiberon have not terminated any other supply agreements to sell fluorspar, bismuth and other minerals from the Mine and that it is fully within the power of Nui Phao and Tiberon to perform.

78. Moreover, Nui Phao and Tiberon breached the Agreements by failing to use their best efforts to close the Debt Financing and the Siemens Financing, with the result that any loss of Mine financing or other delays or disruptions of the development of the Mine arise entirely out of the conduct of Nui Phao and Tiberon and their abandonment and breach of their contractual obligations to SYLVANIA.

79. For example, Tiberon's negotiations with Dragon and the competing third party from September 26, 2006 to December 18, 2006 materially interfered with, and disrupted the closing of, the Debt Financing and the Siemens Financing, causing Nui Phao and Tiberon to be in material violation of their obligations under the Agreements to use their best efforts to finalize the Debt Financing and the Siemens Financing.

80. In addition, the Pre-Acquisition Agreement between Dragon and Tiberon prohibits Nui Phao and Tiberon from incurring debt or issuing any equity securities unless approved by Dragon. This proscription began in December 18, 2006 and continues until Dragon designates its own appointees to the board of directors of Tiberon. These restrictions on the ability of Tiberon and Nui Phao to incur debt or issue equity securities materially interfered with their performance of their obligations and directly caused Tiberon and Nui Phao to be in knowing violation of the Agreements. A copy of the relevant portions of the Pre-Acquisition Agreement is attached as Exhibit 3.

81. SYLVANIA is informed and now believes that, at the end of 2006, Nui Phao and Tiberon deliberately and in bad faith abandoned the financing that they had obtained months before by allowing the bank mandate for the development of the Mine to expire.

82. SYLVANIA is informed and believes that the Defendants intentionally and in bad faith allowed the WestLB Financing to expire on or about January 2, 2007.

83. In addition, SYLVANIA is informed and believes that the Defendants intentionally and in bad faith delayed the closing of the Debt Financing and the Siemens Financing for the last several months.

84. Nui Phao and Tiberon and their new owner Dragon seek to avoid or mitigate risks undertaken by them in the Agreements by using this improper termination as a pretext to attempt to force SYLVANIA to renegotiate the terms of the Agreements.

85. SYLVANIA relied on Nui Phao and Tiberon's commitments in the Agreements and the representations and assurances provided to SYLVANIA by Nui Phao and Tiberon since the execution of the Agreements. In light of current market conditions and the lengthy period of time required to develop sources of Tungsten Ore, SYLVANIA will be unable to secure a reliable supply of Tungsten

Ore from a supplier with proven sources of Tungsten Ore in the volumes promised over the terms of the Agreements.

### FIRST CLAIM FOR RELIEF
### ACTION FOR DECLARATORY JUDGMENT
### AGAINST NUI PHAO AND TIBERON

86. SYLVANIA reasserts the facts and statements contained in the previous paragraphs and incorporates the same herein as if restated verbatim.

87. Section 2.3(d) of the Agreements provides that Nui Phao may terminate if it "fails to obtain the Required Financing Amount" by April 26, 2007.

88. Nui Phao obtained the Required Financing Amount prior to April 26, 2007. As a result, Nui Phao does not have the right or ability to terminate the Agreements pursuant to Section 2.3(d) of the Agreements.

89. Nui Phao and Tiberon have repeatedly confirmed the fact, in public announcements as late as March 2007, that the Required Financing Amount was obtained.

90. The conditions cited by Nui Phao as its basis for termination have not occurred, and by attempting to terminate the Agreements Nui Phao and Tiberon are in breach of the Agreements.

91. As a result of the foregoing, the rights, status and other relations between SYLVANIA and Nui Phao and Tiberon are uncertain, and an actual and

justiciable controversy exists between SYLVANIA and Nui Phao and Tiberon regarding their obligations under the Agreements.

92. Declaratory relief from this Court will determine all or some of the dispute between SYLVANIA and Nui Phao and Tiberon.

93. A judicial declaration is necessary to establish SYLVANIA's rights and Nui Phao and Tiberon's obligations under the Agreements.

94. Pursuant to 28 U.S.C. § 2201, SYLVANIA seeks a declaration by this Court that Nui Phao and Tiberon have not lawfully terminated the Agreements and that the Agreements continue in full force and effect.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT – SPECIFIC PERFORMANCE

95. SYLVANIA reasserts the facts and statements contained in the previous paragraphs and incorporates the same herein as if restated verbatim.

96. Nui Phao and Tiberon are in breach of their representations, warranties, covenants and obligations under the Agreements including the following:

    a. Nui Phao and Tiberon are in breach of their warranty under Section 1.1 of the Agreements that the Required Financing Amount would be no greater than the amount indicated by the June 2005 Final Feasibility Study.

