EXECUTION COPY

### PRE-ACQUISITION AGREEMENT

**THIS PRE-ACQUISITION AGREEMENT** (this "**Agreement**") is made as of the 18th day of December, 2006.

**BETWEEN:**

> **Vietnam Enterprise Investments Limited**, a company existing under the laws of the Cayman Islands ("**VEIL**"),
>
> - and –
>
> **Tiberon Minerals Ltd.**, a corporation existing under the laws of Canada (the "**Corporation**"),
>
> - and –
>
> **The other Parties hereto** (as defined herein).

**BACKGROUND:**

A.    The Corporation is a mining exploration and development company with a controlling interest in Nui Phao Mining Joint Venture Company which holds the Nui Phao tungsten/fluorspar polymetallic project ("**Nui Phao Project**") in Vietnam.

B.    The Corporation received a proposal from Dragon Capital Management Limited ("**DCML**"), as agent and manager of VEIL, Vietnam Growth Fund Limited ("**VGFL**") and Vietnam Dragon Fund Limited ("**VDFL**") (VEIL, VGFL and VDFL are hereinafter referred to collectively as the "**Dragon Funds**"), and entered into discussions which culminated in receipt of the Offer (as defined herein).

C.    After concluding that the Offer is fair to the Corporation's shareholders, from a financial point of view, and is in the best interests of the Corporation and its shareholders, the board of directors of the Corporation (the "**Board**") desires that VEIL directly or through a direct or indirect subsidiary (the "**Acquisition Company**") make an offer to purchase all of the issued and outstanding common shares in the capital of the Corporation (the "**Shares**") to all of the holders of Shares (the "**Shareholders**") and to all of the holders of other rights and securities entitling the beneficiary or holder thereof to receive or acquire Shares or securities convertible, exercisable or exchangeable for Shares other than Options (as hereinafter defined).

D.    VEIL and the Acquisition Company are prepared to make or cause an offer to purchase all of the issued and outstanding Shares to be made, subject to the terms and conditions of this Agreement.

E.    DCML is a party to this Agreement for the purpose of providing a covenant to cause the Dragon Funds to complete the transactions set out herein.

- 2 -

**AGREEMENT:**

**IN CONSIDERATION** of the covenants and agreements herein contained, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), DCML, the Dragon Funds and the Corporation covenant and agree as follows:

## ARTICLE 1
## INTERPRETATION

1.1    **Defined Terms.** In this Agreement, unless otherwise indicated or the context requires otherwise, the following terms shall have the meanings set forth below:

"**Acquisition Company**" has the meaning ascribed thereto in the recitals to this Agreement.

"**Acquisition Proposal**" means the submission or initiation of any inquiries, proposals or offers by any Person (other than the Offeror) with respect to (i) any merger, amalgamation, arrangement, share exchange, take-over bid, recapitalization, liquidation, dissolution, reorganization, consolidation, business combination or any similar transaction involving the Corporation or any of its Subsidiaries; (ii) the acquisition in any manner, directly or indirectly, by any Person (or group of Persons acting jointly or in concert) of material assets of the Corporation or any of its Subsidiaries (or any lease, long-term supply agreement or other arrangement having a similar economic effect to the purchase or sale of assets) out of the ordinary course of business; (iii) the acquisition in any manner, directly or indirectly, by any Person (or group of Persons acting jointly or in concert) of beneficial or registered ownership of any Shares or Other Securities which could have the effect of such Person (or group of Persons acting jointly or in concert) acquiring or beneficially owning or exercising control or direction over (in a single transaction or a series of related transactions) more than 20% of the issued and outstanding Shares (calculated on a fully diluted basis); or (iv) any sale of treasury shares of the Corporation or of any Subsidiary or securities convertible, exercisable or exchangeable for such treasury shares which exceed 20% of the issued and outstanding shares (calculated on a fully diluted basis) in a single transaction or a series of related transactions.

"**Advisor**" means CIBC World Markets Inc.

"**affiliate**" means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person, and includes any Person in like relation to an affiliate. A Person shall be deemed to control another Person if such first Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; and the term "**controlled**" shall have a similar meaning.

"**Board**" means the board of directors of the Corporation, as defined in the recitals to this Agreement.

"**Business Day**" means any day, other than a day that is a Saturday, a Sunday or a statutory holiday in Toronto, Canada or Hanoi, Vietnam.

- 3 -

"**CBCA**" means the *Canada Business Corporations Act*, as amended.

"**Compulsory Acquisition**" has the meaning given to that term in Section 2.9.

"**Corporation**" means Tiberon Minerals Ltd., as defined in the recitals to this Agreement.

"**Credit Arrangements**" means any banking and financing facilities granted to the Nui Phao Project or to the Corporation or to its Subsidiaries by third party lenders.

"**DCML**" has the meaning ascribed thereto in the recitals to this Agreement.

"**Directors' Circular**" means the circular of the directors of the Corporation relating to the Offer, as amended from time to time.

"**Disclosure Letter**" means the letter from the Corporation to the Offeror dated the date hereof disclosing certain information regarding the Corporation and its Subsidiaries.

"**Dragon Funds**" means VEIL, VGFL and VDFL collectively, as defined in the recitals to this Agreement.

"**Environmental Law**" means any requirement pursuant to Law relating to the protection of human health, safety or the environment or to emissions, discharges or Releases of pollutants, contaminants, or chemicals, or industrial, toxic or hazardous substances or Hazardous Materials or wastes, into the environment (including structures, ambient air, soil, water, (including oceans, lakes, rivers, streams, groundwater and surface water), wetlands, land or subsurface strata), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or Hazardous Materials or wastes, including petroleum and petroleum products and by-products.

"**fully diluted basis**" means, with respect to the number of outstanding Shares at any time, the number of Shares that would be outstanding if all Other Securities were exercised.

"**GAAP**" means generally accepted accounting principles, and in respect of the financial statement of a particular entity, for example, means the generally accepted accounting principles in the jurisdiction in which the entity is incorporated or, if unincorporated, the jurisdiction in which the entity is organized.

"**Governmental Entity**" means (a) any multinational, federal, provincial, state, regional, municipal, local or other government, governmental or public department, central bank, securities regulator, stock exchange, court, tribunal, arbitral body, commission, board, bureau or agency, domestic or foreign; (b) any subdivision, agent, commission, board, or authority of any of the foregoing; (c) any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing or (d) any self regulatory agencies or organizations.

- 4 -

"**Hazardous Material**" means any chemicals or other materials or substances that are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "pollutants", "contaminants", or words of similar import under any Environmental Law, including petroleum and petroleum products and by-products and radioactive materials (including naturally occurring radioactive materials); and any other chemical, material or substance, the presence of or exposure to which is prohibited, limited or regulated by any Governmental Entities or regulatory authority under any Environmental Law.

"**Hedging Arrangements**" means any rate swap transactions, basis swaps, forward rate transactions, commodity swaps, commodity options, equity or equity index swaps, equity or equity index options, bond options, interest rate options, foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, hedging transactions or any other similar financial instruments or transactions (including any option with respect to any of such transactions) or any combination of such financial instruments or transactions.

"**Laws**" means all laws, by-laws, statutes, rules, regulations, orders, rulings, ordinances, codes, judgements, decrees and the terms and conditions of any grant of approval, permission, authority, permits or licence of any Governmental Entity (including any stock exchange), and the term "applicable" with respect to such Laws and in a context that refers to one or more Parties, means such Laws as are applicable to such Party or its business, undertaking, property, assets, interests or securities and emanate from a Person having jurisdiction over the Party or Parties or its or their business, undertaking, property or securities.

"**Lien**" means any lien, mortgage, charge, hypothec, pledge, security interest, prior assignment, option, warrant, lease, sublease, right to possession, encumbrance, claim, right or restriction which affects, by way of a conflicting ownership interest or otherwise, the right, title or interest in or to any particular property.

"**Mining Rights**" means the mining licences and permits necessary to carry on the business now being conducted by the Corporation.

"**material adverse effect**" means, when used in connection with the Corporation, any change, effect, event, occurrence, circumstance, or state of facts that separately or taken together with any other change, effect, event, occurrence, circumstance or state of facts, is or would reasonably be expected to be material and adverse to the business, operations, assets, prospects or financial condition of the Corporation and its Subsidiaries, taken as a whole, and includes any change, effect, event, occurrence, circumstance or state of facts that would prevent, make illegal or materially delay or interfere with completion of the Offer in accordance with this Agreement, other than any change, effect, event or occurrence, circumstance or state of facts relating to the global economy or securities markets in general or resulting from changes in the price of tungsten, bismuth, fluorspar, copper and gold, or relating to changes in currency exchange rates.

"**Offer**" has the meaning ascribed thereto in Section 2.1.

- 5 -

"**Offer Date**" means the date that the Offeror begins mailing the Offer Documents to the Shareholders and Securityholders.

"**Offer Documents**" means, collectively, the Offer and the take-over bid circular, the letter of transmittal and the notice of guaranteed delivery relating to the Offer, as amended from time to time.

"**Offeror**" means VEIL together with the Acquisition Company, if applicable.

"**Offtake Agreements**" refers to offtake agreements with Osram Sylvania, Sidech S.A. and CMC Cometals all as described in the Corporation's Annual Information Form for 2005.

"**Options**" means the options to purchase Shares outstanding as of the date hereof as set out in the Disclosure Letter.

"**Other Securities**" means all Options and other rights and securities entitling the beneficiary or holder thereof to receive or acquire Shares or securities convertible, exercisable or exchangeable for Shares.

"**Parties**" means the Corporation, DCML and the Dragon Funds; and "**Party**" means any of them.

"**Person**" is to be interpreted broadly and includes an individual, partnership, association, limited liability company, joint venture, trust, body corporate, trustee, executor, administrator, legal representative, government (including any Governmental Entity) or any other entity, whether or not having legal status.

"**Release**" means any actual or threatened release, spill, effluent, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the environment or any structure.

"**Regulatory Approvals**" means those sanctions, rulings, consents, orders, exemptions, permits and other approvals (including the lapse, without objection, of a prescribed time under a statute or regulation that states that a transaction may be implemented if a prescribed time lapses following the giving of notice without an objection being made) of Governmental Entities, required to consummate the Offer and the other transactions contemplated hereby.

"**Returns**" means all reports, estimates, declarations of estimated tax, information statements and returns relating to, or required to be filed in connection with, any Taxes.

"**Securityholders**" means the holders of the Other Securities.

"**Shareholders**" means the holders of the Shares, as defined in the recitals to this Agreement.

"**Shares**" means the common shares in the capital of the Corporation, as defined in the recitals to this Agreement.

- 6 -

"**Stock Option Plan**" means the amended stock option plan of the Corporation approved by the directors of the Corporation on March 8, 2006 and by the shareholders of the Corporation on May 10, 2006.

"**Subsequent Acquisition Transaction**" means the acquisition of the issued and outstanding Shares not deposited under the Offer pursuant to an amalgamation, statutory arrangement, share consolidation, capital reorganization or other transaction involving the Corporation and the Offeror or an affiliate of the Offeror.

"**subsidiary**" means with respect to any specified Person: (i) any corporation, association or other business entity controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person (or a combination thereof); and (ii) any partnership (a) the sole general partner or the managing general partner of which is such Person or a subsidiary of such Person or (b) the only general partners of which are that Person or one or more subsidiaries of that Person (or any combination thereof).

"**Subsidiary**" means a subsidiary of the Corporation, whether direct or indirect, and any other entities, including any partnerships or joint ventures (either a joint venture entity or a contractual joint venture) including Nui Phao Mining Joint Venture Company, in which the Corporation has any interest, whether direct or indirect.

"**Superior Proposal**" means an unsolicited bona fide written Acquisition Proposal that did not result from a breach of this Agreement from a Person subsequent to the date hereof (i) to purchase or otherwise acquire, directly or indirectly, by means of a merger, take-over bid, amalgamation, plan of arrangement, business combination or similar transaction, all of the Shares and offering or making available to all Shareholders the same consideration in form and amount per Share to be purchased or otherwise acquired; (ii) which complies with all applicable Laws; (iii) that is not subject to a financing contingency and in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full for all Shares; (iv) that is not subject to any due diligence and/or access condition which would allow access to the books, records, personnel or properties of the Corporation beyond 11:00 a.m. (Toronto time) on the fourth (4th) day after which access is first given to the Person making the Acquisition Proposal; and (v) that the Board has determined in good faith (after consultation with its Advisors and with its outside legal counsel) is reasonably capable of completion without undue delay taking into account all legal, financial, regulatory and other aspects of such Acquisition Proposal and the person making such Acquisition Proposal and such Acquisition Proposal would, if consummated in accordance with its terms (but not assuming away any risk of non-completion), result in a transaction more favourable financially to the Shareholders than the Offer (including any adjustment to the terms and conditions of the Offer proposed by Buyer pursuant to Section 3.3)).

"**Take-up Date**" means the first date upon which Shares are taken up under the Offer.

"**Tax Laws**" means any requirement pursuant to Law relating to Taxes, including the *Income Tax Act* (Canada), as amended.

- 7 -

"**Taxes**" means all taxes, however denominated (including any interest, penalties or other additions that may become payable in respect thereof) imposed by any Governmental Entity, which taxes shall include all income or profits taxes (including federal, provincial and state income taxes), capital taxes, payroll and employee withholding taxes, employment insurance, social insurance taxes (including Canada Pension Plan payments), sales and use taxes, goods and services taxes, *ad valorem* taxes, excise taxes, franchise taxes, gross receipts taxes, business license taxes, occupation taxes, health taxes, real and personal property taxes, stamp taxes, environmental taxes, transfer taxes, workers' compensation and other governmental charges and other obligations of the same or of a similar nature to any of the foregoing, which the Corporation or any Subsidiary is directly or indirectly required to pay, withhold or collect.

"**TSX**" means the Toronto Stock Exchange.

References in this Agreement to "including" mean "including, without limitation". Further capitalized terms used in this Agreement and not defined above shall have the meanings given in the body of this Agreement.

