

# ANNUAL INFORMATION FORM

# TIBERON MINERALS LTD.

### FOR THE FISCAL YEAR ENDED DECEMBER 31, 2006

### March 29, 2007

*This Annual Information Form, including all documents incorporated by reference herein, contain forward looking statements that involve certain risks, uncertainties and other factors, which could cause actual results, performance or achievements to differ materially from anticipated or future results, performance or achievements expressed or implied by such forward looking statements. Factors that could affect these statements include, without limitation, financing, personnel, metal prices, production record, exploration and development, operating hazards, political conditions, title matters, permits and licences, other factors beyond the control of the Corporation, environmental, uninsurable risks, competition, conflicts of interest and currency fluctuations. These factors and other risks and uncertainties are discussed in the reports and disclosure documents filed by the Corporation with Canadian regulatory authorities and commissions. Statements made in this Annual Information Form are based upon management's beliefs, estimates and opinion on the date the statements are made, or as otherwise noted, and the Corporation disclaims any intention or obligation to update or reverse any statements made herein, whether as a result of new information, future events or otherwise.*



Annual Information Form
March 29, 2007

# TABLE OF CONTENTS

GLOSSARY OF TERMS .................................................................................................................4

CORPORATE STRUCTURE .........................................................................................................6
    NAME, ADDRESS AND INCORPORATION .........................................................................6

INTERCORPORATE RELATIONSHIPS .....................................................................................7

GENERAL DEVELOPMENT OF THE BUSINESS ....................................................................8
    THREE YEAR HISTORY .............................................................................................................8
        Relevant Prior History ...........................................................................................................8
        Three Year History ...............................................................................................................10
        Recent Material Developments .............................................................................................13

NARRATIVE DESCRIPTION OF THE BUSINESS ..................................................................15
    DOING BUSINESS IN VIETNAM ...........................................................................................15
        Introduction .........................................................................................................................15
        Legislation ...........................................................................................................................15
        Remittance Tax (Withholding Tax) .....................................................................................15
        Currency and Repatriation of Funds ....................................................................................15
        Land .....................................................................................................................................16
    HISTORY ....................................................................................................................................16
    THE NUI PHAO PROJECT ........................................................................................................17
        Nui Phao Mining Project .....................................................................................................18
        Project Location ...................................................................................................................18
        Geological Setting ................................................................................................................19
        Mineral Reserve ..................................................................................................................21
        Waste Rock ..........................................................................................................................24
        Mineral Processing ..............................................................................................................24
        Tailings Storage Facility ......................................................................................................26
        Sales (Offtake) Agreements .................................................................................................27
        Transportation and Port Facilities for Concentrate Products ...............................................27
        Resettlement Action Plan .....................................................................................................28
        Closure ................................................................................................................................29
        Project Development Schedule .............................................................................................30
        Project Initial Capital Cost ...................................................................................................31
        Sustaining Capital Costs ......................................................................................................31
        Operating Costs ...................................................................................................................32
        Economic Analysis ..............................................................................................................32
        Controlling Shareholder .......................................................................................................34
        Financing ............................................................................................................................34
        Dependence on Key Personnel .............................................................................................34
        Influence of Metal Prices .....................................................................................................34
        Exploration and Development ..............................................................................................34
        Political Conditions .............................................................................................................35
        Title Matters ........................................................................................................................35
        Permits and Licences ...........................................................................................................35
        Social and Environmental ....................................................................................................35
        Competition .........................................................................................................................35
        Currency Fluctuations .........................................................................................................35

DESCRIPTION OF CAPITAL STRUCTURE .............................................................................37
    GENERAL DESCRIPTION OF CAPITAL STRUCTURE .........................................................37



Authorized and Issued Share Capital ............................................................................. 37
Common Shares ................................................................................................................ 37
First Preferred Shares and Second Preferred Shares .................................................... 37
MARKET FOR SECURITIES ............................................................................................... 38
TRADING PRICE AND VOLUME .................................................................................. 38
DIRECTORS AND OFFICERS ............................................................................................. 39
NAME, ADDRESS AND OCCUPATION ....................................................................... 39
Term of Office ................................................................................................................... 41
Voting Securities .............................................................................................................. 41
Committees ........................................................................................................................ 42
LEGAL PROCEEDINGS ...................................................................................................... 42
TRANSFER AGENTS AND REGISTRARS ........................................................................ 42
MATERIAL CONTRACTS .................................................................................................... 42
INTERESTS OF EXPERTS .................................................................................................... 42
AUDIT COMMITTEE INFORMATION AS REQUIRED BY FORM 52-110F1 ............... 43
AUDIT COMMITTEE CHARTER ................................................................................... 43
COMPOSITION OF THE AUDIT COMMITTEE ........................................................... 43
RELEVANT EDUCATION AND EXPERIENCE ........................................................... 43
PRE-APPROVAL POLICIES AND PROCEDURES ....................................................... 44
EXTERNAL AUDITOR SERVICE FEES (BY CATEGORY) ........................................ 45
SCHEDULE 1 AUDIT COMMITTEE CHARTER .............................................................. 47



## GLOSSARY OF TERMS

All capitalized terms not otherwise defined in this annual information form, have the meanings ascribed to them below:

"**Aliquots**" means the size of the sample, extracted from the total prepared volume of material, to be used for the purpose of analysis;

"**Au**" means the element gold or gold metal;

"**Be**" means the element beryllium;

"**Bi**" means the element bismuth or bismuth metal;

"**CaF2**" means the compound calcium fluoride;

"**Cu**" means the element copper or copper metals;

"**F**" means the element fluorine;

"**Indicated Mineral Resource**" means that part of a Mineral Resource for which quantity, grade or quality, densities, shape and physical characteristics, can be estimated with a level of confidence sufficient to allow the appropriate application of technical and economic parameters, to support mine planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough for geological and grade continuity to be reasonably assumed.

"**Inferred Mineral Resource**" means that part of a Mineral Resource for which quantity and grade or quality can be estimated on the basis of geological evidence and limited sampling and reasonably assumed, but not verified, geological and grade continuity. The estimate is based on limited information and sampling gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes.

"**km**" means kilometres;

"**km2**" means square kilometres;

"**m**" means metres;

"**Mt/a**" means million tonnes per annum;

"**Measured Mineral Resource**" means that part of a Mineral Resource for which quantity, grade or quality, densities, shape, and physical characteristics are so well established that they can be estimated with confidence sufficient to allow the appropriate application of technical and economic parameters, to support production planning and evaluation of the economic viability of the deposit. The estimate is based on detailed and reliable exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough to confirm both geological and grade continuity.



"**Mineral Reserve**" means that economically mineable part of a Measured or Indicated Mineral Resource demonstrated by at least a preliminary feasibility study.  The study must include adequate information on mining, processing, metallurgical, economic and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified.  A Mineral Reserve includes diluting materials and allowances for losses that may occur when the material is mined.

"**Mineral Resource**" means a concentration or occurrence of diamonds, natural solid inorganic material, or natural fossilized organic material including base and precious metals, coal and industrial minerals in or on the Earth's crust in such form and quantity and of such a grade or quality that it has reasonable prospects for economic extraction.  The location, quantity, grade, geological characteristics and continuity of a Mineral Resource are known, estimated or interpreted from specific geological evidence and knowledge.

"**Probable Mineral Reserve**" means the economically mineable part of an Indicated and, in some circumstances, Measured Mineral Resource, demonstrated by at least a Preliminary Study. This study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified.

"**Proven Mineral Reserve**" means the economically mineable part of a Measured Mineral Resource. This study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction is justified.

"**SRM**" means standard reference materials analysed for comparison when assessing the accuracy of analytical techniques and analyses of samples unknown concentration.

"**W**" means the element tungsten; and

"**WO3**" means the chemical compound tungsten trioxide.  Tungsten trioxide is the most common form for referencing tungsten content for the purpose of assessing and comparing concentrations in mineral deposits.



## CORPORATE STRUCTURE

### NAME, ADDRESS AND INCORPORATION

Tiberon Minerals Ltd. ("**Tiberon**" or the "**Corporation**") was incorporated as 669758 Alberta Ltd. on September 29, 1995 pursuant to the provisions of the *Business Corporations Act* (*Alberta*). The Corporation changed its name by articles of amendment to Tiberon Minerals Ltd. on December 14, 1995. The Corporation was continued under the *Canada Business Corporations Act* on October 21, 2002.

Tiberon's head office and registered office  is located at 100 Yonge Street, Suite 1101, Toronto, Ontario, M5C 2W1.

Tiberon also has an office in Hanoi, Vietnam, and, with its joint venture partners, a field site office at its Nui Phao property in Dai Tu, Vietnam (the "**Nui Phao Property**").

The Corporation's articles of continuance (the "**Articles**") currently provide for the Registered Office of the Corporation to be situated in the Province of Alberta. When the Corporation was initially formed, its offices were located in the Province of Alberta. In 2003, the Corporation's offices relocated to the Province of Ontario.

In light of the fact that the Corporation does not have any offices in and does not do business in, the Province of Alberta, the Board of Directors of the Corporation have deemed it desirable to change the location of the Corporation's registered office to the Province of Ontario. In order for the Corporation to change the location of its registered office to the Province of Ontario, it must amend its Articles. In accordance with section 173 of the Canada Business Corporations Act (the "**Act**"), the Articles of the Corporation may be amended by special resolution of the shareholders of the Corporation.

The Corporation's shareholders approved a special resolution authorizing the Corporation to amend its Articles to change the Province where the registered office may be located from Alberta to Ontario. The Corporation filed Articles of Amendment with the Director under the Act and upon the Articles of Amendment being effective, the registered office of the Corporation became the same address as its head office.

While no structural change has taken place, the Corporation was subject to a successful take-over bid this year. The result of this bid is that 93.2% of the shares of the Corporation are held by investment funds managed by Dragon Capital Management Limited. A compulsory acquisition pursuant to the Act is planned at the price of Cdn $3.65 in cash per common share. (*See General Development of the Business – Recent Developments*).



**INTERCORPORATE RELATIONSHIPS**

Tiberon holds a 70% shareholding interest in the Nui Phao Mining Joint Venture Company Limited ("**Nuiphaovica**" or the "**Subsidiary**"), which was created under the terms of the Investment Licence granted by the Government of Vietnam on February 25, 2004, as its primary asset. The following chart sets forth the information concerning the Subsidiary as of the date of this annual information form (the "**AIF**").



In March 2006 Tiberon had agreed to purchase 7.5% of the holding of Intraco in the Subsidiary, subject to regulatory approval. In September 2006, Tiberon was advised by the Vietnamese Ministry of Planning and Investment that it was requesting the parties to continue implementation of the project with the original ownership ratio.



## GENERAL DEVELOPMENT OF THE BUSINESS

### THREE YEAR HISTORY

Tiberon is a mineral exploration company with property located in Vietnam. Its primary asset is its 70% interest in Nuiphaovica. Nuiphaovica holds the Nui Phao tungsten polymetallic project in Vietnam (the "**Nui Phao Project**"), which is currently in the development stage as the production stage has not yet been reached.

Tiberon previously acquired the Ruby Property in the Yukon Territory in February 1999. The Ruby Property was the Corporation's sole Canadian property. The Ruby Property represented 48 mining claims (approximately 8 km$^2$) and was located approximately 78 km south of Whitehorse, adjacent to the British Columbia-Yukon border. The Ruby Property was covered by licences issued by Indian and Northern Affairs Canada, which licences had expiry dates ranging from February, 2006 to July, 2006. The Corporation began exploration work on this property, but abandoned this work in 2000 when the Board of Directors made a strategic decision to explore and eventually develop the Nui Phao Property. The Ruby Property has been written down to its net realizable value of $1.

Tiberon previously applied for three precious metals mineral exploration licences in Vietnam for the Lang Vai, Xi Pa and A Bung areas, which were subsequently joint ventured. The Lang Vai application was submitted on December 21, 2001 and the Xi Pa and A Bung applications were submitted on June 6, 2003. To date, the licences have not been granted and the Corporation does not have any information on when or if the licences will be granted. When issued, in accordance with Vietnam government practice, it is expected that the licences will include minimum exploration expenditure requirements and the Corporation expects that the aggregate minimum expenditure requirement to maintain the three licences will not be a material amount to the Corporation. In October 2003, the Corporation entered into a joint venture agreement with Takara Limited ("**Takara**"). Tiberon received shareholder approval of the Takara Joint Venture in May 2004. Takara was controlled by Mr. Ian Gowrie-Smith, the Chairman of the Board of Tiberon. Takara is now an indirect wholly-owned subsidiary of Triple Plate Junction plc ("**TPJ**"), a public UK company listed on the Alternative Investment Market ("**AIM**") in London, England, of which Mr. Gowrie-Smith is the principal shareholder.

Given that Tiberon's only property and primary asset is the Nui Phao Property located in Vietnam, this "General Development of the Business" section and the "Narrative Description of the Business" section will focus solely on the developments of the Nui Phao Project.

### Relevant Prior History

The Corporation commenced its activities in Vietnam in 1996 by entering into an agreement with Vietnam Resources Corporation Limited ("**VRC**"), whereby the Corporation agreed to conduct exploration activities in the Bac Thai Province of Vietnam in exchange for an interest in the VRC's property.

The Corporation acquired mineral exploration licence No. 2064/QD-DCKS on November 15, 1997 (the "**1997 Licence**"), which permitted the Corporation, in cooperation with the Thai Nguyen Mineral Company ("**TNMC**") and the Hanoi General Export Import Company, Thai Nguyen Branch ("**Geleximco**"), to explore for tin and polymetallics on approximately 46 km2 of land in the Nui Phao area of Vietnam for a two year term. The 1997 Licence was extended by the Ministry of Industry in a decision dated December 16, 1999 and the scope of the 1997 Licence was revised to cover approximately a 32 km2 area of land.



In connection with the 1997 Licence, the Corporation entered into an exploration and technical assistance agreement (the "**1997 Agreement**") dated December 5, 1997 with Geleximco and TNMC providing, among other things, for the exploration and joint development of the licenced area. On April 28, 1999, the Corporation entered into a settlement and mutual release agreement with VRC, pursuant to which VRC renounced any interest in the Nui Phao property in exchange for 1,000,000 common shares of the Corporation.

The 1997 Licence, as extended, was replaced by mineral exploration licence No. 2068/QC-DCKS on September 12, 2001 (the "**2001 Licence**"). The Corporation submitted in mid-August 2003 an application to renew the 2001 Licence for an additional two-year term, as permitted under Vietnam's mineral law.

