# Exhibit "1"

*lian Law Series*



lity

# THE LAW OF CONTRACTS

; 2/e

## JOHN D. McCAMUS
Professor of Law
Osgoode Hall Law School, York University



unreasonable the result the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear."[80]

Relying on provisions of the agreement relating to the ability of the manufacturer to require the distributor to "cure" material breaches, the court was able to conclude that, notwithstanding the use of the term "condition," the parties did not intend that any breach of the visitation requirement, however minor, would permit the manufacturer to terminate the agreement. Conversely, of course, the less unreasonable the meaning of the provision, the less likely it is that such heroics will be undertaken.[81] As these cases tend to illustrate, however, the open-textured nature of concepts such as "commercial absurdity," or "commercial unreasonableness" leave them, perhaps inseparably, to some extent in the eye of the beholder.

### 5) Construction Contra Proferentem

The principle of construction contra proferentem holds that provisions in agreements and other written documents that suffer from ambiguity are to be construed against the interest of the person who drafted or preferred the ambiguous provision. The doctrine was described by Estey J. in McClelland & Stewart Ltd. v. Mutual Life Assurance Co. of Canada[82] in the following terms: "That principle of interpretation applies to contracts and other documents on the simple theory that any ambiguity in the term of the contract must be resolved against the author if the choice is between him and the other party to the contract who did not participate in its drafting."[83]

The apparent rationale for the rule is that the author of the agreement, having had an opportunity to protect his or her interest, ought to be able to take advantage of such protections as have been inserted only to the extent that they are clearly communicated in the language of the agreement to the other party. The doctrine works against unfair surprise of the non-drafting party.[84] A further underlying concern may be to preclude any incentive that might otherwise exist for the author to strategically draft provisions that are deliberately obscure, with the intention of

---

80  Ibid.
81  See, for example, Yorkwood Homes (Georgetown) Inc. v. Law Development Group Georgetown (No. 2) Ltd. (1999), 45 O.R. (3d) 257 (C.A.).
82  Above note 60.
83  Ibid. at 15.
84  See Arthur Andersen Inc. v. Toronto-Dominion Bank, above note 20 at 395, Abella J.A.

---

preserving the opportunity of asserting a more generous interpretation at a later date.[86] It is consistent with the underlying rationale of the principle that resort may be made to construction contra proferentum only if the provision in question is ambiguous and this requirement is well established.[87] Where the authorship of the provisions in question are fairly attributable to both parties, the principle is inapplicable.[88]

Although construction contra proferentum is applicable, in principle, to any type of transaction,[89] it is especially likely to be applied where the author of the document is in a stronger bargaining position than the other party and is able to deal on the basis of the author's own standard terms on a "take it or leave it" basis. Insurance contracts, for example, are frequently construed contra proferentum against the interests of the insurer.[90] Similarly, in the context of guarantees that, in the usual case, are drafted by someone other than the guarantor, provisions imposing burdens on the guarantor will be construed against the interests of the person who drafted the guarantee.[91] Perhaps the most frequent target of construction contra proferentum are exemption or limitation of liability clauses drafted by parties intending to restrict their own liability for breach of contract for the losses caused thereby to the other party. Such provisions, it is often said, are strictly construed against their author. Thus, if a limitation of liability clause does not expressly exclude liability for negligence and, if the provision can reasonably be interpreted as excluding some other type of liability, the clause will be interpreted as not

---

86  See Eli Lilly and Co. v. Novopharm Ltd., above note 18 at 26, Iacobucci J. (the doctrine "operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party by interpreting any ambiguity against the drafting party"). See also American Law Institute, Restatement of Contracts 2d (St. Paul: American Law Institute, 1981) s. 206 Comment.
87  See, for example, McClelland & Stewart Ltd. v. Mutual Life Assurance Co. of Canada, above note 60 at 15; Eli Lilly and Co. v. Novopharm Ltd., Ibid. at 26, Iacobucci J.; Manulife Bank of Canada v. Conlin, [1996] 3 S.C.R. 415 at 425, Cory J.; TransCanada Pipelines Ltd. v. Potter Station Power Limited Partnership (2003), 226 D.L.R. (4th) 262 at 267, Simmons J.A. And see Chilton v. Co-operators General Insurance Co. (1997), 143 D.L.R. (4th) 647 at 654 (Ont. C.A.), Laskin J.A. ("The court should not strain to create an ambiguity where none exists.").
88  See, for example, Birrell v. Dryer (1884), 9 App. Cas. 345.
89  Hillis Oil & Sales v. Wynn's Canada Ltd., above note 61 at 69, Le Dain J.
90  See, for example, Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co., above note 2; McClelland & Stewart Ltd. v. Mutual Life Assurance Co. of Canada, above note 60; Zurich Life Insurance Co of Canada v. Davies, [1981] 2 S.C.R. 670.
91  See, for example, Manulife Bank of Canada v. Conlin, above note 87; Bank of Montreal v. Korico Enterprises Ltd. (2000), 50 O.R. (3d) 520 (C.A.).

