45 B.L.R. (3d) 275

46    Mr. Murray says that in making the notes he referred to his passport to remember when he was in Paris and fix the date of his discussion with Ms. McGarry.

47    Mr. Murray's passport shows that he arrived in Heathrow on Good Friday, April 1, 1994. He appears to have started the long weekend vacation that preceded the Presidents Club meeting in England. The preceding page of Mr. Murray's passport shows he also entered the U.K. through Heathrow on March 20, 1994. Mr. Murray says that he looked at that page in error, and calculated the March 28 date as the date the discussions took place by reference to the March 20 date.

48    I wondered why, if the notes were made in the period April 15 to May 5, 1994, Mr. Murray did not simply refer to his diary to fix the date of the conversation. I have assumed that the notes were made at home and that his diary was at his office.

49    While Mr. Murray explained in his examination in chief that he mistakenly indicated that the meeting with Ms. McGarry occurred on March 28, 1994 because he had referred to the wrong date in his passport in assigning the date, his passport was not made an exhibit in his examination in chief. Counsel for Xerox vigorously cross-examined Mr. Murray about the change in date and his explanation for it. Counsel for Mr. Murray sought to have Mr. Murray's passport made an exhibit during his re-examination. Counsel for Xerox objected. I permitted the passport to be made an exhibit and offered counsel for Xerox the opportunity to further cross-examine Mr. Murray. That offer was declined. I note that my review of the passport did not assist Mr. Murray's case. In my view, nothing of consequence turns on the admission of the passport.

50    Mr. Murray says he made the notes because his daughter, a lawyer, advised him to keep a record of any conversation he had about the incentive stock rights.

51    In the absence of contradictory evidence, I have assumed the accuracy of the notes and of Mr. Murray's testimony.

52    Mr. Allaire says that sometime between April 1 and 15, 1994, Xerox's then head of Human Resources spoke to him about Mr. Murray's incentive stock rights. He advised her that he would not consider approving Mr. Murray's early retirement. Sometime during the same time frame, he also had a conversation with Ms. McGarry about Mr. Murray. He explained why he would not give the approval. Mr. Allaire testified that no one leaving early was ever granted approval. In his words, it defeated the purpose of the plan, which he described as to keep valued employees to age 60.

53    Sometime between April 13 and May 4, 1994, Ms. Medhurst advised Mr. Murray that if he accepted the early retirement offer, his incentive stock rights would become null and void. Ms. Medhurst says that Mr. Murray then went away to think about it. On May 5, 1994, Mr. Murray signed a letter dated April 15, 1994, prepared by Ms. Medhurst, confirming he was not rescinding his earlier election to accept the early retirement offer.

54    Mr. Murray says that he told Ms. Medhurst that he was not going to sign his rights away. This is the second area where Xerox contests the facts as recounted by Mr. Murray. Ms. Medhurst said that when she told him he would not get the units, Mr. Murray did not say that

Copr. © West 2007 No Claim to Orig. Govt. Works

45 B.L.R. (3d) 275

he was reserving his rights on the units. She did not recall any conversation about the document when Mr. Murray handed it to her. Mr. Murray points out that Ms. Medhurst initially testified that she told Mr. Murray on April 15, 1994 that he would not get the units, and later, when confronted with Mr. Murray's diary showing that Mr. Murray was away on vacation on April 14 and 15, admitted that her memory was faulty regarding the date that she gave him this advice. Mr. Murray argues that because Ms. Medhurst's recollection was faulty in that respect, I should prefer his testimony over that of Ms. Medhurst. Xerox says that I should prefer the testimony of Ms. Medhurst because she is an uninterested witness.

55    In my view, nothing turns on this disputed area of testimony. It is not disputed that prior to May 4, 1994, Mr. Murray received legal advice, both orally and in writing, with respect to his entitlement to exercise his incentive stock rights upon commencing early retirement pursuant to the offer. Whether or not Mr. Murray advised XCL or Xerox, it is clear that he considered asserting subsequently that he was entitled to the shares.

56    On May 9, 1994, Ms. Medhurst wrote to Mr. Murray extending his retirement date to December 31, 1994. On December 31, 1994, Mr. Murray was 57 years of age. The effect of the Enhanced Early Retirement Program was that he was deemed to be 62 years of age for purposes of calculating pension entitlement.

57    Subsequent to his technical retirement on December 31, 1994, Mr. Murray entered into a consulting agreement with XCL and, until October 15, 1995, continued to perform the same job as before, but as a contractor. Around October 15, 1995, XCL threw a large retirement party for Mr. Murray.

