# Exhibit "3"

215 O.A.C. 43

**H**
2006 CarswellOnt 3769

CivicLife.com Inc. v. Canada (Attorney General)
CIVICLIFE.COM INC. (Plaintiff / Respondent / Appellant by way of cross-appeal) and THE ATTORNEY GENERAL OF CANADA (Defendant / Appellant / Respondent by way of cross-appeal)
Ontario Court of Appeal
K.M. Weiler J.A., M. Rosenberg J.A., and R.A. Blair J.A.
Heard: May 8, 2006
Judgment: June 21, 2006
Docket: CA C43915

Copyright © CARSWELL

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved

Proceedings: reversing in part *CivicLife.com Inc. v. Canada (Attorney General)* (2005), 2005 CarswellOnt 4228 (Ont. S.C.J.)

Counsel: Lynn Marchildon, Simon Fothergill for Appellant / Respondent by way of cross-appeal

K. Scott McLean, David R. Elliott for Respondent ./ Appellant by way of cross-appeal

Subject: **Contracts**; Civil Practice and Procedure; Public

Contracts --- Performance or breach -- Obligation to perform -- Sufficiency of performance -- Duty to perform in good faith

Defendant federal Crown wanted on-line portal to allow access to government information and services -- Plaintiff software company was formed to develop portal, while second software company S Inc. was to provide certain components to be integrated into plaintiff's portal -- Defendant entered into intellectual property and supply agreements with plaintiff and S Inc., and they made development agreements with each other -- Agreements provided that S Inc. and plaintiff would co-operate to develop one portal -- Certain employee of defendant secretly encouraged S Inc. to develop competing portal instead of co-operating with plaintiff -- Plaintiff and S Inc. each delivered their own portal -- After making only two pilot tests of plaintiff's portal, defendant abandoned portal without further testing or advance notice to plaintiff -- Plaintiff brought successful action for damages for breach of contract, and was awarded $2.52 million in consequential damages, as well as $400,000 in punitive damages -- Defendant appealed -- Appeal dismissed -- Trial judge made no clear and obvious errors in finding that defendant deliberately and secretly undermined its contractual agreement with plaintiff -- Defendant failed to meet high standard required to overturn trial judge's findings of fact on that issue -- Defendant's conduct appeared to come within each of three categories that courts have recognized as giving rise to imposition of duty of good faith -- Trial judge found

in effect that actions of defendant undermined reasonable expectations of parties in five specific ways and did not fit with what they had agreed upon -- Trial judge used term breach of good faith globally to encompass his conclusion that defendant had acted in such way as to undermine very objectives of contract.

Remedies --- Damages -- Damages in contract -- General principles

Defendant federal Crown wanted on-line portal to allow access to government information and services -- Plaintiff software company was formed to develop portal, while second software company S Inc. was to provide certain components to be integrated into plaintiff's portal -- Defendant entered into intellectual property and supply agreements with plaintiff and S Inc., and they made development agreements with each other -- Agreements provided that S Inc. and plaintiff would co-operate to develop one portal -- Certain employee of defendant secretly encouraged S Inc. to develop competing portal instead of co-operating with plaintiff -- Plaintiff and S Inc. each delivered their own portal -- After making only two pilot tests of plaintiff's portal, defendant abandoned portal without further testing or advance notice to plaintiff -- Plaintiff brought successful action for breach of contract, and was awarded $2.52 million in consequential damages -- Defendant appealed -- Appeal dismissed -- Trial judge did not err in holding defendant liable to pay plaintiff damages for breach of contract -- Trial judge found in effect that actions of defendant undermined reasonable expectations of parties in five specific ways and did not fit with what they had agreed upon -- Trial judge did not err in awarding damages for defendant's failure to adequately test plaintiff's portal -- Trial judge's finding that damages should be awarded for defendant's failure to conduct 10 more pilot tests was supportable on evidence.

