*mined its contractual agreement with CivicLife?*

38   The Crown submits that the trial judge erred, "factually and legally", in concluding that Industry Canada acted deliberately to undermine the objectives of the contract.

39   The appellant's submission raises the issue of the applicable standard of review. Matters of law are subject to review on a standard of correctness whereas findings of fact are subject to review on the basis of palpable and overriding error. A third, or middle, category is that of a question of mixed fact and law and the standard of review in this third category will lie along a spectrum.

40   Where, as here, one of the issues on appeal is the judge's interpretation of the evidence as a whole, the general rule is that the judge's interpretation should be reviewed on the basis of palpable and overriding error: *Housen v. Nikolaisen,* [2002] 2 S.C.R. 235 (S.C.C.) at para. 36; *Jaegli Enterprises Ltd. v. Ankenman,* [1981] 2 S.C.R. 2 (S.C.C.), at 4; *Amertek Inc. v. Canadian Commercial Corp.* (2005), 76 O.R. (3d) 241 (Ont. C.A.) at paras. 67-68.

41   The Crown submits that the trial judge made a palpable and overriding error in finding that the conduct of Industry Canada, or any of its employees, led to a breach of its contractual obligations to CivicLife.

42   More specifically, the Crown's submissions concerning the trial judge's findings respecting the conduct of Industry Canada and my response are as follows:

> 1. *Crown:* Industry Canada was entitled to communicate privately with SmartSources. These secret communications did not breach any term of the agreement it had with CivicLife. It was a term of the commercial and development agreement between SmartSources and CivicLife that SmartSources communicate all pertinent information to CivicLife. Industry Canada had no such obligation.
>
> *Response:* This submission ignores: (a) the fact that the supply agreements with each of CivicLife and SmartSources specifically required that all five agreements be read together; (b) the purpose of the secret communications between Industry Canada and SmartSources which was to encourage SmartSources to provide its own portal in direct breach of the terms of the agreement; and (c) the expectations of the parties set out in the supply agreement between Industry Canada and CivicLife. In addition, the communications had the effect of undermining Industry Canada's obligation under the I.P. agreement to assist CivicLife with the commercialization of its portal. Mr. Casselman testified at trial that he understood that CivicLife must be a part of or advised of all cogent communications made between SmartSources and Industry Canada, and he admitted that part of his responsibility was to keep the contractors equally informed. Yet, as found by the trial judge, when CivicLife learned of the portal submitted by SmartSources, Industry Canada invented a false story to cover up what was happening.
>
> 2. *Crown:* There is no evidence to support the finding that Mr. Casselman set out to sabotage CivicLife. In Mr. Casselman's view, the integration problems were due to CivicLife's failure to communicate with SmartSources. Mr. Casselman understood that his role on the Access.ca project was to ensure that Industry Canada got what it paid

Copr. © West 2007 No Claim to Orig. Govt. Works

for. To elevate his intention to one of deliberate sabotage is a patently unreasonable interpretation of the evidence.

*Response:* Upon becoming engaged in the project, Mr. Casselman stated that it was his intention to redirect the Access.ca project in support of SmartSources, but at trial he was not able to identify what information, if any, he used to form his stated preference for the SmartSources architecture. A substantial email record established his involvement in forming an agreement with SmartSources to develop a secret competing portal. Mr. Casselman's conduct was contrary to the supply agreement between Industry Canada and CivicLife that required CivicLife and SmartSources to have clearly defined roles, and which specified the individual elements that each party was to contribute to the overall deliverables. The agreement further required that any changes be done by mutual agreement between the parties. Industry Canada's decision to encourage SmartSources to develop a competing portal was a change that was not done by mutual agreement between the parties. The trial judge correctly found that Industry Canada's agreement with SmartSources to produce a competing portal was in direct breach of the terms of their overall agreement. Further, in the I.P. agreement, Industry Canada agreed "to use its best efforts to assist CivicLife during the currency of [the] Agreement with the commercialization of the Civic Portal Software and to make available its expertise and marketing materials in connection therewith." By plotting to replace the CivicLife portal with a SmartSources portal, Mr. Casselman did the opposite.

3. *Crown:* As the project went on, Mr. Casselman eventually became frustrated with CivicLife's failure to deliver what was required by the CivicLife supply agreement. However, CivicLife only raised the integration problems they were having with SmartSources in June 2000, after CivicLife failed to deliver the external beta software incorporating SmartSources' components by May 31, 2000. In Mr. Casselman's view, these problems were due to CivicLife's failure to communicate with SmartSources.

