because a national rollout did not take place as well as because the community program did not proceed. CivicLife submits that the measure of the damages for the lost value of the company is the diminution in market value of the company. On December 31, 2000, CivicLife's Class A Preferred Shares issued for cash were approximately 5 per cent of the total shares issued and outstanding. Based on this percentage and the amount of third party investments ($712,612), CivicLife submits that its implied valuation equaled $14,520,000. CivicLife also submits that it is entitled to an additional award of $4 million in order to compensate it for lost opportunities it claims would have reasonably flowed from the national rollout. Specifically, CivicLife estimated it would have received $2 million for the technical support that would have been a necessary part of the national rollout of Access.ca and a further $2 million in income for software enhancements and community technical support also associated with a national rollout as well as for sales of the portal outside Canada.

70    The trial judge properly found that CivicLife assumed the risk that a national launch of Access.ca might not occur. There is no objective evidence concerning CivicLife's chances of success as a newcomer in a competitive portal market. Nor is there any such evidence that, because of Industry Canada's actions, CivicLife lost the opportunity to make sales of its portal outside of Canada. In *Ticketnet Corp. v. Air Canada,* [1993] O.J. No. 289 (Ont. Gen. Div.), appeal allowed in part [1997] O.J. No. 4638 (Ont. C.A.), a decision on which CivicLife relies, the trial judge found that there was a window of opportunity in which the plaintiff's product would be accepted in the marketplace and that Air Canada actively prevented Ticketnet from selling its virtually completed software. Here, the trial judge did not make any such finding. Nor did he find that Industry Canada's actions caused the demise of CivicLife or that the likelihood of CivicLife's collapse in the event no national rollout took place was within the reasonable contemplation of the parties at the time they entered into their contracts.

71    Mr. Higgins, one of the principals of CivicLife, admitted that in January 2001 there was a "crack in the market" that caused potential investors in CivicLife to retrench. The result was that these "dot-com" companies became inward-looking and conservative and investment activities stopped at such large companies as Sun Microsystems as well as at other companies involved in the internet economy. No evidence was led concerning the effect of this collapse in the market on the value of CivicLife or on the likelihood of its ability to make sales of its portal outside of Canada.

72    In any event, diminution in the value of CivicLife would not even be the appropriate measure of damages if CivicLife was deserving of compensation for the fact that the national rollout did not occur and the community program did not proceed. The appropriate measure of damages would be the value of the lost opportunity to receive income from future sales and technical support that would have reasonably flowed from the national rollout. However, CivicLife's evidence in this regard falls well short of the evidence required to sustain an award for lost opportunity where the loss in question is incapable of exact proof.

73    In *Canlin Ltd. v. Thiokol Fibres Canada Ltd.* (1983), 40 O.R. (2d) 687 (Ont. C.A.), where damages were awarded for a manufacturer's loss of future swimming pool sales, the plaintiff had a proven history of sales with particular customers and adduced evidence as to the volume of business expected to continue with those customers. Similarly, in *National Satellite Newservice Inc. v. Canadian Satellite Communications Inc.,* [1997] O.J. No. 159

Copr. © West 2007 No Claim to Orig. Govt. Works

(Ont. Gen. Div. [Commercial List]), the plaintiff adduced expert evidence regarding its loss of future profit in addition to its own analysis of projected revenue per customer in its fledgling public dissemination service. Even where damages by their inherent nature are difficult to assess, the onus is still on the party claiming damages to prove the facts upon which the damages are based and must adduce proper evidence: *Martin v. Goldfarb* (1998), 163 D.L.R. (4th) 639 (Ont. C.A.) at para. 80. That onus has not been discharged here.

74   Having regard to the evidence before him, the trial judge did not err in making no further award of compensatory damages. Accordingly, I would dismiss the cross-appeal.

**Costs**

75   I would award costs of the appeal to CivicLife fixed in the amount of $40,000. I would award the Crown $5,000 with the respect to the cross-appeal.

*M. Rosenberg J.A.*:

I agree.

*R.A. Blair J.A.*:

I agree.

*Appeal allowed in part; cross-appeal dismissed.*

**Appendix A**
*Relevant Excerpts from the Supply Agreement between Industry Canada and CivicLife*

### 2. Definitions and References

. . . . .

*References*

This Agreement is related to the following separate agreements, all of which taken together are part of a complete whole. The Agreement's requirements must be complied with in concert with the requirements of all these agreements [.] [The I.P. agreements between Industry Canada and CivicLife and Industry Canada and SmartSources, the supply agreement between Industry Canada and SmartSources and the development and commercial agreement between SmartSources and CivicLife are then listed.]

