# Exhibit "4"

37 R.P.R. 74, 50 O.R. (2d) 755, 7 C.C.E.L. 152, 9 O.A.C. 69, 18 D.L.R. (4th) 548

▶
1985 CarswellOnt 727

Greenberg v. Meffert
GREENBERG v. MEFFERT et al.
Ontario Supreme Court, Court of Appeal
Zuber, Morden and Robins JJ.A.
Heard: February 6, 1985
Judgment: May 16, 1985

Copyright © CARSWELL

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved

Counsel: Ronald Carr, for appellant.

Morley Wolfe, Q.C., for respondents Montreal Trust Company and Eric H. Meffert.

Martin Kerbel, Q.C., for respondent Donato Melfi.

Subject: Contracts; Torts; Property; Labour and Employment

Agency --- Real estate agents -- Rights of agent -- Commission -- Commission of employees of agent.

Real estate agents -- Contracts -- Discretion -- Real estate commission for listing payable to agent "at sole discretion" of employer in event sale completed after termination of employment -- Discretion required to be exercised reasonably, honestly and in good faith.

The employment contract between the plaintiff salesman and the defendant real estate company provided that if the plaintiff's employment was terminated prior to the sale of a property, any commission otherwise payable for listing of that property was "at the sole discretion of the company". The plaintiff obtained a listing for the sale of a large property, and participated in negotiations for the sale. The sale was completed after the termination of the plaintiff's employment, to a purchaser found by M, another sales agent with the defendant company. M arranged to secretly split the listing agent's commission with the defendant company's office manager. The plaintiff's action for the listing commission against all of the defendants was dismissed at trial, and he appealed.

Held:

The appeal should be allowed.

The plaintiff's entitlement to a commission was conditional on his being an agent of the defendant company on the date the property was sold or listed, and "the sole discretion of the company" had to be exercised reasonably, honestly and in good faith to deprive a former salesman of a commission earned for a listing during his employment. The defendant company, not having shown any valid reason for denying the plaintiff his commission, is to be

treated as having exercised its discretion favourably to the plaintiff.

Cases considered:

> Minster Trust Ltd. v. Traps Tractors Ltd., [1954] 1 W.L.R. 963, [1954] 3 All E.R. 136 -- applied

Authorities considered:

Corbin on Contracts (1960), Vol. 3A, ss. 644-648.

4 Hals. (4th ed.), p. 612, paras. 1198-99.

Hudson's Building and Engineering Contracts (10th ed., 1970), c. 7.

Restatement, Contracts (2nd ed.), s. 228.

Williston on Contracts (3rd ed.), ss. 675A, 675B.

Words and phrases considered:

sole discretion

APPEAL from trial judgment dismissing plaintiff's claim for commission.

**The judgment of the Court was delivered by** *Robins J.A.*:

1   This appeal concerns the effect to be given to a clause in a contract of employment which grants a company "the sole discretion" to determine whether a salesman whose employment has been terminated shall receive commissions to which he would have been entitled had the employment relationship not been terminated.

2   The appellant is an experienced real estate salesman who initially became associated with the respondent Montreal Trust Company as the manager of its investment property office in Toronto. He had set up the office for the company and was paid a percentage of its profits together with any commissions he might earn as a salesman. In June 1980, the company instituted a new policy which required that all managers be salaried employees and not act as sales agents. This was not satisfactory to the appellant and it was agreed that he would relinquish his managerial position and continue with the company as a salesman.

3   The terms of his employment in this capacity are set forth in a "contract of employment" dated June 26, 1980. The contract stipulates the "commission split" between the company and the appellant and, among other things, provides that a company manual entitled "Terms of Relationship Between Montreal Trust Company and its Sales Agents" shall form part of the contract. The manual is some six pages in length but I shall make reference only to cl. 11 which is headed "Commissions & Listings" and is crucial to this appeal. It reads:

> The sales agent is prohibited by law from taking any listings in his or her own name, and agrees that all listings shall be taken in the name of the company and turned over to the company within one day of receiving information. *In the event that a listing is*

Copr. © West 2007 No Claim to Orig. Govt. Works

> *sold after the sales agent's employment is terminated, any commission he or she receives will be at the sole discretion of the company, and the commission earned on the listing will be disbursed at the company's discretion.* It is further provided that the sales agent has no authority to change, alter, reduce or waive any commission earned by the company on transactions involving himself or herself, other sales agents or brokers, without the express consent of the company. The sales person is not entitled to any listing commission for a listing held in his or her possession or any listing that is given in conjunction with any offer.
>
> *It is understood that all listings shall be the property of the company and that you shall be entitled to commission or other remuneration only if you are an agent of the company on the date the property is sold or listed.*

(Emphasis added.)

