21   To come directly to the point, I agree with the Defendant's submissions.

22   I find:

(a) That the transaction did not involve a new product sale. Bell SYGMA contacted CA to obtain an Application Specific License that would enable it to use a Billing Application developed by MCI that had certain CA support software. Bell SYGMA intended to use MCI software on behalf of Stentor, its sole client at the time.

The basis for the Plaintiff's claim is an e-mail detailing a bonus plan for the last quarter of CA'S 1994 fiscal year in respect of new product sales.

The Plaintiff argued that the grant of new licenses was tantamount to new product sales. I disagree. I find merit in Ms. Joanne Moretti's, the current Canadian Vice-President of CA, testimony that the license was simply the vehicle permitting the use of the product, not the product itself. MCI already had the CA support software and the transaction merely gave Bell SYGMA an Application Specific License to use it on the Billing Application. I find merit in the Defendant's contention that the licensing to Bell SYGMA was not the sale of a new product.

In addition, I agree with Jon Botter, the former Manager of the FM Group, Les Newman, the Canadian Business Manager, and Ms. Moretti, that the transaction did not involve a sales cycle. At best, the Plaintiff put in six hours for which he received $46,000.00 which I find is a more than equitable compensation. In addition, both Botter and Bill McGowan, the head of SYGMA at the time, testified that the threat of competition was unrealistic.

Pursuant to 1C of the SCP CA retained the right to make a binding determination on the terms of the Sales Plan including compensation. I find that Ilan Meller, the then Senior Vice-President of CA for Canada, exercised that discretion in this instance honestly and in good faith.

(b) That the transaction was an FM transaction and therefore, in accordance with sections 1C, 7B(iii) and 7B(x) of the SCP for fiscal 1995, the Defendant had a discretion regarding the determination of compensation. I find that Bell SYGMA was not in the business of providing long distance or billing services and that it entered the contract with CA strictly to run the MCI Billing Application for Stentor (not its own use). Again, I find that the Defendant not only exercised its discretion honestly and in good faith, but also for objectively sound reasons.

(c) That finally, the transaction was non-standard, e.g., an Application Specific License and therefore, according to section 7B(v) for the SCP CA had a discretion to determine how much compensation, if any, the Plaintiff would get. Therefore, the Plaintiff's claim under this head fails.

**Bell Sygma FM Agreement:**

23   The Plaintiff claims full commission on Money Value as calculated by George Tatter, the Vice-President in charge of commissions, for the sale of a Facility Management Agree-

Copr. © West 2007 No Claim to Orig. Govt. Works

ment to Bell SYGMA on the 30th of June, 1994. While acknowledging that CA paid him total commissions amounting to $73,000.00 on this transaction he argued he is owed an additional $675,150.00.

24     In essence, the Plaintiff says that he was a key player in persuading Bell SYGMA to enter into the FM and Multiple Client Processing Agreements which earned CA approximately $10.5 million in revenue over a five year period.

25     He testified that he first began to work on the sale in December 1992, and played a crucial role at all stages. He testified his efforts (he estimated that he expended 200 to 400 hours) continued even after Jon Botter of the Facility Management Group in New York became involved about March 1994. Without his ongoing and creative contribution right up to the 30th of June 1994, the transaction might never have been consummated, he argued.

26     Taking into account the importance of his role in bringing the deal to fruition, the Plaintiff argued that CA improperly and unreasonably exercised its discretion in refusing to recognize the total stream of revenues over the life of the contract for the purposes of calculating his commission.

27     With respect, I disagree.

28     This was an FM transaction which gave CA a **contractual discretion** with respect to commissions. I find that CA exercised that discretion honestly and in good faith and that the Plaintiff was adequately and fairly compensated for all his efforts. While I accept that the Plaintiff spent 200 to 400 hours on this transaction, I note that he testified that a hundred or perhaps several hundred of those hours "were devoted to locating and organizing old Bell contracts".

29     In addition, I accept the evidence of Bill McGowan and Veronica Hauwn that his involvement with Bell SYGMA during 1992 and 1994, covered not just the FM Agreement but many other transactions. I also agree with Ms. Hauwn that the FM Agreement did not become serious until April or May 1994, when the FM Group from New York entered the picture.

30     McGowan testified that the actual negotiations were negotiated between himself and Jon Botter of CA's FM Group. Botter testified that CA never gave up on the deal as suggested by the Plaintiff and that the FM contract was a standard template.

31     Without downplaying the Plaintiff's role as information gatherer and general liaison (even perhaps as catalyst in the transaction), I find that he exaggerated the importance of his contribution. I find it significant that Hauwn, the Bell SYGMA employee who worked most closely with the Plaintiff, was unable to quantify his contribution to the negotiation of the FM Agreement. "How do you define importance", she queried.