24

b. Nui Phao is in breach of its obligations to provide SYLVANIA, upon commencement of the Mine construction, with written status reports with regard to the construction progress of the Mine.

c. Nui Phao is in breach of its obligations to provide SYLVANIA, prior to the Delivery Date, with quarterly updates with regard to the status of permitting for the Mine.

d. Nui Phao is in breach of its obligations to use its best efforts to meet the deadlines set forth in the Construction Schedule.

e. Nui Phao is in breach of its obligations to use its best efforts to obtain and finalize the Required Financing Amount.

f. Nui Phao is in breach of its obligations to use its best efforts to cause the Delivery Date to occur on or before January 1, 2008.

g. Nui Phao is in breach of its obligations to reconfirm in writing to SYLVANIA the Estimated Delivery Date (as defined in the Agreements), from time to time as requested by SYLVANIA.

h. Tiberon is in breach of its obligations under Section 27.1 of each of the Agreements to "take all actions as are required to cause [Nui Phao] to perform fully and on a timely basis all of its obligations under this Agreement," including those actions set forth above.

i. Nui Phao and Tiberon are in breach of their obligations to comply with implied covenants under the Agreements, including the implied covenants to act in good faith and with fair dealing.

97. SYLVANIA is informed and believes that (a) the Defendants, either individually or through their affiliates, have solicited or entertained offers from, negotiated with, or encouraged, discussed, accepted or considered proposals from other persons or entities relating to the sale of Tungsten Ore or other tungsten containing products of any kind produced from the Mine in breach of their obligations under Section 4.3 of the Option Agreement and that they are continuing such activities and (b) such actions would and will adversely affect Nui Phao and Tiberon's ability to sell and deliver Tungsten Ore to SYLVANIA in violation of the Agreements. SYLVANIA is informed and believes that such solicitations and negotiations occurred both before and after the pretextual termination of the Agreements.

98. Defendants' solicitation of other buyers of Tungsten Ore or other tungsten containing products, whether individually or through affiliates, and their corresponding repudiation of their commitment to provide up to 100% of the Tungsten Ore output of the Mine to SYLVANIA under the terms of the Agreements will chill SYLVANIA'S ability to contract with its customers for the tungsten products expected to be manufactured by SYLVANIA and subject

CLT 1039855v15

SYLVANIA, and the Towanda Factory in particular, to business uncertainty well into the next decade.

99. Through their pretextual termination, the failure to use best efforts to finalize the financing obtained by them and their other breaches of the Agreements, Nui Phao and Tiberon are preventing SYLVANIA from receiving the benefit of its contractual rights.

100. SYLVANIA has no adequate remedy at law in respect of such breaches. Money damages are inadequate to protect SYLVANIA'S expectation interest. SYLVANIA's damages will be very difficult to calculate.

101. If Nui Phao and Tiberon are not ordered to specifically perform their obligations under the Agreements, SYLVANIA will suffer significant damages that are not fully reparable through an award of money damages, and SYLVANIA will be unable to secure a reliable supply of Tungsten Ore from a supplier with proven sources of Tungsten Ore in the volumes promised over the terms of the Agreements.

102. SYLVANIA has attempted to address this issue with both Nui Phao, Tiberon and Dragon but has been unsuccessful. To remedy these breaches of contract, SYLVANIA seeks a court order for specific performance that would:

    a. Require Nui Phao and Tiberon to withdraw their Notice of Termination;

      b.    Prohibit Nui Phao and Tiberon from terminating the Agreements pursuant to Section 2.3(d) of the Agreements;

      c.    Require Nui Phao and Tiberon to perform Section 4.1 of the Base Agreement and Section 4.3 of the Option Agreement including the cessation, directly or indirectly, of all negotiations or discussions with, all solicitations of, and all entertaining of offers from, other potential purchasers of Tungsten Ore or other tungsten containing products of any kind produced from the Mine;

      d.    Require Nui Phao and Tiberon to use their best efforts to meet the deadlines set forth in the Agreements; and

      e.    Cause Tiberon to require Nui Phao to perform fully and on a timely basis all of its obligations under the Agreements as provided in Section 27.1 of the Agreements.

### THIRD CLAIM FOR RELIEF
### BREACH OF CONTRACT-INJUNCTIVE RELIEF

103. SYLVANIA reasserts the facts and statements contained in the previous paragraphs and incorporates the same herein as if restated verbatim.

104. SYLVANIA is also informed and believes that, since its acquisition of Tiberon, Dragon has taken Tiberon private such that it has become de-listed from the Toronto Stock Exchange. In addition, SYLVANIA is informed and believes that Dragon has replaced one or more of the directors and officers of Tiberon and

that, as a result, it now exercises control over Tiberon and Nui Phao. Dragon is not publicly held.