**1.2    Headings and References.**    The division of this Agreement into Articles and Sections, the insertion of headings, and the provision of any table of contents are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. Unless the context requires otherwise, references in this Agreement to Articles, Sections or Schedules are to Articles, Sections or Schedules of this Agreement.

**1.3    Number and Gender.**    Unless the context requires otherwise, words importing the singular include the plural and *vice versa* and words importing gender include all genders.

**1.4    Statute References.** Any reference in this Agreement to any statute or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such statute or section as amended, restated or re-enacted from time to time.

**1.5    Currency.**    Except as expressly indicated otherwise, all sums of money referred to in this Agreement are expressed and shall be payable in Canadian dollars.  All payments shall be in immediately available funds.

**ARTICLE 2**
**THE OFFER**

**2.1    Obligation to Make Offer.**    Subject to Section 2.3 and the other terms and conditions of this Agreement, the Offeror shall make, as soon as practicable after the date hereof, and in any event not later than 11:59 p.m. (Toronto time) on the date that is ten (10) Business Days after the date of this Agreement, an offer (which, as may be amended or extended in accordance with the terms of this Agreement and applicable Laws, is referred to herein as the "**Offer**") to purchase all of the issued and outstanding Shares (including all Shares which may become issued and outstanding pursuant to the exercise of Other Securities, other than Options) except Shares owned by the Offeror or by any of its affiliates or any funds managed by DCML (collectively, the "**Offeror Shares**") on the basis of $3.65 cash for each Share.

**2.2    Timing of Offer**.  The Offeror shall cause the Offer to be made in accordance with all applicable Laws and subject to the conditions set forth in Schedule A hereto.  The Offer shall

- 8 -

expire no earlier than 5:00 p.m. (Toronto time) on the 36th day after the Offer Date (or if such date is not a Business Day, the next Business Day), provided that the Offer may be extended one or more times, at the sole discretion of the Offeror, to a date or dates no later than 90 days after the Offer Date if the conditions set forth in Schedule A are not satisfied or waived at the date and time at which the Offer otherwise expires (such time, as extended, the "**Expiry Time**"). Subject to the satisfaction or waiver of the conditions set forth in Schedule A, the Offeror shall accept for payment and pay for all Shares validly deposited (and not properly withdrawn) pursuant to the Offer (such date, the "**Take-up Date**") on or before the later of (i) the tenth day following the date on which the conditions set forth in Schedule A are satisfied, and (ii) the first day on which the Offeror is duly authorized under applicable Laws to accept for payment and pay for such Shares. The Offeror shall use all reasonable commercial efforts to consummate the Offer, subject only to the terms and conditions thereof, of this Agreement and of applicable Laws.

**2.3    Conditions Precedent.** The obligation of the Offeror to make the Offer shall be conditional upon the following:

(a)    no event shall have occurred or circumstance shall exist which would make it impossible to satisfy one or more of the conditions to the Offer described in Schedule A;

(b)    each of the representations and warranties of the Corporation which are set out herein shall be true and correct in all material respects at the date that the Offer is made, the Corporation shall have complied in all material respects with each of its covenants and obligations set out in this Agreement, and there shall not have occurred any fact or circumstances that could reasonably be expected to have a material adverse effect on the Corporation and the Offeror shall have received a written certificate of the chief executive officer and chief financial officer of the Corporation (in each case without personal liability) addressed to the Offeror as of the date of the Offer certifying same;

(c)    the Board shall not have withdrawn, modified or changed any of the recommendations or determinations set forth in Section 2.4;

(d)    the directors and officers of the Corporation, as shareholders of the Corporation, will each have entered into a lock-up agreement (collectively, the "**Lock-up Agreements**") with the Offeror (in substantially the form attached hereto as Schedule B), pursuant to which such parties will have agreed to tender and not withdraw the Shares owned by them (representing at least 10% of the Shares) to the Offer;

(e)    the Board shall have prepared and approved in final form, printed for distribution to Shareholders and delivered to the Offeror in Toronto, Ontario a sufficient quantity of commercial copies of the Directors' Circular contemplated by Section 2.5 by 12:00 noon (Toronto time) on the 9th Business Day after the date of this Agreement;

(f)    the Corporation shall have complied with Section 2.7; and

- 9 -

     (g)   the obligations of the Offeror hereunder shall not have been terminated pursuant to Section 8.2.

The foregoing conditions in this Section 2.3 are for the exclusive benefit of the Offeror and may be waived by the Offeror, in whole or in part, in its sole discretion. For greater certainty, the waiver of any condition set out in this Section 2.3 shall not constitute a waiver of any condition, of the same or different nature, set out in Schedule A. Provided that for greater certainty the Offeror shall be responsible for any filings and documents required in order to comply with Ontario Securities Commission Rule 61-501 or similar requirements under applicable Laws and that efforts required to so comply shall not form a condition precedent to the obligation of the Offeror to make the Offer.

**2.4    Corporate Action.**  The Corporation represents and warrants to the Offeror that the Board has received a written opinion from its Advisor that the Offer, if and when made on the terms provided for in this Agreement, is fair from a financial point of view, to all Shareholders (other than the Offeror), and that the Board has unanimously (i) approved the entering into of this Agreement by the Corporation, (ii) determined that the Offer is fair to all Shareholders (other than the Offeror) and the Offer is in the best interests of the Corporation and the Shareholders, and (iii) determined to recommend that the Shareholders (other than the Offeror) accept the Offer.

The Corporation represents and warrants to the Offeror that all members of the Board have advised it that, at the date of this Agreement, they intend to tender the Shares owned by them (including all Shares which may become issued and outstanding pursuant to the exercise of Other Securities, other than Options) to the Offer, and the Corporation will so represent in the Directors' Circular. The Corporation represents and warrants to the Offeror that all members of the Board holding Options have advised it that, at the date of this Agreement, they shall deal with all of their Options in accordance with Section 2.11 of this Agreement and Section 2.4 of the Lock-up Agreement, and they consent to the treatment of all their Options in accordance with Section 2.11 of this Agreement and Section 2.4 of the Lock-Up Agreement.

**2.5    Directors' Circular.**  The Corporation shall co-operate with the Offeror, take all reasonable action to support the Offer and provide the Offeror with a draft copy of the Directors' Circular to be mailed to Shareholders prior to the mailing thereof, on a confidential basis, and shall provide the Offeror and its counsel with a reasonable opportunity to review and provide any comments thereon. The Directors' Circular shall be delivered to the Offeror for mailing with the Offer Documents. The Corporation shall file the Directors' Circular on a timely basis with all applicable Regulatory Authorities. The Directors' Circular will set forth, among other things, the determinations and recommendations of the Board and the opinion described in Section 2.4. The Directors' Circular, when filed with the Regulatory Authorities and mailed to the Shareholders, shall contain all information which is required to be included therein in accordance with all applicable Laws, and shall in all material respects comply with the requirements of all applicable Laws.

**2.6    Offer Documents.**  The Offeror shall provide the Corporation with a draft copy of the Offer Documents to be mailed to Shareholders, prior to the mailing thereof, on a confidential basis, and shall provide the Corporation and its counsel with a reasonable opportunity to review and provide comments thereon. The Corporation will use its best efforts to assist, and to co-operate with, the Offeror in preparing and sending the Offer Documents to the Shareholders, including by providing the Offeror with such information regarding the

- 10 -

Corporation and its Subsidiaries as the Offeror may require to complete the Offer Documents. The Offeror shall file the Offer Documents on a timely basis with the Regulatory Authorities. The Offer Documents, when filed with the Regulatory Authorities and mailed to the Shareholders, shall contain all information which is required to be included therein in accordance with any applicable Laws, and shall in all material respects comply with the requirements of applicable Laws. The terms of the Offer shall be in accordance with the provisions of this Agreement.

**2.7     Lists of Shareholders and Securityholders.** The Corporation shall promptly, and in any event within two (2) Business Days of the date of this Agreement, provide the Offeror with lists (in paper and electronic form) of the registered Shareholders and of the Securityholders, including the names, addresses and numbers of Shares or Other Securities held by all Shareholders and Securityholders, and shall provide, or shall cause its transfer agent to provide, updated lists of such Shareholders and Securityholders from time to time on request (and no later than two (2) Business Days prior to the Offer Date). The Corporation will provide such assistance as the Offeror or its professional advisors may reasonably request, including communicating the Offer and any amendments and supplements thereto to the Shareholders and Securityholders (including participating with the Offeror in joint investor presentations) and promptly providing: (i) to the extent known by the Corporation, lists of the beneficial Shareholders; and (ii) mailing labels for Shareholders and Securityholders.

**2.8     Corporate Co-operation.** The Corporation shall make, as soon as practicable, such enquiries as the Corporation's legal counsel shall advise are necessary to determine, to the extent practical, the number of Shareholders and Securityholders in the United States in order to confirm the availability of exemptions for the Offer from the U.S. laws respecting tender offers. The Corporation will make, as soon as practicable, such enquiries as are necessary to determine, to the extent practical, the number of Shareholders and Securityholders in the Province of Quebec.

**2.9     Subsequent Transaction.** If, within 120 days after the date of the Offer, the Offer has been accepted by holders of not less than 90% of the outstanding Shares as at the Expiry Time, the Offeror may, to the extent possible, acquire (a "**Compulsory Acquisition**") the remainder of the Shares from those Shareholders who have not accepted the Offer pursuant to Section 206 of the CBCA. If that statutory right of acquisition is not available or the Offeror chooses not to avail itself of such statutory right of acquisition, the Offeror will use its commercially reasonable efforts to pursue other means of acquiring the remaining Shares not tendered to the Offer. The Corporation agrees that, in the event the Offeror takes up and pays for Shares under the Offer representing at least a simple majority of the outstanding Shares, it will assist the Offeror in connection with any proposed Subsequent Acquisition Transaction, provided that the consideration per Share offered in connection with the Subsequent Acquisition Transaction is at least equivalent in value to the consideration per Share offered under the Offer.

**2.10     Directors.** The Corporation represents and warrants to the Offeror that the Board has determined unanimously to permit the Offeror to elect or appoint all of the directors of the Corporation promptly after the Offeror takes up and pays for Shares pursuant to the Offer, which together with the Offeror Shares constitute at least a majority of the issued and outstanding Shares calculated on a fully diluted basis without the necessity of a meeting of Shareholders. In addition, the Corporation represents and warrants that each of the directors

- 11 -

of the Subsidiaries of the Corporation has agreed to resign as a director promptly after the Offeror takes up and pays for at least a majority of the issued and outstanding Shares calculated on a fully diluted basis pursuant to the Offer, if so requested by the Offeror.

**2.11    Options.**  Subject to receipt of all necessary Regulatory Approvals, the Corporation shall be permitted to pay to those Option Holders who elect to exercise the Cashless Alternative referred to in Section 7 of the Stock Option Plan an amount equal to the amount by which $3.65 exceeds the exercise price for the relevant Options.  The Corporation agrees to use its best efforts to encourage all Persons holding Options to either (a) exercise their Options prior to the expiry of the Offer and to deposit all Shares issued in connection therewith to the Offer, or (b) elect to exercise the Cashless Alternative with respect to their Options on the Take-up Date and to receive payment from the Corporation equal to the cash difference between the exercise price and $3.65.  The Board shall not, prior to completion of the Offer, grant any additional Other Securities (including Options) to any Person.

**2.12    Solicitation of Acceptances of Offer.**  The Offeror will have the right to appoint a dealer manager in connection with the Offer and to solicit acceptances of the Offer.  If appointed, the dealer manager will be authorised to form a soliciting dealer group comprised of members of the Investment Dealers Association of Canada and of the stock exchanges in Canada and the United States to solicit acceptances of the Offer.

### ARTICLE 3
### COVENANTS OF THE CORPORATION

**3.1    Ordinary Course of Business.**  The Corporation covenants and agrees that, prior to the earlier of the termination of this Agreement and the appointment or election to the Board of the persons designated by the Offeror pursuant to Section 2.10, except as set out in the Disclosure Letter or unless the Offeror shall otherwise agree in writing or as otherwise expressly contemplated or permitted by this Agreement:

(a)    the Corporation shall, and shall cause each of its Subsidiaries to, conduct its and their respective businesses only in, and not take any action except in, the usual, ordinary and regular course of business and consistent with past practice;

(b)    the Corporation shall not, by itself or by its Subsidiaries, directly or indirectly, do or permit to occur any of the following:

(i)    issue, sell, pledge, lease, dispose of, encumber or agree to issue, sell, pledge, lease, dispose of or encumber (or permit any of its Subsidiaries to issue, sell, pledge, lease, dispose of, or encumber or agree to issue, sell, pledge, lease, dispose of or encumber):

(A)    any additional shares of, or any options, warrants, calls, conversion privileges or any other rights or securities of any kind entitling the beneficiary or holder thereof to receive or acquire shares or other ownership interests of, the Corporation or any of its Subsidiaries (other than pursuant to the exercise of Options as contemplated in this Agreement); or

- 12 -

    (B)    any material assets or property of the Corporation or any of its Subsidiaries;

(ii)    amend or propose to amend its articles, by-laws or other constating documents or those of any of its Subsidiaries;

(iii)    split, combine or reclassify any Shares, or declare, set aside or pay any dividends or other distributions payable in cash, stock, property or otherwise with respect to the Shares or the shares of any of the Subsidiaries;

(iv)    redeem, purchase or offer to purchase (or permit any of its Subsidiaries to redeem, purchase or offer to purchase) any shares or other securities of the Corporation or any of its Subsidiaries, including under any normal course issuer bid;

(v)    reorganize, amalgamate, merge or otherwise continue the Corporation or any of its Subsidiaries with any other Person whatsoever;

(vi)    acquire or agree to acquire (by merger, amalgamation, arrangement, acquisition of stock or assets or otherwise) any Person or business whatsoever (including any division) or acquire or agree to acquire any material assets;

(vii)    enter into, amend, modify or terminate any agreement, contract or licence that is material to the business of the Corporation and its Subsidiaries, and in particular, any Offtake Agreements or Credit Arrangements or any similar agreement, contract or licence;