In connection with the 2001 Licence, the Corporation entered into an exploration and technical assistance cooperation agreement (the "**2001 Agreement**") dated April 17, 2001 with Geleximco and TNMC in respect of the exploration and development of the Nui Phao Project. The 2001 Agreement replaced the 1997 Agreement. Under the terms of the 2001 Agreement, the Corporation funded all exploration up to and including the date upon which the Investment Licence was granted, thereafter the expenditures have been funded by Nuiphaovica. The expenditures which were funded by the Corporation will be recovered by the Corporation upon Nuiphaovica achieving profitability in the future.

The Nui Phao Property is now held under the terms of Investment Licence No. 2377/GP (the "**Investment Licence**"), as granted by the Government of Vietnam on February 25, 2004. The Investment Licence includes the aforementioned 1997 Licence and 2001 Licence as well as the Mining Licence described below. The parties to the Investment Licence consist of the Corporation, TNMC, and Export-Import Investment Company Thai Nguyen ("**Intraco**"), Geleximco. The Investment Licence provided the legal basis for the formation of Nuiphaovica of which the Corporation initially held a controlling 70% interest. On March 29, 2004, the Corporation agreed, subject to regulatory approval, to acquire an additional 7.5% interest in Nuiphaovica, thereby increasing its total interest in the project to 77.5%. In September 2006, the Vietnamese Ministry of Planning and Investment requested that the project continue in the original ownership ratio.

The Investment Licence provides Nuiphaovica with the right to explore, mine and process minerals from a 54.66 km2 area located in the Thai Nguyen Province, Vietnam. The Investment Licence has an initial term of 30 years with a provision for a 20 year extension. Nuiphaovica will receive a three year corporate tax holiday after achieving profitability, followed by an eight year period of a 50% reduction on the tax rate. During the first 12 year period the corporate tax rate, prior to incentives, is 15%; thereafter the rate is 28% before any tax incentives. Under applicable regulations the royalty rates are 5% for tungsten, 3% for copper, and 2% for bismuth, gold and fluorspar.

Nuiphaovica is governed by the terms of a joint venture agreement (the "**JV Agreement**") between the participants and a charter (the "**Charter**"). The JV Agreement and Charter call for the pro-rata contribution of capital from each of the participants. Should a participant elect not to contribute their pro-rata share of development expenditures, or if such participant defaults and their interest is diluted down to a 5% interest, then such participant would convert to a 1.5% net profits interest and all of its rights, title and interest will be distributed to the remaining parties on a pro-rata basis. The non-defaulting participants may also elect to loan the defaulting participant their capital contribution at a penalty rate of three times the loan amount.

Nuiphaovica operates under the direction of a six member Board of Management. The Corporation will appoint four members to the Board of Management, while TNMC and Intraco will each appoint one member. The Board of Management will appoint a Management Office, responsible for the day-to-day activities of Nuiphaovica. The General Director of the Management Office will also be appointed by the



Corporation. The four appointed representatives of the Corporation are Messrs. Mario Caron, Walter Henry, Timothy Dang and Nigel Tamlyn, and Mr. Nigel Tamlyn was appointed by the Corporation as General Manager in September 2004.

**Three Year History**

In February 2004, the Government of Vietnam granted the Investment Licence for the Nui Phao Project, providing the legal basis for the formation of Nuiphaovica, which is owned by Tiberon and by the two Vietnamese partners, TNMC and Intraco. The provisions of the Investment Licence are described above under "Relevant Prior History". Upon receiving the Investment Licence, Nuiphaovica was responsible for the submission of a mining licence application, which Nuiphaovica subsequently submitted and which encompassed a 0.9 km2 area over the Nui Phao deposit (the "**Mining Licence Application**").

In March 2004, Tiberon entered into an agreement (the "**Acquisition Agreement**") to acquire an additional 7.5% interest in Nuiphaovica from Intraco, subject to the approval of the applicable governmental and regulatory approvals. Under the terms of the Acquisition Agreement, Tiberon acquired the Intraco interest for an immediate payment of U.S.$300,000 and a final contribution of U.S.$2.8 million to the Nui Phao Project as part of the capital Intraco must contribute to retain its remaining 7.5% interest. The total consideration for the acquisition of the Intraco interest is U.S.$3,100,000. In September 2006, the Vietnamese Ministry of Planning and Investment sent correspondence denying the proposed transfer and requesting that the project continue in the original ownership ratio.

In April 2004, Aker Kvaerner E&C, a division of Aker Kvaerner Canada Inc. ("**Aker Kvaerner**") was appointed as the lead engineering consultant to produce the Nui Phao feasibility study.

In July 2004, Tiberon announced that a shortfall was discovered in the amount of metallurgical sample available for pilot plant test work. As a result, new drilling was required which pushed back the completion of metallurgical testing. The revised schedule called for pilot plant testing to be completed in early 2005 in preparation for a release of a final feasibility study by mid-year. Because of this delay, the Corporation instructed Aker Kvaerner to produce an interim feasibility study, which was issued in January 2005.

In August 2004, Mr. Nigel Tamlyn was appointed as the General Manager of Nuiphaovica. Mr. Tamlyn is a Chartered Engineer with more than 20 years experience in the practical management and development of underground and surface mining operations in Africa, the Philippines and Ireland.

Also in August 2004, Tiberon, on behalf of Nuiphaovica, signed a Mandate Letter appointing both Fortis Bank S.A./N.V. and West LB AG to act as the exclusive Structuring Banks and Lead Arrangers for the debt financing of the Nui Phao Project in Vietnam.

In November 2004, the Corporation signed a Memorandum of Understanding ("**MOU**") with Sidech S.A. ("**Sidech**"), the world's leading producer of bismuth end-products. The MOU called for Sidech to purchase 100% of Nui Phao's bismuth product output for the first five years of production, under a price formula related to then-current market prices as published by London-based Metal Bulletin. The MOU also included a Technical Co-operation Agreement under which Sidech will provide, at no cost to Nuiphaovica, technical assistance which will enhance both the recovery and the quality of the bismuth products to be produced at the Nui Phao Project in Vietnam. In February 2006, the MOU was replaced with an off-take agreement, the terms of which are substantially the same as the terms of the MOU.

In January 2005, a positive interim feasibility study (the "**Interim Feasibility Study**") for the Nui Phao Project was completed. The Interim Feasibility Study, led by Aker Kvaerner, showed the Nui Phao



Project to be very robust with low operating costs. The Interim Study favourably concluded that an open-pit mine can produce 69,000 tonnes of tungsten trioxide, 3.5 million tonnes of acid-grade fluorspar concentrate, 15,000 tonnes of bismuth, along with copper and gold over a 16-year mine life, generating a 16.6% internal rate of return.

In March 2005, the Government of Vietnam approved the Environmental Impact Assessment (the "**EIA**") for the Nui Phao Project. Approval of the EIA was the precursor to applying for a mining licence, which was the last major permit required prior to mine development. With the approval of the EIA, the Corporation could formally submit its Mining Licence application.

Also in March 2005, the Corporation accepted a proposal from WestLB AG, a European commercial bank, for a U.S.$10 million two-year convertible loan facility (the "**Facility**"). The proceeds of the Facility were to be used to fund the development of the Nui Phao Project. The Corporation successfully completed this transaction on July 6, 2005, subject to certain conditions. In October 2005, the terms of the Facility were amended and the Facility was subsequently finalized and established. To date, the Corporation has not borrowed from the Facility.

In May 2005, the Corporation, on behalf of Nuiphaovica, signed two tungsten offtake agreements with Osram Sylvania ("**Osram**"), one of the world's largest lighting and tungsten manufacturers. Under the terms of the initial agreement (the "**Base Agreement**"), Osram agreed to purchase approximately 44% of Nuiphaovica's projected tungsten concentrate productions for a minimum of five years. Concurrent with this Base Agreement, the Corporation and Osram also entered into an option agreement (the "**Option Agreement**"), giving Osram the option, subject to certain conditions, to increase its offtake to 100% of tungsten production. Should both the Base Agreement and Option Agreement be fully exercised, the agreements would cover 15 years and represent up to U.S.$1.2 billion in tungsten revenue alone to Nuiphaovica based on the ammonium paratungstate ("**APT**") pricing at the time. In February 2006, the terms of the Option Agreement were amended and Osram exercised its option, resulting in Osram increasing its offtake to up to 100% of the Corporation's project annual average tungsten concentrate production.

In June 2005, the Corporation and its joint venture partners were granted a mining licence by the government of Vietnam (the "**Mining Licence**") to develop and mine the Nui Phao tungsten/fluorspar deposit. As described above, Nuiphaovica holds the Investment Licence over the entire 54.66 square kilometres area of the project, which is inclusive of the Mining Licence. The Mining Licence, extending over 0.9 square kilometres, covers the known proven and probable reserves and is valid for a 30 year period. The Mining Licence is the last major permit required prior to the start of construction. With the receipt of the Mining Licence, the Corporation is able to proceed with project financing, construction, commissioning and start-up of the Nui Phao mine. Nuiphaovica has submitted a new exploration licence which will allow Nuiphaovica to, should it decide to, conduct exploration activities on the area of the Nui Phao Project not covered by the Mining Licence.

In July 2005, the Corporation, on behalf of Nuiphaovica, released a positive final feasibility study (the "**Final Feasibility Study**") on its Nui Phao tungsten/fluorspar deposit in Vietnam. The Final Feasibility Study was prepared by Aker Kvaerner and favourably concluded that an open-pit mine could produce 76,000 tonnes of tungsten trioxide, 3.5 million tonnes of acid-grade fluorspar concentrate, 32,000 tonnes of bismuth, along with copper and gold over a 16.3 year mine life, generating a 23.6% rate of return. The Final Feasibility Study incorporated all of the elements necessary to ensure that the Nui Phao Project is developed to the most stringent international environmental standards. The Final Feasibility Study involved the completion of a mine plan; the drilling and metallurgical testing on an additional 17.3 t of Nui Phao ore sample by Lakefield; the completion of a road and rail realignment study and the commencement of the detail design of these infrastructure items in Vietnam; the completion of a detailed



ESIA; the development and implementation of a Resettlement Action Plan ("**RAP**"); the development of a cleanup plan for pre-existing site contamination; the completion of an extensive tailings management study; and the development of a conceptual project closure plan. The Final Feasibility Study is discussed more fully in the "Narrative Description of the Business – The Nui Phao Project" section and the Summary of the Final Feasibility Study was filed on SEDAR on July 21, 2005 and can be found at www.sedar.com.

In August 2005, the Corporation completed a bought-deal public offering of 33,334,000 common shares of the Corporation at a price of Cdn.$2.40 per share for total gross proceeds of approximately Cdn.$80 million. The net proceeds of the offering will be used to fund the Corporation's equity share of development activities for the Nui Phao Project, to augment the Corporation's working capital and for general corporate purposes.

In October 2005, the Corporation, on behalf of Nuiphaovica, expanded its project finance group to include: Bayerische Hypo-und Vereinsbank AG ("**HVB**"); Caterpillar Financial SARL; Export Development Canada ("**EDC**"); Fortis Bank S.A./N.A.; and Standard Chartered Bank, as exclusive lead arrangers (the "**Lead Arrangers**") for the debt financing of the Nui Phao tungsten-fluorspar project in Vietnam, effective November 1, 2005. The Lead Arrangers will jointly arrange and finalize a term loan facility financing for project development. The anticipated financial close of the project financing is late spring or early summer of 2006.

In January 2006, Nuiphaovica selected Ausenco Limited ("**Ausenco**") to undertake the detailed engineering, procurement and construction management ("**EPCM**") for the Nui Phao Project. Ausenco has significant experience in Asia and an unusual depth of experience in pioneering mineral projects. Building on basic engineering activities, Ausenco's first phase of engagement will include the detailed engineering design for the Nui Phao Project, followed by procurement, construction and final commissioning. The construction phase will include the processing plant as well as site infrastructure including road and rail relocation, accommodation, tailings dam and water management systems.

In February 2006, the Corporation entered into an off-take agreement with Sidech for 100% of Nuiphaovica's bismuth production replacing the MOU. Under the terms of the offtake agreement, which are substantially the same as the terms of the MOU, Sidech will purchase 100% of Nui Phao's projected bismuth output for the first five years of production with successive five-year mutual extension options. Based on the Final Feasibility Study, mine-life annual bismuth production is expected to average 1,991 tonnes (approximately 20% of world supply).

Also in February 2006, the terms of the Option Agreement with Osram were amended and Osram exercised its option, resulting in Osram increasing its offtake to up to 100% of the Corporation's project annual average tungsten concentrate production. Under the amended Option Agreement, the Corporation and Osram agreed to remove the original project-level cash payment and reduce the term of the agreement. Under the initial Base Agreement, Osram had agreed to purchase approximately 44% of Nuiphaovica's tungsten production for a minimum of five years. Based on the Final Feasibility Study, annual tungsten concentrate production from Nuiphaovica is expected to average 4,689 tonnes (468,900 mtu). Under the terms of the Option Agreement, both the Base Agreement and the first 2,250 tonnes of production include a floor price and cover the first five years of tungsten concentrate production. The terms of the Base Agreement include two five-year renewal terms, and the Option Agreement may be renewed for an additional five-year term. The terms of the Option Agreement also provide for an escalated pricing premium, subject to certain conditions, on tungsten purchased under the Option Agreement. Nuiphaovica will have the right to sell to the market any remaining tungsten production under the Option Agreement not purchased by Osram.



In March 2006, the Corporation signed an offtake agreement with CMC Cometals (a division of Commercial Metals Company), one of the world's leading marketers and distributors of raw materials. Under the terms of the agreement, CMC Cometals will purchase 100% of Nui Phao's projected annual average acid-grade fluorspar output for the first three years of production, followed by a three-year renewal at CMC Cometals' option and successive one-year mutual extension options thereafter.

In June 2006, the Company received and approved an underwriting commitment letter from its previously announced group of international banks to provide a commercial facility for up to $210 million, and a cost overrun facility for up to $14 million.  Completion of this facility is subject to certain conditions precedent usual for facilities of this type.

In July 2006, the Corporation signed a memorandum of understanding with Siemens Project Ventures GmbH ("**SPV**"), part of Siemens AG headquartered in Munich, Germany.  Under the terms of the memorandum SPV will subscribe for preferred shares in a wholly-owned subsidiary to be incorporated by the Corporation, for up to $30 million.  The proceeds will be used to fund the project equity contributions.

In July 2006, the Corporation and its joint venture partners awarded a construction contract for the initial infrastructure development of Nui Phao's first resettlement site to a local Vietnamese company.

Ausenco prepared an updated capital cost estimate and project completion schedule for the Nui Phao project.  The project update, completed in September 2006, highlights increased commodity production volumes producing a high rate of return and net present value.  A copy of the new technical report, including the updated capital cost estimate and project completion schedule was filed on SEDAR.