protecting the author against liability for negligence.[94] The application of the contra proferentem to exculpatory clauses thus appears to be particularly vigorous. In a case involving a bill of lading entered into by sophisticated commercial parties, however, the Supreme Court of Canada has emphasized that the rule is not an absolute one and that, especially in the context of an agreement in which commercial parties are essentially determining which of the parties is to bear the cost of insurance at various stages of the agreement, the provision should be construed in the context of the whole agreement. In such circumstances, it may be appropriate to treat the provision as excluding liability for negligence even though an express reference to negligence has not been made.[94] Further, the House of Lords has drawn a distinction between exculpatory clauses excluding liability as opposed to those merely limiting liability and has suggested that clauses of the latter type, though subject to contra proferentum, would not be subject to the "specially exacting standards, applicable to such clauses."[94] It is difficult, however, to justify the drawing of a stark distinction between clauses that limit, as opposed to those that exclude, liability. A more defensible distinction might be drawn between commercial and consumer transactions, with the particularly exacting standards being reserved for the latter context. The problem of interpreting limitation and liability clauses has also inspired the development of the doctrine of so-called fundamental breach. The history and current status of this doctrine will be reviewed in a later chapter.[95]

### 6) List of Particulars Followed by General Language: ejusdem generis

Where a provision lists a series of particular items that share a common characteristic of some kind, and the list is then completed by a more general phrase, the ejusdem generis principle holds that the scope of the

---

92  Canada Steamship Lines Ltd. v. The King, [1952] 2 D.L.R. 786 (P.C.); Salmon River Logging Co. Ltd. v. Burt, [1953] 2 S.C.R. 117; Canadian Pacific Forest Products Ltd. v. Belships (Far East) Shipping (Pte.) Ltd (1999), 175 D.L.R. (4th) 449 (Fed. C.A.). Conversely, a reference in the clause to a limitation of liability "whether or not from negligence or gross negligence" has been held inapplicable to losses resulting from deliberate misconduct. See Medrick Laboratory Services Ltd v. Purolator Courier Ltd. (1995), 125 D.L.R. (4th) 738 (Man. C.A.).
93  I.T.O.—International Terminal Operators Ltd. v. Miida Electronics Inc., [1986] 1 S.C.R. 752 at 799, McIntyre J.
94  Ailsa Craig Fishing Co. Ltd. v. Malvern Co. Ltd., [1983] 1 W.L.R. 964 at 970 (H.L.), Lord Fraser of Tullybelton.
95  See Chapter 20.

general phrase is limited by the common characteristics or the class or genus of the particularized items. Thus, a well-known illustration of the point concerned a lease that provided for an abatement of rent if occupancy was interrupted by "fire, flood, storm, tempest or other inevitable accidents." It was held that the phrase "inevitable accident" does not refer to accidents caused by either of the contracting parties. The principle was applied particularized items indicate that the phrase refers to accidents resulting from circumstances beyond their control.[96] The principle was applied to a force majeure clause in Atlantic Paper Stock Ltd. v. St. Anne-Nackowic Pulp & Paper Co.[97] The clause was contained in a requirements contract that excused the purchaser from a minimum-purchase requirement in various circumstances beyond the control of the parties including acts of God, war, labour unrest, the destruction of production facilities "or the non-availability of markets for pulp or corrugating medium." The purchaser had suffered a decline in the market for his own product and sought to excuse its obligations under the requirements contract on the basis of the latter phrase. The Supreme Court held, however, that the ejusdem generis principle applied and, accordingly, the "non-availability of markets" also must result from circumstances beyond the control of the parties. On the particular facts, the Court was of the view that the purchaser's lack of satisfactory markets resulted in the main from its own poor planning, inadequate marketing efforts and soaring production costs. Accordingly, the force majeure clause did not excuse the purchaser from meeting its minimum commitment.