58    On November 15, 1995, Mr. Murray wrote to Hector Motroni, Vice President, Human Resources & Quality at Xerox, formally expressing his view that he was entitled to the Shares and requesting their issuance to him. Mr. Murray described his retirement date as October 15, 1995. Mr. Motroni responded on January 22, 1996, advising Xerox declined to the issue the Shares. While Mr. Murray's letter describes his retirement as commencing October 15, 1995, at trial his position is that his retirement commenced December 31, 1994.

### The Parties' Positions

59    Mr. Murray says this is a case of interpretation of a contract, and the issue is what is required to constitute approval of the CEO. He also says that the *contra proferentum* rule should be applied, either because the Agreement is a contract of adhesion (see *Davies v. Zurich Life Insurance Co. of Canada*, [1981] 2 S.C.R. 670 (S.C.C.)) or is ambiguous (see *Fridman, The Law of Contract in Canada*, 4th ed. (Toronto: Carswell, 1999) at 497 and the cases referred to in Fridman), and, as a result, in determining what is required to constitute the approval of the CEO, the meaning least favourable to Xerox should prevail.

60    Xerox says that the issue is not one of interpretation of a contract; rather it is an issue of what qualifies as approval. Xerox says that in any event paragraph 2 of the Agreement is unambiguous, and the *contra proferentum* rule would not apply for that reason. Xerox does not specifically argue that the Agreement is not a contract of adhesion, but points to the gift-like character of the grant of the incentive stock rights. Xerox says the Agreement is in favour of a specific individual and therefore requires specific approval of Mr. Murray's early retirement

Copr. © West 2007 No Claim to Orig. Govt. Works

45 B.L.R. (3d) 275

for him to be entitled to the Shares. In the alternative, Xerox says because Mr. Murray is not an employee of Xerox, the logical interpretation of paragraph 2 of the Agreement is that the CEO must approve Mr. Murray's entitlement to the Shares, and not his early retirement. Xerox also cites *Bank of Montreal v. University of Saskatchewan* (1953), 9 W.W.R. (N.S.) 193 (Sask. Q.B.) and *Montreal Trust Co. of Canada v. Birmingham Lodge Ltd.* (1995), 24 O.R. (3d) 97 (Ont. C.A.) and argues that if I am in any doubt as to the interpretation of the Agreement, I should be guided by the subsequent conduct of the parties. Xerox says that the fact that Mr. Murray permitted Ms. McGarry and Ms. Medhurst to make enquiries as to his entitlement to the Shares if he accepted XCL's early retirement offer shows that he knew that specific approval of the CEO was required.

61    Xerox also referred to paragraph 13 of the Agreement, quoted above under the heading," *The Agreement, The Plan and the Board Resolution*". That section says that decisions and interpretations by the Board or the committee of Xerox with respect to the Agreement are binding on the employee. Xerox argued that the Board had delegated authority to Mr. Allaire to make this decision. Mr. Allaire's decision that Mr. Murray was not entitled to the Shares was therefore a decision to which paragraph 13 of the Agreement applied, and the decision was accordingly binding on Mr. Murray, provided it was reasonable. Xerox referred me to *Greenberg v. Meffert* (1985), 50 O.R. (2d) 755 (Ont. C.A.), *Rose v. Edell* (1986), 57 O.R. (2d) 89 (Ont. Dist. Ct.) and *Rivett v. Hospitals of Ontario Pension Plan* (1995), 9 C.C.P.B. 284 (Ont. Gen. Div.). Mr. Murray argued in response that such a clause is void because it purports to oust the jurisdiction of this court and is contrary to public policy. He cites *West of England Ship Owners Mutual Insurance Assn. (Luxembourg) c. Laurentian General Insurance Co.* (1992), [1995] N.L.O.R. No. 2277 (Que. S.C.) and *Baker v. Jones*, [1954] 2 All E.R. 553 (Eng. Q.B.).

## Analysis and Conclusion

62    As to whether the issue before me is one of interpretation of a contract, I think that it is splitting hairs to argue that the question of whether the approval was the kind of approval contemplated by the Agreement is not an issue of interpretation.

63    A contract of adhesion is one where the signatory does not really have the opportunity to negotiate its terMs. He must agree and sign, or forego what the contract might bring. Fridman, 2nd ed. (Toronto: Carswell, 1986) *The Law of Contract in Canada* at 445 and *ETI Explosives Technologies International (Canada) Ltd. V. East Coast Explosives Ltd.*, [1994] N.S.J. No. 426 (N.S. S.C.).