Remedies --- Damages -- Exemplary, punitive and aggravated damages -- Grounds for awarding exemplary, punitive and aggravated damages -- Breach of contract

Defendant federal Crown wanted program to allow for on-line access to information and services -- Plaintiff software company was formed to develop main portal, while second software company S Inc., was to provide certain components to be integrated into plaintiff's portal -- Defendant entered into intellectual property and supply agreements with plaintiff and S Inc., and they made development agreements with each other -- Agreements provided that S Inc. and plaintiff would co-operate to develop one portal -- Certain employee of defendant secretly encouraged S Inc. to develop competing portal instead of co-operating with plaintiff -- Plaintiff and S Inc. each delivered their own portal -- After making only two pilot tests of plaintiff's portal, defendant abandoned portal without further testing or advance notice to plaintiff -- Plaintiff brought successful action for damages for breach of contract -- Plaintiff was awarded $400,000 in punitive damages based on defendant's high-handed and oppressive conduct, in addition to compensatory damages of $2.52 million -- Defendant appealed from punitive damages award -- Appeal allowed -- Punitive damages award was set aside -- Trial judge's description of defendant's conduct grounding his award of compensatory damages was strikingly similar to his description of conduct grounding his award of punitive damages -- Moreover, two of factors court was to consider when deciding whether award of punitive damages was rational were relative vulnerability of plaintiff and any advantage or profit gained by defendant -- Plaintiff's vulnerability was largely self-imposed: wisdom of plaintiff's business plan in choosing to put most of its "eggs in one basket" by entering into portal con-

Copr. © West 2007 No Claim to Orig. Govt. Works

tracts could not be laid at feet of defendant -- There was no evidence that defendant's employee's misconduct in secretly encouraging S Inc. to provide its own portal was part of general culture at government department in question, or that department profited from misconduct -- To punish defendant and, ultimately, Canadian taxpayer for actions of rogue employee over relatively short time frame would not serve rational purpose in case such as this where substantial compensatory damages had already been awarded.

Remedies --- Damages -- Damages in contract -- Loss of profits consequent to breach -- Commercial losses

Defendant federal Crown wanted on-line portal to allow access to government information and services -- Plaintiff software company was formed to develop portal, while second software company S Inc. was to provide certain components to be integrated into plaintiff's portal -- Defendant entered into intellectual property and supply agreements with plaintiff and S Inc., and they made development agreements with each other -- Agreements provided that S Inc. and plaintiff would co-operate to develop one portal -- Certain employee of defendant secretly encouraged S Inc. to develop competing portal instead of co-operating with plaintiff -- Plaintiff and S Inc. each delivered their own portal -- After making only two pilot tests of plaintiff's portal, defendant abandoned portal without further testing or advance notice to plaintiff -- Plaintiff brought successful action for breach of contract, and was awarded $2.52 million in consequential damages -- Plaintiff cross-appealed from damage award, submitting it ought to have been awarded damages for loss of market value of company and loss of opportunity because national rollout of portal never took place -- Cross-appeal dismissed -- Trial judge did not err in making no further award of compensatory damages -- Trial judge properly found that plaintiff assumed risk that national launch of portal might not occur -- There was no objective evidence concerning plaintiff's chances of success as newcomer in competitive portal market, nor was there any evidence that plaintiff lost opportunity to make sales of its portal outside Canada because of defendant's actions.

**Cases considered by *K.M. Weiler J.A.*:**

> *Amertek Inc. v. Canadian Commercial Corp.* (2005), 5 B.L.R. (4th) 199, 31 C.C.L.T. (3d) 238, 2005 CarswellOnt 2784, 200 O.A.C. 38, 256 D.L.R. (4th) 287, 76 O.R. (3d) 241 (Ont. C.A.) -- referred to
>
> *Canadian Pacific Hotels Ltd. v. Bank of Montreal* (1987), 77 N.R. 161, [1987] 1 S.C.R. 711, 21 O.A.C. 321, 41 C.C.L.T. 1, 40 D.L.R. (4th) 385, 1987 CarswellOnt 760, 1987 CarswellOnt 962 (S.C.C.) -- considered
>
> *Canlin Ltd. v. Thiokol Fibres Canada Ltd.* (1983), 40 O.R. (2d) 687, 22 B.L.R. 193, 142 D.L.R. (3d) 450, 1983 CarswellOnt 136 (Ont. C.A.) -- considered
>
> *Dynamic Transport Ltd. v. O.K. Detailing Ltd.* (1978), 85 D.L.R. (3d) 19, [1978] 2 S.C.R. 1072, 20 N.R. 500, 6 Alta. L.R. (2d) 156, 9 A.R. 308, 4 R.P.R. 208, 1978 CarswellAlta 62, 1978 CarswellAlta 298 (S.C.C.) -- referred to
>
> *Gateway Realty Ltd. v. Arton Holdings Ltd.* (1992), (sub nom. *Gateway Realty Ltd. v. Arton Holdings Ltd. (No. 3)*) 112 N.S.R. (2d) 180, (sub nom. *Gateway Realty Ltd. v.*