*Response:* See my response above. Further, the trial judge accepted the evidence of CivicLife's Karl Gretton, as he was entitled to do, that Mr. Gretton took all reasonable steps he could to integrate the SmartSources components. The trial judge further found that CivicLife could have completed the integration within approximately two or three months of May 31, 2000, well in advance of the end of December 2000 (the date the pilots were to begin), had it not been for the deliberately uncooperative attitude of SmartSources. On the evidence, the trial judge was entitled to come to the conclusion he did.

4. *Crown:* The trial judge's finding that but for Mr. Casselman's communications with SmartSources and SmartSources' resulting intransigence, CivicLife would have been able to complete the portal within two to three months of the initial completion date of May 31, 2000 contrasts with the evidence of Xwave, the third-party company retained to independently assess CivicLife's portal.

*Response:* While early Xwave reports were critical of CivicLife's progress, a good proportion of the deficiencies noted by Xwave were due to difficulties encountered with integration, for which the trial judge found Industry Canada solely responsible. In addition, Mr. Casselman instructed Xwave to test CivicLife's components against a

Copr. © West 2007 No Claim to Orig. Govt. Works

standard of 100 per cent completion even though the product was in early stages of development. In the end, CivicLife passed Xwave's final report, and another report prepared by Communications Research Centre Canada praised CivicLife deliverables. The fact is CivicLife did deliver a stand-alone portal that was approved by the independent body chosen by Industry Canada to test it. As I have already indicated, the trial judge was entitled to make the finding that, but for the actions of Mr. Casselman and SmartSources, CivicLife's completion of the portal would have been much more timely.

5. *Crown:* The trial judge's conclusion that Industry Canada acted deliberately to undermine the objectives of the contract is contrary to the evidence of Mr. Casselman (of Industry Canada), Mr. Nifco (of SmartSources) and David Klein (of Xwave, the independent assessor of CivicLife's software).

*Response:* The fact that the trial judge's conclusion is contrary to the evidence of Messrs. Casselman, Nifco and Klein is not of itself a palpable and overriding error. It is not enough that there is a difference of opinion with the trial judge: *Schwartz v. R.,* [1996] 1 S.C.R. 254 (S.C.C.) at paras. 32- 33; *L. (H.) v. Canada (Attorney General),* [2005] 1 S.C.R. 401 (S.C.C.) at para. 74. A core function of a trial judge is to accept all, part or none of the evidence of a witness.

6. *Crown:* The trial judge gave no explanation for finding Mr. Nifco not credible. The reasons for decision provide no insight into the fact-finding process that led to his conclusion. Mr. Nifco testified that it was never SmartSources' objective to take over the Access.ca project. In July 2000, he raised concerns about the platform upon which CivicLife had chosen to build the portal and also stated he had doubts about CivicLife's commitment to working with SmartSources. He only agreed to provide a stand-alone portal once it became clear that CivicLife could not do so.

*Response:* Overall, the trial judge gave detailed reasons on credibility. The trial judge's reasons for rejecting the evidence of Mr. Casselman, an adverse witness, and for accepting the evidence of CivicLife's witness, Mr. Higgins, apply in large measure to Mr. Nifco, a witness whose self-interest in the project was obvious. The trial judge is not required to comment on the evidence of each and every witness. Reasons for judgment are not a running commentary on the trial process but are intended to explain the result arrived at: *Waxman v. Waxman,* [2004] O.J. No. 1765 (Ont. C.A.) at para. 283.

There is evidence that in May 2000, Mr. Nifco was having discussions with Industry Canada about the delivery of a SmartSources portal without CivicLife's involvement. Up to that point, SmartSources had not provided its deliverables and had not cooperated in integrating its deliverables with the CivicLife portal. Industry Canada never gave evidence as to what position it took when the portal was not delivered on May 31, 2000. The supply agreement provided for "Excusable Delays" when a party is prevented from performing a contractual obligation by circumstances beyond its reasonable control. No submissions were addressed to this provision. CivicLife did in fact deliver a stand-alone portal that was approved by the independent body (Xwave) chosen by Industry Canada to test it, and no evidence was led by the Crown that the delay in production, for which Industry Canda was in large measure responsible, meant that the project was no longer practicable.