. . . . .

### 4. Context and Scope

IC [Industry Canada] is in the process of developing and rolling out a national AC-CESS.CA service to be launched in December 2000. In preparation for the national launch, IC requires a functioning portal[FN6][FN7] to be available by the Completion Date for technical verification and immediately thereafter for up to 20 Pilot Trials in communities across Canada. Pilot Trials would be operational until launch of the na-

Copr. © West 2007 No Claim to Orig. Govt. Works

tional service at the end of 2000.

Annex A contains a list of communities that are candidates for Pilot Trials. Other communities may be added to this list. IC will determine the list of Pilot Trial communities and the priority sequence for Pilot Trials. [Annex A states in part, "Pilots will be implemented according to a schedule to be established by IC, and will continue until the national launch of ACCESS.CA service." There then follows a list of 48 communities.]

CivicLife, in partnership with SmartSources, will develop and supply Civic Portal software with the capabilities set out in Section 7 Deliverables, that will be capable of being scaled to provide service in all of the Pilot Trial communities. The software shall be further scalable for national launch and growth. CivicLife and SmartSources will also provide the design and other specifications and requirements for the server hardware and software necessary to host the Civic Portal software in a sufficient scale to provide simultaneous access in the Pilot Trial communities, and subsequently for national launch and growth. These specifications will be provided in document form within 10 working days of receipt of the final list of pilot trial communities and concurrent user estimates from IC.

. . . . .

The contracted cost of the work up to the Completion Date is $1.52 M (Canadian Funds). Decisions regarding specific approach for launch and further expenditures will be dependent on the performance of CivicLife and SmartSources, and other planning considerations.

. . . . .

**5. Expectations of the Parties**

IC requires that CivicLife and SmartSources have established a formal agreement that clearly defines roles, and individual elements that each party contributes to the overall deliverables as defined in this Agreement.

. . . . .

**6. Milestones, Schedule of Work and Payment**

*6.1 Milestones*

The project will be conducted over a four-month period commencing in February 2000 and completing in May 2000.

. . . . .

*6.2 Schedule Elements*

. . . . .

After the Completion Date, CivicLife and SmartSources will provide support as defined in Section 7.10 Operational and Technical Support to Industry Canada for a period of 1 year.

*6.3 Project Funding*

. . . . .

*Proposed Investments*

This proposal requests [Industry Canada] funding in the amount of $2.020 million to be applied as shown in the following summary table. Specific deliverables are associated with each payment, on a detailed schedule as per ANNEX D, Detailed Deliverables and Payments by Stage of Work.

[There then follows a chart containing the milestone dates, stage of work expected on those dates and the amount of the payment on those dates to CivicLife and SmartSources, which, when totalled, adds up to $2.020 million. For the period May 31, 2000 to May 31, 2001, the stage of work is described as "Pilot Operations -- operational and technical support (S)." No amount is filled in in the spaces provided to indicate the amount of payment to be made to CivicLife and SmartSources at this stage.]

. . . . .

**8. Change Process**

This Agreement may be changed by mutual agreement between the parties.

Changes will be formally recorded in new Annexes. They will identify the nature of the change, and may trigger the requirement to issue revised text for various sections of this agreement and/or its annexes. There will also be a recording of the consequent changes in costs and responsibilities of the parties.

Changes may be initiated by either party by providing a request in writing.

Changes will not be unilaterally by either party.

. . . . .

**12. Entire Agreement**

This Agreement constitutes and expresses the entire Agreement of the parties hereto and any amendment or addition thereto shall be in writing and signed by respective parties.

. . . . .

**15. Excusable Delays**

The dates and times by which any Party is required to perform any obligation under this Agreement shall be postponed automatically to the extent, for the period of time, that the Party is prevented from so performing by circumstances beyond its reasonable control....

*Relevant Excerpts from the Intellectual Property Agreement between CivicLife and Industry Canada*

[In the recitals section of the agreement:]

WHEREAS Industry Canada wishes to design and develop a comprehensive civic

Copr. © West 2007 No Claim to Orig. Govt. Works

portal through CivicLife for use by the Government of Canada to deliver information and services to citizens throughout various regions of Canada on a user friendly basis[.]

. . . . .

**Article I Definitions**

*1.01 Definitions*

. . . . .

"Canadian Pilot Phase" means the Canadian Pilot Phase as defined in the CivicLife Supply Agreement;

. . . . .

**Article IV Conditions**

*4.01 License Conditions*

. . . . .