4   During the summer of 1980, the appellant on his own initiative sought and obtained a listing from Costain Limited, a major real estate corporation, for the sale of a very large residential complex in the City of Ottawa. This listing, while an open listing, was expressly found by the trial Judge to constitute "a listing" within the meaning and intent of cl. 11. The correctness of that finding, with which I respectfully agree, was not disputed in this appeal.

5   Having obtained the listing, the appellant then proceeded to inspect the property, to photograph it, to assemble the necessary financial data and other relevant information, and to prepare a brochure for presentation to prospective purchasers. In July, he procured an offer for $8.8 million which was accepted by Costain but was cancelled when certain conditions could not be satisfied. Shortly thereafter, the respondent Donato Melfi, another sales agent with Montreal Trust, found a purchaser who was interested in acquiring the property. Together with the appellant, he commenced negotiations which, as matters developed, extended over several months and followed a course not unusual in transactions of this magnitude. In January 1981, an agreement was finally reached and the property was sold by Costain to the purchaser introduced by Melfi for $9.1 million. As a result, the Montreal Trust Company received a commission of $175,000.

6   The company refused to pay the appellant any part of that commission, and as a result this action was instituted against it and the respondents Melfi and Eric Meffert, the latter being the manager of the company's office at the time. The appellant's claim against the company was based on its alleged breach of contract in not paying him the listing agent's commission or, alternatively, on the basis of quantum meruit; as against the other respondents, his claim was based on statements which allegedly constituted agreements requiring these respondents to pay the listing agent's commission or, alternatively, on the basis that they had themselves improperly received the listing agent's commission and on the doctrine of unjust enrichment were obliged to pay it to the appellant. The action was dismissed at trial against all respondents.

7   Had the appellant been in the employ of the company when the sale took place, he would unquestionably have been entitled to the listing agent's share of the commission. His employment relationship, however, was terminated during the currency of the negotiations. It appears that on September 18, 1980, apparently without prior notice, the company closed its invest-

Copr. © West 2007 No Claim to Orig. Govt. Works

ment property office and moved its sales personnel to a residential sales office at another location. This led to the resignation of a number of agents including the appellant. The facts surrounding the incident are of no consequence to this appeal save that the termination of the appellant's employment as of September 18, 1980, clearly brought into play cl. 11 of his contract. Thereafter, his entitlement to commission as the listing agent of the property in question became dependent on the provisions of that clause.

8   After leaving the company, the appellant, not surprisingly, became concerned about his potential commission. By then the negotiations were progressing favourably, and the prospect of a sale was good. Indeed, an agreement between Costain and Melfi's client was executed as early as October 27, 1980, but for reasons irrelevant to this appeal that agreement was later terminated. After further negotiations, the parties successfully concluded the agreement of January 1981, on the basis of which the transaction was closed.

9   Since I am of the opinion that the appellant's appeal must stand or fall on the basis of the written contract, I think it unnecessary to detail all that transpired between the date of termination of the appellant's relationship with the company and the date the commission was received by the company. It is, however, important to note that the appellant sought assurances that his commission as the listing agent would be protected. For this purpose he contacted both the respondent Melfi and the respondent Meffert. Meffert, as I have indicated, was the manager of the Montreal Trust office and admittedly was the person through whom the company acted throughout this matter. He was assured by Melfi that "whatever happens he [Melfi] would take care of me"; and, more important, was assured by Meffert, "Don't worry, the company won't screw you." The trial Judge found those statements to have been made, but concluded that they did not of themselves constitute promises of such a nature as to provide the basis for a cause of action.