32     I find:

> (a) That in assigning a Money Value to the Enterprise License Agreement ($4,800,000.00) CA made calculations in accordance with CA's usual policies. As this was a MIPS based contract, the $4,800,000.00 was divided by the total MIP's available to arrive at a dollar/MIPS figure of $1,920.00 per MIP. To arrive at the initial Money

Copr. © West 2007 No Claim to Orig. Govt. Works

Value for commissioning purposes of $1,036,800.00 that amount ($1,920.00) was multiplied by the 504 MIPS in actual use by Bell SYGMA. The purpose for this methodology was to encourage sales representatives to foster a partnership between CA and Bell SYGMA by referring potential customers to Bell SYGMA. I observe that the MIPS based Money Value was used for all representatives entitled to commissions on this transaction. Indeed, the Plaintiff received more commission dollars than anyone else involved.

I also note that CA adopted a similar methodology with other FM transactions (EDS, ALLSTATE and IBM). In sum, I find that a reasonable and sound foundation existed for the exercise of CA's discretion.

(b) That the second branch of the contract, an agreement for multiple client processing, was approached in a similar fashion. Pursuant to the Multiple Client Processing Agreement, Bell SYGMA purchased the right to certain "user grants". As customers came on board, sales representatives were paid a commission (the Plaintiff got $20,420.00 for Northern Telecom and $3,675.00 when Pratt and Whitney and Sunnybrook became Bell SYGMA clients.). The rationale again was to encourage sales representative to assist Bell SYGMA to expand its business.

(c) That the $73,476.00 (which translates into $244.00 to $317.00 an hour for his efforts) was a fair and reasonable compensation for all the Plaintiffs contribution including his creativity. Although there is no scale to measure creativity, I find the Plaintiff was amply rewarded for all his efforts. Having exercised its discretion and having told the Plaintiff exactly what he would be getting, I find no bad faith on the part of CA in its failure to respond to his subsequent inquiries.

(d) In summary, the Plaintiff's claim under this head fails.

**Manulife Software Dividend Program Agreement:**

33    This transaction arose as a result of Manufacturers Life's acquisition of part of the business of Confederation Life. The Receiver for Confederation Life wished to transfer CA support software to Manulife to run the acquired business and a re-licensing was required. The CA software was intended to be used by Manulife for a period of at least six months during the transition period.

34    This transaction closed retroactively on December 31, 1994. The Plaintiff claims the Money Value of the sale was $628,000.00 and according to his Compensation Letter he should have been paid $88,492.29. CA paid him nothing. He argued that the Software Dividend Program (SDP) was a regular program offered by CA throughout the fiscal year ended March 31, 1995. Under CA's guidelines both he and Ms. Moretti testified they could have given away $676,981.00 of free software. Further, he testified that Ms. Moretti, who believed at the time that the transaction was win/win for both CA and Manulife, kept Ilan Meller, the Senior Vice-President, abreast in a general way of what was happening prior to sale. According to Ms. Moretti, Meller never expressed an interest in the details of the transaction other than the Money Value.

Copr. © West 2007 No Claim to Orig. Govt. Works

2000 WL 33297174 (Ont. S.C.J.), 2000 CarswellOnt 2013

Page 8

35   Finally, the Plaintiff argued there is nothing in the SCP that allows for the non-payment of commission in relation to an SDP transaction simply because it was a bad deal for CA. Nor was he ever shown the memo from Meller requiring Meller's approval for SDP transactions.

36   The Defendant argued:

> (a) that the transaction involved a disproportionate discount and was not properly approved;
>
> (b) that CA retained a discretion because it was a non-standard transaction; and
>
> (c) CA had a discretion whether to pay commissions because the Plaintiff had exceeded his quota for the year.

37   Bluntly, I find merit in this branch of the Plaintiff's claim. Although a residuary discretion exists, I find the Defendant failed to exercise it here honestly and in good faith. Nor do I find a reasonable foundation for the exercise of the discretion.