105. SYLVANIA will be irreparably and permanently harmed if Tiberon continues to be further reorganized or dissolved by Dragon, which can direct Tiberon to take steps that may impair the licenses and other assets currently held by Nui Phao and which are necessary to enable Nui Phao and Tiberon to perform the Agreements.

106. SYLVANIA requests that this Court issue such injunctive relief as is necessary and proper to preserve the assets, books and records of Tiberon and Nui Phao and to maintain their status quo until such time as SYLVANIA'S rights under the Agreements have been determined.

107. SYLVANIA requests that the Court grant it such preliminary and permanent injunctive relief as is necessary and proper including:

    a.    Preserving the status quo by enjoining Defendants from, directly or indirectly, soliciting or entertaining offers from, negotiating or discussing with, or selling to any other person or entity the Tungsten Ore or other tungsten containing products of any kind produced from the Mine in violation of the Agreements;

29
CLT 1039855v15

b.    Enjoining Nui Phao and Tiberon from altering, removing or destroying corporate books and records whether in documentary or electronic form; and

c.    Enjoining Nui Phao and Tiberon from (i) taking further action to terminate the Agreements under Section 2.3(d) of the Agreements, (ii) conducting themselves as if the Agreements have been terminated, or (iii) impairing their ability to perform under the Agreements.

### FOURTH CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CONTRACT

108.  SYLVANIA reasserts the facts and statements contained in the previous paragraphs and incorporates the same herein as if restated verbatim.

109.  Dragon was, and at all times relevant to this complaint has been, aware of the existence of the Agreements.

110.  Upon information and belief, the restrictions imposed upon Nui Phao and Tiberon by Dragon pursuant to the Pre-Acquisition Agreement and otherwise in connection with and after its orchestrated takeover, through TML, of Tiberon, has directly and substantially interfered with Nui Phao and Tiberon's ability to honor their obligations under the Agreements.

111.  Despite its knowledge of the Agreements, Dragon has taken actions knowing that such actions on its part would prevent Nui Phao and Tiberon from being able to honor their obligations under the Agreements.

30

112. The actions of Dragon constitute tortious interference with the Agreements.

113. Dragon's actions, as set forth above, are wrongful, willful, malicious and without legitimate business justification.

114. For these reasons, Plaintiff is entitled to have the Court preliminarily and permanently enjoin Dragon from continuing to interfere, directly or indirectly, with the contractual relations between SYLVANIA and Nui Phao and Tiberon.

**WHEREFORE**, SYLVANIA requests that this Court enter judgment as follows:

1. Declare that Defendants Nui Phao and Tiberon have not lawfully terminated the Agreements and that the Agreements continue in full force and effect; and

2. Grant an order for specific performance to:

    a. Require Nui Phao and Tiberon to withdraw their Notice of Termination;

    b. Prohibit Nui Phao and Tiberon from terminating the Agreements pursuant to Section 2.3(d) of the Agreements;

    c. Require Nui Phao and Tiberon to perform Section 4.1 of the Base Agreement and Section 4.3 of the Option Agreement including the cessation, directly or indirectly, of all negotiations or discussions with, all

solicitations of, and all entertaining of offers from, other potential purchasers of Tungsten Ore or other tungsten containing products of any kind produced from the Mine;

    d.    Require Nui Phao and Tiberon to use their best efforts to meet the deadlines set forth in the Agreement; and

    e.    Cause Tiberon to require Nui Phao to perform fully and on a timely basis all of its obligations under the Agreements as provided in Section 27.1 of the Agreements;

3.    Enjoin the Defendants preliminarily and permanently from, directly or indirectly, soliciting or entertaining offers from, negotiating or discussing with, or selling to any other person or entity, Tungsten Ore or other tungsten containing products of any kind produced from the Mine in violation of the Agreements;

4.    Enjoin the Defendants preliminarily and permanently from altering, removing or destroying corporate books and records whether in documentary or electronic form;

5.    Enjoin Nui Phao and Tiberon preliminarily and permanently from (a) taking further action to terminate the Agreements under Section 2.3(d) of the Agreements, (b) conducting themselves as if the Agreements have been terminated or (c) impairing their ability to perform under the Agreements;

6. Enjoin Dragon preliminarily and permanently from interfering, directly or indirectly, with the contractual relations between SYLVANIA and Nui Phao and Tiberon;

7. Such other and further relief as the Court deems just and proper;

8. Plaintiff requests that it be permitted to recover costs and attorneys fees as appropriate; and

9. Plaintiff requests trial by jury on all issues so triable.