(viii)    amend, modify or terminate the Mining Rights;

(ix)    enter into, amend or terminate any Hedging Arrangements;

(x)    except in the usual, ordinary and regular course of business and consistent with past practice, satisfy any material claims or liabilities (except such as have been reserved against in the Financial Statements), or relinquish any material contractual rights;

(xi)    incur or commit to incur any indebtedness for borrowed money or issue any debt securities, except in the ordinary course of business pursuant to the existing credit facilities of the Corporation and its Subsidiaries and consistent with past practice;

(xii)    commit to any capital expenditures other than as set out in the Disclosure Letter;

- 13 -

(xiii)    change or modify in any way the mining plan or methods at the Nui Phao disclosed to the Offeror;

(xiv)    change or deviate in any material way from the plans outlined in the Technical Report for the Nui Phao Project filed on SEDAR dated September, 2006 and disclosed to the Offeror;

(xv)    grant any participation or earn-in rights in connection with the Mining Rights;

(xvi)    appoint or permit the appointment of a liquidator, receiver or trustee in bankruptcy for the Corporation or its Subsidiaries or in respect of the assets of the Corporation or its Subsidiaries; or

(xvii)    permit the making of an order by a court for the winding-up or dissolution of the Corporation or its Subsidiaries;

(c)    the Corporation shall not, and shall cause each of its Subsidiaries to not take any action other than in the ordinary, regular and usual course of business and consistent with past practice (none of which actions shall be unreasonable or unusual) or as set out in the Disclosure Letter with respect to the entering into or modifying of any employment, severance, collective bargaining or similar agreements, policies or arrangements or with respect to the grant of any bonuses, salary increases, pension benefits, retirement allowances, deferred compensation, severance or termination pay or any other form of compensation or profit sharing or with respect to any increase of benefits payable to directors, officers, employees, consultants or agents of the Corporation or any Subsidiaries otherwise than pursuant to agreements, policies or arrangements in effect (without amendment) on the date hereof and which have been disclosed to the Offeror;

(d)    the Corporation shall use its best efforts to cause its (and its Subsidiaries') current insurance (or re-insurance) policies not to be cancelled or terminated or any of the coverage thereunder to lapse, unless simultaneously with such termination, cancellation or lapse, replacement policies underwritten by insurance and re-insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies for substantially similar premiums are in full force and effect;

(e)    the Corporation shall:

(i)    use its best efforts, and shall cause each of its Subsidiaries to use their best efforts, to preserve intact its and its Subsidiaries' respective business organizations, assets, goodwill, mining leases, licences and permits and tax accounts, to keep available the services of its officers and employees as a group and to maintain satisfactory relationships with suppliers, agents, distributors, customers

- 14 -

and others having business relationships with it or its Subsidiaries;

(ii)  not take any action that would result in, or permit, the unrestricted and unencumbered cash balances and short term or money market investments of the Corporation to be less than an aggregate of Thirty Million Dollars in United States currency (US$30,000,000);

(iii)  not take any action, or permit any of its Subsidiaries to take any action, that would render, or that reasonably may be expected to render, any representation or warranty made by it in this Agreement untrue in any material respect at any time prior to the Expiry Time;

(iv)  use its best efforts to enable the conditions set forth in Section 2.3 and Schedule A to be satisfied;

(v)  promptly notify the Offeror orally and in writing of any material change in its or any of its Subsidiaries' businesses, properties, assets, financial condition or prospects and of any material governmental or third party complaints, claims, investigations or hearings (or communications indicating that the same may be contemplated);

(vi)  confer on a regular basis with the Offeror with respect to operational matters and promptly notify the Offeror orally and in writing of any material change in the normal course or operation of its or any of its Subsidiaries' businesses or properties, and of any material governmental or third party complaints, investigations (including any accident or incident investigations by any Governmental Entity) or hearings (or communications indicating that the same may be contemplated);

(vii)  not settle or compromise any claim brought by any present, former or purported holder of any securities of the Corporation in connection with the transactions contemplated by this Agreement or the Offer without the prior written consent of the Offeror;

(viii)  furnish the Offeror with a copy of all information and reports (including financial statements, officer's certificates, operating statements, reports of operations and operating plans) prepared by or on behalf of the Corporation and provided to directors and management of the Corporation after the date hereof;

(ix)  continue to file all documents or information required to be filed by the Corporation under applicable Laws, in accordance

- 15 -

with applicable Laws and all such documents or information, when filed, shall comply as to form in all material respects with the requirements of applicable Laws; and

(x)    make or cooperate as necessary in the preparation of any exemption applications or orders and any other documents deemed reasonably necessary by the Corporation or the Offeror, acting reasonably, to discharge their respective obligations under applicable Laws in connection with the Offer or as required under applicable Laws in order to permit the making or consummation of the Offer.

(f)    the Corporation shall not enter into or modify any contract, agreement, commitment or arrangement with respect to any of the matters set forth in this Section 3.1, other than as contemplated by this Section 3.1, without the prior written consent of the Offeror.

**3.2    Non-Solicitation.**

(a)    The Corporation shall not, shall cause its Subsidiaries not to, and shall ensure that their respective officers, directors, employees, advisers, representatives or agents do not, directly or indirectly:

(i)    solicit, initiate or encourage any Acquisition Proposal;

(ii)    subject to this Section 3.2 and Section 3.3, and except as may be required by applicable Laws, provide any material non-public information to, continue or participate in any discussions or negotiations relating to any such transactions in respect of an Acquisition Proposal;

(iii)    withdraw the Board's recommendation of the Offer or change such recommendation in a manner adverse to the Offeror; or

(iv)    approve or recommend any Acquisition Proposal or enter into any agreement related to any Acquisition Proposal,

provided that, if the provisions of this Section 3.2 are complied with, nothing contained in this Section 3.2 shall prevent the Board from responding to and recommending to the Shareholders a Superior Proposal. Any good faith determination to be made by the Board in connection with an Acquisition Proposal or Superior Proposal shall only be made after consultation with its Advisors and receipt by the Board of a written opinion of outside counsel or advice of outside counsel that is reflected in the minutes of the Board to the effect that the Board is required to consider such Acquisition Proposal or to furnish information concerning the Corporation in connection therewith in order to discharge its fiduciary duties under applicable Laws.

(b)    The Corporation shall immediately cease and cause to be terminated any existing solicitations, encouragements, activities, discussions or negotiations with any parties (other than the Offeror) with respect to any Acquisition

- 16 -

Proposal. Subject to this Section, the Corporation shall not allow, provide or permit access to any information regarding the Corporation except to the Offeror and its representatives and advisors. The Corporation agrees not to release or permit the release of any third party from or waive any confidentiality or standstill agreement to which the Corporation and such third party are a party (except to allow such third party to make an Acquisition Proposal to the Corporation) provided that the foregoing shall not prevent the Corporation from considering and accepting any new Acquisition Proposal that is determined to be a Superior Proposal that might be made by any such third party, provided that the remaining provisions of this Agreement are complied with.

(c)     Subject to this Section, the Corporation shall immediately cease to provide any party, other than DCML and the Offeror with access to material non-public information concerning the Corporation and the Subsidiary with respect to any Acquisition Proposal.

(d)     The Corporation shall notify the Offeror promptly (but in no event later than 24 hours) after receipt by the Corporation of any Acquisition Proposal or any request for non-public information relating to the Corporation or its Subsidiaries known by the Corporation to be in connection with any Acquisition Proposal or for access to the properties, books or records of the Corporation or any Subsidiary by any person or entity that may be considering making, or that has made, an Acquisition Proposal. Such notice to the Offeror shall be made at first orally and then promptly in writing, and shall include a description of the terms and conditions of, and the identity of the person making such proposal, inquiry or contact and shall include a copy of any such proposal, inquiry or offer or any amendment to any of the foregoing and any other details, as the Offeror may reasonably request. The Corporation shall keep the Offeror promptly and fully informed of the status, including any change to the material terms, of any such proposal, inquiry, offer or request, or any amendment to the foregoing, and will respond promptly to all reasonable inquiries by the Offeror with respect thereto.

(e)     If the Corporation receives a request for material non-public information from a party who proposes to the Corporation a *bona fide* written Acquisition Proposal and the Board determines that such proposal is a Superior Proposal pursuant to this Section 3.2 and determines in good faith that the failure to provide such party with access to such information would be inconsistent with its fiduciary duties, then, and only in such case, the Corporation may, subject to the execution of a confidentiality agreement substantially in the form of the confidentiality agreement (**"Confidentiality Agreement"**) between the Corporation and DCML, acting on behalf of the Dragon Funds, executed October 25, 2006, provide such party with access to information regarding the Corporation. The Corporation shall provide a copy of any such confidentiality agreement to the Offeror forthwith following its execution and provide to the Offeror copies of all information provided to such party forthwith after the information is provided to such party.

(f)     The Corporation shall ensure that the directors, officers, employees, representatives and agents of the Corporation and its Subsidiaries, and the associates or affiliates of such Persons (including any investment banker, other advisor or representative retained by the Corporation), are aware of the provisions of this Section 3.2, and the Corporation shall be responsible for any breach of this Section by any of the foregoing.

(g)     The Corporation shall not accept, approve or recommend, nor enter into any discussions, negotiations or agreement (other than a Confidentiality Agreement contemplated by Section 3.2(e)) relating to, an Acquisition Proposal unless:

    (i)     the Acquisition Proposal constitutes a Superior Proposal;

    (ii)    the Corporation has compiled with Sections 3.2(a) through 3.2(g), inclusive;

    (iii)   the Corporation has complied with Section 3.3;

    (iv)    the Corporation concurrently terminates this Agreement pursuant to Section 8.2; and

    (v)     the Corporation has previously, or concurrently will have, paid to the Offeror the compensation fee contemplated by Section 4.1.

**3.3    Right of First Refusal.**  The Corporation will not enter into any agreement (other than a confidentiality agreement substantially in the form of the Confidentiality Agreement) regarding a Superior Proposal (the **"Proposed Agreement"**) without providing the Offeror with an opportunity of not less than five (5) Business Days to amend this Agreement to provide at least as favourable terms than those to be included in the Proposed Agreement. In particular, the Corporation covenants to provide the Offeror with all material terms and conditions of any Proposed Agreement at least five (5) Business Days prior to its proposed execution by the Corporation. The Board will review any offer by the Offeror to amend the terms of this Agreement in good faith in order to determine, acting reasonably and exercising its fiduciary duties, whether the Offeror's offer, upon acceptance by the Corporation, would result in the Proposed Agreement not being a Superior Proposal. If the Board so determines, it will enter into an amended agreement with the Offeror reflecting the Offeror's amended proposal. In the event the Offeror agrees to amend this Agreement as provided above within such five (5) Business Day period, the Corporation covenants to not enter into the Proposed Agreement. Nothing in this Agreement shall prevent the Board of Directors from responding through a directors' circular or otherwise as required by applicable Laws to an Acquisition Proposal that it determines is not a Superior Proposal.

**3.4    Co-operation.**  The Offeror and the Corporation shall use reasonable commercial efforts to co-operate in satisfying the conditions to the Offer in Section 2.3 and Schedule A. Further, the Corporation will co-operate with the Offeror in structuring the Offer and the acquisition of the issued and outstanding Shares in manner that is efficient to the Offeror and its affiliates, provided that no such co-operation shall be required where such structuring shall

- 18 -

have a material adverse effect on the Corporation or cause any breach of or default under this Agreement by the Corporation.

**3.5    Regulatory Approvals.**    Without limiting the generality of the foregoing, the Corporation will use its best efforts to assist, and to co-operate with, the Offeror in preparing and sending any materials required to be sent to obtain all Regulatory Approvals, including by providing the Offeror with such information regarding the Corporation and its Subsidiaries as the Offeror may require and by assisting the Offeror in negotiating with Governmental Entities and structuring the transactions contemplated herein as necessary to obtain such Regulatory Approvals.    For greater certainty, the Corporation will use its best efforts to prepare and send any materials required to be sent by the Corporation to obtain all Regulatory Approvals, and shall co-ordinate with the Offeror in so doing, and shall provide the Offeror with drafts of all such materials for its review and comment.

**3.6    Other Filings.**    Without limiting the generality of the foregoing, the Corporation will provide the Offeror with drafts of any applications, returns or other filings to be made by the Corporation to any Governmental Entity from the date hereof until the termination of this Agreement.    The Corporation shall provide the Offeror with a reasonable amount of time to review any such applications, returns or filings, and shall incorporate any reasonable comments made by the Offeror into the final version filed with any Governmental Entity.

**3.7    Market Purchases.**    The Corporation agrees that the Offeror may, during the period the Offer is outstanding, purchase Shares through the facilities of the TSX or such other methods that are not prohibited by applicable Laws.

**3.8    Lock-up Agreements.**    The Corporation shall deliver, the Lock-up Agreements duly executed in the manner contemplated in Section 2.3(e).    The Directors' Circular shall reflect the execution and delivery of such Lock-up Agreements and the agreement of the Shareholders party to the Lock-up Agreements to tender their respective Shares to the Offer.

**3.9    Transition.**    The Corporation shall, on or before the date that the Offeror first takes up Shares under the Offer, furnish promptly to the Offeror all information concerning the business, properties and personnel of the Corporation as the Offeror may reasonably request and review with the Offeror's authorized personnel such of the records, systems and processes as would be necessary to allow the Offeror's authorized personnel to assume the continuing operations of the Corporation.