Optimization of the mining plan resulted in projected annual production from the Nui Phao mine, currently expected to average 4.788 tonnes of tungsten trioxide, 222,458 tonnes of acid-grade fluorspar, 2.038 tonnes of bismuth, 5,614 tonnes of copper, 2,3092 ounces of gold and 27,408 ounces of silver over a 16.3 year mine life.  This translates into a 16% rate of return at conservative commodity prices, and a 36% rate of return at current commodity prices on a before tax basis.  Based on the project update, total capital costs to complete the project are expected to be $302.6 million, reflecting increased equipment and fuel costs consistent with general cost inflation for mining projects.  Production from the Nui Phao mine is anticipated to begin in early 2009.

**Recent Material Developments**

The US $20 million convertible loan facility from WestLB AG, a European commercial bank, had a term of eleven months from February 2, 2006.  Tiberon has not borrowed from the facility and, subsequent to December 31, 2006, has allowed the facility to expire.

On December 18, 2006, Dragon Capital Management Limited ("**Dragon Capital**"), certain investment funds managed by Dragon Capital and its affiliates and the Corporation entered into a pre-acquisition agreement under which it was agreed that TML Acquisition Ltd. (the "**Offeror**") was to make an offer to purchase, at a price of CDN $3.65 in cash per common share, all of the issued and outstanding common shares (the "**Tiberon Shares**") of the Corporation, other than Tiberon Shares (the "**Offeror's Shares**") owned by the Offeror and other investment funds managed by Dragon Capital and its affiliates (the "**Offer**").

The Offer  was mailed on January 4, 2007.  On February 12, 2007,  Dragon Capital announced that the Offer was validly accepted by holders of Tiberon Shares representing approximately 93.2% of the outstanding Tiberon Shares other than the Offeror's Shares.  The Offeror took-up and paid for all validly deposited Tiberon Shares on February 14, 2007 and the Offeror intends and is entitled to effect



unilaterally, upon notice to Tiberon shareholders, the compulsory acquisition of all remaining publicly-held Tiberon Shares at CDN $3.65 cash per Tiberon Share pursuant to the Canada Business Corporations Act (the "**CBCA**").

The Corporation has been advised that the Offeror expects to send its notice of compulsory acquisition for all remaining publicly-held Tiberon Shares at CDN $3.65 cash per Tiberon Share by April 10, 2007. Upon receipt of this notice, Tiberon shareholders will be entitled to elect to receive CDN $3.65 per Tiberon Share or to demand the fair value of their Tiberon Shares. Upon complying with the compulsory acquisition requirements of the CBCA, the Offeror will be able to become the owner of 100% of the Tiberon Shares.

In December 2006, the Corporation was advised in early 2007 that the Vietnamese Ministry of Finance had amended the Vietnamese tax legislation which will expend the scope of export taxes the Vietnamese government currently levies on certain exported commodities, including those to be produced at Nui Phao. Under the amendment, certain ores and concentrates will be subject to a 10% export tax and refilled commodities will be subject to a 5% export tax.



## NARRATIVE DESCRIPTION OF THE BUSINESS

Tiberon is a mineral exploration company with property located in Vietnam. Its primary asset is its 70% interest in Nuiphaovica. Nuiphaovica holds the Nui Phao tungsten polymetallic project in Vietnam (the "**Nui Phao Project**"), which is currently in the development stage as the production stage has not yet been reached.

## DOING BUSINESS IN VIETNAM

### Introduction

The Socialist Republic of Vietnam shares borders with China, Laos and Cambodia, and has a population of approximately 83 million people. Vietnam is divided into sixty-four provinces and city administrations. The country's main urban centres are the northern city of Hanoi (population approximately three million), which is the capital, and the southern city of Ho Chi Minh City (formerly Saigon, population approximately six million), which serves as the centre of economic activity.

Vietnamese is the national language; Roman script with added marks indicating vowel changes and tones is used for the written language. English is commonly used in business and is spoken by a large number of educated people.

Vietnam is a full member of the Association of Southeast Asian Nationals ("**ASEAN**") and the Asia Pacific Economic Co-operation Forum and is in the process of complying with the ASEAN Free Trade Agreement (the "**AFTA**"). The AFTA is an agreement which has the objective of gradually reducing tariffs among Brunei, Indonesia, Malaysia, the Philippines, Singapore, Thailand, Laos, Myanmar, Cambodia and Vietnam. In 2001, Vietnam signed a bilateral trade agreement with the United States, normalizing the trade arrangements between the two countries. Vietnam has joined the World Trade Organization ("**WTO**").

### Legislation

The legislative framework in Vietnam is a multi-tiered hierarchical system in which administrative and legislative powers are delegated to subordinate bodies. Laws passed by the National Assembly form the primary level of legislation in Vietnam. The secondary levels of legislation are ordinances of the Standing Committee of the National Assembly. Degrees of the government, which is the highest body of the executive branch of Vietnam and headed by the Prime Minister, are almost as authoritative as ordinances of the Standing Committee of the National Assembly. Circulars and decisions issued by various ministries provide further detail to the broad legislation passed by the aforementioned bodies.

### Remittance Tax (Withholding Tax)

As of January 1, 2004, the enactment of Decree 164 has eliminated the remittance tax.

### Currency and Repatriation of Funds

Vietnam's currency, the dong, has an official exchange rate of approximately 16,493 Vietnamese Dong to 1 US Dollar (as of February 28, 2007). The U.S. dollar is commonly used in many transactions.

Foreign invested enterprises and representative offices are required to open a bank account in a foreign currency (usually in U.S. dollars) with a Vietnamese bank or Vietnamese branch of a foreign bank,



through which payment of all income and expenditures should be effected.  The approval of the State Bank of Vietnam is required in order for such enterprises and offices to maintain bank accounts outside of Vietnam.

For the purposes of investment, the transfer of capital and remittances overseas, and the conversion of foreign currency are done at rates published by the State Bank of Vietnam at the time of investment, transfer or remittance and according to foreign exchange control regulations.  If certain legal criteria are met, foreign entities can convert dong to a foreign currency at banks without specific approvals of the State Bank of Vietnam.  Conversion is at the rate set by the State Bank of Vietnam.

The circumstances under which the Foreign Investment Law permits foreign investors to transfer abroad include: 1. their share of profits derived from licenced business operations; 2. any payments received as a result of the transfer of technology or services; 3. the principal on any loans and interests on any foreign currency loans; 4. invested capital; and 5. other sums of money and assets legally owned by them.

These provisions permit foreign investors to remit foreign currency overseas provided that they have met certain legal requirements, such as payment of all taxes or holding hard currency.

**Land**

There is no private land ownership in Vietnam.  Article 1 of the Land Law provides that land is the property of the people (as a whole) and is managed by the government.  Instead of title, an individual or organization has a right to use the land, such right being evidenced by a certificate issued by the government.  The certificate stipulates the purposes for which the land may be used and the duration of that use.  During the term of the land use right, the land user may transfer, lease, mortgage or bequeath the land use right within the land use limits set out in the certificate.

The Government is the highest authority responsible for administering the Land Law.  The Standing Committee produces land use plans and determines land use at the national level.  A corresponding function is performed at the provincial level by the People's Committees, which in turn delegate the day-to-day administration of land use to the various provincial departments.

While residents of Vietnam can establish a land use right by prolonged and continuous occupation and use, a foreign investor must procure a land use right by formally leasing the land from the government.

A lease is not required to prospect or explore land (unless the rights of other users of the same land are affected); but it is required in order to conduct mineral extraction or processing.  A land lease lasts only as long as the corresponding extraction or processing licence.  Subject to the terms of the Investment Licence, buildings constructed by a foreign investor on leased land, and other improvements to the leased land, may be owned by that foreign investor.

**HISTORY**

Alluvial tin mining has been carried out for many years over the Nui Phao granite and along its northern contact.  Production figures for any period are not available.  A state enterprise mined alluvial tin from an area east of the Ha Thuong pit for a number of years up to 1999.  Alluvial tin mining ultimately led to the discovery in 1990 of lode tin at the Ha Thuong pit in the main valley of the project area, some 700 m east of the Main Zone gossan (as defined below).  Lode tin mining at the Ha Thuong pit commenced in 1993, which in turn led to a number of small tin veins being mined and processed at the treatment plan.  During the 1980's, alluvial gold was mined by local artisans from the many valleys in the project area.  This



small-scale mining continued until the early 1990s when the resource was depleted and the valleys were restored to rice production.

The Geological Survey of Vietnam (the "**GSV**"), which has since evolved to become the Department of Geology and Minerals, mapped the area in 1960 and 1964. In 1978, the GSV returned to the area, along with members of the Russian Geological Survey, to investigate the magnetic high at Da Lien. They commenced a comprehensive appraisal of the Da Lien locality for W, Be and associated metals (Cu, Sn, Bi) for over a 12 year period. The GSV carried out surveying, geological mapping, trenching, pitting, ground geophysics and drilling. A broad extent of sulphide mineralization was recognized during the initial work. This was followed up by a regional diamond drilling program, with holes in the Da Lien area spaced approximately 500 m apart with local 250 m spacing. Some holes in the Main Zone gossan area were 50 m to 100 m apart. By 1992, 33 drill holes were completed and covered an area of 6 km$^2$. Work was stopped due to exhaustion of funds.

Only partial sections of a few holes of GSV drilling are available at the GSV core library in Thai Nguyen City. Tiberon obtained and re-assayed small samples of pulverized core material and found generally higher assays for tungsten than those reported by the GSV. Both the GSV and Tiberon used colorimetric assay methods for tungsten in the first phase of its exploration. However, Tiberon subsequently employed the use of neutron activation analysis for the assaying of tungsten and gold as it provided a more accurate analysis. This permits the use of larger samples (30 g as opposed to 1 g or less aliquots), and eliminates the need to correct for any matrix effects in the analyses.

The GSV defined mineralization in four separate "deposits" from its interpretation of drill results. Bodies 1, 2 and 3 adjoin each other and lie along the Main Zone trend; their total strike length is 2,200 m, with widths varying from 200 to 600 m. Body 4 lies in an interpreted roof pendant of the Da Lien granite and measures 800 m x 200 m.

Tiberon first took an interest in the region in 1997 when it drilled for extensions to the tin deposit at the Ha Thuong pit. This proved to be an isolated zone of tin-mineralized skarn near the contact with the Da Lien Granite, containing up to 1.7 parts per million (ppm) gold and significant tungsten and copper values. Tonnage potential was limited, however, and interest then shifted about 1 km west to the area now known as the Main Zone. During the summer of 1998, all historical data was reviewed and Dr. Teunis Kwak, a director of the Corporation at that time, completed a field examination. The project was re-appraised and work was focused on the Da Lien W-Bi-Be mineralization (i.e. the Nui Phao Project area). A program of trenching and sampling was executed over this area in late 1998 and early 1999. A regional airborne magnetic geophysical survey was conducted in August 1999. The positive results of this geophysical survey provided strong support to design and carry out a major exploration program in the area. This work in the Nui Phao region entailed the layout of detailed grids for soil sampling, ground magnetics and induced polarization geophysical surveys. The results of this work culminated in a diamond drilling campaign that concentrated on the central part of the Main Zone. The work confirmed the presence of a significant polymetallic mineralized system.

## THE NUI PHAO PROJECT

In accordance with National Instrument 51-102 and Form 51-102F2, the following disclosure under this "Narrative Description of the Business – The Nui Phao Project" section of the AIF is a reproduction of the "Executive Summary" from the technical report entitled "Technical Report for Nui Phao Mining Project" dated September 2006 (the "**2006 Technical Report**"). The detailed disclosure in the 2005 Technical Report is hereby incorporated into the AIF by reference. The 2006 Technical Report has been filed, and is available, on SEDAR at www.sedar.com.



The 2006 Technical Report was prepared for Tiberon by Nui Phao in accordance with National Instrument 43-101 for the submission of technical reports on mining properties. Mineral resource classifications contained in the 2006 Technical Report follow the standards of the Canadian Institute of Mining, Metallurgy and Petroleum, adopted by Canadian Institute of Mining Council on August 20, 2000. All currency amounts in the 2006 Technical Report are expressed in U.S. dollars.

The Qualified Person, as such term is defined in National Instrument 43-101, who prepared the 2006 Technical Report Trevor A. Moss, PE M.ASCE. They were retained by Aker Kvaerner and are independent for the purposes of National Instrument 43-101.

Developments subsequent to the release of the 2006 Technical report are discussed in the "General Development of the Business – Three Year History" section of the AIF.

**Nui Phao Mining Project**

This Technical Report (hereinafter the "**Report**" or "**Technical Report**") has been compiled for Tiberon Minerals Ltd. ("**Tiberon**" or "**the Company**") in accordance with the guidelines set forth under National Instrument 43-101 for the submission of technical reports for mining properties. This Report has been developed to provide a technical description of the Nui Phao Mining Project ("**Nui Phao Project**" or the "**Project**") as of the effective date of 31st August 2006, and reflects the modifications and definitions that have occurred since the July 2005 report prepared by Aker Kvaerner and posted by the Company on SEDAR.

Moreover this report has been configured and is based upon the July 2005 report which was entitled "Summary of Final Feasibility Study – Nui Phao Project, Dai Tu District, Nguyen Province, Northern Vietnam".

The mineral resource descriptions, definition and classifications contained herein remain unchanged from the July 2005 report due to the fact that no further investigation has been performed. Such mineral resource data were developed by AMEC and are described in detail in the report entitled "Technical Report – 2003 Update, Nui Phao Property Viet Nam", by Stephen Juras, PhD., P. Geo., and dated October 9, 2003. This mineral resource report was also filed on SEDAR. The mineral resource classifications are reported to follow the standards of CIMM 2000.

All currency amounts expressed herein are expressed in Q2 2006 US dollars ("**USD**" or "**US Dollars**").

**Project Location**

The Nui Phao Project is located approximately 80 km northwest of Hanoi in the Dai Tu District of Thai Nguyen Province in Northern Viet Nam. Located about 2-km west of the mine site is Dai Tu, the closest town. Thai Nguyen City, the provincial capital with a population of 240,000 residents, is situated approximately 20 km to the southeast, and the Chinese Border is approximately 150 km to the north; see the following map, Figure 1-1.\

The Project will be developed by the Nui Phao Mining Joint Venture Company Limited (alternatively referred to as "**Nuiphaovica**") a Vietnamese Company. Ownership of Nuiphaovica is as follows:

- Tiberon Minerals Ltd., a Canadian Company – 70%;

- Thai Nguyen Mineral Company, a Vietnamese Company –15%; and,



- Thai Nguyen Import Export Investment Company ("**Intraco**"), a Vietnamese Company – 15%.

Tiberon has signed a contract with Intraco for transfer of ownership of a further 7.5% of Nuiphaovica which would bring Tiberon ownership in Nuiphaovica to 77.5%; however as of the effective date of this Report this contract has not been approved by the Vietnamese Ministry of Planning and Investment.