Like other canons of construction, ejusdem generis is a guide to interpretation rather than a rule. Its application is dependent on a careful assessment of the context of the particular clause. Indeed, the common sense underlying the canon is that the particular items in a list are suggestive of the object of the provision and it is generally appropriate, of course, to interpret a clause in the light of its object.[98] It has been said that the doctrine "is a very valuable servant, but it would be a most dangerous master."[99] The principle will not be of assistance in a case where the itemized particulars do not share a common characteristic.[100] Obviously, parties minded to avoid application of the maxim may draft provisions that signal a contrary intention by including phrases such as "from any cause whatsoever" or "whether or not similar to the foregoing."[101]

---

96  Sauer v. Bilton (1878), 7 Ch. D. 815.
97  [1976] 1 S.C.R. 580.
98  See Sun Fire Office v. Hart (1889), 14 App. Cas. 98 at 104, Lord Watson.
99  Anderson v. Anderson, [1895] 1 Q.B. 749 at 753, Lopes L.J.
100 S.S. Magnhild v. McIntyre Bros. & Co., [1920] 3 K.B. 321 at 329–31, McCardie J.
101 Chandris v. Isbrandtsen-Moller Co. Inc., [1951] 1 K.B. 240 at 245, Devlin J.

# Exhibit "2"

**H**
2004 CarswellOnt 2234

Murray v. Xerox Corp.
ALLAN MURRAY (Plaintiff) and XEROX CORPORATION, INC. (Defendant)
Ontario Superior Court of Justice
Hoy J.
Heard: May 18-20, 2004
Judgment: May 31, 2004
Docket: 96-CU-107055

Copyright © CARSWELL

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved

Counsel: W.A. Kelly for Plaintiff

John A. Campion, Nicole Samson for Defendant

Subject: Contracts; Civil Practice and Procedure

Contracts --- Construction and interpretation -- Resolving ambiguities -- Contra proferentem

Plaintiff was in senior managerial position with defendant -- Defendant agreed under incentive plan to issue shares to plaintiff if he worked until age 60 or took early retirement with approval of chief executive officer -- Agreement provided that all decisions of board of directors respecting questions arising under agreement or plan were binding on parties -- Plaintiff accepted offer of early retirement four years later as part of extensive lay-offs -- Defendant refused to issue shares -- Plaintiff brought action for breach of contract -- Action allowed -- Agreement was form of contract of adhesion -- Issuance of shares was not gift but incentive to loyalty and continued employment -- Meaning of "approval of CEO" least favourable to defendant applied -- General approval of voluntary lay-offs was sufficient approval of plaintiff's retirement -- Board did not delegate to officer its authority to make decisions respecting agreement -- Alternatively, right of defendant to unilaterally decide that it complied with agreement was void as contrary to public policy.

Damages --- Valuation of damages -- Duty to mitigate -- Types of mitigation -- Replacement of goods

Plaintiff was in senior managerial position with defendant -- Defendant agreed under incentive plan to issue shares to plaintiff if he worked until age 60 or took early retirement with approval of chief executive officer -- Plaintiff accepted offer of early retirement four years later as part of extensive lay-offs -- Defendant refused to issue shares -- Plaintiff brought action for breach of contract -- Action allowed -- Plaintiff awarded value of shares as of date of retirement -- Plaintiff had duty to mitigate by purchasing like shares on market on date of breach or within reasonable time -- Plaintiff could have obtained shares at that time -- Plaintiff had sufficient funds and replacement shares were readily available.

Copr. © West 2007 No Claim to Orig. Govt. Works

Cases considered by Hoy J.:

Baker v. Jones (1954), [1954] 2 All E.R. 553 (Eng. Q.B.) -- referred to

Bank of Montreal v. University of Saskatchewan (1953), 9 W.W.R. (N.S.) 193, 1953 CarswellSask 48 (Sask. Q.B.) -- referred to

Baud Corp., N.V. v. Brook (1978), [1979] 1 S.C.R. 633, [1978] 6 W.W.R. 301, (sub nom. Asamera Oil Corp. v. Sea Oil & General Corp.) 89 D.L.R. (3d) 1, (sub nom. Asamera Oil Corp. v. Sea Oil & General Corp.) 23 N.R. 181, 12 A.R. 271, 5 B.L.R. 225, 1978 CarswellAlta 268, 1978 CarswellAlta 302 (S.C.C.) -- considered