64    Mr. Murray did not have an opportunity to negotiate the Agreement. While the format of the Agreement did not require his signature, he accepted the grant and the parties agree that the Agreement is binding on Mr. Murray. Notwithstanding the voluntary nature of the grant to Mr. Murray, I conclude that the Agreement is a form of contract of adhesion and should be construed in favour of Mr. Murray. While the grant might be seen as giftlike, it was not a gift. Xerox made it because it thought it would, and it undoubtedly did, influence Mr. Murray's loyalty to and continued employment with Xerox between the more than four years that elapsed after he was notified of the grant and before he accepted XCL's offer of early retirement. If I am wrong in this conclusion, then I conclude that because Xerox drafted the Agreement, the meaning of "approval of the CEO" least favourable to Xerox should prevail.

Copr. © West 2007 No Claim to Orig. Govt. Works

45 B.L.R. (3d) 275

65      I am also influenced in my decision by Mr. Allaire's testimony that although Xerox entered into an agreement which provided that the incentive period lapsed when the employee attained the age of 60 or commenced early retirement prior thereto with the approval of the CEO, no employee who took early retirement was ever granted specific approval, at least by him. There was, for example, no consideration of the number of years that had elapsed between the date of the grant and the effective date of early retirement, or the age, or deemed age, of the employee at the time of early retirement. Nor was there any consideration of the employee's level of performance or the reason for the early retirement. Mr. Allaire thought that granting any such approval was inconsistent with the objectives of the Plan. It seems to me that in drafting the Agreement, Xerox must have contemplated that in some circumstances approval of early retirement would be given by the CEO. If not, why provide for it? As specific approval would never be given by Mr. Allaire, it seems to me that a general approval, such as approval of the voluntary layoff in Canada of a specified number of Head Office Staff through an early retirement program, has to constitute the requisite approval, if the words drafted by Xerox are to have any meaning.

66      I do not accept Xerox's submission that the proper interpretation of paragraph 2 of the Agreement is that Mr. Allaire must approve Mr. Murray's entitlement to the Shares if he retires prior to age 60, and that entitlement to the Shares does not follow early retirement approved by Mr. Allaire. Paragraph 2 clearly defines the incentive period with reference to the date the employee commences early retirement prior to 60 with the approval of the CEO.

67      As to Mr. Murray's conduct in permitting Ms. McGarry and Ms. Medhurst to follow-up with Mr. Allaire, I am not convinced that such conduct should be taken as an acknowledgement by Mr. Murray that the specific approval of Mr. Allaire was required. I think that Mr. Murray should be seen as simply testing the water. He was able to ascertain before he elected to accept early retirement that he would have a fight on his hands after retirement to obtain the Shares he thought he was entitled to. Given the position of Mr. Allaire as communicated to him sometime between April 13 and May 5, 1994, it is understandable that he waited to embark on the fight, by sending his November 15, 1995 letter to Hector Motroni, until after he was no longer at XCL.

68      As to Xerox's argument that paragraph 13 of the Agreement gives its Board and the committee the right to interpret the Agreement and make decisions with respect to the Agreement, counsel conceded before me that there was no evidence that the Board or the committee had delegated to Mr. Allaire, by way of resolution or otherwise, the authority to make decisions and interpretations with regard to questions arising under the Agreement. Nor was there evidence that the Board or the committee had considered the issue before me. Clearly, paragraph 2 of the Agreement defines the incentive period by reference to early retirement commenced with the approval of the CEO. That does not in my view constitute a delegation of the Board's or the committee's asserted right under paragraph 13 to make binding decisions and interpretations with regard to whether the approval of the CEO under paragraph 2 had to be individual, specific or any other questions arising under the Agreement. I note that the only example of delegated authority under the Plan was in the February 6, 1989 board resolution which specifically authorized Mr. Kearns, the then Chair of the Board, to grant certain options and rights in 1989, subject to conditions fixed by the Board.