Copr. © West 2007 No Claim to Orig. Govt. Works

215 O.A.C. 43

*Arton Holdings Ltd. (No. 3))* 307 A.P.R. 180, 1992 CarswellNS 518 (N.S. C.A.) -- referred to

*Gateway Realty Ltd. v. Arton Holdings Ltd. (No. 3)* (1991), 106 N.S.R. (2d) 180, 288 A.P.R. 180, 1991 CarswellNS 320 (N.S. T.D.) -- referred to

*GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 1 O.T.C. 322, 27 B.L.R. (2d) 251, 1996 CarswellOnt 1434 (Ont. Gen. Div. [Commercial List]) -- referred to

*Greenberg v. Meffert* (1985), 50 O.R. (2d) 755, 18 D.L.R. (4th) 548, (sub nom. *Greenberg v. Montreal Trust Co.*) 9 O.A.C. 69, 7 C.C.E.L. 152, 37 R.P.R. 74, 1985 CarswellOnt 727 (Ont. C.A.) -- considered

*Greenberg v. Meffert* (1985), 64 N.R. 156 (note), 56 O.R. (2d) 320 (note), 30 D.L.R. (4th) 768 (note), 14 O.A.C. 240 (note), [1985] 2 S.C.R. ix (note) (S.C.C.) -- referred to

*Guarantee Co. of North America v. Gordon Capital Corp.* (1999), [1999] 3 S.C.R. 423, 1999 CarswellOnt 3171, 1999 CarswellOnt 3172, 178 D.L.R. (4th) 1, 247 N.R. 97, [2000] I.L.R. I-3741, 126 O.A.C. 1, 49 B.L.R. (2d) 68, 15 C.C.L.I. (3d) 1, 39 C.P.C. (4th) 100 (S.C.C.) -- considered

*Hill v. Church of Scientology of Toronto* (1995), 25 C.C.L.T. (2d) 89, 184 N.R. 1, (sub nom. *Manning v. Hill*) 126 D.L.R. (4th) 129, 24 O.R. (3d) 865 (note), 84 O.A.C. 1, [1995] 2 S.C.R. 1130, (sub nom. *Hill v. Church of Scientology*) 30 C.R.R. (2d) 189, 1995 CarswellOnt 396, 1995 CarswellOnt 534, 1995 SCC 67 (S.C.C.) -- considered

*Housen v. Nikolaisen* (2002), 2002 SCC 33, 2002 CarswellSask 178, 2002 CarswellSask 179, 286 N.R. 1, 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, [2002] 7 W.W.R. 1, 219 Sask. R. 1, 272 W.A.C. 1, 30 M.P.L.R. (3d) 1, [2002] 2 S.C.R. 235 (S.C.C.) -- referred to

*Jaegli Enterprises Ltd. v. Ankenman* (1981), [1981] 2 S.C.R. 2, 124 D.L.R. (3d) 415, 40 N.R. 4, 1981 CarswellBC 635, 1981 CarswellBC 635F (S.C.C.) -- referred to

*L. (H.) v. Canada (Attorney General)* (2005), 251 D.L.R. (4th) 604, 333 N.R. 1, [2005] 8 W.W.R. 1, 262 Sask. R. 1, 347 W.A.C. 1, 2005 SCC 25, 2005 CarswellSask 268, 2005 CarswellSask 273, 24 Admin. L.R. (4th) 1, 8 C.P.C. (6th) 199, [2005] 1 S.C.R. 401 (S.C.C.) -- referred to