Copr. © West 2007 No Claim to Orig. Govt. Works

>7. *Crown:* CivicLife failed to design software to integrate the SmartSources components. Mr. Klein testified that CivicLife's lack of documentation describing how the CivicLife and SmartSources software would fit together was "a key element that would affect integration". The trial judge's inflation of the role SmartSources played in CivicLife's delay is inconsistent with Mr. Higgins' own evidence that SmartSources' two components were relatively minor in the context of the overall Access.ca project.
>
>*Response:* The trial judge was entitled to find, as he did, that CivicLife was to be the prime contractor on the project. This accorded with the contracts and the amounts paid to each party. The trial judge's finding in this regard is in no way inconsistent with his finding concerning the role SmartSources played in CivicLife's delay. The trial judge was entitled to accept the evidence of Mr. Gretton that all reasonable steps had been taken by CivicLife to integrate the SmartSources components. There is no evidence that Industry Canada found fault with CivicLife's portal despite the fact that it did not integrate the SmartSources software.

43   In conclusion, the essence of the Crown's appeal is an attempt to show that the trial judge made a palpable and overriding error in finding that Industry Canada secretly and deliberately undermined the contractual framework of its agreement with CivicLife. I have reviewed the Crown's main challenges directed to the trial judge's findings of fact above. The trial judge made no clear and obvious errors. The Crown has failed to meet the high standard required to overturn these findings of fact. The trial judge was entitled to come to the conclusion he did that there was a causal link between Industry Canada's conduct and CivicLife's delayed performance.

***(2) Did the trial judge err in law in holding that Industry Canada owed an implied duty of good faith to CivicLife?***

44   As noted previously, the trial judge held that Industry Canada breached its duty of good faith in the following ways:

>(a) It deliberately and secretly interfered with the relationship between SmartSources and CivicLife thereby significantly contributing to CivicLife's failure to integrate the SmartSources components;
>
>(b) It encouraged SmartSources to compete with CivicLife by soliciting and accepting from SmartSources another portal;
>
>(c) When dealing with SmartSources, Industry Canada deliberately kept these transactions secret;
>
>(d) It failed to notify CivicLife that it contemplated not proceeding with the national launch and instead communicated with CivicLife in such a way as to indicate that the project was proceeding as planned; and
>
>(e) It failed to adequately test CivicLife's portal and proceeded to test the portal supplied by SmartSources.

45   The Crown submits that it was not a specific term of the contracts that it act in good

Copr. © West 2007 No Claim to Orig. Govt. Works

faith and that by implying a term to act in good faith, the trial judge added a substantive, unbargained for contractual term to the contracts.

46 The question of when a term may be implied in a contract was considered by the Supreme Court of Canada in *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619 (S.C.C.). The issue was whether a "privilege clause", which allowed the person calling for tenders to disregard the lowest bid in favour of any other tender, allowed acceptance of a non-compliant tender or whether the court should imply terms. In coming to its conclusion that there was an implied term only compliant tenders would be accepted, the court confirmed its decision in *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711 (S.C.C.), as to when a term may be implied in a contract. One of the bases for implying a term is presumed intention -- *i.e.* "the implication of a term as necessary to give business efficacy to a contract or as otherwise meeting the 'officious bystander' test as a term which the parties would say, if questioned, that they had obviously assumed": *Canadian Pacific Hotels*, at 775. Based on the presumed intention of the parties, the court concluded that persons tendering in response to the tender specifications assumed only compliant tenders would be accepted and implied that term. In determining the intention of the parties, the court considered the express terms of the contract to see whether the suggested implication was necessary, fit in with what had been agreed upon and the precise nature of what had been implied.

47 In this case, there are a number of express provisions from the agreements that bear on the issue of the parties' intentions:

> • All five of the agreements between Industry Canada, CivicLife and SmartSources are, as stated in the supply agreement between Industry Canada and CivicLife, "part of a complete whole."
>
> • The recitals at the beginning of each of the five agreements include the phrase: "Industry Canada wishes to design and develop a comprehensive civic portal through CivicLife for use by the Government of Canada to deliver information and services throughout the various regions of Canada on a user friendly basis".
>
> • The supply agreements provide that "[Industry Canada] is in the process of developing and rolling out a national ACCESS.CA service to be launched in December 2000."
>
> • In article VII of the I.P. agreement with CivicLife, Industry Canada agreed "to use its best efforts to assist CivicLife during the currency of this Agreement with the commercialization of the Civic Portal Software and to make available its expertise and marketing materials in connection therewith."
>
> • In the development and commercial agreement between CivicLife and SmartSources, one of the agreements that was part of the "complete whole", the parties agreed "to be true and faithful to each other in all dealings and transactions relating to the Civic Portal Software."