(g) if Industry Canada enters into a licensing agreement in a developed country or a developing country and is requested to provide the installation, operation and ongoing support services required pursuant to such agreement, Industry Canada shall ensure that CivicLife.com is always included on the list of qualified vendors for the supply of such services; and

(h) Industry Canada acknowledges that CivicLife shall have the exclusive right to market, operate, license and commercialize the Civic Portal Software outside of Canada and the United States...In such ventures, CivicLife shall provide Industry Canada with a revenue share equivalent to the 45% license share earned by Industry Canada in comparable licensing arrangements...or on reasonable terms to be negotiated by the Parties.

. . . . .

**Article VII Trade Marks**

*7.01 Trade Marks*

Industry Canada agrees to use its best efforts to assist CivicLife during the currency of this Agreement with the commercialization of the Civic Portal Software and to make available its expertise and marketing materials in connection therewith.

. . . . .

**Article XI Miscellaneous**

. . . . .

*11.05 Entire Agreement*

This Agreement constitutes the entire agreement between the Parties pertaining to the matters contemplated hereby and superseded all prior agreements, understandings, ne-

Copr. © West 2007 No Claim to Orig. Govt. Works

gotiations and discussions, whether oral or written, of the Parties.

*Relevant Excerpts from the Development and Commercial Agreement Between SmartSources and CivicLife*

**Article v SmartSources Responsibility**

*5.04 Relations with Industry Canada*

Although CivicLife is the prime contractor to Industry Canada, it is recognized that SmartSources may have continuing relations with Industry Canada or its Agents, and may be the recipient of inquiries concerning the SmartSources Deliverables. Therefore, any cogent communications invited by Industry Canada or its Agents directly with SmartSources concerning any matter involving this Agreement or the Civic Portal Software shall not be deemed to be a breach of this Agreement, provided CivicLife is notified of such contact by SmartSources prior to the contact where possible or, where not possible, subsequently in a timely manner.

. . . . .

**Article VII Proprietary Information**

*7.02 Non-Disclosure*

The Parties agree to be true and faithful to each other in all dealings and transactions relating to the Civic Portal Software....

FN1. Innovative Solutions Agency (PEI) Inc. (subsequently replaced by Prince Edward Island Business Development Inc.) actually entered into the agreements on behalf of Industry Canada but we are advised nothing turns on this and throughout the appeal the parties refer to Industry Canada.

FN2. CivicLife submitted that "functioning" means tested.

FN3. The agreements contain certain relevant headings, recitals and provisions that are attached to this judgment as Appendix A.

FN4. See also *Dynamic Transport Ltd. v. O.K. Detailing Ltd.*, [1978] 2 S.C.R. 1072 (S.C.C.); *GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div. [Commercial List]), Blair J.; *Greenberg v. Meffert* (1985), 50 O.R. (2d) 755 (Ont. C.A.), leave to appeal to S.C.C. refused, 56 O.R. (2d) 320 (note) (S.C.C.); *LeMesurier v. Andrus* (1986), 54 O.R. (2d) 1 (Ont. C.A.), leave to appeal to the S.C.C. refused (1986) 74 N.R. 239 (note) (S.C.C.); *MDS Health Group Ltd. v. King Street Medical Arts Centre Ltd.* (1994), 12 B.L.R. (2d) 209 (Ont. Gen. Div. [Commercial List]), Haley J.; *Gateway Realty Ltd. v. Arton Holdings Ltd. (No. 3)* (1991), 106 N.S.R. (2d) 180 (N.S. T.D.), aff'd (1992), 112 N.S.R. (2d) 180 (N.S. C.A.); *Multi-Malls Inc. v. Tex-Mall Properties Ltd.* (1980), 108 D.L.R. (3d) 399 (Ont. H.C.), aff'd (1981), 128 D.L.R. (3d) 192 (Ont. C.A.), leave to appeal to the S.C.C. refused (1982), 41 N.R. 360n (S.C.C.).

FN5. Where, however, the facts underlying the breach of contract also give rise to a separate

Copr. © West 2007 No Claim to Orig. Govt. Works

cause of action in tort, a claim for punitive damages can be made. In this case, for example, it may have been possible to plead that Industry Canada committed the tort of interference with economic relations between CivicLife and SmartSources.

FN6. Innovative Solutions Agency (PEI) Inc. (subsequently replaced by Prince Edward Island Business Development Inc.) actually entered into the agreements on behalf of Industry Canada but we are advised nothing turns on this and throughout the appeal the parties refer to Industry Canada.

FN7. CivicLife submitted that "functioning" means tested.

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works