10   Accepting that conclusion, it is nonetheless clear that the statements could not have been made honestly or in good faith. They no doubt were designed to forestall any action by the appellant that might interfere with the negotiations or the closing of the transaction. The fact is that these respondents had devised a scheme whereby they would divide the listing agent's commission between themselves and the appellant would receive no part of it. The trade record sheets of the company relating to the sale from the time of the incompleted October 27, 1980, agreement were drawn so as to show Melfi as both the "listing salesman" and the "selling salesman". These documents were prepared by Meffert and signed by Melfi both of whom were fully aware that the appellant, and not Melfi, was the listing salesman. According to the trade record sheet upon which the commission was divided, the $175,000 commission when received by the company was to be paid as follows:

  Listing Salesman, Don Melfi ...... $57,625.00

  Selling Salesman, Don Melfi ...... $65,625.00

  Office, M.T.C. 1992 Yonge St. ...... $51,750.00

11   Meffert, as manager of the company, authorized payment accordingly and, as the evidence revealed, when Melfi received the listing and selling commissions he in turn paid Meffert $30,000. Since Meffert, as manager, held a salaried position and was not entitled to any

Copr. © West 2007 No Claim to Orig. Govt. Works

commission, he was asked at trial to explain the basis upon which he received these moneys. He testified, as did Melfi, that the $30,000 payment represented, to the extent of $2,000, the repayment of a loan and, to the extent of $28,000, the payment of a "consulting fee". The so-called "consulting fee" was purportedly paid in consideration of Meffert's assistance to Melfi with respect to certain unnamed and incompleted transactions and was said to be entirely unrelated to the subject transaction. The trial Judge did not believe this. He characterized the payment of $28,000 as "a bribe" saying:

> Meffert accepted a payment of $28,000.00 from Melfi which, in my opinion, amounted to a bribe to exercise his discretion and as such his company's discretion in favour of Melfi in so far as the selling [sic, listing] commission was concerned.

12   However, notwithstanding his view as to the patent impropriety of the respondents' conduct, the trial Judge went on to dismiss the appellant's claim insofar as it was based upon an alleged breach of the terms of the employment contract for the brief reasons set forth in the following paragraph of his judgment:

> ... I am prepared to accept that the obtaining of the information from Costain by Greenberg constituted a 'listing' within the provisions of the employment agreement. In my opinion, those parts of the employment agreement already quoted [cl. 11] can be read together. In order to be paid a commission the selling agent must have been employed by the company on the date the 'listing' was obtained but can only obtain payment 'at the sole discretion of the company'. Meffert may well have been bribed by Melfi to exercise the company's discretion in the way that it did but this exercise of discretion is not reviewable by a court as is the exercise of a discretion by some boards or tribunals.

13   With deference, I am unable to agree with that disposition of the case. The learned trial Judge's reference to the law relating to judicial review of the discretionary power of administrative tribunals is not apt. This is an action in contract. Whether a Court may interfere with the exercise of a discretion conferred by a contract depends upon the interpretation of the contract and the effect to be given its terms.

14   Clause 11, as I indicated earlier, is critical to the dispute in this case. The concluding paragraph of the clause, to repeat it, reads:

> It is understood that all listings shall be the property of the company and that you shall be entitled to commission or other remuneration only if you are an agent of the company on the date the property is sold or listed.

15   Plainly, an agent's entitlement to commission is conditional upon his being an agent of the company on the date the property is either sold or listed. Here, the appellant was in fact an agent of the company on the date the property was listed and it follows, reading this part of cl. 11 alone, is entitled to the listing agent's share of the commission. Had he remained in the company's employ, he would without question have been entitled to the commission he earned by obtaining the listing. That entitlement, at least insofar as this provision is concerned, would be unaffected by the termination of his employment. On what basis then may he be deprived of his commission?

Copr. © West 2007 No Claim to Orig. Govt. Works

16   This brings into consideration the earlier provision of cl. 11 which deals specifically with a listing that is sold after a sales agent's employment is terminated. This provision, which must be read together with the concluding paragraph of cl. 11, states:

> In the event that a listing is sold after the sales agent's employment is terminated, any commission he or she receives will be at the sole discretion of the company, and the commission earned on the listing will be disbursed at the company's discretion.