38   I find:

> (a) That the Softward Dividend Program (SDP) was a regular program offered by CA throughout 1995 fiscal year. Under the program CA gave away licenses for free in consideration for the client entering into long term maintenance agreements at 110% of regular fees. The program served CA as a way to get its "foot in the door", so to speak, for future business. I note too that after the closing of the Manulife transaction the Plaintiff completed a similar SDP transaction for which he was paid full commission.
>
> (b) That Ms. Moretti and the Plaintiff followed the CA guidelines for the program in calculating the amount of software they could give away, namely, $676,981.00. In the end they gave away less, namely, $623,286.00.
>
> (c) That Ms. Moretti and the Plaintiff kept Ilan Meller, who did not testify at Trial, apprised of the Manulife transaction during the two week period prior to its closing through regular meetings and forecast sheets. Moretti testified that Meller expressed no interest in the details of the transaction except the Money Value. I accept the Plaintiff's testimony that on the day of sale he consulted with Meller on several occasions as well as with the Legal Accounting and Contract Administration in New York. No one, including Meller, expressed reservations about the transaction. I find that Ms. Moretti and the Plaintiff acted in good faith throughout and both genuinely believed that the transaction was a win win situation for both CA and Manulife. Indeed, Ms. Moretti prepared a BARF for the transactions (see Exhibit 3, Tab 66) setting out the reasons for her belief that the transaction was a good deal. At present, Ms. Moretti is Senior Vice President of CA Canada and her change of opinion on this issue must be weighed in that light. The failure of Meller to testify on what transpired between him and Moretti and the Plaintiff leaves the Plaintiff's allegations unanswered.
>
> (d) That CA did not lose money on the transaction (as opposed to opportunity) and that over the five year term of the SDP, Manulife paid it $1,760,149.00. Given that the alternative of leasing and eventually buying elsewhere always existed, I am not per-

Copr. © West 2007 No Claim to Orig. Govt. Works

2000 WL 33297174 (Ont. S.C.J.), 2000 CarswellOnt 2013

suaded on the evidence that Manulife could have been forced to buy the software. In any case, I find there is nothing in the SCP that empowers CA to deny commissions simply on the ground that the bargain was unfavourable to CA.

(e) That the Plaintiff was never told about the memo requiring approval of the transaction with so-called excessive discounts. Ms. Moretti, his superior, testified that she never informed the Plaintiff. Nor was she even aware of the memo until after the transaction.

(f) That taking into account his role in this transaction, I find that Meller's disapproval of the transaction after it closed, to be disingenuous and dishonest. Having failed to properly investigate and supervise the transaction, I find he was being hypocritical and dishonest in heaping blame on the Plaintiff and Moretti. In the absence of his testimony I can only conclude he was attempting to cover his tracks. In any event, I find his conduct prior to closing amounted to an implicit approval of the transaction.

(g) That it would be unfair and inequitable to penalize the Plaintiff for the default of his superiors in failing to properly monitor the deal especially in circumstances where they had every opportunity to do so and the Plaintiff acted in good faith throughout and contributed greatly to the success of this transaction. I find that CA's denial of the Plaintiff earned commissions in this transaction amounts to bad faith and scapegoating.

(h) Therefore, I find the Plaintiff is entitled to be compenated for commissions in accordance with the June Summary Sheet for fiscal 1995 as modified with respect to my further findings in this Judgment with respect to roll back.

**The Stentor Canadian Manager Network Management Agreement:**

39   The Plaintiff claims commission on the sale of new product licenses to Stentor of Ottawa which provided for the installation of software products at the premises of ISM in Alberta. As Account Manager for Stentor, the Plaintiff says he is entitled to a 50/50 split in commission with the sales representative for ISM. That share amounting to $69,689.00 plus a cash bonus of 40% of $27,875.00 constitutes his compensation claim of $97,564.00. He received no commission from CA.

40   Again the Plaintiff argued that this as the sale of a new product and the CA arbitrarily and unjustly withheld compensation under the pretext of exercising its discretion.

41   CA submitted that it was not obliged to pay either commission or bonus on this transaction because:

    (a) it involved an FM transaction;

    (b) like the Bell SYGMA MCI transaction it was a non-standard agreement;

    (c) it did not involve a new product sale;

    (d) in any event, the Plaintiff had exceeded his quota for the year and CA had a discretion to determine whether to pay commission.

Copr. © West 2007 No Claim to Orig. Govt. Works

42    I find merit in the Defendant's submissions. I find:

(a) That the Defendant conceded that the transaction was an FM transaction and therefore, the discretionary clause of the SCP (sections 1C, 7B(iii) and 7B(x)) apply. Further, I note that the Plaintiff made little or no contribution to this transaction.

Because the Plaintiff had failed to split his commission on the MCI billing application, CA decided when the Stentor transaction closed that the Plaintiff should receive no commission on this transaction. The Plaintiff had previously taken the viewpoint on the Northern Telecom transaction that CA should not award commissions when the sales representative had limited or no involvement, a reversal of his present position.

While the Plaintiff's Manager, Ms. Moretti, initially believed that there should be a split between the Plaintiff (the representative of Stentor at this time) and the representative of ISM, she was unaware of the Plaintiff's failure to split his commission on the earlier Bell SYGMA MCI deal. Ms. Moretti received a small commission ($4,000.00 to $5,000.00) because she was not involved in the earlier Bell SYGMA MCI transaction.

(b) That like the Bell SYGMA and the MCI transactions, this was a non-standard transaction giving rise to CA's **contractual discretion** to determine what, if any, commission should be paid (see section 7B(v) of the SCP for the 1995 fiscal year).