**ARTICLE 4**
**FEES AND OTHER ARRANGEMENTS**

**4.1    Compensation Fee.**    Provided that there is no breach or non-performance by the Offeror, in any material respect, of any of its respective representations, warranties or covenants made in this Agreement, if at any time after the execution of this Agreement:

(a)    the Board has withdrawn or, in any manner adverse to the Offeror, redefined, modified or changed any of its recommendations or determinations referred to in Section 2.4 prior to the Expiry Time, or has resolved to do so;

(b)    if any *bona fide* Acquisition Proposal for the Shares is publicly announced or commenced and the Board shall have failed to reaffirm and maintain its recommendation of the Offer to Shareholders by press release within four (4)

- 19 -

Business Days after the announcement or commencement of any such Acquisition Proposal;

(c)    the Board shall have recommended that Shareholders deposit their Shares under, vote in favour of, or otherwise accept, an Acquisition Proposal;

(d)    the Corporation shall have entered into an agreement (other than a confidentiality agreement substantially in the form of the Confidentiality Agreement) with any Person with respect to an Acquisition Proposal prior to the Expiry Time; or

(e)    an Acquisition Proposal is publicly announced, proposed, offered or made to the Shareholders or to the Corporation prior to the Expiry Time and upon the Expiry Time the Minimum Condition (as defined in Schedule A) of the Offer has not been satisfied, and, on or prior to the date which is 12 months subsequent to the Expiry Time, the Corporation shall have entered into any agreement in respect of an Acquisition Proposal;

the Corporation shall pay to the Offeror a cash fee (the "**Compensation Fee**") the amount of ten million U.S. dollars (US$10,000,000).  Such payment shall be made by wire transfer in immediately available funds to an account designated by the Offeror, within five (5) Business Day after the first to occur of the events described above.  The Corporation shall only be obligated to make one payment pursuant to this Section 4.1.  Payment of such fees shall be considered to be a genuine pre-estimate of the Offeror's liquidated damages to compensate the Offeror for its direct and indirect costs of negotiating with the Corporation, settling this Agreement and making the Offer, and is not considered a penalty.  For greater certainty, the obligations of the Corporation under this Section 4.1 shall survive the termination of this Agreement, regardless of circumstances thereof.

**4.2    Fees and Expenses.**  Subject to Section 4.1, all fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such fees, costs or expenses.

## ARTICLE 5
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF
## DCML AND THE DRAGON FUNDS

Each of DCML and the Dragon Funds hereby represents and warrants to the Corporation, and covenants with the Corporation, in each case jointly and severally, as follows:

**5.1    Organization and Qualification.**  Each of DCML and the Dragon Funds is a company duly organized and validly existing under the Laws of its jurisdiction of incorporation.

**5.2    Authority Relative to this Agreement.**  Each of DCML and the Dragon Funds has the requisite corporate power and authority to enter into this Agreement and to carry out its respective obligations hereunder.  The execution and delivery of this Agreement by the Offeror and the consummation of the transactions contemplated hereby and by each of DCML and the Dragon Funds have been duly authorized by each of DCML and the Dragon Funds, and no other corporate proceedings on the part of it is or will be necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement has been duly

- 20 -

executed and delivered by each of DCML and the Dragon Funds or and constitutes a legal, valid and binding obligation of each of DCML and the Dragon Funds enforceable against each of DCML and the Dragon Funds in accordance with its terms, subject to the qualification that such enforceability may be limited by bankruptcy, insolvency, reorganization or other Laws of general application relating to or affecting the rights of creditors, and equitable remedies, including specific performance, are discretionary and may not necessarily be ordered by a court.

5.3    **No Violations.**  Neither the execution nor the delivery of this Agreement by each of DCML and the Dragon Funds, nor the consummation of the transactions contemplated hereby and by the Offer, nor compliance by them with any of the provisions hereof, will:

       (a)    violate, conflict with, or result in a breach of any provision of, require any consent, approval or notice under, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under any of the terms, conditions or provisions of the constating documents (including the articles and by-laws) of DCML and the Dragon Funds; or

       (b)    subject to compliance with the statutes and regulations referred to in Schedule C, violate any judgment, ruling, order, writ, injunction, determination, award, decree or Law applicable to DCML and the Dragon Funds,

except for such violations, conflicts, breaches, defaults, terminations, accelerations or creations of Liens which, or any consents, approvals or notices which if not given or received, would not prevent or materially delay the ability of the Offeror to consummate the transactions contemplated hereby.

5.4    **Regulatory Approvals.**  Other than the Regulatory Approvals set out in Schedule C:

       (a)    there is no legal impediment to the Offeror's consummation of the transactions contemplated by this Agreement; and

       (b)    no filing or registration with, or authorization, consent or approval of, any Governmental Entity is required of the Offeror in connection with the making or the consummation of this Agreement or the Offer, except for such filings or registrations which, if not made, or for such authorizations, consents or approvals which, if not received, would not prevent or materially delay the ability of the Offeror to consummate the transactions contemplated hereby.

5.5    **Compliance with Law.**  Each of DCML and the Dragon Funds has complied with and is in compliance with all Laws applicable to it, except where such non-compliance would not, considered individually or in the aggregate, prevent or materially delay the ability of the Offeror to make the Offer or consummate the transactions contemplated hereby.

5.6    **Directors' and Officers' Insurance.**  From and after the Effective Time, the Offeror agrees that for the period from the Expiry Time until six years after the Expiry Time, the Offeror will cause the Corporation or any successor to the Corporation to use commercially reasonable efforts to maintain (subject to the limitation below) the Corporation's current directors' and officers' insurance policy or a policy reasonably equivalent subject in either case to terms and conditions no less advantageous to the directors and officers of the Corporation than those contained in the policy in effect on the date hereof, for all present and

- 21 -

former directors and officers of the Corporation and its Subsidiaries, covering claims made prior to or within six years after the Expiry Time. Alternatively, the Offeror may purchase as an extension to the Corporation's current insurance policies, pre-paid non-cancellable run-off directors' and officers' liability insurance providing such coverage for such Persons on terms comparable to those contained in the Corporation's current insurance policies; provided that in either event the aggregate premiums for such coverage shall not exceed $75,000. From and after the Effective Time, the Offeror shall cause the Corporation (or its successor) to, indemnify the current and former directors and officers of the Corporation and its Subsidiaries to the fullest extent to which the Corporation is permitted to indemnify such officers and directors under its charter, by-laws, contracts of indemnity and under applicable Laws.

**5.7    Funds Available.**  The Offeror shall at the time of entering into this Agreement and at the time of making the Offer pursuant to Section 2.1 have sufficient funds or financing available to make the Offer on the terms as contemplated hereby and to purchase all of the Shares of the Corporation pursuant to the Offer and to pay all of its related fees and expenses.

**5.8    Filings.**  The Offeror will deliver to the Corporation, as soon as they become available, true and complete copies of any documents or information required to be filed by the Offeror with any Regulatory Authorities in respect of the Offer subsequent to the date hereof.   As of their respective dates, such documents and information (excluding any information therein provided by the Corporation, as to which the Offeror makes no representation) will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they are made, not misleading and will comply in all material respects with all requirements of applicable Laws.

**5.9    Litigation, etc.**  There are no actions, suits or proceedings pending or, to the knowledge of each of DCML or the Dragon Funds, threatened directly or indirectly affecting DCML or the Dragon Funds at law or in equity or before or by any Governmental Entity, which action, suit or proceeding involves a reasonable possibility of any judgment against or liability of the Offeror which, if successful, would prevent or materially delay the ability of the Offeror to consummate the transactions contemplated by this Agreement or the Offer. The Offeror is not subject, directly or indirectly, to any outstanding order, writ, injunction or decree that has had or is reasonably likely to prevent or materially delay the ability of the Offeror to consummate the transactions contemplated by this Agreement or the Offer.

**5.10    Performance Covenants.**  Each of the Dragon Funds covenants and agrees to be jointly liable with the Acquisition Company for, the due and punctual performance of each and every obligation of the Acquisition Company arising under this Agreement. DCML covenants and agrees to cause each Dragon Fund to perform its obligations under this Agreement and to cause each Dragon Fund to complete the transactions set out herein.

**ARTICLE 6**
**REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE**
**CORPORATION**

The Corporation hereby represents and warrants to the Offeror, and covenants with the Offeror, as follows:

- 22 -

**6.1    Organization and Qualification.**  The Corporation and each of its Subsidiaries that is a corporate entity is a corporation duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation, and each Subsidiary that is not a corporate entity is also duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation.  The Corporation and each of its Subsidiaries has the requisite power and authority to carry on its business as it is now being conducted.  The Corporation is, and its Subsidiaries are, duly registered to do business, and each is in good standing, in each jurisdiction in which the character of its properties, owned or leased, or the nature of its activities makes such registration necessary, except where the failure to be so registered or in good standing would not have a material adverse effect on the Corporation and its Subsidiaries, taken as a whole, or on the ability of the Corporation to consummate the transactions contemplated hereby.  Copies of the constating documents (including articles, by-laws and shareholder agreements) of the Corporation and its Subsidiaries together with all amendments (collectively, the **"Corporation Governing Documents"**) heretofore delivered to the Offeror are accurate and complete and have not been amended or superseded.

**6.2    Authority Relative to this Agreement.**  The Corporation has the requisite corporate power and authority to enter into this Agreement and to carry out its obligations hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by the Board, and no other corporate proceedings on the part of the Corporation are necessary to authorize this Agreement and the transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Corporation and constitutes a legal, valid and binding obligation of the Corporation enforceable against the Corporation in accordance with its terms, subject to the qualification that such enforceability may be limited by bankruptcy, insolvency, reorganization or other Laws of general application relating to or affecting the rights of creditors, and equitable remedies, including specific performance, are discretionary and may not necessarily be ordered by a court.

**6.3    No Violations.**  Neither the execution nor the delivery of this Agreement by the Corporation, nor the consummation of the transactions contemplated hereby (including the Offer), nor compliance by the Corporation with any of the provisions hereof will:

(a)    violate, conflict with, or result in a breach of any provision of, require any consent, approval or notice under, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) or result in a right of termination or acceleration under, or result in the creation of any Lien upon any of the properties or assets of the Corporation or any of its Subsidiaries or under any of the terms, conditions or provisions of their respective constating documents or any resolution of their directors or Shareholders (or approvals of those exercising similar functions) or any material note, bond, mortgage, indenture, loan agreement, deed of trust, agreement, lien, contract, licence or other instrument or obligation to which the Corporation or any of its Subsidiaries is a party, or to which any of them or any of their respective properties or assets may be subject, or by which the Corporation or any of its Subsidiaries is bound; or

(b)    subject to compliance with the statutes and regulations referred to in Schedule C, violate any judgment, ruling, order, writ, injunction, determination, award, decree or Law applicable to the Corporation or any of its Subsidiaries or any

- 23 -

of their respective properties or assets, (except, in the case of this Section 6.3(b) or (a) above, for such violations, conflicts, breaches, defaults, terminations, accelerations or creations of Liens which, or any consents, approvals or notices which if not given or received, would not have any material adverse effect on the Corporation and its Subsidiaries taken as a whole or on the ability of the Corporation to consummate the transactions contemplated hereby); or

(c)    cause the suspension or revocation of any authorization, consent, approval or license currently in effect which would have a material adverse effect on the Corporation and its Subsidiaries taken as a whole.

6.4    **Regulatory Approvals.** Other than the Regulatory Approvals set out in Schedule C:

(a)    there is no legal impediment to the Corporation's consummation of the transactions contemplated by this Agreement; and

(b)    no filing or registration with, or authorization, consent or approval of, any Governmental Entity is required of the Corporation in connection with the making or the consummation of this Agreement or the Offer , the taking up and payment for Shares deposited thereunder and any Compulsory Acquisition or Subsequent Acquisition Transaction carried out in accordance with applicable laws, except for such filings or registrations which, if not made, or for such authorizations, consents or approvals which, if not received, would not have a material adverse effect on the Corporation and its Subsidiaries, taken as a whole, or on the ability of the Corporation to consummate the transactions contemplated hereby.

6.5    **Compliance with Law and Constating Documents.**  The Corporation and each of its Subsidiaries has complied with and is in compliance with all Laws applicable to the operation of its business, its constating documents and the resolutions of its directors and shareholders (or of those exercising similar functions) except where such non-compliance would not, considered individually or in the aggregate, have a material adverse effect on the Corporation and its Subsidiaries, taken as a whole, or on the ability of the Corporation to consummate the transactions contemplated hereby.

6.6    **Capitalization.**  As at the date hereof, the authorized share capital of the Corporation consists of an unlimited number of common shares, an unlimited number of first preferred shares and an unlimited number of second preferred shares, of which as of the date hereof, 75,519,695 Shares are issued and outstanding, and there are no other shares of any class or series outstanding.  Schedule D sets out a description of all outstanding Other Securities, including the number of Shares that may be issued upon exercise of such Other Securities and Options and the exercise prices therefor.  Except as set forth above and in Schedule D, there are no options, warrants or other rights, agreements or commitments of any character whatsoever requiring the issuance, sale or transfer by the Corporation of any shares of the Corporation (including the Shares) or any securities convertible into, or exchangeable or exercisable for, or otherwise evidencing a right to acquire, any shares of the Corporation (including the Shares).  All outstanding Shares have been duly authorized and validly issued, are fully paid and non-assessable and are not subject to, nor were they issued in violation of, any pre-emptive rights, and all Shares issuable upon the exercise of outstanding Options, in

- 24 -

accordance with their terms, will be duly authorized and validly issued, fully paid and non-assessable and will not be subject to any pre-emptive rights. There are no outstanding stock appreciation rights, phantom equity or similar rights, agreements, arrangements or commitments based on the book value, income or any other attribute of the Corporation or a Subsidiary.

**6.7    Subsidiaries.**  All interests held by the Corporation, directly or indirectly, in all Subsidiaries are disclosed in Schedule D and, where the Corporation does not hold directly or indirectly 100% of the ownership interests of a Subsidiary, the holder of any remaining ownership interests (and the percentage held) is also indicated. All of the outstanding shares of capital stock and other ownership interests in the Subsidiaries are duly authorized, validly issued, fully paid and non-assessable, and all such shares and ownership interests indicated as being owned directly or indirectly by the Corporation or its Subsidiaries are owned free and clear of all Liens, and there are no outstanding options, rights, entitlements, understandings or commitments (contingent or otherwise) regarding the right to acquire any such shares of capital stock or other ownership interests (from the Corporation, from treasury or otherwise) in, or material assets or properties of, any Subsidiary.