Also Thai Nguyen Minerals Company is in the process of being merged with Batimex, another Vietnamese Company, to form a Joint Stock Company which will remain at least 51% by the Provincial Vietnamese Government. As of the effective date of this report this merger is not complete. There is no reported change to the Ownership interest of Batimex/Thai Nguyen Minerals Company.

Applicable license boundaries are provided as Figure 1-2. On September 12, 2001 Nuiphaovica was granted the right to explore within the bounds of its exploration license ("**ELA**"). The ELA reference number is 2068/QD-DCKs. Such license expired on September 12, 2003. Tiberon submitted an application to renew the 2001 exploration license on August 7, 2003, for an additional 2-yr term as permitted under Viet Nam's mineral law, which covers the entire exploration area with the exception of the mineral resources area covered under this 43-101 report.

The area covering the mineral resource of this 43-101 report is specifically identified and secured through the Investment Licence granted to Tiberon on February 25, 2004.

The exploration license comprises a Gold-Polymetallic Exploration Licence that covers an area of 47.94 km2 (Figure 1.2) and is centred at latitude 21°38'50", longitude 105°40'00". Based on Vietnamese 1:50,000 scale topographic map No. 6152III, the ELA lies within an area bounded to the north and south by Gauss-Kruger grid lines 2400464N and 2393461N, respectively, and to the west and east by Gauss-Kruger grid lines 18560574E and 18570578E, respectively.

The property boundaries have not been legally surveyed. However, a significant extensive area within the licence area, centred on the most significant area of known mineralization, has been surveyed for exploration and mine design purposes. Within the development period topographic surveys have been performed over the Project area and such definition will continue as the Project progresses. The reference point for all surveying is a geodetic marker measured in the Gauss-Kruger coordinate system for Dai Tu. However the majority of engineering development activities have occurred in the VN 2000 coordinate system per the standard adopted in Viet Nam. Therefore certain figures contained within this report may provide the VN 2000 grid reference.

**Geological Setting**

(This sub-section has been reproduced from the July 2005 report.) The Nui Phao Project is located in the Tam Dao region, northeast of the Song Ma Suture zone and the Hanoi rift, near the intersection of three tectonic zones: the Song Lo Anticlinorium, the An Chao Rift depression and the Dong Bac Fold system.

In southern China, Middle to Upper Cretaceous granites overprints Devonian marbles, resulting in replacement-style mineralization (such as occurs in the Gejiu and Dachang mineral fields) including skarns, greisens and veins. No similar large deposits have previously been found in northern Viet Nam. This likely reflects a paucity of exploration in this part of the country, since the area shares similar complex tectonics and a close spatial relationship with other districts in southern China.

Nuiphaovica is developing the Project which comprises an open pit mine and mineral processing plant to produce tungsten, copper, bismuth and fluorite by mining and processing 3,500,000 t/a of ore over a



nominal operating life of 16.3 years. The advent of mining on the scale proposed by the operators brings the opportunity for unprecedented social and economic development to the region. In addition, the mine plan includes proposals to rehabilitate serious pre-existing pollution. These pre-existing impacts have affected land, water, biological and socioeconomic resources; and currently threaten human health and the livelihoods of downstream communities. Thus, the overall environmental and socioeconomic impact of the Nui Phao Project is planned to be a significant improvement compared to existing conditions (Richards et al 2003).

Nuiphaovica is committed to developing the Project in a manner consistent with world best practices including World Bank policies and directives and the Equator Principles. As such is it expected that development will meet or exceed the legal/regulatory requirements of Viet Nam. A particular objective is to ensure that proper environmental and social protection measures are followed, that the specific needs and interest of local people are taken into account during planning, and that any adverse effect on communities or their resources are minimized.

Climatic conditions are described as a monsoon tropical climate with temperature variations from 16°C in December and January to 28°C in May through September. The relative humidity is high and fairly consistent year-round, ranging from an average of 78% in December to 86% in April. Average annual rainfall is approximately 2056 mm, with 75% or more of the rain falling from May to December.

The Nui Phao Project area is underlain predominantly by Ordovician-Silurian metasediments of the Phu Ngu Formation, which is the primary host lithology for the mineralization. Late Triassic porphyritic, biotite-dominant Nui Phao granite is present in the south-eastern portion of the licence area. This unit hosts a large number of narrow tin-bearing sulphide veins which have historically been exploited by local miners. The Cretaceous leucocratic, two-mica, Da Lien granite is considered to be the main source of mineralizing fluids for the skarn and greisen. It is exposed over an area of about 2 km$^2$ to the immediate north of the main sulphide body. Property geology is shown in Figure 1.3.

The main deposit type in the Project area is an intrusive-related polymetallic skarn and greisen. The Nui Phao skarn and associated greisen-style mineralization are characterized by an assemblage of W-Au-Cu-Bi-F-Be-bearing minerals that occurs within, and proximal to, the two-mica Da Lien granite. A large west-northwest-trending, iron- and quartz-rich gossan body represents the surface expression of the Main Zone skarn/greisen polymetallic deposit. This unit is exposed over an area approximately 850-m long and up to 200-m wide and varies from 5-to 15-m thick, averaging approximately 10 m. The lithological units of the Main Zone consist of intercalated assemblages of pyroxene (minor garnet) skarn, retrograde amphibole/biotite skarn, well-foliated calc-silicate rock/hornfels, marble, magnetite-dominant skarn (with wrigglite texture) and granitic and pegmatitic dykes and sills. The Da Lien and Nui Phao granites encapsulate these intercalated lithologies. A zone of day overburden and saprolitic sediments varying in thickness from 3 to 110 m, generally around 20- to 40-m thick, overlies the rock units.

The mineralization consists of tungsten, gold, bismuth, copper and fluorine. These metals occur in scheelite, rare wolframite, native gold, chalcopyrite, native bismuth, minor bismuthinite and fluorite (generally clear or green/blue coloured). Beryllium is also common, and is present as the mineral danalite in amphibole skarns and light blue beryl in the greisenised rocks.

Drilling totals 20 567 m in 155 drill holes for mineralization delineation. Metallurgical sampling resulted in 33 "twinned" holes being completed strictly for metallurgical study for a total of 3588.33 m; metallurgical sample (for the second stage of the program) was also collected from archived core from four exploration holes (NP-132, 135, 137 and 140) totalling 259.96 m in length.



The mineral resource estimate for the Nui Phao deposit was made by AMEC under the direction of Dr. Stephen Juras, P.Geo. The estimates were made from three-dimensional block models utilizing commercial mine planning software (MineSight®) and were based on data from 174 total drill holes (including 155 drill holes for resource delineation and 19 completed at that time for metallurgical study) and 6,633 assay intervals (tungsten trioxide, gold, copper, bismuth, fluorine and iron values). The complete results of Dr. Juras' study has been presented in the report "Technical Report – 2003 Update, Nui Phao Project, Viet Nam" dated October 9, 2003 and filed on SEDAR.

The mineralization of the Nui Phao Project as of October 9, 2003, is classified as Measured, Indicated and Inferred mineral resources. The classified mineral resources are shown as Figure 1-3.

**Table 1-1 – Mineral Resource Summary including Mineral Reserve – October 9, 2003**

| | Tonnes | $WO_3eq$ (%) | $WO_3$ (%) | $CaF_2$ (%) | Au (g/t) | Cu (%) | Bi (%) |
|---|---|---|---|---|---|---|---|
| **O.2 $WO_3$eq Cutoff Grade** | | | | | | | |
| Measured Mineral Resources | 25 070 000 | 0.68 | 0.25 | 8.4 | 0.26 | 0.23 | 0.108 |
| Indicated Mineral Resources | 35 450 000 | 0.54 | 0.17 | 8.3 | 0.16 | 0.15 | 0.081 |
| Measured and Indicated Mineral Resources | 60 520 000 | 0.60 | 0.20 | 8.4 | 0.20 | 0.18 | 0.092 |
| Inferred Mineral Resources | 27 420 000 | 0.50 | 0.16 | 7.1 | 0.15 | 0.17 | 0.078 |
| **0.5 $WO_3$eq Cutoff Grade** | | | | | | | |
| Measured Mineral Resources | 19 640 000 | 0.77 | 0.29 | 9.0 | 0.30 | 0.26 | 0.125 |
| Indicated Mineral Resources | 18 560 000 | 0.71 | 0.23 | 9.9 | 0.23 | 0.22 | 0.116 |
| Measured and Indicated Mineral Resources | 38 200 000 | 0.74 | 0.26 | 9.5 | 0.26 | 0.24 | 0.121 |
| Inferred Mineral Resources | 10 410 000 | 0.78 | 0.29 | 8.7 | 0.26 | 0.29 | 0.133 |

Note:  $WO_3$ = tungsten Trioxide; Au = gold; Cu = Copper; Bi = Bismuth; $CaF_2$ = Fluorite

**Mineral Reserve**

The Nui Phao deposit will be mined as an open pit, using a fleet of Owner operated mining equipment consisting of production drills, an excavator, loaders and haul trucks supported by the customary ancillary equipment for this scale of production. The AMEC resource model was used by Independent Mining Consultants Inc. of Tucson Arizona ("**IMC**") as the basis for mine planning and the development of the reserve estimate defined as Table 1-2 - Mineral Reserve.

The selected ore production rate is 3.5 Mt/a, resulting in a mine life of 16.3 years. The production plan is designed to provide higher than average grades in the early years and ensure that several months of ore production is always exposed by waste stripping.



**Table 1-2 – Mineral Resource Estimate**

**Nui Phao Mineral Reserve Estimate**

| Mineral Reserve Class | Ore Ktonnes | Eq WO$_3$ (%) | WO$_3$% (%) | CaF$_2$ (%) | Bi (%) | Cu (%) | Au (g/t) |
|---|---|---|---|---|---|---|---|
| Proven Mineral Reserve | 23,515 | 0.524 | 0.262 | 8.57 | 0.112 | 0.232 | 0.269 |
| Probable Mineral Reserve | 31,910 | 0.399 | 0.173 | 8.38 | 0.083 | 0.154 | 0.163 |
| **Total Mineral Reserve** | **55,425** | **0.452** | **0.211** | **8.46** | **0.095** | **0.187** | **0.208** |

Total Pit Material is 173,711 k tonnes.  Strip Ratio (Waste to Ore) of 2.13 to 1.

No additional allowance for dilution has been incorporated into the mine plans or reserve estimate provided above. IMC indicated that the kriging of the resource model will inherently provide dilution and that based on their experience this is often sufficient to characterise the reserve.

The mine production schedule upon which this reserve is based is provided as Table 1-3.



**Annual Information Form**
**March 29, 2007**

| Mine Production Schedule | | | | | | | | | | | | Revised 20-07-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Eq WO₃ Cutoff(%) | Ore Ktonnes | Eq WO₃ (%) | WO% (%) | CaF2 (%) | Bi (%) | Cu (%) | Au (g/t) | S (%) | Lg. Stock (ktonnes) | Waste Ktonnes | Total Tonnes | Strip Ratio |
| Yr – 2 Q1 | 0.40 | | | | | | | | | | | | |
| Yr –2 Q2 | 0.40 | | | | | | | | | | | | |
| Yr –2 Q3 | 0.40 | | | | | | | | | | 531 | 531 | |
| Yr --2 Q4 | 0.40 | | | | | | | | | 13 | 782 | 795 | |
| Yr – 2 | 0.40 | | | | | | | | | 13 | 1,313 | 1,326 | |
| Yr – 1 Q1 | 0.40 | 2 | 0.472 | 0.273 | 7.79 | 0.091 | 0.048 | 0.112 | 1.53 | 31 | 762 | 795 | 23.09 |
| Yr – 1 Q2 | 0.40 | 16 | 0.439 | 0.256 | 7.07 | 0.070 | 0.092 | 0.126 | 3.78 | 42 | 737 | 795 | 12.71 |
| Yr – 1 Q3 | 0.40 | 19 | 0.438 | 0.255 | 7.06 | 0.070 | 0.094 | 0.126 | 3.84 | 41 | 735 | 795 | 12.25 |
| Yr – 1 Q4 | 0.40 | 89 | 0.474 | 0.239 | 9.37 | 0.072 | 0.147 | 0.172 | 6.53 | 22 | 684 | 795 | 6.16 |
| Yr - 1 | 0.40 | 126 | 0.464 | 0.244 | 8.70 | 0.072 | 0.130 | 0.158 | 5.70 | 136 | 2,918 | 3,180 | 11.14 |
| Yr – 1 Q1 | 0.40 | 62 | 0.471 | 0.236 | 9.40 | 0.070 | 0.149 | 0.170 | 6.64 | | 1,937 | 1,999 | 31.24 |
| Yr – 1 Q2 | 0.40 | 467 | 0.598 | 0.325 | 8.99 | 0.111 | 0.252 | 0.269 | 11.85 | | 1,546 | 2,013 | 3.31 |
| Yr – 1 Q3 | 0.40 | 700 | 0.586 | 0.314 | 7.97 | 0.131 | 0.278 | 0.327 | 13.16 | | 1,800 | 2,500 | 2.57 |
| Yr – 1 Q4 | 0.40 | 875 | 0.534 | 0.265 | 7.40 | 0.133 | 0.304 | 0.337 | 14.46 | | 1,975 | 2,850 | 2.26 |
| Year 1 | 0.40 | 2,104 | 0.564 | 0.294 | 8.00 | 0.126 | 0.279 | 0.314 | 13.22 | 0 | 7,258 | 9,362 | 3.45 |
| Yr2 Q1 | 0.30 | 875 | 0.525 | 0.274 | 7.24 | 0.118 | 0.272 | 0.292 | 12.83 | | 1,975 | 2,850 | 2.26 |
| Yr2 Q2 | 0.30 | 875 | 0.553 | 0.304 | 7.61 | 0.110 | 0.254 | 0.285 | 11.93 | | 1,975 | 2,850 | 2.26 |
| Yr2 Q3 | 0.30 | 875 | 0.527 | 0.272 | 8.17 | 0.110 | 0.230 | 0.299 | 10.71 | | 1,975 | 2,850 | 2.26 |
| Yr2 Q4 | 0.30 | 875 | 0.572 | 0.304 | 8.44 | 0.117 | 0.257 | 0.305 | 12.08 | | 1,975 | 2,850 | 2.26 |
| Year 2 | 0.30 | 3,500 | 0.544 | 0.289 | 7.87 | 0.114 | 0.253 | 0.295 | 11.89 | 0 | 7,900 | 11,400 | 2.26 |
| Year 3 | 0.30 | 3,500 | 0.555 | 0.278 | 8.41 | 0.132 | 0.260 | 0.314 | 12.25 | | 7,900 | 11,400 | 2.26 |
| Year 4 | 0.27 | 3,500 | 0.493 | 0.218 | 8.48 | 0.128 | 0.258 | 0.285 | 12.14 | | 7,900 | 11,400 | 2.26 |
| Year 5 | 0.24 | 3,500 | 0.508 | 0.243 | 7.42 | 0.136 | 0.279 | 0.302 | 13.21 | | 7,900 | 11,400 | 2.26 |
| Year 6 | 0.22 | 3,500 | 0.519 | 0.237 | 8.06 | 0.142 | 0.289 | 0.291 | 13.72 | | 7,900 | 11,400 | 2.26 |
| Year 7 | 0.24 | 3,500 | 0.532 | 0.258 | 8.37 | 0.129 | 0.261 | 0.272 | 12.29 | | 7,900 | 11,400 | 2.26 |
| Year 8 | 0.21 | 3,500 | 0.545 | 0.290 | 8.92 | 0.099 | 0.207 | 0.229 | 9.55 | | 7,900 | 11,400 | 2.26 |
| Year 9 | 0.15 | 3,500 | 0.438 | 0.214 | 8.56 | 0.077 | 0.143 | 0.198 | 6.32 | | 7,900 | 11,400 | 2.26 |
| Year 10 | 0.16 | 3,500 | 0.466 | 0.188 | 8.11 | 0.147 | 0.259 | 0.214 | 12.19 | | 7,900 | 11,400 | 2.26 |
| Year 11 | 0.15 | 3,500 | 0.384 | 0.180 | 7.70 | 0.077 | 0.123 | 0.157 | 5.33 | | 7,900 | 11,400 | 2.26 |
| Year 12 | 0.15 | 3,500 | 0.360 | 0.164 | 7.60 | 0.067 | 0.116 | 0.142 | 4.99 | | 7,900 | 11,400 | 2.26 |
| Year 13 | 0.15 | 3,500 | 0.346 | 0.158 | 8.13 | 0.047 | 0.095 | 0.109 | 3.91 | | 7,815 | 11,315 | 2.23 |
| Year 14 | 0.10 | 3,500 | 0.352 | 0.149 | 8.72 | 0.054 | 0.100 | 0.113 | 4.19 | | 5,098 | 8,598 | 1.46 |
| Year 15 | 0.10 | 3,500 | 0.357 | 0.145 | 9.75 | 0.045 | 0.077 | 0.096 | 3.05 | | 4,210 | 7,710 | 1.20 |
| Year 16 | 0.10 | 3,500 | 0.325 | 0.118 | 10.23 | 0.030 | 0.056 | 0.060 | 1.98 | | 2,493 | 5,993 | 0.71 |
| Year 17 | 0.10 | 695 | 0.395 | 0.128 | 12.57 | 0.048 | 0.100 | 0.110 | 4.15 | | 132 | 827 | 0.19 |
| TOTAL | | 55,425 | 0.452 | 0.211 | 8.46 | 0.095 | 0.187 | 0.208 | 8.59 | 149 | 118,137 | 173,711 | 2.13 |