Cooper v. Miller (1994), (sub nom. Cunningham v. Wheeler) [1994] 4 W.W.R. 153, (sub nom. Cunningham v. Wheeler) 23 C.C.L.I. (2d) 205, (sub nom. Cooper v. Miller (No. 1)) 164 N.R. 81, (sub nom. Cooper v. Miller (No. 1)) 66 W.A.C. 1, (sub nom. Cunningham v. Wheeler) 88 B.C.L.R. (2d) 273, (sub nom. Cunningham v. Wheeler) 2 C.C.P.B. 217, (sub nom. Cunningham v. Wheeler) 20 C.C.L.T. (2d) 1, (sub nom. Cooper v. Miller (No. 1)) 41 B.C.A.C. 1, (sub nom. Cunningham v. Wheeler) 113 D.L.R. (4th) 1, 1994 CarswellBC 1235, [1994] 1 S.C.R. 359, 1994 CarswellBC 121 (S.C.C.) -- followed

Davies v. Zurich Life Insurance Co. of Canada (1981), [1982] I.L.R. 1-1471, 39 N.R. 457, (sub nom. Zurich Life Insurance Co. of Canada v. Davies) [1981] 2 S.C.R. 670, 130 D.L.R. (3d) 748, 1981 CarswellOnt 630, 1981 CarswellOnt 630F (S.C.C.) -- referred to

ETI Explosives Technologies International (Canada) Ltd. v. East Coast Explosives Ltd. (1994), 57 C.P.R. (3d) 525, 135 N.S.R. (2d) 142, 386 A.P.R. 142, 1994 CarswellNS 199 (N.S. S.C.) -- referred to

Greenberg v. Meffert (1985), 50 O.R. (2d) 755, 18 D.L.R. (4th) 548, (sub nom. Greenberg v. Montreal Trust Co.) 9 O.A.C. 69, 7 C.C.E.L. 152, 37 R.P.R. 74, 1985 CarswellOnt 727 (Ont. C.A.) -- distinguished

Hunt v. TD Securities Inc. (2003), 175 O.A.C. 19, 229 D.L.R. (4th) 609, 36 B.L.R. (3d) 165, 66 O.R. (3d) 481, 39 C.P.C. (5th) 206, 2003 CarswellOnt 3141 (Ont. C.A.) -- considered

Jennings v. Cronsberry (1966), (sub nom. R. v. Jennings) [1966] S.C.R. 532, 57 D.L.R. (2d) 644, 1966 CarswellOnt 61 (S.C.C.) -- followed

Montreal Trust Co. of Canada v. Birmingham Lodge Ltd. (1995), 46 R.P.R. (2d) 153, 125 D.L.R. (4th) 193, 24 O.R. (3d) 97, 82 O.A.C. 25, 21 B.L.R. (2d) 165, 1995 CarswellOnt 541 (Ont. C.A.) -- referred to

Rivett v. Hospitals of Ontario Pension Plan (1995), 9 C.C.P.B. 284, C.E.B. & P.G.R. 8251, 1995 CarswellOnt 1139 (Ont. Gen. Div.) -- considered

Rose v. Edell (1986), 57 O.R. (2d) 89, 1986 CarswellOnt 962 (Ont. Dist. Ct.) -- distin-

Copr. © West 2007 No Claim to Orig. Govt. Works

guished

West of England Ship Owners Mutual Insurance Assn. (Luxembourg) c. Laurentian General Insurance Co. (1992), [1993] R.J.Q. 122, [1993] R.R.A. 213 (Que. S.C.) -- referred to

Statutes considered:

Courts of Justice Act, R.S.O. 1990, c. C.43

Generally -- referred to

ACTION by employee for damages for breach of contract.

*Hoy J.*:

1   Mr. Murray was a long-term and highly valued employee of Xerox Canada Ltd. ("XCL"), the Canadian subsidiary of the defendant Xerox Corporation Ltd. (Xerox"). Under an Incentive Stock Right Agreement dated October 2, 1989 (the "Agreement") executed by Xerox in favour of Mr. Murray, Mr. Murray was entitled to receive 2300 common shares of Xerox (the "Shares") if he worked until he was 60 or commenced early retirement before that time with the approval of the Chief Executive Officer of Xerox. In 1993, after input from XCL and its other subsidiaries, the Chief Executive Officer of Xerox, Paul Allaire, announced worldwide productivity initiatives, which included the elimination of more than 10,000 jobs worldwide. Mr. Allaire announced that the required employment reductions would be accomplished through normal attrition, involuntary layoffs and, in some selected cases, voluntary layoffs. The Xerox board of directors, of which Mr. Allaire was the Chair, approved the required manpower reductions on a geographic basis and, in order to effect the requisite employment reductions in Canada, XCL offered voluntary layoffs, through an enhanced early retirement program, to a category of employees that included Mr. Murray. Mr. Murray accepted the offer and took early retirement from XCL effective December 31, 1994, prior to attaining 60 years of age.