Copr. © West 2007 No Claim to Orig. Govt. Works

69     Should I be found wrong in finding that paragraph 2 of the Agreement does not consti-
tute a delegation of the Board's and the committee's asserted rights under paragraph 13 of the
Agreement, I conclude, based on the authorities cited by Mr. Murray, that to the extent that
paragraph 13 operates to make Xerox the sole judge of whether it has complied with its oblig-
ations under the Agreement, it is void as contrary to public policy. The _Greenberg_ and _Rose_
cases cited by Xerox should be distinguished. They provide that the words "at the sole discre-
tion" of a party mean that the party must act reasonably in exercising its discretion. What is at
issue here is not whether Mr. Allaire acted reasonably in indicating that Mr. Murray was not
entitled to the Shares. The issue is whether he approved Mr. Murray's early retirement within
the meaning of paragraph 2 of the Agreement. In the _Rivett_ case cited by Xerox, the adminis-
trator of a pension plan was given the exclusive right, under the pension plan, to "interpret the
Plan and to decide any and all matters arising thereunder . . . " Justice Farley agreed with the
administrator's interpretation of the pension plan. There was therefore no need for him to con-
clude that the administrator has usurped the court's jurisdiction.

## CALCULATION OF DAMAGES

### The Parties' Positions

70     Since Mr. Murray's retirement on December 31, 1994, the Shares have been split on a
6:1 basis. The 2300 Shares that Mr. Murray would have been entitled to on December 31,
1994 are now equivalent to 13,800 Shares. The market price of the Shares, adjusted to reflect
the splits, was US$16.50 on December 31, 1994, climbing to a high of US$59.00 on Decem-
ber 31, 1998 and falling to US $13.80 on December 31, 2003. Not surprisingly, Mr. Murray
and Xerox present competing theories as to how I should calculate the damages. Happily, the
parties agree on the trading prices of the Shares and the exchange rates to be applied on the
relevant dates.

71     Mr. Murray says that I should determine how long he would have held the Shares had
they been issued to him, calculate the sale proceeds had he disposed of the Shares at that date,
and provide for interest on those sale proceeds from that date to the date of judgment. Mr.
Murray says that based on how long Mr. Murray typically held vested options before exer-
cising them and selling the shares issued upon their exercise, I should assume that Mr. Murray
would have held the Shares one or two years after December 31, 1994 before selling them. If
Mr. Murray had sold the Shares on December 29, 1995, he would have realized gross sales
proceeds of $430,111.72. If Mr. Murray sold the Shares on December 31, 1996, he would
have realized gross sales proceeds of $492,271.62. Mr. Murray says that in calculating the
damages, I should not take into account the amount of taxes that would have been payable on
the notional disposition of the Shares. For that proposition, he cites _Cooper v. Miller,_ [1994] 1
S.C.R. 359 (S.C.C.) and _Jennings v. Cronsberry,_ [1966] S.C.R. 532 (S.C.C.).

72     Xerox says that the correct approach is to crystallize Mr. Murray's loss at the time he
could reasonably have obtained substitute shares in Xerox and relies on _Baud Corp., N.V. v.
Brook_ (1978), 89 D.L.R. (3d) 1 (S.C.C.) and _Hunt v. TD Securities Inc._ (2003), 66 O.R. (3d)
481 (Ont. C.A.). Mr. Murray says that these cases should be distinguished. Xerox says that
Mr. Murray knew more than seven months before his December 31, 1994 retirement date that
he was technically retiring on that date and that Xerox was not issuing the Shares to him. Xer-
ox accordingly says that Mr. Murray could have obtained substitute shares on December 31,

Copr. © West 2007 No Claim to Orig. Govt. Works

45 B.L.R. (3d) 275

1994 and his loss should therefore be crystallized on that date. Based on the trading price of the Shares and the exchange rate in effect on December 31, 1994, the amount is $319,417.56. Xerox says that Mr. Murray would be entitled to interest on such amount from December 31, 1994 to the date of judgment.

73    Xerox also says that if Mr. Murray's theory as to how damages should be calculated prevails, he should only be entitled to pre-judgment interest on an amount equal to the after tax proceed of the sale, from the date the taxes would have been payable, to the date of judgment. Xerox concedes that Mr. Murray would be entitled to interest on the gross proceeds from the date of sale until the tax obligation triggered by the sale was payable.

74    The parties agree that 5.6% is the applicable pre-judgment interest rate.

*Analysis and Conclusion*

75    In *Asamera*, the defendant breached a contract by failing to return shares lent to it in negotiable form. The value of the shares fluctuated widely between the date of breach and the date of trial. The Court held that the principle of mitigation, which had been applied in the case of conversion of shares and breach of contract to sell shares, should also be applied to the case of a breach of a contract to return shares. That principle, it concluded, imposed on the injured party the obligation to purchase like shares in the market on the date of the breach or within a reasonable time thereafter. The realities of market operations should however be taken into account in implementing this principle. The court postponed the date of mitigation for several reasons, including the large number of shares involved, the volatility of the market, the time needed to arrange financing to reacquire the shares in a careful manner and the breaching party's request that the injured party postpone acting on the claim.