*LeMesurier v. Andrus* (1986), 38 R.P.R. 183, 54 O.R. (2d) 1, 25 D.L.R. (4th) 424, 12 O.A.C. 299, 1986 CarswellOnt 670 (Ont. C.A.) -- referred to

*LeMesurier v. Andrus* (1986), 74 N.R. 239 (note), 21 O.A.C. 239 (note), (sub nom. *Le Mesurier v. Andrus*) 63 O.R. (2d) x (note), (sub nom. *Andrus v. Lemesurier*) [1986] 2 S.C.R. v (note) (S.C.C.) -- referred to

*M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.* (1999), 170 D.L.R. (4th) 577, 237 N.R. 334, 44 C.L.R. (2d) 163, 232 A.R. 360, 195 W.A.C. 360, 1999 CarswellAlta 301, 1999 CarswellAlta 302, [1999] 1 S.C.R. 619, [1999] 7 W.W.R. 681, 69

Alta. L.R. (3d) 341, 3 M.P.L.R. (3d) 165, 49 B.L.R. (2d) 1, 15 Const. L.J. 455, 2 T.C.L.R. 235 (S.C.C.) -- considered

*Martin v. Goldfarb* (1998), 1998 CarswellOnt 3319, 112 O.A.C. 138, 163 D.L.R. (4th) 639, 42 C.C.L.T. (2d) 271, 41 O.R. (3d) 161, 44 B.L.R. (2d) 158 (Ont. C.A.) -- referred to

*MDS Health Group Ltd. v. King Street Medical Arts Centre Ltd.* (1994), 12 B.L.R. (2d) 209, 55 C.P.R. (3d) 360, 1994 CarswellOnt 229 (Ont. Gen. Div. [Commercial List]) -- referred to

*Multi-Malls Inc. v. Tex-Mall Properties Ltd.* (1980), 28 O.R. (2d) 6, 12 R.P.R. 77, 9 B.L.R. 240, 108 D.L.R. (3d) 399, 1980 CarswellOnt 120 (Ont. H.C.) -- referred to

*Multi-Malls Inc. v. Tex-Mall Properties Ltd.* (1981), 128 D.L.R. (3d) 192, 37 O.R. (2d) 133, 1981 CarswellOnt 1126 (Ont. C.A.) -- referred to

*Multi-Malls Inc. v. Tex-Mall Properties Ltd.* (1982), 41 N.R. 360n, [1982] 1 S.C.R. xiii (S.C.C.) -- referred to

*National Satellite Newservice Inc. v. Canadian Satellite Communications Inc.* (1997), 1997 CarswellOnt 89 (Ont. Gen. Div. [Commercial List]) -- considered

*Schwartz v. R.* (1996), 17 C.C.E.L. (2d) 141, (sub nom. *Minister of National Revenue v. Schwartz*) 193 N.R. 241, (sub nom. *Schwartz v. Canada*) 133 D.L.R. (4th) 289, 96 D.T.C. 6103, 10 C.C.P.B. 213, [1996] 1 C.T.C. 303, (sub nom. *Schwartz v. Canada*) [1996] 1 S.C.R. 254, 1996 CarswellNat 422F, 1996 CarswellNat 2940 (S.C.C.) -- referred to

*Shelanu Inc. v. Print Three Franchising Corp.* (2003), 38 B.L.R. (3d) 42, 64 O.R. (3d) 533, 2003 CarswellOnt 2038, 226 D.L.R. (4th) 577, 172 O.A.C. 78 (Ont. C.A.) -- considered

*Ticketnet Corp. v. Air Canada* (1993), 1993 CarswellOnt 2046 (Ont. Gen. Div.) -- considered

*Ticketnet Corp. v. Air Canada* (1997), 154 D.L.R. (4th) 271, 105 O.A.C. 87, 1997 CarswellOnt 4273 (Ont. C.A.) -- referred to

*Transamerica Life Canada Inc. v. ING Canada Inc.* (2003), 2003 CarswellOnt 4834, 68 O.R. (3d) 457, [2004] I.L.R. I-4258, 41 B.L.R. (3d) 1, 234 D.L.R. (4th) 367 (Ont. C.A.) -- considered