48 Having regard to the above provisions, the overall intention of the parties was that Industry Canada would facilitate cooperation between CivicLife and SmartSources to build a single portal that it planned to rollout on a national basis. The trial judge found in effect that

Copr. © West 2007 No Claim to Orig. Govt. Works

the actions of Industry Canada undermined the reasonable expectations of the parties in five specific ways and did not fit with what they had agreed upon. The trial judge used the term breach of good faith to globally encompass his conclusion that Industry Canada had acted in such a way as to undermine the very objectives of the contract. He further found that as a result of the actions of Industry Canada it took CivicLife at least twice as long to build its portal. The business efficacy of the contract was seriously affected.

49    The classical theory of contract interpretation emphasizes that courts should ascertain and give effect to the intention of the parties: Ruth Sullivan, "Contract Interpretation in Practice and Theory" (2000) 13 S.C.L.R. (2d) 369. In *Transamerica Life Canada Inc. v. ING Canada Inc.* (2003), 68 O.R. (3d) 457 (Ont. C.A.), O'Connor A.C.J.O. for the majority at para. 53 and Laskin J.A. in dissent at para. 87 held respectively that this court and other courts have used the doctrine of good faith to ensure that the parties do not act in such a way as to defeat the objectives of the agreement or to police the bargain the parties have already made.[FN4] In his recent book, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 784-805, Professor McCamus examines a number of Canadian cases in which good faith has been found to be an implied term of the contract and groups them into three categories: (a) those imposing a duty to cooperate in achieving the objectives of the agreement; (b) those imposing limits on the exercise of discretionary powers provided for in the contract; and (c) those precluding parties from acting to evade contractual duties, such as by engaging in conduct not strictly prohibited by the letter of the terms of their agreement but that has the effect of defeating rights under the agreement. In his opinion, the result in each case could have been, and was, explicitly grounded in the application of traditional contract doctrine. In the event that a generalized duty of good faith is adopted as part of the Canadian common law of contracts, he suggests that the duty might be defined in terms of these three categories, although he acknowledges such a definition is more restrictive than the general duty found in the American Uniform Commercial Code.

50    In addition to breaching the necessity of cooperation and undermining the very objectives of the contract, Industry Canada's conduct would also appear to be an abuse of its discretion under the contract. In oral argument before us, the Crown conceded that Industry Canada's duty to use its "best efforts" to assist CivicLife in the commercialization of the portal involved the exercise of a discretion that had to be exercised reasonably and fairly. That concession is well founded. In *Greenberg v. Meffert*, supra, a real estate company had an agreement with its real estate agent that, after termination of their relationship, payment of commission was payable "at the sole discretion" of the company. This court held that these words meant the company must act reasonably in exercising its discretion, and also honestly and in good faith. Since the company had not done so, the agent was entitled to his commission. Additionally, in *Shelanu Inc. v. Print Three Franchising Corp.* (2003), 64 O.R. (3d) 533 (Ont. C.A.) at para. 96, this court affirmed that a discretion under a contract must be exercised reasonably, fairly and with regard to how the other party's interests are affected. See also F. Paul Morrison and Hovsep Afarian, "Good Faith in Contracts: A Continuing Evolution" in The Honourable Justice Todd Archibald & Michael Cochrane, eds., *Annual Review of Civil Litigation, 2003* (Toronto: Carswell, 2004) 197 at 213-223; John D. McCamus, "Abuse of Discretion, Failure to Cooperate and Evasion of Duty: Unpacking the Common Law Duty of Good Faith in Contractual Performance" (2005) 29 Advocates' Q. 72.

Copr. © West 2007 No Claim to Orig. Govt. Works

51   Thus, Industry Canada's conduct appears to come within each of the three categories that courts have recognized as giving rise to the imposition of a duty of good faith. For the purposes of this appeal it is unnecessary for me to enter into the debate as to whether Industry Canada's misconduct should be characterized as a breach of the duty of good faith, as an abuse of the **exercise** of **discretion** or simply as undermining the reasonable expectations of the parties to the agreement. The trial judge was entitled to find, as he did, that Industry Canada's conduct breached its contractual obligations to CivicLife. I will deal more fully with the Crown's submissions concerning the trial judge's finding that Industry Canada was required to adequately test the portal below.