17   From that, the company contends that the determination of whether a former sales agent is to be paid any commission on a listing is wholly within its discretion. That discretion, being a "sole discretion", may be exercised on the basis of purely personal or subjective considerations so that, the argument goes, if the company denies payment in circumstances which, viewed objectively, may appear unreasonable or even arbitrary, its decision is nonetheless not open to challenge. In short, the company's position is that a sales agent whose employment is terminated is not entitled to receive the commission earned on a listing if for any reason the company sees fit not to make the payment.

18   Notwithstanding the able argument of counsel for the company, that contention must fail. In my opinion, the company's discretion in this matter is not unbridled, firstly, because the nature of this contract and the subject matter of the discretion are such that the company's decision should be construed as being controlled by objective standards; and secondly, because the exercise of the discretion, whether measured by subjective or objective standards, is subject to a requirement of honesty and good faith.

19   Provisions in agreements making payment or performance subject to "the discretion", "the opinion" or "the satisfaction" of a party to the agreement or a third party, broadly speaking, fall into two general categories. In contracts in which the matter to be decided or approved is not readily susceptible of objective measurement -- matters involving taste, sensibility, personal compatibility or judgment of the party for whose benefit the authority was given -- such provisions are more likely construed as imposing only a subjective standard. On the other hand, in contracts relating to such matters as operative fitness, structural completion, mechanical utility or marketability, these provisions are generally construed as imposing an objective standard of reasonableness. See, generally, 4 Hals. (4th ed.), p. 612, paras. 1198-99; Corbin on Contracts (1960), Vol. 3A, ss. 644-648; Williston on Contracts (3rd ed.), ss. 675A and 675B; Hudson's Building and Engineering Contracts (10th ed., 1970), c. 7.

20   In any given transaction, the category into which such a provision falls will depend upon the intention of the parties as disclosed by their contract. In the absence of explicit language or a clear indication from the tenor of the contract or the nature of the subject matter, the tendency of the cases is to require the discretion or the dissatisfaction to be reasonable: Minster Trust Ltd. v. Traps Tractors Ltd., [1954] 1 W.L.R. 963, [1954] 3 All E.R. 136 at 145. This construction imposes the least hardship in that it produces a result that cannot be said to be unfair or unjust to either of the parties. Other things being equal, I think it preferable that provisions of this kind be construed as implying the less arbitrary standards of the objective test: Restatement, Contracts (2d), s. 228.

21   Returning to the instant case, it is significant that the clause in issue appears in a detailed manual defining the terms of the employment relationship which was prepared by the com-

pany and is weighted in its favour. Counsel concedes, and properly so, that any ambiguity or uncertainty in the clause should by the familiar rule of interpretation be construed most favourably to the appellant, and I approach the clause accordingly.

22   The subject matter of the discretion in this case is "the commission earned on the listing". It is significant that that commission was earned while the appellant was in the company's employ; the services rendered to earn the commission were fully performed before the employment was terminated; and, but for the termination, the appellant would have been entitled to the commission when the property was sold. Regardless of whether the agent remained with the company, the company profited from his performance when a sale of the listing was effected. In the context of this employment relationship, it is my view that the sole discretion held by the employer ought not to be construed so as to authorize the employer to deprive a former salesman of commission earned through services performed during his employment without reasonable grounds for so doing.

23   Clause 11 makes it clear that all listings obtained by the agent become and remain the property of the company. On that understanding, as I view the clause, the company agrees to pay the agent his commission provided he is an agent on the date the property is either sold or listed. That promise is modified in the case of listings sold after the agent's employment is terminated; in that event the commission will be payable at the discretion of the company. To construe the discretionary power as the company urges it should be construed, the clause would mean no more than "We will pay you your commission only if we feel like it." That construction renders the clause meaningless, indeed, illusory.