(c) That this was not a new product sale as distinct from a new licensing agreement and the transaction had none of the features of a sales cycle. Stentor had to pay the license fee for existing products in order for ISM to use CA's software, Therefore, I find the bonus provisions were inapplicable.

(d) That because the Plaintiff had exceeded his quota at the time all bonuses or extra commissions were payable at the discretion of CA (Ilan Meller, Senior Canadian Vice-President).

In all of the above categories (a), (b), (c) and (d), I find no evidence that CA failed to exercise its discretion honestly and in good faith. The previous transaction with Northern Telecom which involved a transfer of software from an existing data centre to a multi-data centre is distinguishable.

In any case, I find that there was an objective rationale for the exercise of the discretion.

**The 1995 Roll Back in Commission From 12.5% to 7% Retroactive to December 1994:**

43    Because of the large commission earned on the Bell SYGMA FM transaction the Plaintiff's sales exceeded his quota for the 1995 fiscal year by December 1994. Pursuant to the terms of the Compensation Letter, CA advised the Plaintiff that he would be paid commissions for the balance of the fiscal year at 7% subject to CA's discretion to refuse to pay commissions on any particular transaction in the future. The Plaintiff protested this decision but elected to stay with CA at the new rate.

Copr. © West 2007 No Claim to Orig. Govt. Works

2000 WL 33297174 (Ont. S.C.J.), 2000 CarswellOnt 2013

44   The Plaintiff contended that CA improperly exercised its discretion in rolling back the commission rate from 12.5% to 7%. He argued that the words on the Summary Sheet (Exhibit 1, Tab 4) "incentive compensation which exceeds 100% of your total quota is discretionary" means CA's discretion only comes into play when the Plaintiff's earned incentive compensation exceeds $2,666,600.00. Further, he submitted that when he reviewed this clause with Les Newman, the Canadian Vice-President Business Manager, it was explained that this discretion was only intended to cover those situations where the representative stood to receive a large commission on an FM transaction and the representative had done nothing. Further, he argued there was no consideration for the fresh Summary Sheet which was issued to the Plaintiff in June 1994.

45   The Plaintiff now claims that he is entitled to continue to earn commissions at the rate of 12.5% until the end of the 1995 fiscal year, in other words an additional $42,236.00. As well, I note that the Plaintiff calculated his commission on most of the other claims at issue at the same rate of 12.5%. By contrast CA maintained that it had a discretion to determine the rate once the Plaintiff achieved his direct sales quota and that it exercised its discretion honestly and in good faith.

46   I find:

> (a) That commissions were paid on a tired basis to encourage agents to meet their quotas and that CA retained a discretion to determine additional compensation once direct or indirect sales quotas were met.
>
> (b) That there is no merit to the Plaintiff's argument that the discretion only becomes operative after he earned incentive compensation of $2,133,280.00, an amount fourteen times greater than his anticipated earnings (of $149,330.00) set out in the Compensation Letter. The Plaintiff's interpretation is contrary to common sense and would lead to a commercially absurd result. On this issue, I preferred the testimony of Newman and Moretti. Further, even if the initial Compensation Letter was ambiguous I find that it was cleared up in the second Compensation Letter of June 1994 which the Plaintiff acknowledged in writing and agreed to. This is not a case for the application of the contra proferentem principle.
>
> (c) That Newman did not make the remarks attributed to him by the Plaintiff. Given that he had no authority to make decisions re: compensation, I find that it is improbable he would have ventured an opinion in that field.
>
> (d) That there was no evidence to indicate that CA failed to exercise its discretion honestly and in good faith.
>
> (e) That even applying the objective standard (which I find is not the proper test here) I find CA exercised its discretion in a reasonable manner. I accept the evidence of Moretti that the other software companies paid no commissions after an agent achieved quota. Given that 7% was the average commission rate of the Plaintiff if he met his direct incentive sales quota of $149,330.00, I also find the new rate has a rational foundation.

Copr. © West 2007 No Claim to Orig. Govt. Works

2000 WL 33297174 (Ont. S.C.J.), 2000 CarswellOnt 2013

Page 12

47   But for the Bell SYGMA FM deal, the Plaintiff's effective commission rate would have been only 6%. He had already received $154,655.00 in commissions (his projected earnings were $149,330.00). I find that the discretionary feature was tailored to cover exactly this situation of disproportionately large transactions in any given fiscal year.

48   In summary, I find no merit in the Plaintiff's argument with regard to roll back.

**Conclusion:**

49   There will, therefore, be Judgment for the Plaintiff for unpaid commission on the Manulife SDP transaction calculated in accordance with the fiscal 1995 Compensation Letter as modified by my findings with respect to the question of rates. I will leave it to counsel to make the calculations. All other claims of the Plaintiff are dismissed.

50   The parties have two weeks to make submissions in writing with respect to costs.

*Action allowed in part.*

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works