**6.8    Reporting Issuer Status.**  The Corporation is a "reporting issuer" in compliance with all applicable Laws in the provinces of British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, New Brunswick, Nova Scotia, Prince Edward Island and Newfoundland. The Shares are only listed on, and the Corporation is in compliance with the rules, requirements and policies of, the TSX.

**6.9    Filings.**  All documents and information filed with Regulatory Authorities by the Corporation since December 31, 2005 (the "**Public Documents**"), as of their respective dates, complied in all material respects with all applicable Laws and at the time filed did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The Corporation shall deliver to the Offeror as soon as they become available, true and complete copies of any documents or information required to be filed by it with any Regulatory Authorities subsequent to the date hereof. Between the date hereof and the Expiry Time, the Corporation will also deliver to the Offeror as soon as they become available copies of any press releases issued by the Corporation.

**6.10    Financial Statements.**  The audited consolidated financial statements of the Corporation and its Subsidiaries, including balance sheets, statements of operations and statements of cash flow, for the fiscal period ended December 31, 2005 and all other financial statements contained in the Public Documents (collectively, the "**Financial Statements**"), were prepared in accordance with GAAP and present fairly, in all material respects, the financial position of the Corporation and its Subsidiaries, the results of their operations and cash flow for such period and as at such date. Except as disclosed in the Financial Statements, the Corporation and its Subsidiaries had no material liabilities (whether actual, accrued or contingent, and whether direct or indirect) at such dates. The financial statements of the Corporation and its Subsidiaries to be filed with the Regulatory Authorities subsequent to the date hereof will be prepared in accordance with GAAP and will present fairly the financial position, results of operations and cash flow of the Corporation and its Subsidiaries as of the dates thereof and for the periods indicated therein (subject, in the case of any unaudited interim financial statements, to non-material, customary year-end audit adjustments). Except: (a) as expressly disclosed or reflected in the Financial Statements; and

- 25 -

(b) for liabilities and obligations: (i) incurred in the ordinary course of business and consistent with past practice; or (ii) pursuant to the terms of this Agreement, the Corporation has not incurred any material liabilities of any nature, whether accrued, contingent or otherwise or which would be required by GAAP to be reflected on a consolidated balance sheet of the Corporation. Further, the Corporation has not entered into any Hedging Arrangements.

**6.11    Transaction Fees.** The Corporation has not retained any financial advisor, broker, agent, finder, or paid or agreed to pay any financial advisor, broker, agent, finder on account of this Agreement or any transaction contemplated hereby, except that CIBC World Markets has been retained as the Corporation's financial advisor in connection with certain matters, including the transactions contemplated hereby, and Fraser Milner Casgrain LLP has been retained by the Board as legal counsel. A true and complete copy of the engagement letters between CIBC World Markets and the Corporation has been provided to the Offeror and shall not be amended without the prior consent of the Offeror. The fees and expenses payable by the Corporation to CIBC World Markets and Fraser Milner Casgrain LLP in connection with this Agreement and the transactions contemplated hereby are not expected to exceed $4,000,000 in the aggregate.

**6.12    Absence of Changes.** Since December 31, 2005, and except as has been disclosed in the Public Documents, the Disclosure Letter or contemplated herein:

        (a)     the Corporation and the Subsidiaries have conducted their respective businesses only in the usual, ordinary and normal course and consistent with past practice;

        (b)     no liability or obligation of any nature (whether absolute, accrued, contingent or otherwise) material to the Corporation or any Subsidiary has been incurred other than in the usual, ordinary and normal course of business;

        (c)     there has not been any material adverse change prior to the date hereof in the financial condition, results of operations, prospects, business or property of the Corporation or any Subsidiary;

        (d)     as of the date of this Agreement, there are no confidential material change reports filed with any Regulatory Authority; and

        (e)     no event has occurred which, if it had occurred after the date hereof, would have been prohibited by Section 3.1 without the consent of the Offeror.

**6.13    Books and Records.** Other than as disclosed in the Disclosure Letter, the corporate records and minute books and the other books, records and accounts of the Corporation and each Subsidiary provided to the Offeror for review have been maintained in accordance with all applicable Laws and are complete and accurate in all material respects.

**6.14    Material Agreements.** All agreements, permits, licences, approvals, certificates and other rights and authorizations material to the conduct of the Corporation's and its Subsidiaries' businesses (collectively, the "**Material Agreements**") are disclosed in the Public Documents. The Offeror has been provided with true and complete copies of the Material Agreements or access thereto. The Material Agreements are all the agreements, permits, licences, approvals, certificates and other rights and authorizations necessary to

- 26 -

permit the Corporation and its Subsidiaries to conduct their business as they are now being conducted and as they are proposed to be conducted as described in the Public Documents. Other than as disclosed in the Disclosure Letter, such agreements do not contain any "change of control" provisions which would be triggered or affected by this Agreement or the Offer or the taking of and payment for Shares deposited thereunder or any Subsequent Acquisition Transaction carried out in accordance with applicable laws. All of the Material Agreements are valid and subsisting and neither the Corporation nor its Subsidiaries is in material default under any of the foregoing and there is no pending or, to the knowledge of the Corporation or its Subsidiaries, any threatened cancellation or termination or event, condition or occurrence which after notice or lapse of time, or both, would constitute a default of or under any Material Agreement. All agreements entered into by the Corporation with Persons other than the Offeror regarding the confidentiality of information provided to such Persons or reviewed by such Persons duly restrict the use of such information by such Persons and protect the Corporation's rights and interest in such information.

**6.15    Restrictions on Business Activity.**  Other than as disclosed in the Disclosure Letter, there is no agreement, judgment, injunction, order or decree binding upon the Corporation or any of its Subsidiaries that has or would reasonably be expected to have the effect of prohibiting, restricting or impairing any business practices of the Corporation or any of its Subsidiaries.

**6.16    Title.**  The Corporation and each of its Subsidiaries has good and indefeasible right, title and interest in and to all of its respective properties, assets and interests including those reflected in the Financial Statements and the Public Documents, including all real property and exploration rights, and no such property, asset or interest is subject to any Lien of any kind, whether by law or by equity, except those set out in the Financial Statements and the Disclosure Letter.

**6.17    Employment Arrangements.**  The Disclosure Letter contains a list of the costs that would be incurred by the Corporation upon a change of control of the Corporation in respect of payments to the directors, officers, employees, consultants, contractors and agents of the Corporation and its Subsidiaries and, the costs that would be incurred in the event that the employment of the directors and officers of the Corporation and its Subsidiaries is terminated upon the closing of the Offer. Neither the Corporation nor any Subsidiary is (except as set forth in the Disclosure Letter) or will become a party to any employment agreement or to any written or oral policy, agreement, obligation or understanding (and for greater certainty, to any amendment to any of the foregoing) which contains any specific agreement as to notice of termination or severance pay in lieu thereof or which cannot be terminated without cause upon giving reasonable notice as may be implied by Law, or which creates rights in respect of loss or termination of office or employment in the event the Offer is successful (other than with the prior written consent of the Offeror).

**6.18    Employee Benefit Plans.**  Except as disclosed in the Disclosure Letter:

(a)    the Corporation and its Subsidiaries do not have any defined benefit plans or any other employee benefit plans and have not made any promises with respect to increased benefits under such plans, and all contributions (including premiums) required by Law or contract to have been made or accrued, under or with respect to such plans, have been paid or accrued, as the case may be; and

- 27 -

    (b)    the Corporation and its Subsidiaries have no stock option plans (other than the Stock Option Plan) or other compensation arrangements and are not otherwise parties to any agreement to provide any shares of the Corporation or any Subsidiary (including the Shares) or other securities (including any options, warrants or securities convertible into or exchangeable or exercisable for, or otherwise evidencing a right to acquire shares of the Corporation or any Subsidiary, including the Shares). The Corporation and its Subsidiaries do not have any plan to establish, modify or enter into any of the foregoing (other than in respect of the Options as contemplated hereby).

**6.19    Employee Arrangement Compliance.**    Except in each case as would not, individually or in the aggregate, have a material adverse effect on the Corporation and its Subsidiaries, taken as a whole:

    (a)    the Corporation and each of its Subsidiaries have performed, in all material respects, all obligations required to be performed by it under, is not in material default or violation of, and has no knowledge of any material default or violation by any other party to, any agreements, plans, arrangements or other matters contemplated by Sections 6.17 or 6.18, this Section 6.19 or Section 6.20 (the "**Employee Arrangements**") and each Employee Arrangement has been established and maintained in all material respects in accordance with its terms and in compliance with all applicable Laws;

    (b)    as at the date hereof, there are no actions, suits or claims pending, or, to the knowledge of the Corporation, threatened or reasonably anticipated (other than routine claims for benefits) against any Employee Arrangement or against the assets of any Employee Arrangement;

    (c)    each Employee Arrangement can be amended, terminated or otherwise discontinued after the Expiry Time in accordance with its terms, without liability to the Offeror, the Corporation or any of its affiliates (other than reasonable expenses typically incurred in a termination event); and

    (d)    all contributions due from the Corporation or any of its affiliates with respect to any Employee Arrangements have been accrued on the books and records of the Corporation in accordance with the terms of such Employee Arrangements and in accordance with GAAP.

The Corporation has provided adequate accruals in the Financial Statements (or such amounts are fully funded), for all pension or other employee benefit obligations of the Corporation and its Subsidiaries arising under or relating to each of the pension or retirement income plans or other employee benefit plans or agreements or policies maintained by or directly or indirectly binding on the Corporation or any Subsidiary.

**6.20    Labour and Employee Relations.**    Except as disclosed in the Public Disclosure:

    (a)    there exists no collective bargaining agreement or other labour union contract or work councils applicable to any employees of the Corporation or any Subsidiary and no such agreement or contract has been directly or indirectly requested by any employee or group of employees of the Corporation or any

- 28 -

Subsidiary, nor, other than set out in the Disclosure Letter, has there been any discussion with respect thereto by management of the Corporation or any Subsidiary with any of its employees;

(b)     neither the Corporation nor any Subsidiary has received any written notification of any unfair labour practice charges or complaints pending before any agency having jurisdiction thereof nor are there any current union representation claims involving any employees of the Corporation or any Subsidiary (except for any charges, complaints or claims that are usual course matters and which would not have a material adverse effect on the Corporation or on the ability of the Corporation to consummate the transactions contemplated hereby) and the Corporation is not aware of any such threatened charges or claims;

(c)     the Corporation is not aware of any union organizing activities or proceedings involving, or any pending petitions for recognition of, a labour union or association as the exclusive bargaining agent for, or where the purpose is to organize, any group or groups of its, or any Subsidiary's, employees. There is not currently pending, with regard to any of its facilities or projects, any proceeding before the applicable agency wherein any labour organization is seeking representation of any employees of the Corporation or any Subsidiary;

(d)     the Corporation is not aware of any strikes, work stoppages, work slowdowns or lockouts nor of any threats thereof, by or with respect to any of its, or any Subsidiary's, employees;

(e)     neither the Corporation nor any of its Subsidiaries is a party to any contract or agreement where the primary purpose is the sourcing of labour; and

(f)     as of the date hereof, neither Corporation nor any Subsidiary is a member of any employer, management, trade or industry association with which the Corporation or a Subsidiary may be required to bargain collectively on, or contribute in respect of any, terms and conditions of employment affecting the employees of the Corporation or any Subsidiary.

**6.21    Effect of Transaction.**  The execution of this Agreement and the consummation of the transactions contemplated hereby (including the Offer, the taking up and payment for Shares deposited thereunder and any Compulsory Acquisition or Subsequent Acquisition Transaction carried out in accordance with applicable Law) will not (either alone or upon the occurrence of any additional or subsequent events) constitute an event under any Employee Arrangement, trust or loan that will or may result in any payment, acceleration, forgiveness of indebtedness, vesting (other than full vesting as a result of partial or full plan termination of a qualified plan), distribution, increase in benefits or obligation to fund benefits with respect to any employee of the Corporation or any of its affiliates (other than in respect of the Options as contemplated hereby).  There is no contract, plan or arrangement (written or otherwise) covering any employee or former employee of the Corporation or any of its affiliates that, individually or collectively, could give rise to the payment of any amount that would not be deductible pursuant to applicable Tax Laws.

- 29 -

**6.22    Litigation and Statutory Compliance.**  Except as disclosed in the Disclosure Letter, there are no actions, assessments, audits, grievances, claims, suits or proceedings pending or, to the knowledge of the Corporation, threatened which directly or indirectly adversely affect or could adversely affect the Corporation or any Subsidiary at law or in equity or before or by any Governmental Entity, which action, assessment, audit, grievance, claim, suit or proceeding involves a reasonable possibility of any judgment against or liability of the Corporation or any Subsidiary which, if successful, could have a material adverse effect on the Corporation and its Subsidiaries, taken as a whole, or on the ability of the Corporation or the Offeror to consummate the transactions contemplated by this Agreement or the Offer. Neither the Corporation nor any Subsidiary is subject, directly or indirectly, to any outstanding order, writ, injunction or decree that has had or is reasonably likely to have a material adverse effect on the Corporation and its Subsidiaries, taken as a whole, or on the ability of the Corporation or the Offeror to consummate the transactions contemplated by this Agreement or the Offer.