**Table 1-3 – Mine Production Schedule**



**Waste Rock**

The open pit will also produce about 118.0 Mt of waste rock and overburden, of which about 20.9 Mt is expected to be potentially acid generating ("**PAG**"). The remainder is non-acid generating ("**NAG**") waste rock and overburden.

Both PAG and NAG will be used in the initial construction of the tailings facilities and thereafter for the systematic raising of the associated impoundment dams. The remainder will be either stockpiled in the dumps to the north and south of the open pit, as in the case of NAG, or within the sulphide cell of the tailings facility in the case of PAG.

Waste rock will be hauled by the production haul trucks to the appropriate stockpile location and the haul roads have been included in the design layout thus far developed.

**Mineral Processing**

The Nui Phao mineral processing facility has been designed to treat 3,500,000 tonne/annum. The plant will operate 24 hours per day and 365 days per year. Plant availabilities of 75% were used for the crusher station, while the rest of the facility was assumed to run 90% of the time.

The unit operations used in the Nui Phao flow sheet are all conventional and have been used elsewhere for the recovery of the minerals concerned.

The ore size is reduced to a liberation size of 80% passing 180 microns. This is accomplished in a jaw and cone crusher circuit, followed by a two-stage rod milling section. Fine screens are used for classification in the secondary milling circuit to preclude overbreaking the friable scheelite mineral.

Conventional sulphide flotation chemistry is used for the removal of bulk sulphides, mainly pyrrhotite, and for the recovery of copper and bismuth. Oxide flotation methods are used to recover fluorite. The tungsten is recovered by gravity methods using shaking tables. Conventional equipment is used throughout the process. The plant produces tungsten, copper, and fluorite concentrates and bismuth cement.

The plant includes the following unit operations:

- a three-stage crushing plant
- crushed ore storage and reclamation
- a two-stage grinding section, followed by thickening
- copper flotation, bismuth leaching from the copper concentrate, copper concentrate dewatering and storage
- bulk sulphide flotation
- bismuth flotation, bismuth leaching and cementation, and bismuth packaging
- tungsten gravity recovery, upgrading, drying and bagging
- fluorspar flotation, concentrate dewatering and storage
- effluent treatment.



Research metallurgical test work and pilot plant development has been performed over the past few years to develop confidence in the process flow sheet and the estimated mineral recovery values reflected in this Report.

The test program was designed and monitored by H. Matt Bolu, P.Eng. Vancouver, BC, Canada, performed by SGS Lakefield of Lakefield Ontario Canada. Such testing was monitored and reviewed by Aker Kvaerner E&C, a division of Aker Kvaemer Canada Inc. (Aker Kvaerner) during the development of the Final Feasibility Study during the period from 2004 to 2005 to ensure that it met its standards for bankable feasibility studies. Further reviews have been performed by, Behre Dolbear Australia Pty. (as a part of the due diligence procedure related to debt financing) and SNC Lavalin and Ausenco Asia Pty. Ltd. during further technical development of the Project beyond the Final Feasibility Study. The resultant process flow sheet is provided in schematic form as Figure 1-5 – Schematic Flow Diagram.

As a result of the test work conducted to date, processes were proposed for the recovery of fluorite, copper and bismuth by conventional flotation, and for tungsten by gravity methods. A bismuth leach and cementation process was also developed.

Table 1-4 provides the concentrate grades and recoveries developed as a result of the test work program.

## Table 1-4 – Grades and Recoveries

| Commodity | Grade | Recovery |
|-----------|-------|----------|
| Tungsten | 65% | 66% |
| Fluorspar | 97% | 75% |
| Copper | 27% | 87% |
| Bismuth | 90% | 62% |
| Gold | 4 g/t | 10% |





**Schematic Flow
Diagram**

## Tailings Storage Facility

The Tailings Storage Facility ("**TSF**") area (see Figure 1.5) will be developed in accordance with Vietnamese regulatory requirements and international standards for similar facilities. The TSF has been designed to store all tailings associated with the processing of an anticipated 55.4 Mt or ore over the



projected 16.3-yr mine life which -will result in aggregate disposal of 51.4 Mt of Oxide and Sulphide tails.

The metallurgical process plant will produce two distinct tailings waste streams with different geochemical composition. The Sulphide tails will be generated by the bulk sulphide flotation and will need to be deposited and maintained in a sub-aqueous condition due to their reactivity. The Oxide tails will be deposited in a sub-aerial manner. The division of Oxide to Sulphide tails if nominally 65% to 35% respectively.

Geochemical modelling of the water systems indicates that excess water from the oxide tailings cell ("**OTC**") can be discharged to the environment without further treatment beyond primary settlement of solids to manage total suspended solids ("**TSS**").

The highly reactive sulphide tailings will need to be deposited and stored in the sulphide tailings cell ("**STC**") in a sub aqueous manner and maintained flooded under a nominal cover of 2 m of water at all times. The TSF has been designed such that the water level within the STC will be even with or slightly higher than the water level with the OTC. This will minimise the potential for the oxide tailings water to flow and/or seep into the sulphide cell. Excess water from the STC will be pumped back to the mill via a floating reclaim pump barge.

**Sales (Offtake) Agreements**

Sales (or offtake) agreements have been established for each of the three principal concentrate products from the Project. OSRAM SYLVANIA has agreed to purchase up to 100% of the planned production of Tungsten concentrate. CMC Cometals and Sidech S.A. have likewise agreed to purchase 100% of the production of Fluorspar and Bismuth concentrates respectively.

These agreements provide floor (base level) prices, except for the Bismuth offtake agreement, but are not restricted to a ceiling (high level) price.

**Transportation and Port Facilities for Concentrate Products**

Concentrates produced by the Project will be handled through the load out structure within the process plant perimeter. Here they will be transferred to suitable rail cars for transportation to the ports or elsewhere for sale.

The narrow gauge railway, re-aligned as a part of the Project, connects to the Vietnamese national rail system which serves the two principle ports described below.

Two existing port facilities at, Hai Phong Port and the recently constructed Quang Ninh (previously referred to as Cai Lan Port) near the city of Ha Long are located approximately 180 km and 240 km respectively to the southeast of the Project. These ports provide the export route for the concentrates. Export of concentrates produced by the Project are planned to occur through both Hai Phong and Quang Ninh Ports with the former handling the packaged tungsten and bismuth concentrates and the latter handling the bulk fluorspar and copper concentrates.

Furthermore it is anticipated that the Hai Phong port will serve for the importation of equipment and materials during the construction and operating phases. Such equipment and materials will predominantly be transported to the site by rail.



**Resettlement Action Plan**

At present the area of the proposed mine is used primarily for agriculture. Numerous subsistence and other rural dwellings are located within and adjacent to the Project site. These lands are used for the personal and commercial production of crops such as rice, tea, cassava and other produce.

One of the principal impacts of the Project is on the people and business that now inhabit the area. The communes of Ha Thuong, Hung Son and Tan Linh are affected, to a greater and lesser extent, by the proposed development of the Project including the associated infrastructure re-alignments and installations.

The commune of Ha Thuong (mostly to the east/south-east of the Project area) is the most severely affected by the direct Project area. Hung Son commune to the west is the next most significantly impacted with the remainder being in Tan Linh. Phuc Linh commune is located downstream of the operational area and may be affected as a result of neighbouring Project activities.

The affected households have been classified as 'resident households' including those whose residential land and structures are affected and 'non-resident households' that are affected by agricultural land loss only but are not physically displaced. According to the census and inventory undertaken in the third quarter of 2004, there are 1,153 households who will be affected by the 445 ha of the Project operational area. The number of persons living in these households is 4,276 persons, or on average 3.7 persons per household. Since some of the households only have land in the area, the number of households that need to be physically relocated is somewhat smaller at 793 households, with 2,942 persons.

In order to effect the resettlement of these individuals a program has been devised to compensate and resettle the effects households. This program has been developed and is being implemented in conjunction with the local District and Provincial authorities that are responsible for such activities within the Thai Nguyen Province. At the present time the Nuiphaovica compensation and resettlement program is one of five large such programs underway in the Thai Nguyen province.

Compensation and resettlement is being performed under a Resettlement Action Plan ("**RAP**") that has been developed to comply with the policies of the World Bank Group. Households will be either compensated for their affected assets (as determined through a detailed inventory) or compensated and resettled. Programs to mitigate the impact of the Project include compensation payments, resettlement site development and economic restoration programs devised to return personal economic status to at least that in existence prior to the development of the Project.

During the initial surveys of the Project Affected People ("**PAP**") 90% indicated their preference to be resettled to replacement dwellings in the local area. In order to develop resettlement sites to fulfil this objective resettlement sites have been studied and approved in local areas. The first such sites reside in Hung Son with other sites under consideration also in Ha Thuong. Due to the paucity of available land the development of these sites requires certain resettlement also within such sites leading to so-called secondary resettlement. Such activities expand the overall impact of the Project to include certain indirect areas.

As a result the communes of Ha Thuong, Hung Son, Tien Hoi, Cat Ne and Quang Chu are affected by proposed relocation sites and/or replacement agricultural land.

The total area of land to be acquired for five feasible residential relocation sites, including a site for economic restoration activities is about 56 ha. The number of households affected by the acquisition of these relocation sites is 637 households with a population of 2,600 persons, of which 83 households with



331 people will lose both their land and house, while the balance will lose agricultural land only. Almost all the land of the relocation sites is agricultural land, for which compensation will be paid on the same basis as for the land acquired for the Project operations.

The number of households to be affected by the land acquisition for the re-establishment of cemeteries (in Ha Thuong commune) and the army facility site (in Cat Ne commune) is 120 households with 588 people, and of these only 8 households will have their buildings affected. Thus, there are a total number of 1,910 households affected with a population of 7,464 persons, of which 884 households have to be physically relocated to, or re-arrange their houses at the relocation sites. Considering the portion of productive land loss to total area of holding by affected households, only those affected people occupying agricultural land in the operational area and in the proposed relocation sites are considered severely affected. The agricultural land acquired for the operational area plus the five relocation sites is about 347 ha, and on average this is 0.21 ha per household.

The total number of households affected by loss of productive land is 1,026 households. About 15 percent of the affected population is non-Kinh (ethnic minorities); and there is one Catholic community in Ha Thuong commune. There are also other vulnerable groups that will be affected such as poor families, ethnic minorities and women headed households.

Existing homes, businesses and community infrastructure located within the displacement boundary which are adversely impacted by the new mining and processing operation will be relocated. Agricultural activities which are not impacted by the new operations, but that fall within the displacement area, are planned to continue to a limited extent but with certain restrictions due to concerns regarding safety and security.

Public works and social infrastructure will also be affected, including:

- A segment of National Road No. 37;
- A segment of the narrow gauge railway from Quang Trieu to the Nui Hong coal mine;
- A segment of 35 kV;
- Army storage/facilities (K10 under management of KV3);
- Markets, village cultural halls, schools, and a prayer house of the Catholic community;
- Cemeteries; and,
- Farm irrigation systems.

These public works will be compensated in cash to the community or replaced in kind to previous or better service levels, in close cooperation with the local authorities and communities. Thirty-seven affected households run small businesses, generally along the National Road No. 37 that will be realigned. These businesses are small retail outlets selling drinks and snacks and are usually one of a number of sources of household income for these families.

**Closure**

At the time when the mill shuts down, all buildings and structures, other than those designated for post-mining use, will be demolished or removed off site. The building foundations will be covered with 1 m of soil.



The open pit will be allowed to flood once mining is completed and site reclamation may involve the establishment of plants along the rim of the pit lake. Flooding of the pit is expected to take about 6 years to complete during which the water quality will be closely monitored. Mitigating measures such as lime addition are provided for, if required, to address water quality issues resulting from prolonged exposure to the sulphide bearing pit walls.