2   Xerox refused to issue the Shares to Mr. Murray and he sued for specific performance and damages. At trial, counsel for Mr. Murray confirmed that the claim for specific performance is not being pursued and Mr. Murray only seeks damages.

3   The issue before me was whether Mr. Murray commenced early retirement with the approval of Mr. Allaire, Xerox's then CEO, within the meaning of the Agreement. If Mr. Murray did, he was entitled to the Shares and Xerox has breached the Agreement as a result of its failure to issue them to him. Mr. Murray says because Mr. Allaire had approved, as part of the productivity initiatives, the workforce reduction in Canada through voluntary programs and Mr. Murray commenced early retirement pursuant to such a voluntary program, (the enhanced early retirement option), therefore, Mr. Murray commenced early retirement with the approval of Mr. Allaire. Xerox says that the Agreement required that Mr. Allaire approve of Mr. Murray's early retirement specifically, and that such approval was not given. Moreover, Mr. Murray knew before he took early retirement that Xerox's position was that Mr. Murray did not have the approval of the CEO as required by the Agreement.

Copr. © West 2007 No Claim to Orig. Govt. Works

4   There was virtually no dispute on the facts.

5   For the reasons set out below, I have concluded that Mr. Murray commenced early retirement with the approval of Mr. Allaire and that he is entitled to damages in the amount of $319,417.56 for breach of the Agreement, plus pre-judgment interest thereon from December 31, 1994 to the date of these reasons, at the rate of 5.6% per annum and post-judgment interest thereafter in accordance with the *Courts of Justice Act*, R.S.O. 1990. c.C-43, ss.128-130. Judgment shall issue accordingly.

### DID MR. MURRAY COMMENCE EARLY RETIREMENT WITH THE APPROVAL OF MR. ALLAIRE?

*The Facts*

6   Mr. Murray worked for the Xerox group for slightly more than 30 years, and then, following his official retirement, worked as a consultant to XCL for a further 10 months. For about 20 months of the 30-year period, Mr. Murray was employed by Xerox. The balance of the time he was employed by XCL.

7   Mr. Murray became a key member of the management team. At one time, it was thought he would be the next president of XCL. As of January 1, 1994, Mr. Murray was XCL's Senior Vice President, General Manager Office Documents Products.

8   Mr. Allaire and XCL's former Vice President of Human Resources, Beth Medhurst, both testified that Mr. Murray was highly regarded as a man of honesty and high integrity.

9   Mr. Murray was well compensated, through a combination of base salary, bonuses and stock options.

*The Agreement, The Plan and the Board Resolution*

10   Pursuant to and subject to the terms of the Agreement and Xerox's "1976 Executive Long-Term Incentive Plan" (the "Plan"), Xerox granted Mr. Murray 2300 incentive stock units. The Agreement is a standard form agreement.

11   Each incentive unit entitled Mr. Murray to one common share of Xerox on the lapse of the incentive period, without payment of cash to Xerox by Mr. Murray. During the incentive period, Mr. Murray was entitled to "dividend equivalents" on his units: cash payments at the same time and in the same amounts that a holder of a number of common shares equal to the number of incentive units would be entitled to receive as dividends. Xerox's stock has been split since the date of the Agreement.

12   Paragraph 2 of the Agreement is the provision in issue. It provides as follows:

> 2. <u>Incentive Period and Entitlement to Shares</u>. The Employee's right to receive shares of Common Stock shall be subject to the lapse of an incentive period. The incentive period shall lapse on the date the Employee attains age 60 or the date the Employee commences early retirement prior thereto with the approval of the Chief Executive Officer of the Company and shall apply to 100% of the total number of

Copr. © West 2007 No Claim to Orig. Govt. Works

incentive stock units covered.

13  Paragraph 13 provides as follows:

> 13. <u>Interpretation of this Agreement</u>. All decisions and interpretations made by the Board of Directors or the Committee with regard to any questions arising hereunder or under the Plan shall be binding and conclusive on the Company and the Employee. In the event there is inconsistency between the provisions of this agreement and of the Plan, the provisions of the Plan shall govern.