76    In *Hunt*, the defendant investment advisor sold BCE shares in an unauthorized transaction. The Court of Appeal concluded that the sale was a breach of contract and the Hunts therefore had a duty to mitigate. On the facts, the Court of Appeal concluded that a brief mitigation period of about one month was reasonable. Repurchase of BCE shares would have been relatively easy. The requisite quantity of shares was readily available on the market and the sale proceeds from the unauthorized transaction were available to the plaintiffs, so they had the financial means to repurchase the shares.

77    Mr. Murray says that *Asamera* and *Hunt* are different than the case before me. This case, he says, involves the breach of a contract to issue and deliver shares. *Asamera* and *Hunt* involved cases of breach of contracts to return shares and not to sell shares without authorization, respectively.

78    In my view, there is no reason to distinguish *Asamera* and *Hunt*. In particular, both the plaintiff in *Asamera* and Mr. Murray sued because they were entitled to receive shares. I conclude that Xerox's theory as to how the damages should be calculated is correct.

79    This then raises the issue of what was a reasonable mitigation period in the circumstances. The replacement cost of the Shares was $319,417.56 as of December 31, 1994. The evidence was that Mr. Murray was a well-compensated senior executive. While there was a dispute about the aggregate amount of his gains from the exercise of stock options in the peri-

Copr. © West 2007 No Claim to Orig. Govt. Works

45 B.L.R. (3d) 275

od between 1988 and 1994, it appears clear that those gains alone were greater than the $319,417.56. While the amount in issue is significant, I believe that Mr. Murray was in a position to finance the purchase of replacement Shares without difficulty on his retirement on December 31, 1994, had he wished to. There was no evidence to the contrary. Replacement shares were readily available: no market factors affect the mitigation period.

80    Mr. Murray is accordingly entitled to damages of $319,417.56, plus interest thereon at the rate of 5.6% from December 31, 1994 to the date of these reasons, and post-judgment interest thereafter at the rate stipulated in the *Courts of Justice Act*. I note that while in his November 15, 1995 letter to Mr. Motroni at Xerox Mr. Murray describes his formal retirement as occurring on October 15, 1995, Mr. Murray's position before me at trial was that his retirement commenced effective December 31, 1994, and that he was entitled to the Shares as of December 31, 1994. As a result, I do not consider the issuance of the November 15, 1995 letter by Mr. Murray to Mr. Motroni, or the fact that Xerox did not respond to that letter until January 22, 1996, as factors justifying the extension of the mitigation period until January 22, 1996. I also note that Mr. Murray did not argue before me that this exchange of correspondence was a reason to extend the mitigation period.

81    If I am wrong in concluding that Xerox's theory as to the calculation of damages is the correct one, the result is the same: I believe that had Mr. Murray received the Shares, he would have sold them very shortly after December 31, 1994. First, the one- to two-year period that Mr. Murray says he typically held vested options for before exercising them and immediately selling the shares issued upon their exercise was not calculated with precision. It appears to me that the average hold period for vested options was closer to one year. Second, when he exercised options, Mr. Murray did not sell just enough shares to finance the exercise of the options. He seems to have sold all of the shares resulting from the exercise of the options. I suspect the delays in exercising the vested options were related more to market timing. Mr. Murray did not seem to be someone who was an investor, *per se*, in Xerox stock. Third, I do not think that the period an employee holds vested options before exercising them is indicative of the period that someone who acquires shares on retirement and is no longer an employee will hold the shares. Once one ceases to be an employee, different interests are at play. He may well have received advice to diversify his investments. Based on the *Cunningham* and *Jennings* cases cited by Mr. Murray, in my view, pre-judgment interest would be payable on the gross sales proceeds.

## COSTS

82    If the parties are unable to agree as to costs, Mr. Murray may provide brief written submissions as to costs, including a bill of costs setting out counsel's actual hourly rate, year of call and particulars of any special fee arrangements in place. Mr. Murray's submissions shall be provided within two weeks of the date these reasons are released. Xerox shall provide its submissions within ten days thereafter. No reply submissions shall be provided.