*Vorvis v. Insurance Corp. of British Columbia* (1989), 25 C.C.E.L. 81, [1989] 1 S.C.R. 1085, [1989] 4 W.W.R. 218, 58 D.L.R. (4th) 193, 94 N.R. 321, 36 B.C.L.R. (2d) 273, 42 B.L.R. 111, 90 C.L.L.C. 14,035, 1989 CarswellBC 76, 1989 CarswellBC 704 (S.C.C.) -- referred to

*Waxman v. Waxman* (2004), 186 O.A.C. 201, 44 B.L.R. (3d) 165, 2004 CarswellOnt

Copr. © West 2007 No Claim to Orig. Govt. Works

1715 (Ont. C.A.) -- referred to

*Whiten v. Pilot Insurance Co.* (2002), 2002 SCC 18, 2002 CarswellOnt 537, 2002 CarswellOnt 538, [2002] I.L.R. I-4048, 20 B.L.R. (3d) 165, 209 D.L.R. (4th) 257, 283 N.R. 1, 35 C.C.L.I. (3d) 1, 156 O.A.C. 201, [2002] 1 S.C.R. 595 (S.C.C.) -- distinguished

APPEAL by defendant Crown from judgment, reported at *CivicLife.com Inc. v. Canada (Attorney General)* (2005), 2005 CarswellOnt 4228 (Ont. S.C.J.), awarding damages for breach of contract; CROSS-APPEAL by plaintiff from damages award.

*K.M. Weiler J.A.*:

### The Nature of the Appeal and Cross-Appeal

1   The Crown appeals both the trial judge's finding of liability for breach of contract and his award of $2.52 million as damages plus $400,000 punitive damages against it.

2   With respect to liability, the Crown submits that the trial judge erred in finding that Industry Canada breached its contractual obligations to CivicLife.com Inc. ("CivicLife"), an internet software developer, by deliberately and secretly undermining the objectives of their agreement and by implying a term of good faith on the part of Industry Canada in carrying out the contract. With respect to damages, the Crown submits that CivicLife was paid the full amount under the contract and the trial judge erred in awarding any damages for the Industry Canada's alleged failure to properly test the software CivicLife developed. The Crown further submits that the trial judge grounded his award of punitive damages on the very same conduct he used to conclude that Industry Canada had breached its contract, namely breach of an implied duty of good faith, and that he erred in law in holding that breach of the duty of good faith entitled CivicLife to punitive damages. In addition, the Crown submits that the amount of punitive damages is not rational.

3   CivicLife cross-appeals the award of damages on the basis that although the trial judge awarded it compensation for the money it spent and the pilot tests it was promised, no award was made to address the value and opportunity that CivicLife once had, but lost, because of Industry Canada's failure to perform the contract in good faith. CivicLife seeks additional damages of $14,520,000, on the basis that CivicLife was worth this amount and was destroyed, plus $4,000,000 for the reasonable expectation that a national rollout of the software would occur.

4   For the reasons that follow, I would dismiss the Crown's appeal with respect to liability and damages but I would allow the appeal with respect to punitive damages. I would dismiss the cross-appeal.

### Background

5   The trial judge's decision is reported at [2005] O.J. No. 3485 (Ont. S.C.J.). The following background is sufficient for the purposes of this appeal.

6   Starting in the mid 1990s, the Information Highway Applications Branch ("IHAB") of In-

Copr. © West 2007 No Claim to Orig. Govt. Works

dustry Canada put in place a number of on-line programs intended to make the internet accessible to schools and communities and to encourage the use of the internet. The director of IHAB, Doug Hull, envisioned that a program known as "Access.ca" would make all information and services of federal ministries and agencies accessible on-line. In order to do so, a portal had to be created. In 1999, a pilot of such a portal was attempted in Prince Edward Island by SmartSources.com Technologies Inc. ("SmartSources"), another software developer. IHAB decided to proceed further with the project.