52   Before leaving this point I wish to mention that in oral argument the Crown submitted that the presence of "entire agreement" clauses in the supply and I.P. agreements between CivicLife and Industry Canada precluded the trial judge from holding that Industry Canada breached its contract with CivicLife because nowhere did the agreements say that there was a duty of good faith or a duty to **exercise** a **discretion** reasonably and fairly. There are several responses to this submission. The first is that an entire agreement clause will not preclude the implication of a term of the contract, such as a duty of good faith performance or the duty not to abuse a discretion, because such a term is already part of the existing agreement. The trial judge was not adding a term to the agreement that was not part of the parties' bargain; he was enforcing the reasonable expectations of the parties under the agreement. Second, neither of the entire agreement clauses here says that their agreement contains no implied terms. Indeed, it would be difficult to set out every aspect of the expectations of the parties to a contract. The wording of the entire agreement clauses does not preclude the implication of a term. Third, an agreement in writing may be varied by a subsequent oral agreement. Here, at the July 2000 meeting the parties orally agreed to vary their written arrangement and adopt a "minimal integration approach". The entire agreement clause does not affect the reasonable expectations of the parties with respect to that oral agreement. Fourth, based on the Supreme Court of Canada's decision in *Guarantee Co. of North America v. Gordon Capital Corp.,* [1999] 3 S.C.R. 423 (S.C.C.), even if the entire agreement clause did cover the conduct at issue here, the court has a discretion to refuse to enforce it where to do so would be unconscionable, unfair, unreasonable or otherwise contrary to public policy: *Shelanu, supra,* at paras. 30-35.

53   For the reasons given above, the trial judge did not err in holding Industry Canada liable to pay CivicLife damages for breach of contract.

*(3) Did the trial judge err in finding that Industry Canada was obligated to finance twelve pilot tests of CivicLife's portal software?*

54   In the event this court found that Industry Canada breached its contract with CivicLife, the Crown did not appeal the amount of damages awarded for wasted expenditures ($1.52 million).

55   However, the trial judge also found that Industry Canada breached its contractual obligation to properly pilot test CivicLife's portal software in twelve different communities. Because CivicLife's portal was only tested in two communities, the trial judge awarded CivicLife $1 million in damages, based on CivicLife's estimated financial return of $100,000 per pilot. The Crown challenges this finding of fact as well as the trial judge's calculation of damages in this regard. The Crown submits that the agreement provided that CivicLife would be paid $1.52

Copr. © West 2007 No Claim to Orig. Govt. Works

million for the delivery of the portal software and that testing of the portal in twelve different communities was not part of the contract.

56    On the issue of whether testing of the portal in twelve different communities was part of the contract, in addition to the provisions of the parties' agreements mentioned already in these reasons, the following additional provisions from the supply agreement between Industry Canada and CivicLife are relevant:

> **4. Context and Scope**
>
> IC [Industry Canada] is in the process of developing and rolling out a national ACCESS.CA service to be launched in December 2000. In preparation for the national launch, IC requires a functioning portal to be available by the Completion Date for technical verification and immediately thereafter for up to 20 Pilot Trials in communities across Canada. Pilot Trials would be operational until launch of the national service at the end of 2000.
>
> Annex A contains a list of communities that are candidates for Pilot Trials. Other communities may be added to this list. IC will determine the list of Pilot Trial communities and the priority sequence for Pilot Trials. [Annex A states in part, "Pilots will be implemented according to a schedule to be established by IC, and will continue until the national launch of ACCESS.CA service." There then follows a list of 48 communities.]
>
> CivicLife, in partnership with SmartSources, will develop and supply Civic Portal software with the capabilities set out in Section 7 Deliverables, that will be capable of being scaled to provide service in all of the Pilot Trial communities. The software shall be further scalable for national launch and growth. CivicLife and SmartSources will also provide the design and other specifications and requirements for the server hardware and software necessary to host the Civic Portal software in a sufficient scale to provide simultaneous access in the Pilot Trial communities, and subsequently for national launch and growth. These specifications will be provided in document form within 10 working days of receipt of the final list of pilot trial communities and concurrent user estimates from IC.
>
> . . . . .
>
> The contracted cost of the work up to the Completion Date is $1.52 M (Canadian Funds). Decisions regarding specific approach for launch and further expenditures will be dependent on the performance of CivicLife and SmartSources, and other planning considerations.
>
> . . . . .
>
> **6. Milestones, Schedule of Work and Payments**
>
> . . . . .
>
> *6.2 Schedule Elements*
>
> . . . . .
>
> After the Completion Date, CivicLife and SmartSources will provide support as defined in Section 7.10 Operational and Technical Support to Industry Canada for a

Copr. © West 2007 No Claim to Orig. Govt. Works

period of 1 year.