24   A sales agent signing this contract has the right to expect that he will be dealt with fairly. Termination of employment does not automatically eliminate his entitlement to commission, call for the imposition of a penalty, or relieve the company of all obligation towards him. The clause does not so provide; quite to the contrary, its presence serves to assure the agent that notwithstanding termination, the company will make a discretionary decision with respect to the commission earned on the listing. If this provision is to have purpose and substance, the discretion must be exercised in a reasonable way, not arbitrarily or capriciously but for good reason. Simple fairness dictates that construction, and particularly so where the exercise of the discretion can result in a windfall to the company. It can keep for itself a commission which but for the termination it would not have obtained, while the agent whose listing led to the sale receives nothing. In this employment relationship, based as it is upon a splitting of commissions, I think it only fair and just, and not too onerous, to require the employer company to show that in the circumstances relevant to the transaction its decision was not unreasonable.

25   Manifestly, in this case the exercise of the discretion was not based on reasoned considerations. Meffert admittedly represented the company in this matter. He, in collusion with Melfi, directed payment of the listing agent's commission to Melfi so that the commission could be divided between them. This kick-back arrangement, or bribe as the trial Judge termed it, obviously formed the basis of the purported exercise of discretion on the company's behalf. The company, it is to be noted, did not seek to disassociate itself from the individual respondents but throughout these proceedings has sought to justify their conduct. Its failure to recognize any contractual responsibility to act fairly or reasonably towards the appellant in the ex-

Copr. © West 2007 No Claim to Orig. Govt. Works

37 R.P.R. 74, 50 O.R. (2d) 755, 7 C.C.E.L. 152, 9 O.A.C. 69, 18 D.L.R. (4th) 548

Page 8

ercise of its discretionary power is evidenced by the testimony at trial of its Ontario manager, who indicated that the company had no interest in the arrangements between Melfi and Meffert. "What Mr. Melfi does with his share of the commission", he said, "is Mr. Melfi's business and that has nothing to do with the company."

26   Apart altogether from the question of reasonableness, a discretion must be exercised honestly and in good faith. That proposition is so fundamental as to require no elaboration. The collusive conduct here clearly deprived the discretion of those qualities and contaminated the decisional process. That patently improper conduct vitiated not only the reasonableness required in the objective criteria but the good faith and honesty required whether the discretion is objective or subjective. In either case the decision to deprive the appellant of any commission was not made honestly and in good faith and cannot stand. Fair dealing is implicit in the contract. The clause in issue, in my opinion, ought not to be construed so as to shield the company's improper exercise of discretion from any review.

27   In light of the unjustifiable basis upon which the company purported to discharge its contractual obligation and in the absence of any valid reason for denying the appellant his commission, the matter must now be dealt with by treating the discretion as having been exercised favourably to the appellant. It follows that the appellant is entitled to the commission earned on the listing. The company, it might be added, has made no claim over against the individual respondents and has not sought to compel them to disgorge this commission. Having reached this conclusion I need not consider the appellant's alternate claim against the company, nor need I consider his claims against the individual respondents to which I referred earlier and which, as framed, were correctly dismissed by the learned trial Judge.

28   In the result, I would allow the appeal and award the appellant judgment against Montreal Trust Company in the amount of $57,625 together with the costs of the appeal and the trial. The appellant is entitled also to prejudgment interest, the calculation of which I would leave to counsel. If they are unable to agree, they may make written submissions to the Court. The appeal against the respondents Meffert and Melfi is dismissed but, in the circumstances, without costs.

*Appeal allowed.*

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works

# Exhibit "5"

2000 WL 33297174 (Ont. S.C.J.), 2000 CarswellOnt 2013

2000 CarswellOnt 2013

Baines v. Computer Associates Canada Ltd.

David Baines, Plaintiff and Computer Associates Canada Ltd., Defendant

Ontario Superior Court of Justice

Clarke J.

Heard: May 11, 2000
Heard: May 12, 2000
Heard: May 15, 2000
Heard: May 16, 2000
Heard: May 17, 2000
Heard: May 18, 2000
Heard: May 19, 2000
Heard: May 23, 2000
Heard: May 24, 2000
Heard: May 25, 2000
Judgment: June 5, 2000
Docket: Brampton C17510/97

Copyright © CARSWELL

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved

Counsel: William R. Gale, for Plaintiff.

Michael J.W. Round and Vincent C. Kazmierski, for Defendant.