**6.23    Environmental.**  The Corporation, its Subsidiaries and its and their assets, and the ownership, operation, development, maintenance and use thereof, are, in all material respects, in compliance with all Environmental Laws and with all terms and conditions of all Environmental Permits, and all prior instances of non-compliance have been fully and finally resolved to the satisfaction of all Governmental Entities with jurisdiction over such matters. Further, except as disclosed in the Disclosure Letter:

    (a)    neither the Corporation nor any of its Subsidiaries has received (or is otherwise aware of) any demand or notice with respect to the material breach of any Environmental Law or any order or directive which relates to environmental matters and which requires any material work, repairs, construction, or capital expenditures, applicable to the Corporation or any of its Subsidiaries or any of their business undertakings, including any regulations respecting the use, discharge, storage, treatment, transportation, or disposition of environmental contaminants;

    (b)    there are no claims, investigations or inquiries pending or, to the Corporation's knowledge (after due inquiry), threatened against the Corporation or any of its Subsidiaries (or naming the Corporation or any of its Subsidiaries as a potentially responsible party) based on non-compliance with any Environmental Law at any of the properties or facilities currently or formerly owned, leased or operated by the Corporation or any of its Subsidiaries;

    (c)    neither the Corporation nor any of its Subsidiaries has any material contingent liability in connection with: (A) the Release or threatened Release into the environment at, beneath or on any property or facility now or previously owned, leased or operated by the Corporation or any of its Subsidiaries; or (B) the storage or disposal of any Hazardous Material;

    (d)    neither the Corporation nor any of its Subsidiaries has received any claim, complaint, notice, letter of violation, inquiry or request for information involving any matter which remains unresolved as of the date hereof with respect to any alleged violation of any Environmental Law or regarding potential liability under any Environmental Law relating to operations or

- 30 -

conditions of any facility or property (including off-site storage or disposal of any Hazardous Material from such facility or property) currently or formerly owned, leased or operated by the Corporation, or any of its Subsidiaries;

(e)     no property now owned, leased or operated by the Corporation or any of its Subsidiaries is listed by any national or provincial authority as requiring investigation, remedial work or rehabilitation;

(f)     neither the Corporation nor any of its Subsidiaries is transporting, has transported or is arranging for the transportation of any Hazardous Material to any location which is listed on any federal, state, provincial or other governmental list or which is the subject of federal, state, provincial, local or other governmental enforcement actions or other investigations that would reasonably be expected to lead to material claims against the Corporation or any of its Subsidiaries for removal or remedial work, contribution for removal or remedial work, damage to natural resources or personal injury;

(g)     neither the Corporation nor any of its Subsidiaries owns or operates any underground storage tanks, treatment, storage or disposal facilities or any solid waste disposal facilities; and

(h)     the Corporation and each of its Subsidiaries have provided the Offeror with all environmental audits, tests, results of investigations and analyses that have been performed with respect to any property or facility currently or formerly owned, leased or operated by the Corporation or any of its Subsidiaries.

All environmental and health and safety permits, licences, approvals, consents, certificates and other authorizations of any kind or nature ("**Environmental Permits**") necessary for the ownership, operation, development, maintenance, or use of any of the assets of the Corporation or its Subsidiaries or otherwise in connection with the business or operations of the Corporation or its Subsidiaries have been obtained and maintained in full force and effect; the Corporation and each of its Subsidiaries have complied with all Environmental Permits in all material respects, and there is no action, investigation or proceeding pending or to the knowledge of the Corporation, threatened regarding any Environmental Permit.

**6.24    Tax Matters**.  Except in each case as would not, individually or in the aggregate, have a material adverse effect on the Corporation and its Subsidiaries, taken as a whole or otherwise as specifically described in the Disclosure Letter:

(a)     The Corporation has filed and has caused each of its Subsidiaries to file in prescribed manner and within prescribed time periods provided by applicable Laws, all Returns required to be filed by the Corporation and each Subsidiary in all relevant jurisdictions and for all fiscal periods ended prior to the Expiry Time. All such Returns are true, complete and correct and disclose all Taxes required to be paid by the Corporation or any Subsidiary as the case may be to the relevant Governmental Authority for the periods to which they relate. All Taxes shown to be payable on all Returns or on subsequent assessments or reassessments with respect thereto and all installments of Taxes due and payable by the Corporation or any Subsidiary have been paid in full on a timely basis and no other Taxes are directly or indirectly payable by the

- 31 -

Corporation or any Subsidiary with respect to items or periods covered by such Returns or will be payable in respect of installments up to and including the Expiry Time.

(b)    The Corporation and its Subsidiaries have paid in full all Taxes due and payable on or before the date hereof, and have provided adequate accruals in the Financial Statements for all Taxes which have accrued but are not due and payable, including income taxes and related deferred taxes, in conformity with GAAP.

(c)    For all periods ending on December 31, 2005 if the Corporation or the Subsidiary was incorporated on such date or the date of incorporation of a particular Subsidiary if such Subsidiary was not incorporated on December 31, 2000, the Corporation has furnished to the Offeror true complete and accurate copies of (A) all Returns and any amendments thereto filed by the Corporation or the Subsidiary with any relevant Governmental Authority, (B) all federal, provincial, national, state or other Tax assessments or reassessments for the corporation and each Subsidiary issued by any Governmental Authority up to and including the Expiry Time, (C) relevant portions of income tax audit reports, statements of deficiencies, closing or other agreements received by the Corporation or its Subsidiaries or on behalf of the Corporation or its Subsidiaries relating to Taxes, (D) all drafts of all federal, provincial and state income and other tax returns of the Corporation and its Subsidiaries which are prepared for filing prior to the Expiry Time, and (E) any Tax rulings received by the Corporation or any Subsidiary or which relate in any way to the Corporation or any Subsidiary.

(d)    Federal, provincial, national, state or other Tax assessments have been issued to the Corporation and to each Subsidiary covering all periods up to and including its fiscal year ended December 31, 2005.

(e)    (A) No deficiencies exist or have been asserted against the Corporation or any Subsidiary with respect to Taxes; (B) neither the Corporation nor any Subsidiary is currently or has in the past been in violation of any applicable thin capitalization rules; (C) neither the Corporation nor any Subsidiary is a party to any action or proceeding for assessment, reassessment or collection of Taxes, nor has any such event been asserted or threatened against the Corporation or any Subsidiary or any of their respective assets; (D) no waiver or extension of any statute of limitations is in effect with respect to Taxes or Returns of the Corporation or any Subsidiary; (E) as at the date hereof, the Returns of the Corporation and its Subsidiaries have never been audited by a Governmental Entity, nor is any such audit in process, pending or threatened; and (F) the Corporation is not aware of any contingent liability of the Corporation or any Subsidiary for Taxes or of any grounds that could support an assessment or reassessment for any Taxes for all periods up to and including the Expiry Time, and neither the Corporation nor any Subsidiary has received any indication from any Governmental Authority that any assessment or reassessment is proposed.

- 32 -

(f)     Neither the Corporation nor any Subsidiary has entered into any transactions (including any acquisition or disposition of assets or the receipt or provision of any services) with a Person with whom it did not deal at arm's length for purposes of applicable Tax Laws where such transactions were not for fair market value consideration and on arm's length terms and conditions.

(g)     All Taxes required to be deducted, withheld or remitted by the Corporation and each of its Subsidiaries under applicable Laws for amounts paid or credited to or for the account or benefit of any Person, including, without limitation, Taxes on payments to any present or former employees, officers or directors or non-residents of Canada, have been duly and timely deducted, withheld and collected and have been duly and timely remitted to the appropriate Governmental Entity.  The Corporation has not received any requirement from any Canadian federal Governmental Authority pursuant to Section 224 of the Tax Act which remains unsatisfied in any respect.

(h)     None of sections 80 to 80.04, both inclusive, of the Tax Act have applied or will apply to the Corporation or to compute any income of a Subsidiary of the Corporation for Canadian tax purposes under the rules which attribute income of a controlled foreign affiliate to a Canadian shareholder at any time up to and including the Expiry Time. The Corporation does not have any unpaid amounts that may be required to be included in income under section 78 of the Tax Act.

(i)     The corporation is a registrant for purposes of the *Excise Tax Act* (Canada) (the "**ETA**"). All input tax credits claimed by the Corporation pursuant to the ETA have been proper, correctly calculated and documented. The Corporation has collected, paid and remitted, or will collect, pay and remit, when due all Taxes, including goods and services and provincial sales taxes, collectible, payable or remittable prior to the Expiry Time.

(j)     The Corporation keeps its books and records in compliance with section 230 of the Tax Act. Each Subsidiary keeps its books and record in compliance with all applicable Laws of any relevant jurisdiction.

**6.25    Insurance.**  Other than as disclosed in the Disclosure Letter, policies of insurance in force as of the date hereof naming the Corporation as an insured adequately cover all risks reasonably and prudently foreseeable in the operation and conduct of the consolidated business of the Corporation as would be customary in respect of the business carried on by the Corporation.  All such policies of insurance shall remain in force and effect and shall not be cancelled or otherwise terminated as a result of the transactions contemplated by this Agreement, including the Offer.

**6.26    Absence of Certain Business Practices.**  Neither the Corporation, any Subsidiary, nor any of their respective directors, officers, employees or agents, nor any other Person acting on their behalf, has, directly or indirectly, within the past three years, given or agreed to give any gift or similar benefit to any customer, supplier, government employee or other Person who is or may be in a position to help or hinder the business of the Corporation or any Subsidiary (or to assist the Corporation or any Subsidiary with any actual or proposed transaction) which: (a) might subject the Corporation or any Subsidiary to any damage or

- 33 -

penalty in any civil, criminal or governmental litigation or proceeding; (b) if not given in the past, might have had a material adverse effect on the Corporation or any Subsidiary; or (c) if not continued in the future, might materially adversely affect the Corporation or any Subsidiary or which might subject the Corporation or any Subsidiary to suit or penalty in a private or governmental litigation or proceeding.

**6.27    Mineral Reserves and Resources.**  The proven and probable mineral reserves and mineral resources for various mineral properties in which the Corporation or its Subsidiaries hold an interest, as set forth in the Public Documents, were prepared in accordance with sound mining, engineering, geoscience and other applicable industry standards and practices, and in accordance with requirements of National Instrument 43-101, *Standards of Disclosure for Mineral Projects* and to the best of the knowledge of the Corporation were, at such date, true and correct in all material respects.

**6.28    Non-Arm's Length Agreements.**  Other than:

      (a)     as referred to in the Public Documents; or

      (b)     as set forth in a list provided to the Offeror in writing, and copies of which were provided to the Offeror,

there are no agreements entered into by the Corporation or its Subsidiaries with any person (other than the Corporation or its Subsidiaries) that is not at "arm's length" with the Corporation (within the meaning of that expression in the *Income Tax Act* (Canada).

**6.29    Accurate Information.**  All data and information provided by the Corporation (or any of its Subsidiaries or its or their agents or representatives) to the Offeror (or its affiliates or its and their agents and representatives) is true and correct in all material respects and does not omit any data or information necessary to make the data and information provided not misleading.  Except for those matters disclosed in this Agreement, including the Disclosure Letter, there are no facts which, if learned by the Offeror, might reasonably be expected to materially diminish the Offeror's evaluation of the value of the Shares or which, if learned by the Offeror, might reasonably be expected to deter the Offeror from completing the transactions contemplated by this Agreement on the terms of this Agreement.

**ARTICLE 7**
**ADDITIONAL AGREEMENTS**

**7.1    Other Filings.**  The Offeror and the Corporation each have filed, or as promptly as practicable hereafter shall prepare and file, any filings required of it under applicable Laws relating to the Offer, the Directors' Circular and the transactions contemplated hereby.

**7.2    Further Assurances.**  Subject to the terms and conditions herein provided and to fiduciary obligations under applicable Law as advised by legal counsel in writing, each of the Parties agrees to use reasonable commercial efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including the Offer, and to co-operate with each other in connection with the foregoing, including using reasonable commercial efforts to:   (a) obtain all necessary consents, approvals and authorizations as are required to be obtained under any federal, provincial or foreign Laws; (b) defend all lawsuits or other legal proceedings challenging this Agreement

- 34 -

or the consummation of the transactions contemplated hereby, including the Offer; (c) cause to be lifted or rescinded any injunction or restraining order or other order adversely affecting the ability of the Parties to consummate the transactions contemplated hereby, including the Offer; (d) effect all necessary registrations and other filings and submissions of information requested by all Governmental Entities; (e) obtain all necessary waivers, consents and approvals from other parties to material agreements, leases and other contracts or agreements (including the agreement of any Persons as may be required pursuant to any agreement, arrangement or understanding relating to the Corporation's operations); and (f) fulfil all conditions and satisfy all provisions of this Agreement and the Offer. For purposes of the foregoing sentence, the obligation of the Corporation and the Offeror to use "reasonable commercial efforts" to obtain waivers, consents and approvals to loan agreements, leases and other contracts shall not include any obligation to agree to an adverse modification of the terms of such documents or to prepay or incur additional obligations to such other parties.

**7.3     Notice of Material Changes, Untruth and Non-Compliance.** From the date hereof until the termination of this Agreement, the Corporation shall immediately notify the Offeror in written form of:

> (a)     any material change (actual, anticipated, contemplated or threatened, financial or otherwise) in the business, affairs, operations, assets, liabilities (contingent or otherwise) or capital of the Corporation or any Subsidiary;

> (b)     any change in or untruth of any representation or warranty given in this Agreement by the Corporation or in the underlying basis thereof (including where such representation or warranty was true as of the date of this Agreement but has ceased to be true); or

> (c)     any covenant or obligation of the Corporation herein which has not or will not be complied with.

The Corporation shall provide the Offeror with reasonable details of the change, untruth or non-compliance. The Corporation shall in good faith discuss with the Offeror any change in circumstances (actual, anticipated, contemplated or threatened, financial or otherwise) which is of such a nature that there may be a reasonable question as to whether notice needs to be given to the Offeror pursuant to this Section 7.3.

- 35 -

**7.4**     In the event that the Offer is not be completed as contemplated at Section 2.2 for any reason ("**Termination**"), each of the Dragon Funds hereby agrees to participate in an aggregate $50,000,000 share offering by the Corporation at a price per Share to be agreed upon in accordance with the rules of the TSX and to enter into a definitive agreement with the Corporation forthwith upon such Termination.

## ARTICLE 8
## TERM, TERMINATION, AMENDMENT AND WAIVER

**8.1     Term.**  This Agreement shall be effective from the date hereof until the earlier of the termination of this Agreement pursuant to Section 8.2 and the appointment or election to the Board of persons designated by the Offeror pursuant to Section 2.10, provided that Sections 4.1 and 8.3 shall survive the termination of this Agreement.