Progressive rehabilitation of the waste dumps will be carried out during operations. Waste dumps are being designed to account for the necessary closure slope profiles by using shallower benched slopes during their development. Nevertheless they may need to be re-graded to enhance the long-term stability and overall site aesthetics. The waste dumps will be covered with 1 m of soil to reduce infiltration, promote runoff and facilitate re-vegetation.

The sulphide tailings and the PAG waste at the TSF will be covered with 2 m of non-add generating oxide tailings. The tailings ponds will be drained and the entire area covered with 1-m thick soil cover. The soil cover is intended to reduce water infiltration and oxygen diffusion into the underlying tailings and is integral for the return of the impacted land to restricted agriculture use.

Draining the tailings ponds will require relocating a substantial quantity of tailings by dredging, decanting and treating the impounded water and ultimately, partially breaching the dams. This, together with the construction of spillways, will enhance the dam stability and eliminate the risk of dam failure due to overtopping. Dam stability will be further enhanced by re-grading the dam slopes to a profile of no steeper than 2(H):1(V) and reducing the dam heights where possible.

The freshwater reservoir is a resource for clean water with the potential health benefits to the inhabitants who currently rely on groundwater as a water supply. The reservoir and its associated pumping and water distribution system will be turned over to the local Authority upon completion of rehabilitation.

The conceptual mining plan has been incorporated into the Environmental and Social Action Plan ("**ESAP**") and will be updated and refined as closure approaches.

## Project Development Schedule

The Project development schedule upon which the cost estimates and economics are based is provided as Figure 1-9.

This schedule was developed by Ausenco Asia Pty. Ltd. ("**Ausenco**") and is based upon certain data being provided by Nuiphaovica and as a result of its own estimate for the schedule durations and sequence of activities for the development tasks.

The resettlement program is a critical path activity[*] as this aspect needs to be completed in almost all areas prior to the commencement of construction of the Project facilities. This aspect of the schedule was developed by Nuiphaovica based upon experience to date and from discussions with the authorities responsible to manage and oversee the resettlement program.

---

[*]  The consecutive sequence of activities in a project whose cumulative time requirements determine the minimum total project time.  Delays in critical path activities delay the entire project if other steps are not compressed.



**Project Initial Capital Cost**

The estimate of initial capital cost for the Project has been developed by Ausenco and Nuiphaovica with input from IMC and Golder Associates. Table 1-5 provides the initial capital cost estimate. All costs provided are Q2 2006 USD with no allowance for escalation, interest or the costs of financing during construction.

In order to produce the cost estimate provided, updated quotations were received for the majority of equipment for the Project. Moreover, revised rates were obtained for bulk materials and supplies and also for contract service related to installation and construction. These data reflected the labour rates resulting from a renewed labour study. Owner costs and other indirect costs were each estimated upon further evaluation of each of the elements comprising these costs.

A contingency analysis was performed by Nuiphaovica using a Monte Carlo style analysis and also by Ausenco. The contingency value below reflects the combined contingency amount.

| Description | Final Feasibility Study |
|---|---|
| | |
| Mine Facility | 30,415,951 |
| Crushing Plant | 11,857,874 |
| Process Plant | 70,742,684 |
| Tailings Facility | 10,317,989 |
| Utilities | 9,903,789 |
| On-site Infrastructure | 20,502,947 |
| Off-site Infrastructure | 12,083,146 |
| **Total Direct Costs** | **165,824,380** |
| | |
| Temporary Indirects | 7,557,316 |
| EPCM Indirects | 52,016,767 |
| Other Indirects | 4,391,260 |
| **Total Indirect Costs** | **63,965,343** |
| | |
| Project Management | 8,076,851 |
| Compensation and Resettlement exc. Sector 6 | 24,214,326 |
| Administration/Operations | 13,118,172 |
| **Owner Costs** | **45,409,349** |
| **Contingency** | **27,372,182** |
| **Project Total** | **302,571,254** |

**Sustaining Capital Costs**

The requirements of sustaining capital have been assessed to account for such as items as raising of the dams and also replacement of equipment. The sustaining capital estimate is provided as Table 1-7.



## Operating Costs

Operating costs have been developed after a first principles assessment of each aspect of operations. A complete update of the labour study was performed by the Human Resources department of Nuiphaovica and the results are reflected in the cost estimate provided.

Furthermore the operating costs for mining, processing and tailings development were produced after a detailed review of each of the respective unit operations. Owner General and Administrative ("**G&A**") and labour costs were developed from an updated manpower schedule.

Operating costs per tonne milled are provided in Table 1-6. The distribution of operating cost is provided in Figure 1-6.

### Table 1-6 - Operating Cost Estimate per tonne milled

| Operating Costs (US$/t$_{milled}$) | Year 1 | Year 2 | Year 3 | Year 4-16 |
|---|---|---|---|---|
| Concentrator Power | 1.98 | 1.99 | 1.99 | 1.99 |
| Concentrator Maintenance | 0.57 | 0.37 | 0.37 | 0.54 |
| Concentrator Reagents | 1.83 | 1.83 | 1.83 | 1.83 |
| Concentrator Labour | 1.72 | 0.79 | 0.79 | 0.42 |
| Concentrator Consumables | 1.24 | 1.33 | 1.33 | 1.33 |
| Assays | 0.06 | 0.04 | 0.04 | 0.04 |
| Concentrator Mobile Equipment | 0.15 | 0.10 | 0.10 | 0.10 |
| Concentrator Other | 0.05 | 0.03 | 0.03 | 0.03 |
| Owners General & Administration | 1.72 | 1.12 | 1.01 | 0 94 |
| Mining | 3.37 | 3.37 | 3.37 | 3.37 |
| **TOTAL** | **12.70** | **10.98** | **10.86** | **10.60** |

### Table 1-7 – Sustaining Capital Schedule

| Sustaining Capital In 1000 USD | Year of Operation | | | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Total |
| Mine Equipment | 1,915 | 1,040 | 209 | 1,040 | 1,663 | 108 | 285 | 1,040 | 5,025 | 3,120 | 2,791 | 139 | 76 | – | 174 | – | | 18,626 |
| TSF Dam Lifts | 2,788 | 1,986 | 1,215 | 1,420 | 1,215 | 898 | 643 | 610 | 579 | 377 | 326 | 131 | | | | | | 12,188 |
| TSF Sediment Pond | | | 120 | | | | | | | | | | | | | | | 120 |
| Replace Equipment | | | | | | | | | | | | | | | | | | – |
| Light Mobile | | | | | 100 | | | | | 100 | | | | | | | | 200 |
| Process Re-align | | | | | | | | 840 | 818 | | 681 | | 278 | | 670 | | | 3,286 |
| West Pit Road | | | | | | 200 | | | | | | | | | | | | 200 |
| Reclamation | | | | | | | | | | | | | | | | | 9,700 | 9,700 |
| Salvage Value | | | | | | | | | | | | | | | | | (5,000) | (5,000) |
| C&R – Sector 6 | 4,000 | 871 | | | | | | | | | | | | | | | | 4,871 |
| **Total** | **8,704** | **4,017** | **1,423** | **2,461** | **2,978** | **1,006** | **928** | **2,489** | **6,622** | **3,598** | **3,797** | **270** | **354** | **–** | **844** | **–** | **4,700** | **44,192** |

## Economic Analysis

As a result of the input of updated data, developed as described, a renewed economic analysis was performed. The analysis used as a basis, a financial model developed by one of the banks comprising the



senior debt providers for the Project. Summary results are provided in Table 1-8 which provides cash flow data net of Royalties (Natural Resources Taxes) but before other tax.

Note that the input commodity pricing used remained the same as that employed in the July 2005 Aker Kvaerner report even though prices have increased since then. Even though the financial model used was developed by a bank, the estimated economic performance of the Project is based upon a 100% equity basis and does not account for the impact of debt financing.

### Table 1-8 – Summary of Economic Analysis

| Description | Unit | Amount |
|---|---|---|
| Initial Capital Cost | USD | 302.6M |
| Life of Mine Sustaining Capital | USD | 44.2M |
| Total Cash Flow – before tax | USD | 590.2M |
| Peak annual cash flow – before tax | USD | 78.9M |
| NPV at 7.5% discount – before tax | USD | 178.9M |
| Internal Rate of Return – before tax | | 16.0% |
| Pay Back Period | | 5.0 years |
| Input commodity pricing: | | |
| $WO_3$ | USD /mtu | 100.00 |
| $CaF_2$ | USD /dmt | 150.00 |
| Bi | USD/lb | 3.35 |
| Cu | USD/lb | 1.00 |
| Au | USD/troy oz | 400.00 |
| Total Production of each production concentrate: | | |
| $WO_3$ | dmt | 118,765 |
| $CaF_2$ | dmt | 3,608,280 |
| Bi | dint | 36,454 |
| Cu | dmt | 334,911 |

The projected economic performance of the Project is influenced by variances in actual commodity prices and the capital and operating cost of the completed facility. The following charts, presented as Figure 1-7 and Figure 1-8 provide the sensitivity of NPV (at the 7.5% discount rate) to these factors. NPV data has been calculated on a before tax basis but net of Royalties.

As can be noted the influence of both capital and operating cost variances result in similar effects on economic performance.

Royalty rates in Viet Nam are 5% for tungsten, 2% for fluorite, 3% for copper, 2% for gold and 2% for bismuth. There are no back-in rights associated with exploration or mining in Viet Nam other than those associated with Tiberon's partners.

## RISK FACTORS

Companies involved in the mining industry are faced with many risk factors. The following risk factors are those that management views as the most visible. While it is not possible to eliminate all of the factors inherent in the mining business, the Corporation, through ongoing assessment, strives to manage and limit these risks to ensure the protection of its assets.



## Controlling Shareholder

Dragon Capital, the largest shareholder of the Corporation holds 92.3% of the shares of the Corporation. The activities of the Corporation and its board of directors may be significantly influenced by this controlling shareholder. In addition, Dragon Capital has announced its intention to acquire the remaining shares of the Corporation by compulsory acquisition at a price of $3.65 in cash per share. The Corporation anticipates that an application will be made for it to cease to be a reporting issuer upon completion of the compulsory acquisition transaction. There can be no assurance as to the plans or timing of changes including the compulsory acquisition which may be implemented by Dragon Capital, subject to applicable laws, at the time and in the manner of its choosing.

## Financing

The Corporation has limited financial resources, no source of operating cash flow and no assurance that additional funding will be available for further exploration and development of its projects. The Corporation has been successful in the past in obtaining financing through the placements of equity, however, there can be no assurance that it will obtain adequate financing in the future or that the terms of such financing will be acceptable.

## Dependence on Key Personnel

The success of the Corporation is dependent on the services of a number of members of senior management. The experience of these individuals will be a factor contributing to the Corporation's continued success and growth. The loss of one or more of these individuals could have a material adverse effect on the Corporation's operations and business prospects.

## Influence of Metal Prices

Nuiphaovica's revenue, if any, would be derived from mining and subsequent sale of a variety of minerals including tungsten and fluorspar. The prices of both tungsten and fluorspar are affected by numerous factors beyond the Corporation's control, including international economic and political trends, expectations of inflation, currency exchange fluctuations, fluctuations in pricing and demand, the proximity and capacity of natural resources markets and processing equipment, governmental regulations, land tenure, land use, regulation concerning the importing and exporting of minerals, environmental protection regulations, increased production due to new mine developments, improved mining and production methods, increases in exports from non-western countries In addition, tungsten prices may also be affected by potential re-engineering and substitution for tungsten as a key component in manufacturing and increase in any recycling initiatives. The effect of these factors on the prices of tungsten and fluorspar that may be produced, and ultimately, the economic viability of the tungsten and fluorspar, cannot be accurately predicted.

## Exploration and Development

Mineral exploration and development involves a high degree of risk and significant resources and few properties explored are ultimately developed into producing mines. There can be no assurance that any mineral resources defined can be commercially mined or that metallurgical processing will produce economically viable saleable products. The Corporation attempts to mitigate these risks by entering into exploration programs and feasibility studies and by appointing qualified contractors and personnel who will make recommendations based on the findings of these reports.



**Political Conditions**

Any changes in regulations or shifts in political conditions are beyond the control of the Corporation and may adversely affect its business.  Operations may be affected, to varying degrees, by government regulations with respect to restrictions or foreign ownership, production, price controls, export controls, income taxes, withholding taxes, expropriation of property, movement of capital, stability of currency and environmental legislation.  The effect of all of these factors cannot be accurately predicted.  The Corporation does not maintain political risk insurance for its properties.

**Title Matters**

While the Corporation has obtained the usual industry standard title reports with respect to certain of its properties, this should not be construed as a guarantee of title.  The properties may be subject to prior unregistered agreements or transfer or local land claims, and title may be affected by undetected defects.

**Permits and Licences**

The operations of the Corporation and Nuiphaovica require licences and permits from various governmental authorities.  The Corporation and Nuiphaovica believe they presently hold all necessary licences and permits to carry on the activities which it is currently conducting, and that it is presently complying in all material respects with the terms of such licences and permits.  There can be no guarantee, however, that the Corporation will be able to obtain and maintain, at all times, all necessary licences and permits required to continue its proposed exploration and development or to place its properties into commercial production and to operate mining facilities thereon.  In the event of commercial production, the cost of compliance with changes in governmental regulations has the potential to reduce the profitability of operations or preclude the economic development of the Corporation's Vietnamese properties.

**Social and Environmental**

Mining projects are subject to social and environmental laws and regulations of the country in which the activities are undertaken.  Furthermore, they are measured by their compliance with international practices for social and environmental matters, which are a fundamental requirement for obtaining international debt financings.  To mitigate these risks, the Corporation has engaged the services of an internationally recognized environmental consulting group to conduct baseline and impact studies, based on World Bank Standards.

**Competition**

Competition in the mineral exploration business is intense and could adversely affect the Corporation's ability to develop its properties.  The Corporation competes with numerous individuals and companies, including many major mining companies, which have substantially greater technical, financial and operational resources and staff.  Accordingly, there is a high degree of competition for desirable mining properties, suitable prospects for drilling operations, necessary mining equipment, experienced personnel as well as for access to funds.  There can be no assurance that the necessary funds can be raised or that any planned work will be completed.

**Currency Fluctuations**

The Corporation maintains its accounts in U.S. currency.  As the Nui Phao Property is in a foreign country, its operations may be subject to foreign currency fluctuations and such fluctuations may



materially affect the Corporation's financial position and results.  The Corporation does not engage in currency hedging activities.

Nuiphaovica will maintain its accounts in U.S. currency and may be subject to adverse currency fluctuations from the Vietnamese dong and the Canadian dollar.  The operation at Nui Phao may be subject to foreign currency fluctuations and such fluctuations may materially affect Nuiphaovica's financial position and results.  Nuiphaovica will, in the near future, examine the necessity of currency hedging and the impact currency fluctuations may have on the capital costs of the Project.