14  Section 1 of the Plan sets out its purpose:

> The purpose of the plan is to advance the interests of the company and its shareholders by providing for its officers and employees an incentive to service or continued service with the company and its subsidiaries, both in the United States and abroad. By encouraging such officers and employees to become owners of the capital stock of the company, the company seeks to attract and retain in its employ people of training, experience and ability, and to furnish additional incentive to officers and employees upon whose judgment, initiative and efforts the successful conduct of its business largely depends.

15  The Plan indicates that the purpose is to be effected through the granting of incentive stock rights, stock options, stock appreciation rights and performance unit rights.

16  The Plan also provides, in section 6, for the creation of an executive compensation committee (the "committee"), the delegation to the committee of the authority to administer the Plan and the further delegation by the committee to the Chairman of the Board of Xerox, subject to limitations, to select the employees to be granted awards under the Plan. The committee was created and at a board meeting held on February 6, 1989, the authority to grant a maximum of 100,000 incentive stock rights during 1989 was delegated to Mr. Kearns, the then Chairman of the Board of Xerox. The board resolution indicated that in accordance with subsection 8(a)(iii) of the Plan, referred to below, the incentive period with respect to any incentive rights would lapse as determined by the Chairman.

17  Subsection 8(a) of the Plan provides that the grant of incentive stock rights shall be evidenced by incentive stock rights agreements that contain in substance the terms and conditions set out in clause 8(a) of the Plan. Subsection 8(a)(iii) of the Plan provides as follows with respect to the incentive period:

> (iii) <u>Incentive Period</u>. The holder of incentive stock rights shall be entitled to receive shares of common stock only after the lapse of such incentive periods, and in such manner, as shall be fixed by the boards of directors at the time a decision is made to grant incentive stock rights to an executive. (Such period or periods so fixed is herein referred to as an "incentive period".) To the extent the holder of incentive stock rights receives shares of common stock on the lapse of an incentive period, an equivalent number of incentive stock units shall be cancelled.

*Communication of the Grant to Mr. Murray*

Copr. © West 2007 No Claim to Orig. Govt. Works

18  In February of 1990, Mr. Allaire who was then the President of Xerox, but not yet its Chairman or CEO, telephoned Mr. Murray and advised him that he had been awarded 2300 incentive stock units. At the time, Mr. Murray was employed by Xerox, not XCL. The call came "out of the blue" and Mr. Murray was surprised: it was his first direct telephone call from Mr. Allaire. Mr. Murray remembers that he was told that it was a retention award, that it was highly confidential and he was not to discuss it with his immediate manager and that he would be sent a follow-up letter.

19  Mr. Allaire testified that incentive stock units were granted on a very selective basis. In what is referred to as the "1989 cycle" of awards under the Plan, and what I understood to mean the grant of incentive rights pursuant to the February 6, 1989 board resolution of Xerox, Xerox granted not more than 100,000 incentive stock rights to only about 40 employees worldwide.

20  Mr. Allaire could not recall the specifics of his February 1990 call to Mr. Murray, but indicated that he had a message that he communicated to each of the recipients of the incentive stock rights in his telephone call to them. He advised each recipient that the award was a special award, over and above the employee's regular compensation, his immediate manager would not know about the award and it would not affect his other compensation, the award reflected the employee's performance and potential for the future, it was a strong message that the employee was valued, the intent was to encourage the employee to stay with the Xerox group until the age of 60, when the rights would vest, and with their combined effort the rights would be more valuable in the future than they were at present.

21  Mr. Allaire followed up on his phone call to Mr. Murray and sent him an internal memo, dated March 5, 1990, attaching, "your Agreement for your Special Incentive Stock Unit Award which was granted to you October 2, 1989." The memo indicated that, "As outlined in the enclosed Agreement, the Incentive Stock Units will vest at age 60."

22  Mr. Murray read the Agreement when he received it.

*The Productivity Initiatives*

23  In September of 1993, Xerox's top management group, its "Corporate Office", which consisted of a majority of Mr. Allaire's top management and which Mr. Allaire chaired, requested Barry Romeril, Xerox's Executive Vice-President and Chief Financial Officer, to form a Productivity Task Force to co-ordinate the implementation of certain productivity initiatives throughout the worldwide operations of Xerox. Mr. Romeril reported directly to Mr. Allaire.