*Action allowed.*

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works

2005 WL 1670373 (Ont. C.A.), 2005 CarswellOnt 3283

**H**
2005 CarswellOnt 3283

Murray v. Xerox Corp.
ALLAN MURRAY (Plaintiff / Respondent) and XEROX CORPORATION INC. (Defendant / Appellant)
Ontario Court of Appeal
Gillese, LaForme, Rouleau JJ.A.
Heard: July 26, 2005
Judgment: July 26, 2005
Docket: CA C42008

Copyright © CARSWELL

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved

Counsel: John A. Campion for Appellant

W.A. Kelly, Q.C. for Respondent

Subject: **Contracts**; Civil Practice and Procedure

Contracts --- Construction and interpretation -- Resolving ambiguities -- Contra proferentem

Plaintiff was in senior managerial position with defendant -- Defendant agreed under incentive plan to issue shares to plaintiff if he worked until age 60 or took early retirement with approval of chief executive officer -- Agreement provided that all decisions of board of directors respecting questions arising under agreement or plan were binding on parties -- Plaintiff accepted offer of early retirement four years later as part of extensive lay-offs -- Defendant refused to issue shares -- Plaintiff brought action for breach of contract -- Action was allowed -- Agreement was form of contract of adhesion -- Issuance of shares was not gift but incentive to loyalty and continued employment -- Meaning of "approval of CEO" least favourable to defendant applied -- General approval of voluntary lay-offs was sufficient approval of plaintiff's retirement -- Board did not delegate to officer its authority to make decisions respecting agreement -- Alternatively, right of defendant to unilaterally decide that it complied with agreement was void as contrary to public policy -- Appeal by defendant dismissed.

Cases considered:

Davies v. Zurich Life Insurance Co. of Canada  (1981), [1982] I.L.R. 1-1471, 39 N.R. 457, (sub nom. Zurich Life Insurance Co. of Canada v. Davies) [1981] 2 S.C.R. 670, 130 D.L.R. (3d) 748, 1981 CarswellOnt 630, 1981 CarswellOnt 630F (S.C.C.) -- referred to

APPEAL by defendant from judgment reported at Murray v. Xerox Corp.  (2004), 45 B.L.R. (3d) 275, 2004 CarswellOnt 2234 (Ont. S.C.J.), allowing action for breach of contract.

Copr. © West 2007 No Claim to Orig. Govt. Works

2005 WL 1670373 (Ont. C.A.), 2005 CarswellOnt 3283

**Per Curiam:**

1    This is an appeal from a judgment in which the trial judge held that pursuant to an Incentive Agreement, the respondent was entitled to incentive stock units upon early retirement. The trial judge identified the issue as being, "whether [the respondent] commenced early retirement with the approval of a [specific CEO], within the meaning of the Agreement" (para. 3). The trial judge found on the facts that the agreement was a form of contract of adhesion (paras. 63 and 64) and interpreted the disputed clause in the manner more favourable to the respondent.

2    The core of the appellant's appeal is that the trial judge erred in law by applying what amounts to the legal principle of *contra proferentum* without first having tried to resolve the ambiguity in the section by considering factors such as: relevant background, the purpose of the document, the entirety of the document, and what the parties reasonably would have understood the words of the document to mean. We disagree.

3    It is noteworthy that the arguments on this core issue were essentially the same as those advanced by the appellant at trial as appears from the trial judge's reasons. The trial judge summarized the facts including the relevant background, the commercial purpose, and the context. She then identified the applicable law and, applying the law to the facts correctly, held that the contract was one of adhesion: See *Davies v. Zurich Life Insurance Co. of Canada* (1981), 39 N.R. 457 (S.C.C.).

4    Having identified the type of contract before her, the trial judge then went on to make findings of fact from the evidence presented at trial. It is clear to us that the conclusion reached by the trial judge on the meaning of the impugned words was informed by an appreciation of the factual circumstances within which the agreement arose and the commercial purpose of the agreement. In our view, the trial judge adopted an interpretation of the impugned words that accomplished the purpose and was consistent with the applicable legal doctrine.

5    Given our decision on this core issue, we find it unnecessary to address the remainder of the appellant's submissions. Accordingly, we find no basis for interfering with the trial judge's decision, and the appeal is dismissed.

6    The respondent did not pursue his cross-appeal on the trial judge's findings on the issue of damages. We think this was a correct concession. The cross-appeal is dismissed.

7    Finally, the respondent is entitled to costs of the appeal in the all-inclusive agreed upon amount of $3,500.

*Appeal dismissed.*

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works