7  In May 1999, Mr. Hull met Kevin Higgins, the president of FreeBalance, a software company that was already working on a software application that could be used to access government services. In September 1999, Mr. Hull attended a demonstration of the FreeBalance prototype and was impressed by it. Because the FreeBalance board of directors decided not to take on the Industry Canada project, Mr. Higgins resigned his position and in January 2000, he incorporated CivicLife with two other former FreeBalance executives.

8  Industry Canada decided that CivicLife would be the prime contractor of the portal and that SmartSources would provide two specific components for the portal, a search engine and a context information manager. CivicLife's responsibility was to integrate the two components supplied by SmartSources and deliver a completed portal ready for implementation of pilot projects at up to twenty different sites across Canada.

9  Negotiations led to five contracts signed on February 4, 2000. Industry Canada[FN1][FN2] entered into two supply agreements, one with CivicLife and one with SmartSources. According to the provisions of the two supply agreements, the portal was to be delivered in stages with the final product due May 31, 2000. In return, Industry Canada agreed to pay $1.52 million to CivicLife in one supply agreement and $0.5 million to SmartSources in the other. Aside from the cost of the contract, the supply agreements were identical. Similarly, Industry Canada entered into an Intellectual Property ("I.P.") agreement with each of CivicLife and SmartSources. The fifth contract was a development and commercial agreement between SmartSources and CivicLife. [FN3]

10  The development of the portal did not proceed as anticipated. Despite the tight time frame envisaged by the contract, SmartSources and CivicLife did not work together. On July 14, 2000, Industry Canada brought together representatives of SmartSources and CivicLife. At that meeting, the parties orally agreed to a "minimal integration approach" whereby the two companies would work on their software independently and later link them by remote access. Industry Canada requested that Xwave, the independent software technology company it had retained to evaluate the portal software, assist the parties in devising a technical plan for integrating the two products.

11  On January 18, 2001, CivicLife advised that it had been unable to integrate the SmartSources search engine into its software. In May 2001, it delivered a portal software program using an off-the-shelf search engine. After some modifications, Xwave approved the CivicLife portal and Industry Canada ultimately paid the remaining amount owing under the contract.

12  Instead of supplying Industry Canada with the two components it had agreed to provide, in early 2001 SmartSources provided Industry Canada with an entirely separate stand-alone portal using its search engine and context information manager.

Copr. © West 2007 No Claim to Orig. Govt. Works

13  The CivicLife and SmartSources portals were each independently tested at only two separate pilot locations. CivicLife was hired to launch the two pilot tests of its portal for $390,000. Industry Canada did not involve CivicLife in any further expansion of the Access.ca program. CivicLife ultimately went into receivership.

**Summary of the Trial Decision**

14  The following is a summary of the salient portions of the trial judge's reasons.

*The context in which the agreement came to be*

15  Throughout the period of negotiation, Mr. Hull, who had the authority to negotiate this deal with CivicLife, represented that the national rollout was going to take place. CivicLife understood, and Industry Canada was fully aware of CivicLife's understanding, that the national rollout was an integral and fundamental term of the deal. There was no real money in the development of the portal. The real money was in the marketing of the portal after rollout and in numerous incidental economic opportunities that would arise in Canada and abroad from the wide use of the CivicLife portal in Canada. The I.P. agreements were, therefore, "the golden egg" of the transaction. All parties understood that the full potential of the I.P. agreements could only be achieved with the national rollout. This is obvious from the very large revenue projections conveyed by the Assistant Deputy Minister to the Deputy Minister. A careful reading of the memorandum of offering issued by CivicLife clearly shows that the cornerstone of CivicLife's overall business plan was the national rollout, which was expected to provide the impetus and groundwork from which all revenues would emerge.

16  The five contracts signed February 4, 2000 represent one contractual arrangement. Interpretation of one must take into account the terms and conditions of the four others.

*What legal obligations did Industry Canada breach?*

17  Although the parties anticipated and firmly believed that Access.ca would be launched nationwide, the agreement did not go so far as to impose on Industry Canada the legal obligation to proceed with the national launch. The national launch remained contingent on the performance of CivicLife, SmartSources and "other planning considerations", which included final Treasury Board approvals and the continued support of the government officials. CivicLife assumed the risk that the national rollout might not occur if certain of those conditions were not met.