57   The trial judge awarded damages for ten pilot tests that did not occur on the basis of the principle that a plaintiff is entitled to recover losses that directly and naturally result in the ordinary course of events from the breach of contract. As can be seen, s. 4 of the supply agreement between Industry Canada and CivicLife contemplates the requirement for a substantial number of pilots (up to twenty) in order to adequately test the CivicLife portal. The trial judge rejected the Crown's argument that the purpose of the pilots was to test the portal concept as opposed to the functionality of the CivicLife portal. No palpable and overriding error has been shown respecting this finding.

58   While the Crown relies on the wording of the supply agreement, which makes decisions about the specific approach for the national rollout and further expenditures contingent on "the performance of CivicLife and SmartSources, and other planning considerations", it led no evidence indicating that (a) Industry Canada ever rejected or found fault in any of the products supplied by CivicLife, or (b) that planning considerations prevented testing of the portal.

59   The uncontradicted evidence of Mr. Higgins, whom the trial judge found to be credible, was that he left the company where he was employed, incorporated CivicLife and pursued negotiations until a deal was reached in the expectation that the portal would be properly tested and rolled out nationally.

60   Throughout, the parties governed themselves in the expectation there would be a number of pilots. The pilot testing that actually took place was watered down because it only occurred on two occasions, and because the communities in which it was tested, Lanark County and Ste. Hyacinthe, Quebec, did not give any national exposure. In addition, CivicLife's portal was tested along with SmartSources' competing portal, and Industry Canada was in clear breach of the agreement. In order to determine if the portal was worth rolling out nationally it had to be tested nationally and the government study of proposed sites supported the proposition that at least one pilot site per province was required to establish the portal's efficacy. Moreover, CivicLife purchased enough software licenses to support twenty pilots. The trial judge's finding that damages should be awarded for Industry Canada's failure to conduct ten more pilots, one in each province and an additional one in Ontario and Quebec, is therefore supportable on the evidence. A foreseeable consequence of Industry Canada's breach of contract with CivicLife was that pilot testing would be affected. Accordingly, the trial judge did not err in awarding damages for Industry Canada's failure to adequately test CivicLife's portal.

61   In fixing the amount of the award at $1 million, the trial judge found that CivicLife would have been retained to proceed with all the pilots. The trial judge accepted the evidence of Mr. Awrey that each of the pilots had a value of $100,000, a figure the trial judge found to be "very reasonable." The Crown says that Mr. Higgins, who also testified for CivicLife, indicated that CivicLife could have reasonably expected $100,000 of revenue (as opposed to profit) per pilot. The trial judge, however, relied on Mr. Awrey's estimate of what each pilot was worth to CivicLife (which was not challenged by the Crown), and he knew that CivicLife had been paid $390,000 for two pilot tests in small communities. Accordingly, it was open to the trial judge to come to the conclusion he did.

*(4) Did the trial judge err in awarding punitive damages to CivicLife?*

62   Unlike the situation when a court is reviewing compensatory damages, when dealing with punitive damages courts have a much greater scope and discretion on appeal: *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130 (S.C.C.) at para. 197.

63   As the trial judge recognized, punitive damages will rarely be awarded in a case involving breach of contract. In fact, they can only be recovered if the plaintiff can establish a separate actionable wrong -- i.e. the breach of a different obligation under the contract or other duty, such as a fiduciary obligation.[FN5] This is because in contract cases, the remedies open to the plaintiff are only those that arise from the contractual relationship, whereas in tort cases the injured party is entitled to be made whole: see *Vorvis v. Insurance Corp. of British Columbia*, [1989] 1 S.C.R. 1085 (S.C.C.), at 1106-1107.