Subject: **Contracts**; Civil Practice and Procedure; Labour and Employment; Public

Employment law --- Wages and benefits -- Payment by commission -- General

Employee employed by employer as account manager -- Compensation plan gave employer discretion to determine commissions in respect of certain sales -- Employer also reserved overriding discretion to pay commissions -- Compensation letter given to employee stipulated that commissions in excess of quota were discretionary -- Employee brought action for unpaid commissions and bonuses -- Action allowed in part -- One claim related to regular sale for which commission payable -- Employee acted in good faith in belief that transaction benefitted employer -- Employer's disapproval of transaction after fact disingenuous -- Other claims related to sales in which employer had discretion over commissions -- In exercising discretion, employer did not act dishonestly or in bad faith -- Employer also had reasonable and sound basis for exercise of discretion.

Cases considered by Honourable Mr. J. H. Clarke:

> Greenberg v. Meffert (1985), 50 O.R. (2d) 755, 18 D.L.R. (4th) 548, (sub nom. Greenberg v. Montreal Trust Co.) 9 O.A.C. 69, 7 C.C.E.L. 152, 37 R.P.R. 74 (Ont. C.A.) -- applied

2000 WL 33297174 (Ont. S.C.J.), 2000 CarswellOnt 2013

ACTION by employee for unpaid commissions and bonuses.

*Honourable Mr. J. H. Clarke*:

**Introduction:**

1    The Plaintiff claims damages against the Defendant in the sum of $1,000,000.00 for breach of contract for unpaid commissions and bonuses. In the alternative, he seeks damages for quantum meruit against the Defendant in the sum of $1,000,000.00.

2    The Plaintiff commenced employment with Computer Associates Canada Ltd. (hereinafter referred to as CA) November 1990, as an Account Manager. In the position, he was responsible for selling CA's computer software and related products. His base salary, including quotas, commissions and bonuses, was regulated by a Compensation Plan as well as a Compensation Letter or Summary Sheet which he received and acknowledged at the beginning of each fiscal year. CA's fiscal year ran from April 1st to March 31st of the following year. Commissions were payable on a tiered basis to encourage the sales force to meet their quotas.

3    For the relevant periods in this case, the Plaintiff held the position of Marketing Specialist until the 31st of March, 1994, and was Key Account Manager from April 1st, 1994, to March 31st, 1995. The Plaintiff resigned from CA on June 1st, 1995.

4    The Plaintiff's claim arises from five transactions, namely,

> (1) the Bell SYGMA -- MCI Billing Application, which closed the 8th of March, 1994;
>
> (2) the Bell SYGMA FM Agreement which closed the 30th of June, 1994;
>
> (3) the Manulife Software Dividend Program Agreement, which closed the 31st of December, 1994;
>
> (4) the Stentor Canadian Network Management Agreement, which closed the 6th of February, 1995; and finally
>
> (5) the dispute re: the roll back in January 1995, retroactive to December 1994, of the Plaintiff's commission rate from 12.5% to 7%.

5    I will consider these disputed areas chronologically.

6    This has been an ably argued case. All counsel acquitted themselves in a competent, thorough and courteous manner. Their advocacy has been in the highest tradition of the bar.

7    At several stages of the proceedings I strongly urged counsel and the parties to settle their differences and save themselves the cost and the wear and tear of a protracted Trial. I made available the services of a Pretrial Judge to facilitate that effort. Unfortunately, the parties were unable to reach a settlement.

8    Counsel provided me with Factums setting out in succinct fashion their respective positions on all issues. Their written submissions have been helpful. I will attempt to match their

concision.

9    But before I consider the particular transactions, I note that the Plaintiff's entitlement to compensation is governed by CA's Sales Compensation Plan (hereinafter referred to as the SCP). The Plaintiff acknowledges this fact.

10    The SCP is a lengthy and complex document that has a variety of provisions which give CA a discretion to determine commissions in certain circumstances, such as, Facility Management, Non-Standard Agreements, etcetera. CA also reserves an overriding discretion whether to pay any commissions and specifically allocates to itself the right to be the final arbiter of the contract. Further, each year the Plaintiff signs a document confirming his review, understanding and acceptance of the SCP and its terms as well as the Compensation Letter. The Plaintiff concedes he was aware of those provisions.