**8.2     Termination.**  This Agreement, other than the provisions set forth in Section 4.1, may be terminated by written notice promptly given to the other Parties, at any time prior to the time the Offeror first takes up and pays for the Shares:

(a)     by the Corporation, if the Offeror has not mailed the Offer to Shareholders on or before 11:59 p.m. (Toronto time) on the date that is ten (10) Business Days after the date of this Agreement in accordance with Section 2.1; or

(b)     by the Offeror, if the conditions set forth in: (i) Section 2.3 have not been satisfied or waived by the Offeror; or (ii) Schedule A have not been satisfied or waived by the Offeror on or before the Expiry Time; or

(c)     by the Corporation, if the Offeror has not taken up and paid for the Shares deposited under the Offer on or before that date which is ninety (90) days following the Offer Date; or

(d)     by the Offeror or the Corporation, if the Offer terminates or expires at the Expiry Time without the Offeror taking up and paying for any of the Shares as a result of any condition set forth in Schedule A not being satisfied and which has not been waived by the Offeror; or

(e)     by the Offeror, in the event that the fees and expenses contemplated in Section 4.1 becomes payable by the Corporation to the Offeror in accordance with the terms thereof; or

(f)     by either the Offeror or the Corporation, in the event that the other of them shall not have complied with or performed, in all material respects, its respective covenants and obligations under this Agreement to be complied with or performed at or prior to the Expiry Time, or any of the representations and warranties of the other of them under this Agreement are not true and correct in all material respects at or prior to the Expiry Time, in which event, if the Corporation is the Party in breach, the fees set forth in Section 4.1 shall become due and payable by the Corporation to the Offeror;

(g)     by the Offeror, if the Board has withdrawn or, in any manner adverse to the Offeror, redefined, modified or changed any of its recommendations or

- 36 -

determinations referred to in Section 2.4 prior to the Expiry Time, or has resolved to do so;

(h)    by the Offeror, if any *bona fide* Acquisition Proposal is publicly announced or commenced and the Board shall have failed to reaffirm and maintain its recommendation of the Offer to the Shareholders by press release within four (4) Business Days after the announcement or commencement of any such Acquisition Proposal;

(i)    by the Offeror, if the Board shall have recommended that Shareholders deposit their Shares under, vote in favour of, or otherwise accept, an Acquisition Proposal;

(j)    by the Offeror, if the Corporation shall have entered into an agreement (other than a confidentiality agreement substantially in the form of the Confidentiality Agreement) with any Person with respect to an Acquisition Proposal prior to the Expiry Time;

(k)    by the Corporation, if it proposes to enter into a definitive agreement with respect to a Superior Proposal in compliance with Section 3.2, provided that the Corporation has previously or concurrently will have paid to the Offeror the compensation fee contemplated by Section 4.1 and further provided that the Corporation has not breached any of its covenants and agreements or obligations in this Agreement; or

(l)    by mutual written consent of the Offeror and the Corporation.

**8.3    Effect of Termination.**  In the event of the termination of this Agreement as provided in Section 8.2, this Agreement shall forthwith become null and void and there shall be no liability on the part of any Party hereunder; provided that nothing contained in this Section 8.3 shall relieve any Party from liability for any breach of any provision of this Agreement except that, if the Corporation pays the fee provided for in Section 4.1, the Corporation shall have no further liability whatsoever to the Offeror under or in connection with this Agreement, including, without limitation, any liability for any breach of any provision of this Agreement by the Corporation.

**8.4    Waiver.**  Any Party may in its sole discretion: (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive compliance with any of the agreements of any other Party or the fulfilment of any conditions to its own obligations contained herein; or (c) waive inaccuracies in any of the representations or warranties of any other Party contained herein or in any document delivered by any other Party; provided, however, that any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

- 37 -

## ARTICLE 9
## GENERAL PROVISIONS

**9.1    Notices.**  Notwithstanding anything to the contrary contained herein, all notices required or permitted hereunder shall be in writing. Any notice to be given hereunder shall be deemed to be properly provided if delivered in any of the following modes:

> (a)    Personally, by delivering the notice to the Party on which it is to be served at that Party's address for notices as set forth in Section 9.2. Personally delivered notices shall be deemed to be received by the addressee when actually delivered as aforesaid; provided that, such delivery shall be during normal business hours on any Business Day. If a notice is not delivered on a Business Day or is delivered after the addressee's normal business hours, such notice shall be deemed to have been received by such Party at the commencement of the addressee's first Business Day next following the time of the delivery;

> (b)    By facsimile (or by any other like method by which a written message may be sent) directed to the Party on which it is to be delivered at that Party's facsimile number as set forth in Section 9.2. A notice so served shall be deemed to be received by the addressee when transmitted by the Party delivering the notice (provided such Party obtains confirmation from its facsimile of successful transmission), if transmitted during the addressee's normal business hours on any Business Day, or at the commencement of the next ensuing Business Day following transmission if such notice is not transmitted on a Business Day or is transmitted after the Party's normal business hours.

**9.2    Addresses for Notices.**  The address and facsimile number for delivery of notices hereunder to each of the Parties shall be as follows:

> (a)    If to the Offeror:
>
> Vietnam Enterprise Investments Limited
> c/o
> 1901 Me Linh Point
> 2 Ngo Duc Ke, District 1
> Ho Chi Minh City, Vietnam
>
> Attention:    John Shrimpton
> Facsimile:     +84 8 823-9366
>
> with a copy to:
>
> Borden Ladner Gervais LLP
> 4400 - 40 King Street West
> Toronto, Ontario  M5H 3Y4
>
> Attention:    F. R. Allen and G. G. Raman
> Facsimile:     (416) 361-7077 and (416) 361-7311

- 38 -

(b)     if to the Corporation:

Tiberon Minerals Ltd.
100 Yonge Street, Suite 1101
Scotia Plaza
Toronto  ON  M5C 2W1

Attention:     Mario Caron, President and CEO
Facsimile:     (416) 214-0091

with a copy to:

Fraser Milner Casgrain LLP
3900 – 100 King Street West
Toronto, ON  M5X 1B2

Attention:     John W. Sabine
Facsimile:     (416) 863-4592

Any Party may change its address for notices by providing notice of such change to the other Parties as provided in Section 9.1 and this Section 9.2.

**9.3     Publicity.**  So long as this Agreement is in effect and except as required by applicable Laws (including the rules, regulations and policies of any applicable stock exchange), each of the Parties promptly shall advise, consult and co-operate with the other Parties prior to issuing, or permitting any of its subsidiaries, directors, officers, employees or agents to issue, any press release or other statement to the media or any third party with respect to this Agreement or the transactions contemplated hereby, including the Offer.

**9.4     Amendment.**  This Agreement may be amended by agreement among the Parties evidenced by an instrument in writing signed by the appropriate officers on behalf of each of the Parties.

**9.5     Assignment.**  Except as expressly permitted by the terms hereof, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties without the prior written consent of the other Parties.

**9.6     Survival of Representations and Warranties.**  The representations, warranties, covenants and agreements made by the Parties herein shall survive the execution of this Agreement until the earlier of the take-up and payment of Shares pursuant to the Offer and a period of six (6) months from the date hereof, and any claim in respect of such representations, warranties, covenants and agreements shall be made within such period.

**9.7     Time is of the Essence.**  Time shall be of the essence of this Agreement in all respects.

**9.8     Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law. Any provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective to

- 39 -

the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.9    Miscellaneous.**  This Agreement: (a) constitutes, together with the Confidentiality Agreement and the Lock-up Agreements, the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Parties, or any of them, with respect to the subject matter hereof; (b) shall be binding upon and enure to the benefit of the Parties and their respective successors and permitted assigns and is not intended to confer upon any other Person any rights or remedies hereunder; and (c) may be executed in two or more counterparts which together shall constitute a single agreement.  The Parties shall be entitled to rely upon delivery of an executed facsimile copy of this Agreement, and such facsimile copy shall be legally effective to create a valid and binding agreement between and among the Parties.

[execution page follows]

- 40 -

**9.10    Applicable Law and Enforcement.**  This Agreement shall be governed, including as to validity, interpretation and effect, by the Laws of the Province of Ontario and the Laws of Canada applicable therein.    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the Province of Ontario having jurisdiction this being in addition to any other remedy to which they are entitled at law or in equity, subject to the provisions of this Agreement.

**IN  WITNESS  WHEREOF** the Parties have caused this Agreement to be duly executed as of the date and year first above written.

**VIETNAM ENTERPRISE
INVESTMENTS LIMITED**

By:    _____

Name: John Shrimpton
Title:   Director


**VIETNAM GROWTH FUND LIMITED**

By:    _____

Name: John Shrimpton
Title:   Director


**VIETNAM DRAGON FUND LIMITED**

By:    _____

Name: John Shrimpton
Title:   Director


**DRAGON CAPITAL MANAGEMENT
LIMITED**

By:    _____

Name: John Shrimpton
Title:   Director


**TIBERON MINERALS LTD.**

By:    _____

Name: Mario Caron
Title:   President and Chief
          Executive Officer

EXECUTION COPY

THIS IS SCHEDULE A ATTACHED TO AND MADE PART OF THE PRE-ACQUISITION AGREEMENT DATED AS OF THE 18TH DAY OF DECEMBER, 2006

## CONDITIONS TO THE OFFER

Capitalized terms used in this Schedule have the meanings set forth in the Agreement.

Notwithstanding any other provision of the Offer, the Offeror shall not be required to accept for payment, purchase or pay for any Shares tendered, and may terminate the Offer or amend the Offer to postpone the acceptance for payment of, and payment for, Shares tendered, unless all of the following conditions are satisfied or waived by the Offeror prior to the Expiry Time:

(a)     prior to the Expiry Time and at the time the Offeror first takes up Shares under the Offer, there shall have been validly deposited under the Offer and not withdrawn a number of Shares which together with the Offeror Shares constitutes at least 66 2/3% of the outstanding Shares (calculated on a fully-diluted basis) (the "**Minimum Condition**");

(b)     the Commissioner of Competition shall have issued an advance ruling certificate pursuant to Section 102 of the *Competition Act* (Canada) or alternatively, any applicable waiting period related to merger pre-notification under Part IX of the *Competition Act* (Canada) shall have expired and the Commissioner shall have advised (which advice will not have been rescinded or amended) to the satisfaction of the Offeror, in its sole judgment, that the Commissioner does not intend to oppose the acquisition contemplated by the Offer if such advice is considered by the Offeror, in its sole judgment, to be desirable;

(c)     the Minister designated by the Governor in Council as the Minister for the purposes of the *Investment Canada Act* (Canada) shall have given notice pursuant to section 21, 22 or 23 of that Act that the Minister is, or is deemed to be, satisfied that the investment by the Offeror contemplated by the Offer is likely to be of net benefit to Canada, if required by the Offeror, acting reasonably;

(d)     (i) all consents, waivers, permits, orders and approvals (including Regulatory Approvals) of any Governmental Entity which the Offeror, in its sole judgement, views as being necessary to complete the Offer, a Compulsory Acquisition or a Subsequent Acquisition Transaction, shall have been obtained on terms reasonably satisfactory to the Offeror, in its reasonable judgement, and (ii) all waiting periods in connection with, or required to permit, the completion of the Offer which the Offeror, in its sole judgement, views as being necessary to complete the Offer, shall have terminated or expired, as the case may be, without the applicable regulators indicating the intent to oppose the completion of the Offer;

(e)     (i) no act, action, suit or proceeding shall have been threatened or taken before or by any domestic or foreign court, tribunal, arbitrator or Governmental Entity or by an elected or appointed public official or private

- 2 -

Person (including, without limitation, any individual, corporation, firm, group or other entity) in Canada or elsewhere, whether or not having the force of Law, and (ii) no Law shall have been proposed, enacted, promulgated or applied, in the case of (i) and (ii) above,

    (i)    to cease trade, enjoin, prohibit or impose material limitations or conditions on the purchase by or the sale to the Offeror of the Shares or the right of the Offeror to own or exercise full rights of ownership of the Shares or which would prevent the completion of the acquisition by the Offeror of any Shares pursuant to the Offer, a Compulsory Acquisition or a Subsequent Acquisition Transaction, and no judgement, ruling or order shall have been issued to that effect by any such court or Governmental Entity or official, including pursuant to proceedings taken by a private Person (including without limitation any individual, corporation, firm or other entity), or

    (ii)    which, if the Offer were consummated, could, in the Offeror's sole judgement, acting reasonably, result in a material adverse effect on the Corporation and its Subsidiaries, taken as a whole;

(f)    at the time the Offeror proposes to take up and pay for the Shares, there does not exist any prohibition at Law against the Offeror taking up and paying for any Shares deposited under the Offer or completing a Compulsory Acquisition or a Subsequent Acquisition Transaction;

(g)    there does not exist and has not occurred (or, if there does exist or shall have previously occurred, there shall not have been disclosed, generally or to the Offeror in writing on or before the date of this Agreement and the Offeror shall not have discovered) any change (or any condition, event or development involving a prospective change) in the business, operations, prospects or liabilities of the Corporation or its Subsidiaries which constitutes or may constitute a material adverse effect on the Corporation and its Subsidiaries, taken as a whole;

(h)    there shall not have occurred any actual change (including a proposal to amend any applicable Tax Laws or any publicly stated administrative practice regarding taxes) that directly or indirectly increases materially the effective tax liability of, or in respect of the proceeds from, the sale or other disposition of any assets or securities owned by, the Corporation or any of its Subsidiaries, or that has or may have a material adverse effect on the Corporation and its Subsidiaries taken as a whole, with respect to the regulatory regime applicable to their respective business and operation or with respect to taking up and paying for Shares deposited under the Offer or completing a Compulsory Acquisition or Subsequent Acquisition Transaction;

- 3 -

(i)    the Offeror shall not have become aware of any untrue statement of a material fact, or an omission to state a material fact that is required to be stated or that is necessary to make a statement not misleading in light of the circumstances in which it was made and at the date it was made (after giving effect to all subsequent filings in relation to all matters covered in earlier filings) in any of the Public Documents;