## DIVIDENDS

The Corporation has not paid any dividends on its Common Shares.  The Corporation has no present intention of paying dividends on its Common Shares, as it anticipates that all available funds will be invested to finance exploration and development programs on its mineral properties as well as the acquisition of additional mineral properties.

The Corporation is limited in its ability to pay dividends on its Common Shares by generally applicable restrictions under corporate law referred to as "solvency tests".



## DESCRIPTION OF CAPITAL STRUCTURE

### GENERAL DESCRIPTION OF CAPITAL STRUCTURE

**Authorized and Issued Share Capital**

The Corporation is authorized to issue an unlimited number of First Preferred Shares, an unlimited number of Second Preferred Shares and an unlimited number of Common Shares, each having the rights, privileges, restrictions and conditions as summarized below.

As at the date of this AIF, 75,519,695 Common Shares are issued and outstanding, no preferred shares are issued and outstanding and there are no options outstanding.

**Common Shares**

All of the Corporation's Common Shares are fully paid and are not subject to any future call or assessment.  All of the issued Common Shares rank equally as to voting rights, participation in any distribution of the Corporation's assets on liquidation, dilution or winding-up, and the entitlement to dividends, subject to the rights of any holders of preferred shares.

Holders of Common Shares are entitled to receive notice of, to attend and to vote at all of the Corporation's meetings of shareholders.  Each Common Share carries one vote at such meetings.  Holders of Common Shares are entitled to dividends if and when declared by the directors and, upon liquidation, to receive such portion of the Corporation's assets as may be distributable to such holders.

**First Preferred Shares and Second Preferred Shares**

As at the date hereof, no first preferred shares and no second preferred shares have been issued.  Any preferred shares which may be issued in the future would be issuable in series by the Corporation's board of directors who may alter the articles to create, define and attach special rights and restrictions to each series of preferred shares.  The preferred shares shall rank on parity with the preferred shares of every other series and rank in priority over the Common Shares with respect to the payment of dividends and distribution of the Corporation's assets in the event of liquidation, dissolution or winding-up.  In the event of liquidation, dissolution or winding-up, a holder of preferred shares shall be entitled to receive the amount payable on redemption, retraction or repurchase of such shares before any amount is paid or assets distributed to the holders of Common Shares.



## MARKET FOR SECURITIES

**TRADING PRICE AND VOLUME**

The common shares of the Corporation are quoted for trading on the Toronto Stock Exchange (the "**TSX**") under the trading symbol "TBR".

The following table sets forth the sale prices per share and volumes of the Common Shares of the Corporation traded on the TSX for each month beginning January 2006 to February 28, 2007.

### Common Stock Price per Share Volumes Traded
(in Canadian dollars)

|            | Open | High | Low  | Close | Volume     |
|------------|------|------|------|-------|------------|
| Feb. 2007  | 3.62 | 3.65 | 3.61 | 3.63  | 2,179,200  |
| Jan. 2007  | 3.55 | 3.62 | 3.53 | 3.62  | 10,851,500 |
| Dec. 2006  | 3.04 | 3.82 | 2.88 | 3.59  | 24,103,400 |
| Nov. 2006  | 2.63 | 3.14 | 2.63 | 3.05  | 8,296,500  |
| Oct. 2006  | 2.24 | 2.90 | 2.20 | 2.70  | 8,407,900  |
| Sep. 2006  | 2.60 | 2.65 | 2.20 | 2.32  | 1,932,000  |
| Aug. 2006  | 2.76 | 2.80 | 2.55 | 2.58  | 2,548,600  |
| Jul. 2006  | 2.75 | 2.94 | 2.75 | 2.80  | 803,300    |
| Jun. 2006  | 3.00 | 3.00 | 2.65 | 2.78  | 1,819,500  |
| May 2006   | 2.60 | 3.05 | 2.35 | 3.00  | 3,778,400  |
| Apr. 2006  | 2.61 | 2.78 | 2.55 | 2.65  | 4,124,300  |
| Mar. 2006  | 2.70 | 2.80 | 2.55 | 2.65  | 3,115,300  |
| Feb. 2006  | 2.55 | 2.78 | 2.50 | 2.70  | 2,168,300  |
| Jan. 2006  | 2.75 | 2.85 | 2.50 | 2.55  | 1,083,200  |

All options of the Corporation have been exercised pursuant to the terms of the successful take-over bid for the Corporation by investment funds managed by Dragon Capital.



**Annual Information Form**
**March 29, 2007**

## DIRECTORS AND OFFICERS

## NAME, ADDRESS AND OCCUPATION

| Name, Province/State and Country of Residence and Year first became a Director (or n/a if not a director) | Position or Office with the Corporation and Principal Occupation During Five Preceding Years | Number and Percentage of Common Shares Beneficially Owned, Directly or Indirectly, or over which control or direction is exercised at March 29, 2007[1] |
|---|---|---|
| Mario Caron, P.Eng. Ontario Canada 2003 | Director, President and Chief Executive Officer of the Corporation. <br><br> President and Chief Executive Officer of the Corporation since July 2003. Vice President of Operations for Defiance Mining Corporation from October 2001 to July 2003. Vice President of Mining and Infrastructure, Financial Advisory Services Practice of Price Waterhouse Coopers Securities from April 2000 to October 2001. | Nil |
| Clifford Davis[5] [6] Ontario Canada 2003 | Director of the corporation. <br><br> Director of the Corporation since June 2003. Director of Rio Narcea Gold Mines, Ltd. since September 2004. Chairman of New Gold, Inc. since January 2006. President and Chief Executive Officer of Gabriel Resources Ltd. from April 2001 to June 2002. President and Chief Operating Officer of TVX Gold Inc. from January 1999 to March 2001. | Nil |
| Ian Gowrie-Smith[2] [6] London England 2003 | Chairman of the Board of the Corporation. <br><br> Non-executive Chairman of the Corporation since February 2003. Chairman of SkyePharma PLC from 1996 to 2006. | Nil |
| Lars-Eric Johansson[4] Ontario Canada 2004 | Director of the Corporation. <br><br> Executive Vice President and Chief Financial Officer of Kinross Gold Corp. since June 2004. Executive Vice President and Chief Financial Officer of Noranda Inc. from May 2002 to November 2003. Senior Vice President and Chief Financial Officer of Falconbridge Limited from September 1989 to May 2002. | Nil |
| Loren Komperdo[4] [7] Alberta Canada 1995 | Director of the Corporation. <br><br> President and Chief Executive Officer of Keeper Resources Inc. since October 2003. President and Chief Executive Officer of the Corporation from November 1995 to July 2003. | Nil |
| Richard Lister[3] [5] [6] Ontario Canada 2005 | Director of the Corporation. <br><br> Director of the Corporation since May 2005. President and Chief Executive Officer of Zemex Corporation from 1993 to 2002. | Nil |



| Name, Province/State and Country of Residence and Year first became a Director (or n/a if not a director) | Position or Office with the Corporation and Principal Occupation During Five Preceding Years | Number and Percentage of Common Shares Beneficially Owned, Directly or Indirectly, or over which control or direction is exercised at March 29, 2007[1] |
|---|---|---|
| Ray Morley[7] Oregon U.S.A. 2000 | Director of the Corporation.<br><br>Founder and Vice President of Business Development of Western Oil Sands Inc. since January 2000. Prior to 2000, Mr. Morley managed business development at BHP Minerals for 20 years. | Nil |
| David Garofalo[4] Ontario Canada 2006 | Director of the Corporation<br><br>Vice President and Chief Financial Officer of Agnico-Eagle Mines Limited and Contact Diamond Corp since 1998. Prior to that Mr. Garofalo held several finance positions at Inmet Mining Corporation from 1990 to 1998. | Nil |
| Walter Henry, CFA Ontario Canada n/a | Vice President, Finance and Chief Financial Officer of the Corporation.<br><br>Chief Financial Officer of the Corporation since October 2003. Vice President, Finance since November 2003. Manager of CIBC World Markets from January 2003 to October 2003. Self Employed from January 2002 to December 2002. Assistant Vice President, Financial Advisory Services of Pricewaterhouse Coopers Securities Inc. from August 2000 to December 2001. | Nil |
| Trevor Moss [8] California U.S.A. n/a | Vice President, Operations of the Corporation.<br><br>Vice President, Operations of the Corporation since August 2005. Vice President of Gabriel Resources Ltd. from 2002 to August 2005. Senior Project Director with Aker Kvaener from 2000 to 2002. | Nil |
| Jodi Peake [9] Ontario Canada n/a | Vice President, Investor Relations of the Corporation.<br><br>Vice President, Investor Relations of the Corporation since June 2005. Director, Investor Relations and Corporate Communications of Dimethaid Research Inc. from September 2002 to June 2005. Senior Consultant of Strategic Investor Relations from 2000 to September 2002. | Nil |
| Sonya Stark [9] Ontario Canada n/a | Vice President, Administration and Corporate Secretary of the Corporation.<br><br>Vice President, Administration and Corporate Secretary of the Corporation since October 2005. Director, Corporate Affairs of CFM Corporation from February 2004 to October 2005. Director, Investor Relations and Corporate Secretary of CFM Corporation from February 2001 to October 2005. Director, Legal Affairs of CFM Corporation from February 2001 to February 2004. | Nil |



| Name, Province/State and Country of Residence and Year first became a Director (or n/a if not a director) | Position or Office with the Corporation and Principal Occupation During Five Preceding Years | Number and Percentage of Common Shares Beneficially Owned, Directly or Indirectly, or over which control or direction is exercised at March 29, 2007[1] |
|---|---|---|
| Nigel Tamlyn [10] Hanoi Vietnam n/a | Resident General Manager of the Corporation, on behalf of Nuiphaovica.<br><br>Resident General Manager of the Corporation, on behalf of Nuiphaovica, since September 2004. Assistant General Manager, Operations of MIDROC Gold SC from 2002 to September 2004. Resident Manager of Manila Mining Corp & Lepanto Consolidated Phillipines (Gold) from 2000 to 2002. | Nil |
| Christian Marti [11] Hanoi Vietnam n/a | General Manager of Nuiphaovica<br><br>Resident General Manager of Nuiphaovica from September 2006. Senior Mining Engineer at SNC-Lavalin Inc. From 2005 to September 2006 General Manager – Vice President Operations, Defiance Mining Corporation from 2002-2005, Vice President Operations, ALLICAN from 2000-2002. | Nil |

(1)    The information with respect to the shares beneficially owned, directly or indirectly, by the above nominees has been furnished by the respective nominees individually, such information not being within the knowledge of the Corporation.
(2)    Chairman of the Board
(3)    Lead Director
(4)    Member of the Audit Committee.
(5)    Member of the Compensation Committee.
(6)    Member of the Corporate Governance and Nominating Committee.
(7)    Completed services at 2006 Annual General Meeting.
(8)    Terminated in August 2006.
(9)    Resigned in February 2007, following completion of the successful Dragon Capital take-over bid.
(10)   Terminated in July 2006.
(11)   Began employment in September 2006.

## Term of Office

Each director remains in office until the next annual shareholders' meeting or until his or her successor is duly elected, unless his office is earlier vacated in accordance with the by-laws of the Corporation and/or any other applicable law.

## Voting Securities

As at the date of this AIF, being March 29, 2007, directors and senior officers of the Corporation, as set out on pages 34 to 36 of this Annual Information Form, as a group do not beneficially own, directly or indirectly, or exercise control or direction over any common shares.



**Committees**

Under the provisions of the *Canada Business Corporations Act*, the Corporation is required to have an audit committee.  Messrs. Johansson, Komperdo and Garofalo are currently members of the Corporation's audit committee.  Mr. Johansson is the Chairman of this committee.

The Corporation also has a Compensation Committee of which Messrs. Davis and Lister are currently members.  Mr. Davis is the Chairman of this committee.

The Corporation has a Corporate Governance and Nominating Committee of which Messrs. Davis, Gowrie-Smith and Lister are currently members. Mr. Lister is the Chairman of this committee.

## CONFLICTS OF INTEREST

There are potential conflicts of interest to which some of the Corporation's directors and officers will be subject in that they are engaged and will continue to be engaged in various capacities with other corporations in the mining industry and other industries.  To the extent such conflicts arise, they will be dealt with in accordance with the relevant provisions of the *Canada Business Corporations Act*.

## LEGAL PROCEEDINGS

The Corporation is unaware of any legal proceedings to which the Corporation is a party of or of which any of its property is the subject.

## TRANSFER AGENTS AND REGISTRARS

The transfer agent and registrar for the common shares of the Corporation is Computershare Trust Company of Canada at its principal offices in Toronto at 100 University Avenue, 9th Floor, Toronto, Ontario M5J 2Y1.

## MATERIAL CONTRACTS

The Corporation has not entered into any material contracts outside the ordinary course of business.

## INTERESTS OF EXPERTS

The following persons and companies have prepared or certified a statement, report or valuation described or included in a filing, or referred to in a filing, made by the Corporation under National Instrument 51-102, Continuous Disclosure Obligations during, or relating to, the financial year of the Corporation ended December 31, 2006:

- Ernst & Young LLP
- Trevor A. Moss, PE M.ASCE
- Fraser Milner Casgrain LLP

To the knowledge of the Corporation, after reasonable enquiry, none of the foregoing persons beneficially owns, directly or indirectly, or exercises control or direction over any outstanding common shares of the Corporation.



<u>**AUDIT COMMITTEE INFORMATION as Required by Form 52-110F1**</u>

**AUDIT COMMITTEE CHARTER**

The Audit Committee of the Board of Directors of the Corporation (the "**Audit Committee**") and the Board of Directors adopted a charter of the Audit Committee on December 9, 2005.  The Audit Committee Charter is set out in full in Schedule 1 to this AIF.

**COMPOSITION OF THE AUDIT COMMITTEE**

Messrs. Johansson, Komperdo and Morley are currently members of the Corporation's audit committee. All members of the Audit Committee are independent and financially literate for the purpose of Multilateral Instrument 52-110, Audit Committees ("**MI52-110**").  Mr. Morley is the Chairman of this committee.