24  Mr. Allaire explained that the Productivity Task Force engaged Xerox's units on a worldwide basis as to what productivity initiatives could be implemented in their respective organizations.

25  As part of this process, on November 15, 1993, Rich Ragazzo of XCL sent a memo entitled "Head Count/Costs Chart" to Dan Marchibroda, Xerox's assistant controller. Mr. Marchibroda reported to Ragunadan Sachdev, who in turn reported to Mr. Romeril. The memo summarized the headcount reductions proposed by XCL for each of 1994, 1995 and 1996, breaking out the reductions into various categories, such as "Field Service Rep and Manager

Copr. © West 2007 No Claim to Orig. Govt. Works

Reduction" and "Head Office Staff", and the estimated costs of those reductions. XCL proposed a total headcount reduction of 379 people in 1994.

26   It is apparent from the wording of Mr. Ragazzo's memo that this was not XCL's first communication to Xerox with respect to the headcount reduction. The memo indicates that it updates information provided earlier. The memo specifically noted that a higher provision had been made "due to implementation of an early retirement program rather than an IRIF."

27   As of January 1, 1994, Mr. Murray was the Senior Vice-President and General Manager, Office Documents Products of XCL. He described this as a "staff" as opposed to a "line" position. I assume he fell within the "Head Office Staff" category at the time early retirement was offered to him, although it is not material if I am wrong. As evidenced by the subsequent offer, Mr. Murray was clearly within one of the targeted categories.

28   At the December 6, 1993 meeting of the Xerox board, Mr. Allaire, a member and Chair of the Board, introduced the topic of the productivity initiative. Mr. Romeril then presented a report with recommendations arising out of the work of the Productivity Task Force. The minutes of the meeting indicate that,

> Management believes that these initiatives are necessary and doable. Mr. Romeril then led the board through a discussion of the manpower reduction by function and geographically, facilities redundancies and a breakdown of the proposed provision between labor, plant closures/consolidations and productivity investments.

29   Mr. Allaire clarified that the reference to "management" in the excerpted portion of the minutes refers to the "Corporate Office" which he chaired: Mr. Allaire believed that the manpower reductions were necessary and doable. Mr. Allaire also clarified in his discovery that the geographic breakdown referred to in the minutes was probably a breakout between U.S. and Europe and others.

30   The board of directors unanimously approved the restructuring for productivity described to it and the recommended communication process.

31   On December 8, 1993, Mr. Allaire, as Chairman and CEO, sent a Management Communique to Xerox Managers with respect to the productivity initiative. He explained that between the date of the announcement and 1996 10,000 jobs would be eliminated worldwide, with about half of the reduction planned for 1994. He explained,

> These will cut across the entire organization and include manufacturing, sales management, service, engineering, administration and staff . . . The required employment reductions will be accomplished through normal attrition; involuntary layoffs with standard company salary continuance and benefits; and, in some selected cases, voluntary layoffs . . . Implementation of the actions we are taking will vary by unit. Your senior management will be communicating with you directly over the coming weeks and months. In the meantime, I expect you to keep your employees informed. To that end, immediately following this <u>Management Communique,</u> I am attaching a set of questions and answers as well as a copy of the <u>Today at Xerox.</u>

32   Xerox issued a press release on the same date. It indicated that,

A variety of approaches will be used to accomplish the planned employment reduction. These include normal attrition, involuntary layoffs and, in some cases, controlled voluntary programs.

33    Mr. Allaire testified that he did not have specific individuals in mind who would be the subject of the voluntary prograMs. While the corporate office approved the workforce reductions conceptually, it did not look at and approve the details of any given organization; Mr. Allaire says that would have been done by the line management.

34    Also on December 8, 1993, Diane McGarry, President of XCL, issued a memo to all XCL employees, explaining the initiative and advising that XCL would be reducing its workforce along with the rest of Xerox Corporation. She attached *Today at Xerox* and advised the employees that their managers had received a communiqué and set of questions and answers from Paul Allaire and that she had asked that they share these with the employees.

*XCL's Early Retirement Option*

35    On December 16, 1993, eight days after she announced that XCL would reduce its workforce as part of the Xerox productivity initiative, Ms. McGarry announced an enhanced early retirement option to the existing pension plan as part of XCL's strategy to reach its 1994 workforce reduction goal.