18  It was a term of the agreement that Industry Canada would act fairly and take all reasonable steps to achieve the objectives of the agreement and the expectations of the parties. Simply paying the amount owed under the contract to CivicLife was not the sum total of Industry Canada's legal obligations. It was an implied term of the agreement that Industry Canada would at all times deal fairly with CivicLife in order not to nullify the reasonable expectations that Industry Canada had itself fostered. Industry Canada breached this implied term and the duty of good faith it owed to CivicLife in many respects.

19  Roger Casselman, the Industry Canada representative who was responsible for the deliverables from CivicLife and SmartSources, with the acquiescence of his IHAB supervisors, deliberately encouraged SmartSources to provide its own portal. By doing so, Industry Canada

Copr. © West 2007 No Claim to Orig. Govt. Works

destroyed the relationship of trust and cooperation required between SmartSources and CivicLife to accomplish integration of the SmartSources components. The secret "un-official" emails between Mr. Casselman and SmartSources' principal, Nathan Nifco, paint a picture of deceit and sabotage. CivicLife took all reasonable steps it could to integrate the SmartSources components. If not for the deliberately uncooperative attitude of SmartSources, integration could have been completed within two to three months of May 31, 2000. SmartSources' decision not to cooperate in the integration was promoted and encouraged by Industry Canada. Further, Industry Canada encouraged SmartSources to supply its stand-alone portal in direct breach of the terms of the agreement.

20  As part of the bargain, it is reasonable to conclude that CivicLife would obtain a properly tested portal at the end of the deal. Accordingly, it was a term of the agreement that Industry Canada would act fairly and reasonably in proceeding to adequately test CivicLife's portal. To be adequately tested, the portal had to undergo a substantial number of pilots. Section 4 of the supply agreement contemplates the requirement for a substantial amount of pilot testing, specifically, up to twenty pilot trials in communities across Canada. It is meaningful that the last sentence in s. 4 reads, "The Intellectual Property Agreement provides the terms and conditions of the use of the Intellectual property by the Parties."

21  Industry Canada failed to adequately test the portal. On the one hand, it tested a competitor's portal in clear breach of the agreement and, on the other, it only tested CivicLife's portal at two pilot locations. That was clearly inadequate testing well below what was contemplated by the agreement. There is cogent evidence Industry Canada knew that the testing was inadequate.

22  CivicLife was never notified it had not met its part of the bargain. Industry Canada never terminated the agreement. To the contrary, throughout the relevant period Industry Canada continued to encourage CivicLife to proceed with the project.

23  Industry Canada never provided any evidence to explain: (a) what position it took when the portal was not delivered on May 31, 2000; (b) whether it ever rejected or found fault with any of the products supplied by CivicLife; (c) why it decided to ask SmartSources to provide a stand-alone portal; (d) why it proceeded only with the pilots it did; and (e) why it did not proceed with the national launch.

24  Industry Canada was required to act fairly and take all reasonable steps to achieve the objectives of the agreement. These objectives included working cooperatively in the development, supply and commercialization of the Civic Portal so as to have it ready to market. Industry Canada breached its duty of good faith and in many respects, particularly in its dealings with SmartSources, deliberately took steps to nullify the contractual objectives.

25  Specifically, Industry Canada breached its duty of good faith in the following ways:

(a) It deliberately and secretly interfered with the relationship between SmartSources and CivicLife thereby significantly contributing to CivicLife's failure to integrate the SmartSources components;

(b) It encouraged SmartSources to compete with CivicLife by soliciting and accepting

Copr. © West 2007 No Claim to Orig. Govt. Works

from SmartSources another portal;

(c) When dealing with SmartSources, Industry Canada deliberately kept these transactions secret;

(d) It failed to notify CivicLife that it contemplated not proceeding with the national launch and instead communicated with CivicLife in such a way as to indicate that the project was proceeding as planned; and

(e) It failed to adequately test CivicLife's portal and proceeded to test the portal supplied by SmartSources.

*Damages*

26   The general principle governing the award of damages for breach of contract is that the complaining party should, insofar as can be done by money, be placed in the same position as if the contract had been performed.