64   CivicLife relies on the decision of the Supreme Court in *Whiten v. Pilot Insurance Co.*, [2002] 1 S.C.R. 595 (S.C.C.), in support of its position that a breach of the contractual duty of good faith can justify an award of punitive damages. In that case, Binnie J. held at para. 79:

> In the case at bar, Pilot acknowledges that an insurer is under a duty of good faith and fair dealing. Pilot says that this is a contractual duty. *Vorvis*, it says, requires a tort. However, in my view, a breach of the contractual duty of good faith is independent of and in addition to the breach of contractual duty to pay the loss. It constitutes an "actionable wrong" within the *Vorvis* rule, which does not require an independent tort.

65   The problem is that in this case, unlike in *Whiten*, *supra*, the breach of the duty of good faith is the basis for the trial judge's award of compensatory damages. In awarding these damages, the trial judge's description of Industry Canada's conduct is strikingly similar to his description of the conduct grounding his award of punitive damages. For example, in dealing with compensatory damages, the trial judge held that Industry Canada breached its duty of good faith to CivicLife in that:

> The defendant [Industry Canada] failed to immediately notify the plaintiff [CivicLife] that it contemplated not proceeding with the national launch and instead communicated with the plaintiff in such a way as to indicate to the plaintiff the project was proceeding as planned.

In describing Industry Canada's conduct that merited punitive damages, the trial judge stated:

> When the project was faltering, the defendant [Industry Canada], knowing that the plaintiff was in dire financial straits and needed to be told the truth as soon as possible, deliberately chose not to respond to the plaintiff's many letters and in fact deliberately kept silent to allow the plaintiff to drown in useless and expensive attempts to keep the project alive.

The gravamen of Industry Canada's conduct in each case is its silence and its encouragement of CivicLife all the while acting as it did with SmartSources.

66   Moreover, when reviewing an award of punitive damages, the question the reviewing court must ask both with respect to entitlement as well as quantum is whether punitive damages serve a rational purpose: *Hill*, *supra*, at para. 197; *Whiten*, *supra*, at para. 101. That rational purpose is achieved when punitive damages are required to deter the conduct in issue

Copr. © West 2007 No Claim to Orig. Govt. Works

and to denounce it: *Hill*, at para. 197; *Whiten*, at para. 103. Two of the factors the court is to consider in deciding whether an award of punitive damages is rational are the relative vulnerability of the plaintiff and any advantage or profit gained by the defendant. However, the wisdom of CivicLife's business plan in choosing to put most of its "eggs in one basket" by entering into the portal contracts cannot be laid at the feet of Industry Canada. CivicLife's vulnerability was largely self-imposed. Moreover, there is no evidence that Mr. Casselman's misconduct (*i.e.* his secret and deliberate encouragement of SmartSources to provide its own portal) was part of the general culture at Industry Canada, or that Industry Canada profited from the misconduct as in *Whiten*, *supra*. To punish Industry Canada and, ultimately, the Canadian taxpayer for the actions of a rogue employee over a relatively short time frame would not serve a rational purpose in such a case as this where substantial compensatory damages have already been awarded. Furthermore, I do not think an award of punitive damages is necessary to deter such conduct in the future. Accordingly, I would allow the appeal with respect to punitive damages and set aside the award of punitive damages.

**The Cross-Appeal**

67    CivicLife raises two issues in its cross-appeal:

> 1. Is CivicLife entitled to its lost market value, and if so, what is the total loss of value to be awarded in damages?
>
> 2. Does CivicLife's understanding and reasonable expectation of a national rollout entitle it to additional damages in the amount of $4 million?

68    At paragraphs 71 and 72 of his reasons the trial judge held:

> [71] The second claim [for damages] arises out of loss of three types of opportunities related to the contract, namely:
>
>> (a) Pilot and Post Pilot Enhancement
>>
>> (b) National Rollout
>>
>> (c) Community Program
>
> [72] The last two (2), items (b) and (c), can only arise if the defendant [Industry Canada] had a legal obligation to proceed with the national rollout. As I have found this not to be the case, no damages can be awarded for these two heads of damages. The same applies to post pilot enhancements which would have been carried out only in final preparation for the national rollout.

In accordance with his reasons the trial judge awarded damages for pilot testing but did not award any further damages.

69    Before us, CivicLife accepted the trial judge's finding of fact that Industry Canada had no obligation to proceed with a national rollout of the portal. CivicLife submits, however, that the trial judge did not correctly apply the law of damages to the facts. Had he done so, CivicLife submits it ought to have been awarded damages for loss of value and opportunity

Copr. © West 2007 No Claim to Orig. Govt. Works