11    In addition, at the "kick-off" of each fiscal year the Plaintiff was provided the Compensation Letter setting out his sales designation for the year, the types of sales upon which commissions would be payable, rates, sales quotas, etcetera. Again the Plaintiff acknowledged in writing his receipt of the Compensation Letter.

12    Finally, I note that starting in fiscal year 1995, the Compensation Letter stipulated that payment of commissions in excess of quota would be discretionary.

13    Let me say a few words about credibility.

> While credibility did not play a pivotal role in this case, I find that the Plaintiff contradicted his previous sworn testimony on several occasions. He claimed that his memory of events improved since discovery as he researched his documentation and reviewed events in his mind. The Defendant, however, was not advised of these changes prior to Trial. In addition, I find that he frequently exaggerated his points. For example, he stated that Jennifer King had a miserable 1995 fiscal year whereas the Business Manager, Leslie Newman, whose evidence I found credible, testified that she exceeded her quota by 12%.

> As well, I find no evidentiary basis for his allegation that his change of position from a key Accounts Manager to a Marketing Specialist for fiscal 1996 was a demotion or indication of CA's bad faith. The evidence is overwhelming that the change was simply part of a general restructuring in the company and applied across the board. With the exception of Jonathan Botter, the former Manager of the FM Group, whose recollection of detail left something to be desired, I find that the Defendant's witnesses gave consistent and credible evidence. I instruct myself that I can believe, all, none or part of a witness's testimony. Unless otherwise specified (and I intend to make a certain credibility distinctions during the course of this Judgment), I preferred their testimony to the testimony of the Plaintiff on disputed areas.

**The Law:**

14    Both counsel provided me with Case Books on the Law with respect to the proper exercise of discretion. I will not review the Law in detail.

Copr. © West 2007 No Claim to Orig. Govt. Works

2000 WL 33297174 (Ont. S.C.J.), 2000 CarswellOnt 2013

15   Suffice to say that the Ontario Court of Appeal's approach to **contractual discretion** is set out in *Greenberg v. Meffert* (1985), 50 O.R. (2d) 755 (Ont. C.A.). In that case, the Court held that in determining the limited basis upon which a Court could interfere with a contractual party's exercise of a **contractual discretion** a distinction must be drawn between the different categories of contractual provisions that confer discretion:

> (a) where the matters to be considered in exercising the discretion are not readily susceptible of objective measurement, such as matters of taste or judgment, the exercise of discretion can only be interfered with if it is shown that the party exercising the discretion acted dishonestly or in bad faith; and

> (b) where the matters to be considered in exercising the discretion are readily susceptible of objective measurement, such as matters of mechanical fitness, the exercise of discretion may be interfered with if it is shown that the party exercising the discretion did not do so in a reasonable manner.

16   The Plaintiff contends that the Defendant has failed under both branches of the test and therefore, should be held accountable for unpaid commissions and bonuses.

17   On the other hand, CA submits that the discretionary provisions at issue in this case fall into the first category and that in order to justify interference with the exercise of CA's discretion pursuant to those provisions the Plaintiff must demonstrate that CA acted either dishonestly or in bad faith. In the alternative, if an objective standard is found to apply, CA submits that it exercised its discretion reasonably in all circumstances in this case.

18   Finally, taking into account the existence of a written contact in the case at bar, I find this is not a case where the principle of quantum meruit applies

Let me turn now to the disputed transactions:

**The Bell Sygma -- MCI Billing Application:**

19   While CA paid him commissions of $46,003.00 for the sale on the 8th of March, 1994 of new product licenses to Bell SYGMA, the Plaintiff argued that it failed to pay him a 50% bonus pursuant to the Cash Bonus Bonanza Promotion that was in effect for new product sales closing in March 1994. Based on commissions received of $10,519.00, $26,468.00, and $9,016.00, for invoice numbers 8772066, 8772067, and 8772068, respectively, the Plaintiff contended that CA owed him a further $23,000.00.

20   CA submitted that it was not obliged to pay the bonus for three reasons:

> (a) the transaction did not involve a new product sale;

> (b) the transacton was an FM transaction and therefore, CA reserved a discretion with respect to the payment of compensation;

> (c) in any event the transaction was non-standard where again CA held a discretion with respect to payment of compensation.

Copr. © West 2007 No Claim to Orig. Govt. Works