(j)    neither the Corporation nor any of its Subsidiaries is in default under, and there exists no event, condition or occurrence which, after notice or lapse of time or both, (i) would constitute such a default under any material contract or agreement to which it is a party, (ii) would give rise to any right of termination or acceleration of material indebtedness of the Corporation or any of its Subsidiaries or cause any such indebtedness to come due before its stated maturity or cause any available credit of the Corporation or any of its Subsidiaries to cease to be available, or (iii) would result in the imposition of any material Lien upon any of the Corporation's assets or the assets of any of its Subsidiaries, except where in the sole judgment of the Offeror, acting reasonably, such event, condition or occurrence would not cause a material adverse effect on the Corporation and its Subsidiaries, taken as a whole;

(k)    neither the Corporation nor any of its Subsidiaries shall have entered into, terminated, amended or varied the terms of any material credit facility or banking arrangement, including the Credit Arrangements;

(l)    all Options and Other Securities shall have been repurchased and terminated and be null and void upon expiry of the Offer as contemplated by the Agreement or shall otherwise be resolved in a manner satisfactory to the Offeror, in its sole discretion, acting reasonably;

(m)    there will not have occurred any event, action, state, condition, act of war or terrorism, or major financial occurrence of national or international consequence or any law, regulation, action or governmental regulation, inquiry or other occurrence of any nature whatsoever which, in the opinion of the Offeror, acting reasonably, has a material adverse effect or may have a material adverse effect on the Corporation and its Subsidiaries, taken as a whole;

(n)    representations and warranties of the Corporation contained in the Agreement qualified by references to materiality or to material adverse effect shall be true and correct, and all representations and warranties not qualified by materiality or to material adverse effect shall be true and correct in all material respects, and in either case, as if made on and as of a specific date which shall speak of that date only) and the Offeror shall have received a certificate of the chief executive officer and chief financial officer of the Corporation (in each case without personal liability) addressed to the Offeror and dated as of the date of the Effective Time confirming the same;

(o)    the Corporation shall have complied in all material respects with all covenants contained in the Agreement that are to be complied with at or before the date of the Effective Time, and the Offeror shall have received a

- 4 -

certificate of the chief executive officer and chief financial officers of the Corporation (in each case without personal liability) addressed to the Offeror and dated as of the date of the Effective Time confirming the same; and

(p)     this Agreement shall not have been terminated by the Offeror or the Corporation in accordance with its terms.

The foregoing conditions are for the exclusive benefit of the Offeror and may be waived by the Offeror, in whole or in part, in its sole discretion, at any time and from time to time, both before or after the Expiry Time.

EXECUTION COPY

THIS IS SCHEDULE B ATTACHED TO AND MADE PART OF THE PRE-ACQUISITION AGREEMENT DATED AS OF THE 18TH DAY OF DECEMBER, 2006

## FORM OF LOCK-UP AGREEMENT

*CONFIDENTIAL*

**TO:**   The Shareholder named on the execution page hereof

**Date:**  December 18, 2006

**Re:**   Tiberon Minerals Ltd.

---

We understand that you (the "**Shareholder**") are the beneficial owner of, or are otherwise authorized to enter into this agreement in relation to holders of, certain common shares of Tiberon Minerals Ltd. (the "**Corporation**"). Vietnam Enterprise Investments Limited, Vietnam Growth Fund Limited and Vietnam Dragon Fund Limited (collectively, the "**Dragon Funds**"), Dragon Capital Management Limited and the Corporation have entered into a Pre-Acquisition Agreement (defined below) pursuant to which one of the Dragon Funds has agreed to cause a corporation to be incorporated by it (the "**Offeror**") to offer to acquire all of the outstanding common shares of the Corporation (the "**Offer**"). This letter sets forth the agreement between the Shareholder and Dragon Funds and the Offeror providing for the circumstances under which the Shareholder will submit all common shares owned by the Shareholder in the capital of the Corporation (the "**Shares**") to the Offer and shall deal with all options to acquire common shares (the "**Options**") by electing to exercise the Cashless Alternative referred to in Section 7 of the Stock Option Plan and to receive payment from the Corporation equal to the difference between the Consideration (as defined below) and the exercise price of such Options as permitted under Section 2.11 of the Pre-Acquisition Agreement (as defined below) and to exercise all "out-of-the money" Options.

1.     **The Offer**

1.1    The Corporation, Dragon Funds and the Offeror have entered into a Pre-Acquisition Agreement dated as of December 18, 2006 (as the same may be amended or supplemented, the "**Pre-Acquisition Agreement**"), pursuant to which, subject to the terms and conditions of the Pre-Acquisition Agreement, the Offeror will offer to acquire all of the outstanding common shares of the Corporation in exchange for payment by the Offeror of $3.65 per common share (the "**Consideration**"). The Offer shall be made in accordance with applicable corporate and securities laws and the rules of applicable stock exchanges.

- 2 -

2.      **Covenants of the Shareholder**

2.1      Subject to the terms and conditions hereof, and provided that the Pre-Acquisition Agreement shall not have been amended to decrease the consideration payable to shareholders of the Corporation, the Shareholder agrees:

      (a)      to tender (or to cause to be tendered) the Shares to the Offer, and to deposit the certificate or certificates representing all such Shares (or cause such certificates to be deposited), together with a duly completed and executed Letter of Transmittal, with the Depositary appointed in connection with the Offer prior to the Expiry Date;

      (b)      to vote (or to cause to be voted) the Shares at any meeting of shareholders of Corporation called to propose a resolution or transaction which would in any manner, frustrate, prevent, delay or nullify the Offer or any of the other transactions contemplated by the Pre-Acquisition Agreement, against such resolution or transaction, except to the extent that any such resolution or transaction shall have been approved or recommended by the board of directors of the Corporation in a manner consistent with its obligations under the Pre-Acquisition Agreement;

      (c)      not to sell, assign, convey, encumber or otherwise dispose of any of the Shares or enter into any contract, option or other arrangement in respect thereto; and

      (d)      to execute and deliver, or cause to be executed and delivered, such additional or further consents, documents or other instruments as the Offeror may reasonably request for the purpose of effectively carrying out the matters contemplated by this Agreement.

2.2      Notwithstanding the foregoing, for greater certainty, in the event that a Superior Proposal (as defined in the Pre-Acquisition Agreement) is made, unless the Offeror amends the Offer to at least match such Superior Proposal within five (5) business days of the Superior Proposal being made, the Shareholder shall no longer be required to tender the Shares to the Offer and may withdraw any such Shares tendered to the Offer, and may tender the Shares to the Superior Proposal.  For greater certainty, in the event that the Offeror amends the Offer to increase the consideration to be paid for the common shares in the capital of the Corporation for any reason, the Shareholder shall be entitled to receive such increased consideration for the Shares tendered by the Shareholder to the Offer which are taken up by the Offeror in accordance with the Offer.  Further, in the event that fewer than 66-2/3 % of the common shares in the capital of the Corporation are tendered to the Offer and the Offeror waives the Minimum Condition (as defined in the Pre-Acquisition Agreement) to take up the shares that have been tendered to the Offer, the Shareholder shall be entitled to withdraw the Shares tendered to the Offer.

- 3 -

2.3 The Shareholder also agrees:

 (a) not to solicit, initiate, facilitate, promote or encourage proposals or offers from, or entertain, enter into or continue discussions or negotiations with, directly or indirectly, any person other than the Offeror relating to the Shares or concerning any transaction involving the Corporation or any of its subsidiaries, or permit any of the Shareholder's officers, directors, employees, agents or representatives to do likewise on the Shareholder's behalf; and

 (b) not to initiate, propose, assist or participate in any solicitation of shareholders of the Corporation, nor to induce or attempt to induce any other person to initiate any transaction which may reduce the likelihood of the Offer being successfully completed.

The Shareholder will notify the Offeror promptly if any such discussions or negotiations are sought or if any proposal in respect of a transaction involving the Corporation is received, being considered or indicated to be forthcoming.

2.4 The Shareholder also agrees to comply fully with the provisions of Section 2.11 of the Pre-Acquisition Agreement and agrees to tender the Options and elect to exercise the Cashless Alternative referred to in Section 7 of the Stock Option Plan and to receive from the Corporation payment equal to the difference between the Consideration and the exercise price of such Options and to exercise all "out-of-the money" Options.

3. **Covenants, Representations and Warranties**

3.1 The Shareholder covenants, represents and warrants to the Offeror that:

 (a) the Shareholder is duly authorized to execute and deliver this agreement and this agreement is a valid and binding agreement, enforceable against the Shareholder in accordance with its terms; neither the execution of this agreement by the Shareholder nor the completion by the Shareholder of the transactions contemplated hereby will constitute a violation of or default under, or conflict with, any contract, commitment, agreement, understanding, arrangement or restriction of any kind to which the Shareholder will be a party or by which it will be bound at the time of such completion;

 (b) the Shareholder is the beneficial owner of, or are otherwise authorized to enter into this agreement in relation to holders of, the Shares and any Options and has the authority to enter into this agreement and carry out the transactions contemplated hereby;

 (c) the Shares are validly issued, fully paid and non-assessable shares of the Corporation and the Shareholder has good and marketable title to the Shares and any Options, free and clear of all claims, liens, charges, encumbrances and security interests;

- 4 -

(d)     the Shares constitute all of the shares in the capital of the Corporation owned, directly or indirectly, by the Shareholder;

(e)     other than any Options listed on the signature page hereof, the Shareholder has no agreement, option, right or privilege capable of becoming an agreement, option, right or privilege, for the purchase, subscription or issuance of any of the unissued shares in the capital of the Corporation or for the issue of any other securities of any nature or kind of the Corporation; and

(f)     the Shareholder has not previously granted or agreed to grant any proxy or other right to vote the Shares in respect of any meeting of shareholders of the Corporation and has not entered into a voting trust, vote pooling or other agreement with respect to his right to vote, call meetings of shareholders or give consents or approvals of any kind as to the Shares or any Option Shares.

3.2     The Offeror hereby represents and warrants to the Shareholder that the Offeror is duly authorized to execute and deliver this agreement and the Pre-Acquisition Agreement, and each of this agreement and the Pre-Acquisition Agreement is a valid and binding agreement, enforceable against the Offeror in accordance with its terms; neither the execution of this agreement or the Pre-Acquisition Agreement nor the consummation of the transactions contemplated thereby will constitute a violation of or default under, or conflict with, any contract, commitment, agreement, understanding, arrangement or restriction of any kind to which the Offeror is a party or by which the Offeror is bound.

4.     **Fiduciary Duty**

Nothing contained here shall restrict or limit the actions of any Shareholder who is a director or officer of the Corporation which are required to be taken by such Shareholder in the discharge of his fiduciary duties as a director or officer of the Corporation.

5.     **Expenses**

Each party agrees to pay its own expenses incurred in connection with this agreement.

6.     **Public Disclosure**

Each party shall consult with the other before making any public disclosure or announcement of or pertaining to this agreement and any such disclosure or announcement shall be mutually satisfactory to both parties; provided that this paragraph shall not apply to any disclosure or announcement pertaining to this agreement which a party is advised by legal counsel is required to be made by applicable laws, stock exchange rules or policies of regulatory authorities having jurisdiction and which the other party after reasonable notice will not consent to.

- 5 -

7.          **Amendments**

          This agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto. Neither party to this agreement may assign any of its rights or obligations under this agreement without the prior written consent of the other party.

8.          **Termination of Agreement**

          This Agreement shall terminate upon the termination of the Pre-Acquisition Agreement in accordance with the provisions thereof.  Notwithstanding the foregoing, such termination shall not relieve either party from liability for breaches of this agreement prior to the date of such termination, which liability shall survive any such termination indefinitely.

9.          **Time**

          Time shall be of the essence of this agreement.

10.         **Successors and Assigns**

          This agreement shall be binding upon, enure to the benefit of and enforceable by the Shareholder, the Offeror and their respective successors and permitted assigns.

11.         **Governing Law**

          This agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein, and the parties irrevocably attorn to the jurisdiction of the courts of the Province of Ontario.

* * * * *

[execution page attached]

- 6 -

If the foregoing correctly sets forth our understanding, please indicated your acceptance thereof by signing and returning the enclosed duplicate of this letter. This letter may be signed in two counterparts, which together shall be deemed to constitute one valid and binding agreement, and delivery of the counterparts may be effected by means of telecopier from us to you and from you to us.

Yours truly,

**VIETNAM ENTERPRISE INVESTMENTS LIMITED**

By:        _____
          Name:
          Title:

**VIETNAM GROWTH FUND LIMITED**

By:        _____
          Name:
          Title:

**VIETNAM DRAGON FUND LIMITED**

By:        _____
          Name:
          Title:

The foregoing is in accordance with our understanding and is accepted and agreed to by us as of this ____ day of December, 2006.

_____
(Print name of Shareholder)

_____
(Insert number of Shares held)

_____
(Signature of Shareholder or, if a corporation, authorized signing officer)

_____
(Insert total number of Options held, number vested and exercise price)

_____
(Address of Shareholder)

_____
(Facsimile number for Shareholder)

| Number of Options | Number of Options Vested | Exercise Price |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

- 7 -

THIS IS SCHEDULE C ATTACHED TO AND MADE PART OF THE PRE-
ACQUISITION AGREEMENT DATED AS OF THE 18TH DAY OF DECEMBER, 2006

## REGULATORY APPROVALS

- Filings, consents and approvals under the *Competition Act* (Canada).

- Filings, consents and approvals under the *Investment Canada Act*.

- Filings, consents and approvals in compliance with applicable securities Laws.

- Filings, consents and approvals in compliance with the rules of the Toronto Stock Exchange.

EXECUTION COPY

THIS IS SCHEDULE D ATTACHED TO AND MADE PART OF THE PRE-ACQUISITION AGREEMENT DATED AS OF THE 18TH DAY OF DECEMBER, 2006

## CAPITALIZATION AND SUBSIDIARIES

**Options**

There are 2,801,000 options (the "**Options**") to purchase common shares in the capital of the Corporation (the "**Shares**") outstanding pursuant to the Stock Option Plan.

**Subsidiaries**

The Subsidiaries of the Corporation, the jurisdiction of incorporation and the percentage ownership interest held in each are set out in the attached chart.