**RELEVANT EDUCATION AND EXPERIENCE**

| Member | Relevant Education and/or Experience |
| --- | --- |
| Lars-Eric Johansson Chairman | Mr. Johansson's education and experience is directly related to his performance and responsibilities of the Corporation's Audit Committee Mr. Johansson has an accounting and finance university degree from the Gothenburg School of Economics in Sweden, which is similar to the educational requirements of a Chartered Accountant in Canada. .  Mr. Johansson has significant experience as the Chief Financial Officer of several public companies within the same industry as the Corporation's industry.  Mr. Johansson's education and experience has provided him with an understanding of the accounting principles used by the Corporation to prepare its financial statements.  His education and experience has provided him with the ability to assess the general application of such accounting principles in connection with the accounting for estimate, accruals and reserves.  His education and experience have provided him with experience preparing, auditing, analyzing or evaluating financial statements, and experience actively supervising one or more individuals engaged in such activities, that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the Corporation's financial statements.  Mr. Johansson's education and experience has provided him with an understanding of internal controls and procedures for financial reporting. |
| Loren Komperdo | Mr. Komperdo's experience is indirectly related to his performance and responsibilities of the Corporation's Audit Committee in his capacity as President of a public company in a related industry.  Mr. Komperdo is also the former President and Chief Executive Officer of the Corporation.  Mr. Komperdo's experience provides him with an understanding of the accounting principles used by the Corporation to prepare its financial statements through his experience directing accounting professionals in other public companies to prepare financial statements in accordance with |



| Member | Relevant Education and/or Experience |
| --- | --- |
| | GAAP. Mr. Komperdo's experience as President and Chief Executive Officer of a public company provides him with the ability to assess the general application of such accounting principles in connection with the accounting for estimates, accruals and reserves as the accounting issues in the public company in which he serves as President are the same accounting issues in the Corporation. While Mr. Komperdo does not have experience directly preparing and auditing financial statements, he does have experience directly supervising the accounting professionals retained to prepare and audit financial statements. In his capacity as President of a public company, Mr. Komperdo has experience analyzing and evaluating financial statements that present a breadth and level of complexity of accounting issues that can reasonably be expected to be raised by the Corporation's financial statements. In his capacity as President of a public company, Mr. Komperdo has an understanding of internal controls and procedures for financial reporting. |
| David Garofalo | Mr. Garofalo's profession and employment experience directly relates to his performance and responsibilities on the Corporation's Audit Committee. He has been a Chartered Accountant since 1990 and brings this significant experience to his role on the Audit Committee. Mr. Garofalo is an experienced multi-listed company Chief Financial Officer in the mining sector. Mr. Garofalo has significant expertise in international capital markets, commercial bank financing, corporate development and financial accounting. Mr. Garofalo is currently the Vice President and Chief Financial Officer of Agnico-Eagle Mines Limited and Contact Diamond Corp. (affiliated with Agnico-Eagle) and has been with both companies since 1998. Prior to that, Mr. Garofalo held several finance positions at Inmet Mining Corporation from 1990 through to 1998. |

**PRE-APPROVAL POLICIES AND PROCEDURES**

In accordance with the applicable regulatory requirements and with the Corporation's Audit Committee Charter, the Audit Committee has the sole authority to pre-approve: (a) all auditing services, including all engagement fees and terms; and (b) all non-audit services, including certain tax services to be performed by the Company's independent auditor. The Audit Committee currently approves any such proposed audit and non-audit matters prior to the services being performed. The Audit Committee is currently considering the implementation of a policy with respect to the pre-approval of such audit and non-audit items.



Annual Information Form
March 29, 2007

## EXTERNAL AUDITOR SERVICE FEES (BY CATEGORY)

| Category of Fee | Description | Amount 2006 Cdn.$ | Amount 2005 Cdn.$ |
|---|---|---|---|
| Audit Fees | Fees billed by the Corporation's external auditor in connection with the audit of the Corporation's financial statements. | 157,430 | 34,450 |
| Non-Audit fees | | | |
| Tax Fees | Fees billed by the Corporation's external auditor in connection with certain tax advice. | 73,557 | 5,550 |
| All Other Fees | Fees billed by the Corporation's external auditor in connection with certain advice with respect to stock compensation, future income tax, management's discussion and analysis and other public company documents. | 83,625 | 8,000 |
| **Total Fees** | | **314,612** | **48,000** |

## ADDITIONAL INFORMATION

When the securities of the Corporation are in the course of a distribution pursuant to a short form prospectus, or a preliminary short-form prospectus has been filed in respect of a distribution of its securities, the Corporation will provide to any person, upon request to the Secretary of the Corporation, the following:

    (i)        one copy of the Annual Information Form (the "**AIF**"), together with one copy of any document, or the pertinent pages of any document, incorporated by reference in the AIF;

    (ii)      one copy of the comparative financial statements for the most recently completed financial year, together with the accompanying report of the auditor and one copy of any interim financial statements subsequent to the financial statements for its most recently completed financial year;

    (iii)     one copy of the information circular in respect of the most recent annual meeting of shareholders that involved the election of directors; and

    (iv)     one copy of any other documents that are incorporated by reference into the preliminary short form prospectus or the short form prospectus and are not required to be provided under (i) to (iii) above.

Additional information, including directors' and officers' remuneration and indebtedness, principal holders of the Corporation's common shares, options to purchase securities and interests of insiders in material transactions, where applicable, will be contained in the Corporation's information circular for the Corporation's most recent annual meeting of shareholders that involves the election of directors. Additional financial information is provided in the comparative financial statements and management's



Annual Information Form
March 29, 2007

discussion and analysis for the fiscal year ended December 31, 2006. A copy of any of the above-referenced documents may be obtained upon request from the Corporate Secretary of the Corporation. In addition, all of the above referenced documents and additional information relating to the Corporation may be found on the SEDAR website at www.sedar.com.



**Annual Information Form**
**March 29, 2007**

# SCHEDULE 1
# AUDIT COMMITTEE CHARTER

## 1.0    PURPOSE

1.1    The Audit Committee (the "**Committee**") is established by the Board of Directors (the "**Board**") of Tiberon Minerals Ltd. (the "**Company**") for the purpose of overseeing the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

The Committee is responsible for assisting the Board's oversight of:

1.1.1    the independent auditor's qualifications and independence;

1.1.2    the performance of the Company's independent auditors;

1.1.3    the quality and integrity of the Company's financial statements and related disclosure;

1.1.4    oversight of the Company's internal and disclosure controls and reporting; and

1.1.5    the Company's compliance with legal and regulatory requirements.

## 2.0    COMPOSITION

2.1    Members

2.1.1    The Committee shall consist of as many members as the Board shall determine, but in any event not fewer than three members.

2.1.2    The Board shall appoint members of the Committee annually.

2.2    Qualifications

2.2.1    Each member of the Committee shall be an "unrelated" director within the meaning of the applicable Toronto Stock Exchange ("**TSX**") and Ontario Securities Commissions ("**OSC**") guidelines.

2.2.2    Each member of the Committee shall be financially literate, meaning each member, at the time of their appointment, must be able to read and understand financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of the Company that can reasonably be expected to be raised by the Company's financial statements.

2.3    Service on Multiple Committees.    It is recommended that Committee members not simultaneously serve on the committees of more than three other public companies.  If a Committee member serves on more than two other committees, the Committee (or Board) must determine whether membership on multiple committees impairs the ability of the member to serve on the Committee.

2.4    Chair.  The Chair of the Committee shall be appointed by the Committee.



2.5    Removal and Replacement.  The members of the Committee may be removed or replaced, and any vacancies on the Committee shall be filled, by the Board.  Membership on the Committee shall automatically end at such time as the Board determines that a member ceases to be an unrelated director.

## 3.0    OPERATIONS

3.1    Meetings.  The Chair of the Committee, in consultation with the Committee members, shall determine the schedule and frequency of the Committee meetings, provided that the Committee shall meet at least four times per year.

3.2    Executive Sessions.  The Committee shall meet separately with management, the Corporate Secretary and the independent auditor in periodic executive sessions.  The Committee shall also meet separately with the independent auditor at every meeting of the Committee at which the independent auditor is present.

3.3    Agenda.  The Chair of the Committee, with the assistance of the Corporate Secretary, shall develop and set the Committee's agenda, in consultation with other members of the Committee, the Board and management.  The agenda and information concerning the business to be conducted at each Committee meeting shall be, to the extent practical, communicated to the members of the Committee sufficiently in advance of each meeting to permit meaningful review.

3.4    Report to Board.  The Committee shall report regularly to the entire Board and shall submit to the Board the minutes of its meetings.

3.5    Self-Evaluation.  The Committee shall conduct an annual performance self-evaluation and shall report to the entire Board the results of the self-evaluation.

3.6    Assessment of Charter.  The Committee shall review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

## 4.0    COMMITTEE AUTHORITY AND RESPONSIBILITIES

4.1    Independent Auditor's Qualifications and Independence

   4.1.1    The Committee shall be directly responsible for the appointment (subject to shareholder approval), retention or replacement of the independent auditor.

   4.1.2    The Committee shall be directly responsible for the compensation and oversight of the work of the independent auditor, (including resolution of disagreements between management and the auditor regarding financial reporting), employed by the Company to audit its financial statements.

   4.1.3    The independent auditor shall report directly to the Committee.

   4.1.4    The Committee shall review and evaluate the experience, qualifications, performance and independence of the independent auditor.

   4.1.5    The Committee shall have the sole authority to pre-approve:

      (a)    all auditing services, including all audit engagement fees and terms; and



(b)     all non-audit services, including certain tax services to be performed by the Company's independent auditor.

4.1.6   The Committee shall review with the lead audit partner whether any of the audit partners receive any discretionary compensation from the audit firm with respect to non-audit services performed by the independent auditor.

4.1.7   The Committee shall obtain and review with the lead audit partner and a more senior representative of the independent auditor, annually or more frequently as the Committee considers appropriate, a report by the independent auditor describing:

(a)     the independent auditor's internal quality-control procedures;

(b)     any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor, or by any inquiry, review or investigation by governmental, regulatory or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the independent auditor, and any steps taken to deal with these issues; and

(c)     all relationships between the independent auditor and the Company in order to assess the independent auditor's independence.

4.1.8   The Committee shall ensure a five-year rotation period and a five-year "time-out" period of the lead audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law and a seven-year mandatory rotation period with a two-year "time-out" period for certain other audit partners depending on the partner's involvement in the audit.  In addition, the Committee shall consider whether, in order to assure continuing auditor independence, it is appropriate to adopt a policy of rotating the independent auditing firm on a regular basis.

4.1.9   The Committee shall recommend to the Board policies for the Company's hiring of partners, employees or former partners and employees of the current and former independent auditor who participated in any capacity in the audit of the Company.

4.1.10  The Committee shall pre-approve the hiring of any partner, employee or former partner and employee of the independent auditor who was a member of the Company's audit team during the preceding two fiscal years.  In addition, the Committee shall pre-approve the hiring of any partner, employee or former partner or employee of the independent auditor within the preceding two fiscal years for senior positions within the Company, regardless of whether that person was a member of the Company's audit team.

4.2     Performance of the Audit Functions and Independent Auditors

4.2.1   The Committee shall discuss with management and advise on the appointment, replacement, reassignment or dismissal of any senior internal auditor, if applicable.

4.2.2   The Committee shall meet with management and the independent auditor prior to the audit to discuss the scope, planning and staffing of the proposed audit for the current year.



4.2.3    The Committee shall review and discuss with management and the independent auditor, any internal audit department responsibilities, plans, results, budget and staffing, if applicable.

4.2.4    The Committee shall review and discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's policies with respect to risk assessment and risk management.

4.2.5    The Committee shall review with management, any internal auditor and the independent auditor and conduct an annual assessment and a quarterly evaluation of the Company's disclosure controls and procedures and the Company's internal controls over financial reporting and determine if there are any significant deficiencies or weaknesses in the Company's control procedures.   The Committee shall review with management the Company's anti-fraud control procedures.

4.2.6    The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to the independent auditor for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

4.3    Financial Statements and Related Disclosure

4.3.1    The Committee shall review and discuss with management and the independent auditor the Company's annual audited financial statements, including the management's discussion and analysis before the filing of such statements.

4.3.2    The Committee shall review and discuss with management and the independent auditor the Company's quarterly financial statements, including the interim management's discussion and analysis, and the results of the independent auditor's review of the quarterly financial statements, before the filing of such statements.

4.3.3    The Committee shall discuss the independent auditor management's competency in preparing the financial statements.

4.3.4    The Committee shall review and discuss quarterly and annual reports from the independent auditor on:

(a)    all critical accounting policies and practices to be used by the Company in preparing its financial statements;

(b)    all material alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of these alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

(c)    other material communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.



4.3.5    The Committee shall review and discuss with management earnings (and/or other financial) press releases with particular attention to the use of "pro forma" or "adjusted" non-GAAP information, before they are issued.

4.3.6    The Committee shall review and discuss generally with management the nature of the financial information and earnings guidance provided to analysts and rating agencies.

4.3.7    The Committee shall review with management, any internal auditor and the independent auditor disclosures made to the Committee by the Company's CEO and CFO during their certification process for the quarterly and annual financial filings about the quality, adequacy and effectiveness of the Company's internal controls over financial reporting and any significant deficiencies in the design or operation of internal controls over financial reporting or material weakness therein and any fraud involving management or other employees who have a significant role in the Company's internal controls over financial reporting.

4.3.8    The Committee shall review and discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

4.3.9    The Committee shall discuss with management and the independent auditor any audit problems or difficulties and management's response.

4.3.10    The Committee shall review and discuss with management and the independent auditor the effectiveness of the Company's disclosure controls and procedures.

4.3.11    The Committee shall discuss with management and the independent auditor financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls over financial reporting and any special steps adopted in light of material control deficiencies.

4.3.12    The Committee shall review with management, and any outside professionals as the Committee considers appropriate, important trends and developments in financial reporting practices and requirements and their effect on the Company's financial statements.

4.3.13    The Committee shall review with management any related party transactions and ensure such related party transactions are appropriately disclosed.

4.4    Compliance with Legal and Regulatory Requirements

4.4.1    The Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company.

4.4.2    The Committee shall establish procedures for



    (a)    the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing matters or potential violations of law; and

    (b)    the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters or potential violations of law.

## 5.0   GENERAL

5.1    The foregoing list of duties is not exhaustive, and the Committee may, in addition, perform such other functions as may be necessary or appropriate for the performance of its oversight function.

5.2    The Committee has the power to delegate its authority and duties to a subcommittee or individual members of the Committee, as it deems appropriate, provided that the subcommittee is composed entirely of unrelated directors.

5.3    In discharging its oversight role, the Committee shall have full access to all Company books, records, facilities and personnel.

5.4    The Committee may retain, and determine the fees of, independent counsel and other advisors, in its sole discretion.

## 6.0   CLARIFICATION OF AUDIT COMMITTEE'S ROLE

6.1    The Committee's responsibility is one of oversight.  It is the responsibility of the Company's management to prepare consolidated financial statements in accordance with applicable law and regulations and of the Company's independent auditor to audit those financial statements. Therefore, each member of the Committee shall be entitled to rely, to the fullest extent permitted by law, on the integrity of those persons and organizations within and outside the Company from whom he or she receives information, and the accuracy of the financial and other information provided to the Committee by such persons or organizations.