36    Beth Medhurst, XCL's Vice-President, Human Resources and Organization Development was responsible for the design and administration of the Enhanced Early Retirement Program. Employees who were 50 years of age on or before December 31, 1994 and with age plus service credits equalling a minimum of 70 points were eligible. Under the enhanced program, 5 years was added to an employee's age and service for purposes of calculating the minimum pension entitlement. The program was entirely voluntary.

37    By letter dated January 17, 1994, Ms. Medhurst notified Mr. Murray that he was eligible for the Enhanced Early Retirement Program. He was advised that he had until March 31, 1994 to decide if he wanted to take advantage of the program and that if he elected the program, he would retire May 1, 1994, unless management requested a delay beyond that date for business reasons.

38    Sometime in February or March of 1994, Mr. Murray discussed with Ms. Medhurst whether he would be eligible to receive his incentive stock units if he retired early. Ms. Medhurst was not familiar with the units, asked for the relevant documents and advised Mr. Murray that she would look into the matter. She followed up by speaking with Ms. McGarry and the Xerox compensation group. By March 31, 1994, Ms. Medhurst had not received a definitive response. By letter dated March 31, 1994, she advised Mr. Murray that XCL had not been able to make a final determination of how the units would be treated, that if Mr. Murray wished to elect early retirement he would still be required to deliver a signed election form by March 31, 1994, but, in consideration of the time required to address the treatment of the units, he would be entitled to revoke his retirement decision in writing through to April 15, 1994.

*Acceptance of the Enhanced Early Retirement Offer*

Copr. © West 2007 No Claim to Orig. Govt. Works

39   On Thursday, March 31, 1994, Mr. Murray delivered his election to retire early under the Enhanced Early Retirement Program. He then left for the meeting of Xerox's "Presidents Club", being held in Paris the following week. He took a four-day vacation, spanning the Easter weekend, before the meeting started.

40   Ms. McGarry also attended the Presidents Club meeting in Paris. During the course of the four-day meeting, the group went on an excursion to Giverny. In the gardens at Giverny, Ms. McGarry sought out Mr. Murray to discuss what he had decided to do about early retirement.

41   Mr. Murray testified as to the substance of that conversation. He also provided a copy of the notes he made following the meeting. The notes were admitted as an exhibit with the consent of Xerox, as were all the documents filed by the parties at the outset of the trial. Mr. Murray's testimony was consistent with the notes.

42   Mr. Murray testified, and the notes indicate, that he thought that the early retirement package looked very good. If he accepted it, his pension would be greater at age 60 than if he worked to age 60. He says he advised Ms. McGarry that he felt the voluntary retirement package qualified for "retirement with permission" of the CEO and his incentive stock rights would as a result vest. He also says that Ms. McGarry did not know that he had incentive stock rights, and asked if anybody had asked Mr. Allaire about the stock. She indicated that she wanted Mr. Murray to stay at least to year-end, and hopefully until year-end 1995, and get the benefit of the early retirement package. She was confident that all the issues, including the extension and the incentive stock rights, could be worked out. She said that they should get Beth Medhurst involved.

43   The accuracy of the content of the notes is one of only two areas where Xerox challenges the facts as asserted by Mr. Murray. Xerox challenged the accuracy of the entire content of the notes because Mr. Murray acknowledged that the date the notes indicate his discussions with Ms. McGarry took place is wrong and twice changed the date he said the discussion took place. Although Ms. McGarry continues to work for the Xerox group, Xerox did not call her as a witness. Mr. Murray argues that I should therefore infer that her testimony would have been consistent with his.

44   The notes initially indicated that the discussion with Ms. McGarry took place March 28, 1993. The "3" in 93 was struck out in a different coloured ink than that in which the note was written and replaced with a "4". Mr. Murray says he cannot remember when he changed the "3" to a "4". The notes are with respect to events which occurred in 1994; the 1993 reference appears to me simply to have been an error and I take nothing from it.

45   Mr. Murray subsequently advised that the discussions did not occur on March 28, 1994 as indicated by the notes. He says the discussions occurred sometime between April 5 and 8, 1994 and he thinks the notes were in fact made between April 15 and May 5, 1994. At his examination for discovery in January of 2004, Mr. Murray was asked to produce his diary for the relevant period. He did not think that he had it. To his surprise, he was able to locate it at home. The diary indicated that the meeting of the Presidents Club in Paris occurred on Tuesday, April 5 through Friday, April 8, 1994. From that, Mr. Murray realized that he had made a mistake in indicating that the discussion occurred on March 28, 1994.

Copr. © West 2007 No Claim to Orig. Govt. Works