27   The damages that are recoverable are the losses a reasonable person at the time of making the contract would contemplate as being a serious possibility. Once a foreseeable consequence occurs, all the damages of that kind are recoverable.

28   CivicLife claims damages under three main headings. The first of these claims relates to alleged wasted expenditures.

29   CivicLife incurred expenditures that it would not have had to make but for Industry Canada's interference between CivicLife and SmartSources. CivicLife identified seven specific items in its quantification of the alleged loss. All of these sums, totalling $3,130,712.90, are said to have been spent during the life of the project over and above the amounts received from Industry Canada under the contract. Industry Canada did not challenge the actual quantification and validity of these expenses. CivicLife spent the amounts claimed. The question was: What amounts could be said to flow directly from Industry Canada's breach? The trial judge was not satisfied that three of the items flowed directly from Industry Canada's breach. In addition, some of the additional expenditures were incurred as a result of Xwave's deficiency reports.

30   The trial judge accepted CivicLife's evidence that the external beta version of the portal could have been delivered as required within approximately two to three months after the original deadline of May 31, 2000. A good proportion of the deficiencies noted by Xwave were due to the integration difficulties. Industry Canada was obliged to assume responsibility for those.

31   As a result of the Crown's breach, it took CivicLife at least double the time and resources to finally obtain approval of the portal. In the circumstances, it was just and reasonable to double the cost of the contract from $1.52 million to $3.04 million. CivicLife's damages under this head were therefore fixed at $1.52 million.

32   The second claim was for the loss of three types of opportunities related to the contract, namely: (a) Pilot and Post Pilot Enhancement; (b) National Rollout; and (c) Community Pro-

Copr. © West 2007 No Claim to Orig. Govt. Works

gram.

33    The last two items can only arise if Industry Canada had a legal obligation to proceed with the national rollout. Since it did not, no damages can be awarded for these two items. The same applies to post pilot enhancements, which would only have been carried out in final preparation for the national rollout.

34    As for the claim for the loss of pilot testing, if Industry Canada had performed its contractual obligation to properly test the portal at least one pilot would have proceeded in each province and likely two in Quebec and Ontario, for a total of twelve pilots. Brian Awrey's (CivicLife's Chief Financial Officer) estimate of a financial return of $100,000 per pilot is very reasonable. That estimate was in no way challenged by Industry Canada. CivicLife would likely have been retained to proceed with all pilots. Taking into account the two pilots carried out (for which CivicLife was paid $390,000), damages under this head were fixed at $1 million.

35    CivicLife's final claim was for punitive damages. The law is clear that in commercial contract cases punitive damages should only be awarded in the most exceptional circumstances and only for very harsh and outrageous conduct. This is such a case. Instead of treating CivicLife fairly, Industry Canada engaged in very oppressive and highhanded conduct. For instance:

> (a) Industry Canada engaged in a deliberate and protracted course of duplicitous conduct;
>
> (b) The conduct was aimed at destroying the very core of the reasonable expectations that CivicLife was entitled to hold;
>
> (c) The misconduct was carried out in secret while all along Industry Canada was telling CivicLife the project was proceeding as agreed, and when CivicLife learned of the portal submitted by SmartSources, Industry Canada invented a false story to convince CivicLife that its position was not altered;
>
> (d) Even though Industry Canada knew CivicLife was in dire financial straits and needed to be told the truth as soon as possible, it deliberately chose not to respond to CivicLife's many letters and kept silent to allow CivicLife to drown in useless and expensive attempts to keep the project alive.

36    The Crown chose not to call one single officer to try to give a reasonable explanation for Industry Canada's conduct. (Those that were called were called by CivicLife as adverse witnesses.) The court can only conclude that Industry Canada did not have any explanation to offer for its outrageous conduct.

37    $400,000 is a just amount of punitive damages to denounce Industry Canada's very high handed and oppressive conduct.

**Analysis of the Issues in the Appeal**

*(1) Did the trial judge err in finding that Industry Canada deliberately and secretly under-*

Copr. © West 2007 No Claim to Orig. Govt. Works